# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

|  |  |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, UNITED STATES DEPARTMENT OF LABOR, *et al.*, <br><br> *Defendants.* | No. 6:24-cv-00271-ADA-DTG <br><br> **JOINT APPENDIX** |

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JULIE STRAUS HARRIS
Assistant Director

CHRISTINE L. COOGLE
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
202-880-0282
christine.l.coogle@usdoj.gov

*Counsel for Defendants*

Noel J. Francisco
(D.C. Bar No. 286666) (*pro hac vice*)
Brett A. Shumate
(D.C. Bar No. 974673) (*pro hac vice*)
Charles E.T. Roberts
(W.D. Tex. Bar No. 326539)
(D.C. Bar No. 1780573)
Louis J. Capozzi III
(D.C. Bar 90018764) (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
Fax:  (202) 626-1700

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

| Date | Document |
| --- | --- |
| 08/30/2023 | Worker Walkaround Representative Designation Process, proposed rule and request for comments, 88 Fed. Reg. 59825 (OSHA Aug. 30, 2023), https://www.regulations.gov/document/OSHA-2023-0008-0001 |
| 02/21/2013 | OSHA Archive: Letter from Richard Fairfax, Deputy Assistant Secretary, OSHA, to Steve Sallman, Health and Safety Specialist, Energy, Allied Industrial and Service Workers International Union (February 21, 2013), https://www.regulations.gov/document/OSHA-2023-0008-0003 |
| 2019 | OSHA Field Operations Manual (FOM), Chapter 3, CPL 02-00-163 (2019),  https://www.regulations.gov/document/OSHA-2023-0008-11544 |
| 04/25/2017 | Memorandum regarding the Rescission of the February 21, 2013 Letter to Mr. Steve Sallman and Update to the OSHA Field Operation Manual (April 25, 2017), https://www.regulations.gov/document/OSHA-2023-0008-0006 |
| 11/13/2023 | Comments of Employers Walkaround Representative Rulemaking Coalition, OSHA-2023-0008-1976 (Nov. 13, 2023), https://www.regulations.gov/docket/OSHA-2023-0008/comments |
| 04/01/2024 | Worker Walkaround Representative Designation Process, Final Rule, 89 Fed. Reg. 22558 (OSHA Apr. 1, 2014), https://www.regulations.gov/document/OSHA-2023-0008-11545 |

List of Subjects in 27 CFR Part 9

Wine.

**Proposed Regulatory Amendment**

For the reasons discussed in the preamble, we propose to amend title 27, chapter I, part 9, Code of Federal Regulations, as follows:

## PART 9—AMERICAN VITICULTURAL AREAS

■ 1. The authority citation for part 9 continues to read as follows:

**Authority:** 27 U.S.C. 205.

### Subpart C—Approved American Viticultural Areas

■ 2. Add § 9.____ to read as follows:

**§ 9.____    San Luis Rey.**

(a) *Name.* The name of the viticultural area described in this section is "San Luis Rey". For purposes of part 4 of this chapter, "San Luis Rey" is a term of viticultural significance.

(b) *Approved maps.* The 8 United States Geological Survey (USGS) 1:24,000 scale topographic maps used to determine the boundary of the viticultural area are as follows:

(1) Oceanside, CA, 2018;

(2) San Luis Rey, CA, 2018;

(3) San Marcos, CA, 2018;

(4) Valley Center, CA, 2018;

(5) Bonsall, CA, 2018;

(6) Temecula, CA, 2018;

(7) Fallbrook, CA, 2018; and

(8) Morro Hill, CA, 2018.

(c) *Boundary.* The San Luis Rey viticultural area is located in San Diego County, California. The boundary of the San Luis Rey viticultural area is described as follows:

(1) The beginning point is on the Oceanside map at the intersection of Interstate 5 and the Marine Corps Base (MCB) Camp Pendleton boundary. From the beginning point, proceed northeast for a total of 11.21 miles along the MCB Camp Pendleton boundary, crossing over the San Luis Rey map and onto the Morro Hill map, and continuing along the MCB Camp Pendleton boundary to its intersection with the Naval Weapons Station (NWS) Seal Beach Fallbrook California boundary; then

(2) Proceed east along the NWS Seal Beach Fallbrook California boundary for a total of 6.85 miles, crossing onto the Bonsall map and continuing north, then west along the boundary, and crossing back onto the Morro Hill map and continuing northerly along the boundary, crossing onto the Fallbrook map, and continuing along the boundary as it becomes concurrent with the MCB Camp Pendleton boundary,

and continuing along the boundary to its intersection with De Luz Road; then

(3) Proceed east along De Luz Road for 0.38 mile to its intersection with Sandia Creek Drive; then

(4) Proceed northerly along Sandia Creek Drive for a total of 3.98 miles, crossing onto the Temecula map and continuing along Sandia Creek Drive to its intersection with an unnamed road known locally as Rock Mountain Road; then

(5) Proceed east along Rock Mountain Road for 0.21 mile to its intersection with the San Diego County line; then

(6) Proceed south then east along the San Diego County line for 6.72 miles to its intersection with an unnamed road known locally as Old Highway 395; then

(7) Proceed south along Old Highway 395 for a total of 14.9 miles, crossing onto the Bonsall map and continuing south along Old Highway 395 to its intersection with an unnamed road known locally as Old Castle Road; then

(8) Proceed east on Old Castle Road for a total of 0.59 mile, crossing onto the San Marcos map and continuing east along Old Castle Road to its intersection with Gordon Hill Road; then

(9) Proceed southeasterly along Gordon Hill Road for 0.92 mile to its intersection with the 800-foot elevation contour; then

(10) Proceed east along the 800-foot elevation contour for a total of 2.5 miles, crossing onto the Valley Center map and continuing east along the 800-foot elevation contour to its intersection with Canyon Country Lane; then

(11) Proceed northwest and then south along Canyon Country Lane for 0.83 mile to its intersection with the 1,240-foot elevation contour; then

(12) Proceed east along the 1,240-foot elevation contour for 2.90 miles to its intersection with Cougar Pass Road; then

(13) Proceed west then south along Cougar Pass Road for 0.4 mile to its intersection with Meadow Glen Way East; then

(14) Proceed south along Meadow Glen Way East for 0.46 mile to its intersection with Hidden Meadows Road; then

(15) Proceed southwest along Hidden Meadows Road for 0.73 mile to its intersection with Mountain Meadow Road; then

(16) Proceed southwest along Mountain Meadow Road for a total of 1.44 miles, crossing onto the San Marcos map and continuing along Mountain Meadow Road to the point where Mountain Meadow Road becomes known as Deer Springs Road just west of Interstate 15; then

(17) Proceed southwest along Deer Springs Road for 2.42 miles to its intersection with an unnamed road known locally as North Twin Oaks Valley Road; then

(18) Proceed south along North Twin Oaks Valley Road for 3.01 miles to its intersection with an unnamed road known locally as West Mission Road; then

(19) Proceed northwest along West Mission Road (which becomes South Santa Fe Avenue) for a total of 3.9 miles to its intersection with Robelini Drive; then

(20) Proceed southwest along Robelini Drive (which becomes Sycamore Avenue) for a total of 0.55 mile to its intersection with State Highway 78; then

(21) Proceed northwest, then westerly along State Highway 78 for a total of 9.09 miles, crossing onto the San Luis Rey map and continuing westerly along State Highway 78 to its intersection with Interstate 5; then

(22) Proceed northwest along Interstate 5 for a total of 3.14 miles, crossing onto the Oceanside map and returning to the beginning point.

Signed: August 21, 2023.

**Mary G. Ryan,**
*Administrator.*

Approved: August 22, 2023.

**Thomas C. West, Jr.,**
*Deputy Assistant Secretary (Tax Policy).*

[FR Doc. 2023–18587 Filed 8–29–23; 8:45 am]

**BILLING CODE 4810–31–P**

## DEPARTMENT OF LABOR

## Occupational Safety and Health Administration

### 29 CFR Part 1903

**[Docket No. OSHA–2023–0008]**

**RIN 1218–AD45**

### Worker Walkaround Representative Designation Process

**AGENCY:** Occupational Safety and Health Administration (OSHA), Labor.

**ACTION:** Proposed rule; request for comments.

**SUMMARY:** OSHA is proposing to amend its Representatives of Employers and Employees regulation to clarify that the representative(s) authorized by employees may be an employee of the employer or a third party; such third-party employee representative(s) may accompany the OSHA Compliance Safety and Health Officer (CSHO) when they are reasonably necessary to aid in

the inspection. OSHA is also proposing clarifications of the relevant knowledge, skills, or experience with hazards or conditions in the workplace or similar workplaces, or language skills of third-party representative(s) authorized by employees who may be reasonably necessary to the conduct of a CSHO's physical inspection of the workplace. OSHA has preliminarily determined that the proposed changes will aid OSHA's workplace inspections by better enabling employees to select a representative of their choice to accompany the CSHO during a physical workplace inspection. Employee representation during the inspection is critically important to ensuring OSHA obtains the necessary information about worksite conditions and hazards. The agency requests comments regarding the proposed revisions.

**DATES:** Submit comments by October 30, 2023. All submissions must provide evidence of the submission date. (See the following section titled **ADDRESSES** for instructions on making submissions.)

**ADDRESSES:** Comments may be submitted as follows:

*Written comments:* You may submit comments and attachments electronically at *https://www.regulations.gov*, which is the Federal eRulemaking Portal. Follow the online instructions for submitting comments.

*Instructions:* All submissions must include the agency's name and docket number for this rulemaking (Docket No. OSHA–2023–0008). All comments, including any personal information you provide, are placed in the public docket without change and may be made available online at *https://www.regulations.gov*. Therefore, OSHA cautions interested parties about submitting information that they do not want made available to the public or submitting materials that contain personal information (either about themselves or others), such as Social Security numbers and birthdates.

*Docket:* To read or download comments or other information in the docket, go to Docket No. OSHA–2023–0008 at *https://www.regulations.gov*. All comments and submissions are listed in the *https://www.regulations.gov* index; however, some information (*e.g.*, copyrighted material) is not publicly available to read or download through that website. All comments and submissions, including copyrighted material, are available for inspection through the OSHA Docket Office. Contact the OSHA Docket Office at (202) 693–2500 (TDY number 877–889–5627)

for assistance in locating docket submissions.

**FOR FURTHER INFORMATION CONTACT:**
*Press inquiries:* Frank Meilinger, Director, OSHA Office of Communications, telephone: (202) 693–1999; email: *meilinger.francis@dol.gov.*

*General and technical inquiries:* Donald Klineback, OSHA Directorate of Construction, telephone: (202) 693–2020; email: *klineback.donald.w@dol.gov.*

*Copies of this Federal Register notice and news releases:* Electronic copies of these documents are available at OSHA's web page at *https://www.osha.gov*.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
II. Background
  A. The OSH Act and OSHA's Inspection Authority
  B. Regulatory History and Interpretive Guidance
  C. Litigation and Subsequent Agency Enforcement Actions
III. Legal Authority
IV. Summary and Explanation of Proposed Changes
V. Preliminary Economic Analysis and Regulatory Flexibility Act Certification
  A. Cost
  B. Benefits
  C. Certification of No Significant Impact on a Substantial Number of Small Entities
VI. Office of Management and Budget (OMB) Review Under the Paperwork Reduction Act
VII. Federalism
VIII. State Plans
IX. Unfunded Mandates Reform Act
X. Consultation and Coordination With Indian Tribal Governments
XI. Environmental Impact Assessment
XII. Questions and Options
XIII. Public Participation
  A. Public Submissions
XIV. List of Subjects
XV. Authority and Signature

## I. Executive Summary

Section 8(e) of the OSH Act grants a representative of the employer and a representative authorized by employees the opportunity to accompany OSHA during the physical inspection of the workplace for the purpose of aiding the inspection. While OSHA long interpreted one of section 8(e)'s implementing regulations, 29 CFR 1903.8(c), to permit third-party representatives authorized by employees to accompany OSHA on the walkaround inspection when reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace, a district court concluded that interpretation was not consistent with the regulation. OSHA is therefore

proposing to revise 29 CFR 1903.8(c) to clarify the types of individuals who can be a representative(s) authorized by employees during OSHA's physical inspections of the workplace (also referred to as the "walkaround inspection"). This revision will more clearly align with section 8(e) of the OSH Act, 29 U.S.C. 657(e), and with OSHA's longstanding interpretation of the OSH Act.

OSHA is proposing two revisions of 29 CFR 1903.8(c). First, OSHA is proposing to clarify that the representative(s) authorized by employees may be an employee of the employer or a third party. Second, OSHA is proposing to clarify that a third-party representative authorized by employees may be reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace by virtue of their knowledge, skills, or experience. This proposed revision clarifies that the employees' options for third-party representation during OSHA inspections are not limited to only those individuals with skills and knowledge similar to that of the two examples provided in existing regulatory text: Industrial Hygienist or Safety Engineer.

The proposed revisions to 1903.8(c) do not change the CSHO's authority to determine whether an individual is a representative authorized by employees (29 CFR 1903.8(b)). Also, the proposed revisions do not affect other provisions of section 1903 that limit participation in walkaround inspections, such as the CSHO's authority to prevent an individual from participating in the walkaround inspection if their conduct interferes with a fair and orderly inspection (29 CFR 1903.8(d)) or the employer's right to limit entry of employee authorized representatives into areas of the workplace that contain trade secrets (29 CFR 1903.9(d)).

The agency preliminarily concludes that these changes would not increase costs or compliance burdens for employers.

## II. Background

### A. The OSH Act and OSHA's Inspection Authority

The Occupational Safety and Health Act of 1970 (OSH Act or Act) was enacted "to assure so far as possible every working [person] in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. 651 (b). To effectuate the Act's purpose, Congress authorized the Secretary of Labor to promulgate occupational safety and health standards. See 29 U.S.C. 655. The Act

also grants broad authority to the Secretary to promulgate rules and regulations related to inspections, investigations, and recordkeeping. See 29 U.S.C. 657.

Section 8 of the OSH Act states that OSHA's inspection authority is essential to carrying out the Act's purposes and provides that employers must give OSHA access to inspect worksites ''without delay.'' 29 U.S.C. 657(a). Section 8(e) of the Act provides specifically that ''[s]ubject to regulations issued by the Secretary, a representative of the employer and a representative authorized by [its] employees shall be given an opportunity to accompany [the CSHO] for the purpose of aiding such inspection.'' 29 U.S.C. 657(e). Section 8(g) further authorizes the Secretary to promulgate such rules and regulations as the agency deems necessary to carry out the agency's responsibilities under this Act, including rules and regulations dealing with the inspection of an employer's establishment. 29 U.S.C. 657(g).

*B. Regulatory History and Interpretive Guidance*

On May 5, 1971, OSHA proposed rules and general policies for the enforcement of the inspection, citation, and penalty provisions of the OSH Act. (36 FR 8376, May 5, 1971). OSHA subsequently issued regulations for inspections, citations, and proposed penalties at 29 CFR part 1903. (36 FR 17850, Sept. 4, 1971).

The OSH Act and 29 CFR part 1903 provide OSHA CSHOs with significant authority to conduct workplace inspections. Part 1903 contains specific provisions that describe the CSHO's authority and role in carrying out inspections under the OSH Act. For example, the CSHO is in charge of conducting inspections and interviewing individuals, and has authority to permit additional employer representatives and representative(s) authorized by employees to participate in the physical inspection of the workplace. See 29 CFR 1903.8(a). In addition, the CSHO has the authority to resolve any disputes about who the employer and employee representatives are and to deny any person from participating in the inspection whose conduct interferes with a fair and orderly inspection. See 29 CFR 1903.8(b), (d). The CSHO also has authority to use various reasonable investigative methods and techniques, such as taking photographs, obtaining environmental samples, and questioning individuals while carrying out their inspection. 29 CFR 1903.7(b); see also 1903.3(a).

Section 1903.8(c), the subject of this proposed rulemaking, grants additional authority to the CSHO to determine whether third-party representatives would aid in the physical workplace inspection. This paragraph provides: ''The representative(s) authorized by employees shall be an employee(s) of the employer. However, if in the judgment of the Compliance Safety and Health Officer, good cause has been shown why accompaniment by a third party who is not an employee of the employer (such as an industrial hygienist or a safety engineer) is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace, such third party may accompany the Compliance Safety and Health Officer during the inspection.'' 29 CFR 1903.8(c). Section 1903.8, which primarily addresses employer and employee representatives during inspections, has not been revised since 1971.

Since issuing its inspection-related regulations, OSHA has provided guidance on its interpretation of section 1903.8(c) and the meaning of representative authorized by employees for purposes of the OSHA walkaround inspection. For example, on March 7, 2003, OSHA issued a letter of interpretation to Mr. Milan Racic (Racic letter), a health and safety specialist with the International Brotherhood of Boilermakers. (Docket ID OSHA–2023–0008–0002). Mr. Racic asked whether a union representative who files a complaint on behalf of a single worker could then also act as a walkaround inspection representative in a workplace that has no labor agreement or certified bargaining agent. In its response letter, OSHA stated that there was no ''provision for a walkaround representative who has filed a complaint on behalf of an employee of the workplace.'' (Docket ID OSHA–2023–0008–0002).

On February 21, 2013, OSHA issued a letter of interpretation to Mr. Steve Sallman (Sallman letter) of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union. (Docket ID OSHA–2023–0008–0003). Mr. Sallman asked whether workers at a worksite without a collective bargaining agreement could designate a person affiliated with a union or a community organization to act on their behalf as a walkaround representative. OSHA responded in the affirmative, explaining that such person could act on behalf of employees as long as they had been authorized by employees to serve as their representative.

OSHA further explained that the right is qualified by 29 CFR 1903.8, which gives CSHOs the authority to determine who can participate in an inspection. OSHA noted that while 1903.8(c) acknowledged that most employee representatives will be employees of the employer being inspected, the regulation also explicitly allowed walkaround participation by an employee representative who is not an employee of the employer when, in the judgment of the CSHO, such representative is reasonably necessary to the conduct of an effective and thorough physical inspection. OSHA explained that such representatives are reasonably necessary when they will make a positive contribution to a thorough and effective inspection.

OSHA gave several examples of how an authorized employee representative who was not an employee of the employer could make an important contribution to the inspection, noting that the representative might have a particular skillset or experience evaluating similar working conditions in a different facility. OSHA also highlighted the usefulness to workers and to the CSHO of an employee representative who is bilingual or multilingual to better facilitate communication between employees and the CSHO.

Additionally, OSHA noted that the 2003 Racic letter had inadvertently created confusion among the regulated community regarding OSHA's interpretation of an authorized employee representative for walkaround inspection purposes. OSHA explained that the Racic letter merely stated that a non-employee who files a complaint does not necessarily have a right to participate in an inspection arising out of that complaint, but that it did not address the rights of workers without a certified or recognized collective bargaining agent to have a representative of their own choosing participate in an inspection. OSHA withdrew the Racic letter to eliminate any confusion and then included its interpretation of 29 CFR 1903.8(c) as to who could serve as an authorized employee representative when it updated its Field Operations Manual (FOM) CPL 02–00–159 on October 1, 2015. (Docket ID OSHA–2023–0008–0004). The FOM explained that ''[i]t is OSHA's view that representatives are 'reasonably necessary,' when they make a positive contribution to a thorough and effective inspection'' and recognized that there may be cases in which workers without a certified or recognized bargaining agent would authorize a third party to represent the

workers on the inspection. *Id.* OSHA noted that "[t]he purpose of a walkaround representative is to assist the inspection by helping the compliance officer receive valuable health and safety information from workers who may not be able or willing to provide such information absent the third-party participants." *Id.*

### C. Litigation and Subsequent Agency Action

In September 2016, several years after OSHA issued the Sallman letter, the National Federation of Independent Business (NFIB) filed a suit in the district court for the Northern District of Texas challenging the Sallman letter, arguing it should have been subject to notice and comment rulemaking and that it conflicted with OSHA's regulations and exceeded OSHA's statutory authority. *Nat'l Fed'n of Indep. Bus.* v. *Dougherty,* No. 3:16–CV–2568– D, 2017 WL 1194666 (N.D. Tex. Feb. 3, 2017). On February 3, 2017, the district court concluded that OSHA's interpretation as stated in the Sallman letter was not consistent with 29 CFR 1903.8(c) and such a change to a regulation could not be made without notice and comment rulemaking. *Id.* at *11. The district court held that the letter "plainly contradicts § 1903.8(c)'s requirement that the employee representative be an employee himself." *Id.*

Nevertheless, the court rejected NFIB's claim that the Sallman letter conflicted with the OSH Act, finding that OSHA's Sallman letter of interpretation was "a persuasive and valid construction of the Act." *Id.* at *12. The court concluded that "the Act merely provides that the employee's representative must be authorized by the employees, not that the representative must also be an employee of the employer." *Id.*

Following this decision, on April 25, 2017, OSHA rescinded the Sallman letter. (Docket ID OSHA–2023–0008– 0005). OSHA also revised the FOM to remove language that incorporated the Sallman letter. OSHA is now engaging in notice and comment rulemaking to clarify who may serve as a representative authorized by employees for the purpose of walkaround inspections.

### III. Legal Authority

The OSH Act authorizes the Secretary of Labor to issue safety and health "standards" and other "regulations." See, *e.g.,* 29 U.S.C. 655, 657. An occupational safety and health standard, issued pursuant to section 6 of the Act, prescribes measures to be taken to

remedy an identified occupational hazard. Other regulations issued pursuant to general rulemaking authority found, inter alia, in section 8 of the Act, establish enforcement or detection procedures designed to further the goals of the Act generally. See 29 U.S.C. 657(c); *Workplace Health and Safety Council* v. *Reich,* 56 F. 3d 1465, 1468 (D.C. Cir. 1995). The proposed amendments in this notice are to a regulation issued pursuant to authority expressly granted by section 8 of the Act. 29 U.S.C. 657(e) (authority to promulgate regulations related to employer and employee representation during an inspection) and (g) (authority to promulgate rules and regulations dealing with workplace inspections). These proposed revisions clarify employees' statutory right to a walkaround representative under section 8 of the OSH Act and do not impose any new substantive inspection-related requirements.

Numerous provisions of the OSH Act underscore Congress' understanding that OSHA's ability to conduct comprehensive inspections is essential to fulfilling the purposes of the OSH Act to protect working people from occupational safety and health hazards. Congress provided OSHA with broad authority to conduct inspections of workplaces and records, to require the attendance and testimony of witnesses, and to require the production of evidence. 29 U.S.C. 657(b). OSHA's ability to carry out these workplace inspections is critical to the OSH Act's entire enforcement scheme. 29 U.S.C. 658 (authorizing OSHA to issue citations for violations following an inspection or investigation); 659 (citations shall be issued within a reasonable time after inspection or investigation). Moreover, any approved State occupational safety and health plan must provide for an OSHA inspector's right of entry and inspection that is at least as effective as the OSH Act. 29 U.S.C. 667(c)(3).

To enable OSHA to conduct robust inspections, the OSH Act grants the Secretary broad authority to enact inspection-related regulations. Section 8(g)(2) of the Act generally empowers the Secretary to prescribe such rules and regulations as the Secretary may deem necessary for carrying out inspection activity. See 29 U.S.C. 657(g)(2). Section 8(e) also specifically contemplates regulations related to employee and employer representation during OSHA's inspection of the workplace. 29 U.S.C. 657(e).

In addition to granting OSHA broad authority to conduct comprehensive workplace inspections and promulgate

regulations to effectuate those inspections, Congress also recognized the importance of ensuring employee participation and representation in the inspection process. The legislative history of section 8 of the OSH Act shows Congress' intent to provide representatives authorized by employees with an opportunity to accompany the inspector in order to benefit the inspection process and "provide an appropriate degree of involvement of employees." S. Rep. No. 91–1282 91st Cong., 2nd Sess. (1970), reprinted in Legislative History of the Occupational Safety and Health Act of 1970 at 151 (Comm. Print 1971). Senator Harrison A. Williams of New Jersey, who was a sponsor of the bill that became the OSH Act, explained that the opportunity for workers themselves and a representative of their choosing to accompany OSHA inspectors was "manifestly wise and fair" and "one of the key provisions of the bill." Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational Safety and Health Act of 1970, at 430 (Comm. Print. 1971).

The OSH Act's legislative history further indicates that Congress considered potential concerns related to the presence of a representative authorized by employees at the inspection and ultimately decided to expressly include this right in section 8(e) of the Act. Congressional debate around this issue included concern from some members of Congress that a representative authorized by employees' presence in the inspection would cause an undue burden on employers or be used as "an effort to ferment labor unrest." See Comments of Congressperson William J. Scherle of Iowa, 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational Safety and Health Act of 1970, at 1224 (Comm. Print 1971); see also Comments of Congressperson Michel of Illinois, *id.* at 1057. Similarly, Senator Peter Dominick of Colorado proposed an amendment to the Senate bill that would have removed the right of a representative authorized by the employees to accompany the CSHO and instead would have only required that the CSHO consult with employees or their representative at a "reasonable time." Proposed Amendment No. 1056., 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational Safety and Health Act of 1970, at 370 (Comm. Print 1971). One of the stated reasons for the proposed amendment was a concern that "[t]he mandatory

'walk-around' provisions now in the bill could . . . lead to 'collective bargaining' sessions during the course of the inspection and could therefore interfere both with the inspection and the employer's operations.'' *Id.* at 372.

This proposed amendment was rejected, and Section 8(e) of the OSH Act reflects Congress' considered judgment of the best way to strike the balance between employers' concerns about workplace disruptions and the critical importance of employee representation in the inspection process. And while section 8(e) underscores the importance of employee representation in OSHA's workplace inspection, the Act itself does not place restrictions on who can be a representative authorized by employees. See 29 U.S.C. 657(e); see also *Matter of Establishment Inspection of Caterpillar Inc.,* 55 F.3d 334, 338 (7th Cir. 1995) (''[T]he plain language of § 8(e) permits private parties to accompany OSHA inspectors,''); *Nat'l Fed'n of Indep. Bus.,* 2017 WL 1194666, at *12 (''[T]he Act merely provides that the employee's representative must be authorized by the employee, not that the representative must also be an employee of the employer.'').

Instead, the Act authorizes the Secretary of Labor (via OSHA) to issue regulations and determine who may be an authorized employee representative for purposes of the OSHA inspection. 29 U.S.C. 657(e). Congress intended to give the Secretary of Labor the authority to issue regulations related to determining the specifics and resolving the question of who could be an authorized employee representatives for purposes of the walkaround inspection. See Legislative History of the Occupational Safety and Health Act of 1970, at 151 (Comm. Print 1971) (''Although questions may arise as to who shall be considered a duly authorized representative of employees, the bill provides the Secretary of Labor with authority to promulgate regulations for resolving this question.'').

While the OSH Act grants the Secretary of Labor broad authority to inspect workplaces ''without delay'' to find and remedy safety and health violations, 29 U.S.C. 657(a)(1)–(2), these inspections must be carried out in a manner consistent with the Fourth Amendment of the U.S. Constitution regarding reasonable searches. See *Marshall* v. *Barlow's Inc.,* 436 U.S. 307 (1978). If an employer refuses entry, OSHA seeks a warrant, as required by the Fourth Amendment. *Id.* at 313; see also 29 CFR 1903.4. At times OSHA might seek an anticipatory warrant to inspect a worksite, such as if OSHA has been refused entry to inspect a

workplace in the past and anticipates that the employer might refuse again without proof of a warrant. See 29 CFR 1903.4(b). Because OSHA's inspections are conducted in accordance with the Fourth Amendment, they do not constitute a ''physical taking'' under the Takings Clause of the Fifth Amendment. See *Cedar Point Nursery* v. *Hassid,* 141 S. Ct. 2063, 2079 (2021) (''Because a property owner traditionally had no right to exclude an official engaged in a reasonable search, government searches that are consistent with the Fourth Amendment and state law cannot be said to take any property right from landowners.'') (internal citations omitted); *Matter of Establishment Inspection of Caterpillar Inc.,* 55 F.3d at 339–41 (upholding warrant that authorized participation of employee representatives as consistent with the Fourth Amendment).

Based on the foregoing, OSHA has determined that section 8(e) of the OSH Act, as well as the Act's history and purpose, support OSHA's longstanding interpretation that the representative(s) authorized by employees may be employees of the employer or a third party and the agency's proposed revisions to 29 CFR 1903.8(c).

## III. Summary and Explanation of Proposed Changes

Section 8(e) of the OSH Act, 29 U.S.C. 657(e), Inspections, Investigations, and Recordkeeping, states that ''[s]ubject to regulations issued by the Secretary'' a representative authorized by employees ''shall be given an opportunity to accompany the [CSHO] during the physical inspection of any workplace under subsection (a) for the purpose of aiding such inspection.'' The first sentence of existing section 1903.8(c) states that an authorized employee representative(s) shall be an employee(s) of the employer being inspected. However, the second sentence of paragraph (c) provides an exception for the presence of a third party if the CSHO determines there is good cause shown why their presence is reasonably necessary to conduct an effective and thorough physical inspection of the workplace. Paragraph (c) provides industrial hygienists and safety engineers as two examples of helpful non-employees who a CSHO might determine are reasonably necessary to include in the inspection.

Since its promulgation in 1971, OSHA has interpreted section 1903.8(c) to allow third parties to serve as authorized employee representatives on the walkaround inspection when reasonably necessary. However, as described in Background, Section II.C of

this preamble, a district court held that OSHA's interpretation of paragraph (c) was inconsistent with the regulatory text as written. See *Nat'l Fed'n of Indep. Bus.,* 2017 WL 1194666, at *11. In OSHA's experience, representatives authorized by employees are usually employed by the employer. However, under the OSH Act, they need not be. *Id.* at *12. OSHA is therefore proposing to amend 29 CFR 1903.8(c) to clarify that, for the purpose of the walkaround inspection, the representative(s) authorized by employees may be an employee of the employer or, when they are reasonably necessary to aid in the inspection, a third party.

These changes will ensure employees are able to select trusted and knowledgeable representatives of their choice, leading to more effective inspections. The OSH Act gives employees in all workplaces—whether they have a collective bargaining agreement or not—the right to have a representative authorized by them to accompany OSHA during a workplace inspection for purposes of aiding the inspection. See 29 U.S.C. 657(e). The criteria outlined in paragraph (c) therefore applies to all worksites that OSHA inspects.

When the representative(s) authorized by employees are not employed by the employer, they may accompany the CSHO during the inspection if in the judgment of the CSHO, good cause has been shown why they are reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace. OSHA proposes to revise paragraph (c) to clarify that third-party representatives authorized by employees may have a variety of skills, knowledge, or experience that could aid the CSHO's inspection. This includes knowledge, skills, or experience with particular hazards or conditions in the workplace or similar workplaces, as well as any relevant language skills a representative may have to facilitate better communication between workers and the CSHO. Therefore, OSHA proposes to delete the examples of industrial hygienists and safety engineers currently in paragraph (c) so that the focus is properly on the knowledge, skills, or experience of the individual rather than their professional discipline. This proposed deletion does not signal that an industrial hygienist or safety engineer cannot be a representative authorized by employees.

In OSHA's experience, there are a multitude of third parties who might serve as representatives authorized by employees for purposes of the OSHA walkaround inspection. The examples discussed in this proposal are not

exhaustive and OSHA seeks comment, including any data or anecdotal examples, of individuals who might be selected by employees to serve as their authorized employee representative in an OSHA walkaround inspection.

One scenario where OSHA has encountered third-party employee representatives is in union workplaces where employees have designated a union representative, such as an elected local union leader, business agent, or safety and health specialist, to be their representative for the walkaround inspection. These representatives are often employees of the union rather than the employer being inspected. Third-party representation may also arise in workplaces without collective bargaining agreements where employees have designated a representative from a worker advocacy group, community organization, or labor union to serve as their representative in an OSHA inspection.

Relatedly, there may be safety organizations, such as local safety councils, with safety professionals or technical representatives for the equipment used and operations performed at the employee's worksite. Section 1903.8(c) as proposed would more explicitly permit employees to designate such a safety professional or technical representative as their authorized employee representative.

Another scenario where employees may wish to designate a third-party representative is on multi-employer worksites or joint-employer worksites where it is not always clear at the time of the walkaround inspection which employees are employed by which employer. On many worksites, employees with different employers may work near each other and may have knowledge of the workplace conditions, work practices, and hazards; in some cases, they may even perform the same or similar work. On worksites like these, it is foreseeable that employees may choose to designate a third party as their representative for the walkaround inspection. Likewise, on worksites where non-union employees work in proximity to union employees, employees may wish to designate the union representative to speak of worksite conditions and operations on their behalf.

There may also be circumstances where employees are not fluent in English (or another language spoken by the CSHO) and want a trusted representative to allow for open and effective communication with the CSHO regarding workplace conditions. For example, employees might determine that a bilingual representative or an

interpreter should represent them on the inspection and the CSHO might find such a representative is useful to ensure the CSHO receives an accurate account of workers' knowledge and experience with safety and health conditions in the workplace.

In other situations, employees may be reluctant to speak directly or candidly with government officials for a number of reasons. For example, some workers, such as immigrants, refugees, or other vulnerable workers, may be unfamiliar with OSHA and the agency's inspection process, face cultural barriers, or fear that their employer will retaliate against them for speaking to OSHA. In these situations, employees may not feel comfortable participating in OSHA's inspection without a trusted presence, which would negatively affect the CSHO's ability to obtain important information about workplace hazards and conditions. Worker advocacy organizations, labor organization representatives, consultants, or attorneys who are experienced in interacting with government officials or have relevant cultural competencies may be authorized by employees to represent them on walkaround inspections. The CSHO may determine such third-party representatives are reasonably necessary to the conduct of an effective and thorough physical workplace inspection if their presence during the walkaround inspection would enable more open and candid communication with employees who may not otherwise be willing to participate in the inspection.

In general, OSHA seeks comment on why employees may wish to be represented by a third-party representative. Additionally, OSHA seeks comment and examples of third-party representatives who have been or could be reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace.

Once the CSHO is notified that the employees have authorized a third party to represent them during a walkaround inspection, the CSHO would allow the third party to participate in the inspection so long as the CSHO determines that they would be reasonably necessary to aid in the inspection. The third party should have relevant skills, knowledge, or experience that would be helpful to OSHA's inspection despite not being directly employed by the employer.

OSHA has found that third-party representatives can help ensure that OSHA's walkaround inspection is comprehensive. In one example from 2012, a worker for a company removing asbestos at a worksite reported safety

concerns to OSHA and a third party. The third party contacted OSHA and a community organization on behalf of the workers to ensure their safety and health concerns were fully communicated to and understood by the CSHO. The community organization's attorney and a former employee of the workplace were chosen as the employees' representatives to participate in the walkaround inspection. OSHA found the presence of both individuals to be very beneficial to the inspection because the representatives were able to clearly identify and communicate safety concerns to the CSHO during the walkaround. Many of the exposed workers on this worksite were not fluent in English, and having representatives who the workers trusted and facilitated communication with the CSHO enabled OSHA to conduct numerous worker interviews and better investigate the workplace conditions. OSHA seeks comment providing examples or information regarding any other unique skills of representatives authorized by employees that have been helpful or added safety and health value to the CSHO's physical inspection of the workplace.

The proposed revisions to paragraph (c) do not change the existing precondition that the CSHO must determine that any third-party employee representative's participation is reasonably necessary to the conduct of an effective and thorough inspection. These proposed revisions also do not implicate any other limitations found elsewhere in part 1903.

For example, paragraph 1903.8(a) explains that the CSHO is in charge of the inspection process. 29 CFR 1903.8(a). Paragraph 1903.8(b) authorizes the CSHO to resolve any disputes as to who the authorized representatives are, and if the CSHO is unable to determine who is the representative authorized by employees, the CSHO will then consult a reasonable number of employees concerning matters of safety and health in the workplace. 29 CFR 1903.8(b). Paragraph 1903.8(d) authorizes the CSHO to deny individuals from participating in the inspection if their conduct interferes with a fair and orderly inspection process. 29 CFR 1903.8(d). Therefore, the CSHO considers a range of factors when determining who can participate in the walkaround inspection as a representative authorized by employees.

In addition to the limitations in 29 CFR 1903.8, employers also maintain the right to request that areas of the facility containing trade secrets be off-limits to the representatives authorized

by employee(s) who do not work in that particular part of the facility. 29 CFR 1903.9(d). As explained in Background, Section II. of this preamble, the proposed revisions to 1903.8(c) do not alter or limit any of these other provisions related to the CSHO's determinations or the inspection process.

Finally, OSHA notes that paragraph 1903.8(c) addresses representatives authorized by employees for purposes of OSHA's physical inspections of workplaces. While OSHA proposes changes to this paragraph to clarify the relevant knowledge, skills, experience with hazards or conditions in the workplace or similar workplaces, or language skills of third-party representatives authorized by employees who may be reasonably necessary to aid in the CSHO's inspection, these proposed revisions are not intended to narrow or otherwise limit OSHA's authority to conduct effective and thorough workplace inspections, including its authority to be accompanied by other types of third parties or experts who may be needed to properly conduct the inspection. See generally, 29 U.S.C. 657(a), (b); see also 29 CFR 1903.4(b)(3).

OSHA seeks comment on whether the proposed changes to paragraph (c) are clear regarding representatives authorized by employees for purposes of walkaround inspections. Why or why not? OSHA also seeks comment on how to best communicate the right of all employees to employee representation on a physical inspection of the workplace.

## V. Preliminary Economic Analysis and Regulatory Flexibility Act Certification

Executive Orders 12866 and 13563 require OSHA estimate the benefits, costs, and net benefits of regulations. Executive Orders 12866 and 13563, the Regulatory Flexibility Act (5 U.S.C. 601–612), and the Unfunded Mandates Reform Act (UMRA) (2 U.S.C. 1532(a)) also require OSHA to estimate the costs, assess the benefits, and analyze the impacts of certain rules that the agency promulgates. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. This proposal is not significant under section 3(f)(1) of Executive Order 12866, as amended by Executive Order 14094, nor is it a major rule under the Unfunded Mandates Reform Act or Section 804 of the Small Business Regulatory Enforcement Fairness Act of 1996 (5 U.S.C. 801 *et seq.*).

OSHA is proposing to revise and clarify its requirements for employee authorized representation during OSHA's physical inspections of the workplace to clarify that the representative(s) authorized by employees may be an employee of the employer or a third party. Additionally, OSHA is proposing to further clarify the relevant knowledge, skills, or experience with hazards or conditions in the workplace or similar workplaces, or language skills of third-party representative(s) authorized by employees who may accompany an OSHA Compliance Safety and Health Officer (CSHO) when they are reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace. The proposed revisions will also clarify that the employees' options for third-party representation during OSHA inspections are not limited to the two examples provided in existing regulatory text: Industrial Hygienist or Safety Engineer. OSHA has preliminarily determined that these clarifications do not introduce a new or expanded burden on employers.

As discussed earlier in Background, Section II. of this preamble, OSHA published rules and general policies for the enforcement of the inspection, citation, and penalty provisions of the OSH Act on September 4, 1971. These include Section 1903.8(c), the subject of this proposed rulemaking, which grants authority to the CSHO to determine whether a third-party representative would aid the physical workplace inspection and to have that representative accompany the CSHO on the inspection.

### A. Costs

This proposed rule imposes no new burden on employers and does not require them to take any action to comply. The proposed rule clarifies who can be an authorized employee representative during OSHA's walkaround inspection. Regulatory impact analysis is meant to estimate the costs of a change from the current situation without the proposed or final rule to a world where the proposed or final rule exists. This proposed rule simply clarifies employee rights and OSHA's authority with regard to inspection procedures. The proposed clarification does not impose any costs on employers.

In evaluating potential costs, OSHA considered that employers may have policies and rules for third parties, such as visitors must wear PPE on site or participate in a safety briefing before entering as well as procedures in place

to protect confidential business information from third parties who may be on site. However, such policies are not required by this regulation, and therefore any associated costs are therefore not attributable to this proposed rule. Moreover, OSHA believes there would be no real cost to an employer to have an additional visitor on site. PPE could be supplied from extra PPE that might be available on site for visitors or could be supplied by the third party. There is no cost to have one more individual present during any potential safety briefing since any potential briefing would be given regardless of the number of individual present.

In addition, this proposed rule does not require the employer make a third party available nor does it require the employer to pay for that third party's time. While there is an opportunity cost to the third party insomuch as their time is being spent on an inspection versus other activities they could be engaged in, that time is not compensated by the employer whose worksite is being inspected and is not a burden on that employer. OSHA has preliminarily determined that this proposed rule does not impose costs on employers. The agency welcomes comment on this determination and information on costs the public believes OSHA should consider.

### B. Benefits

While there are no new costs borne by employers associated with this proposal, clarifying Section 1903.8(c) will reinforce the benefits of the OSH Act. Third-party employee representatives—given their knowledge, expertise, or skills with hazardous workplace conditions—can increase employee participation and help ensure that CSHOs conduct comprehensive workplace inspections, leading to safer workplaces. OSHA welcomes information, data, and comments on anticipated cost savings and benefits.

### C. Certification of No Significant Impact on a Substantial Number of Small Entities

The proposed rule does not impose costs of compliance on employers. Therefore, OSHA certifies that, if promulgated, the proposed rule will not have a significant economic impact on a substantial number of small entities.

## VI. OMB Review Under the Paperwork Reduction Act

This proposed rule for Worker Walkaround Representative Designation Process contains no information collection requirements subject to OMB

approval under the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3501 *et seq.*) and its implementing regulations at 5 CFR part 1320. The PRA defines a collection of information as "the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format." 44 U.S.C. 3502(3)(A). Under the PRA, a Federal agency cannot conduct or sponsor a collection of information unless OMB approves it, and the agency displays a currently valid OMB control number (44 U.S.C. 3507). Also, notwithstanding any other provision of law, no employer shall be subject to penalty for failing to comply with a collection of information if the collection of information does not display a currently valid OMB control number (44 U.S.C. 3512).

## VII. Federalism

OSHA reviewed this proposed rule in accordance with the Executive Order on Federalism (E.O. 13132, 64 FR 43255, August 10, 1999), which requires that Federal agencies, to the extent possible, refrain from limiting State policy options, consult with States prior to taking any actions that would restrict State policy options, and take such actions only when clear constitutional and statutory authority exists, and the problem is national in scope. This proposal merely clarifies requirements related to employee representation during workplace safety and health inspections conducted by OSHA under the OSH Act. Because these inspections are conducted by OSHA, not States, and occur under the authority of federal law, OSHA does not believe that the proposal would restrict any State policy options.

Section 18(a) of the OSH Act states that "[n]othing in this Act shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 6" (see 29 U.S.C. 667(a)). Because this rulemaking action involves a "regulation" issued under Section 8 of the OSH Act (29 U.S.C. 657), and not an occupational safety and health standard under section 6 of the OSH Act (29 U.S.C. 655), it does not preempt State law under section 18(a). See 29 U.S.C. 667(a). The effect of a rule on states and territories with OSHA-approved occupational safety and health State Plans is discussed in Section VIII, State Plans.

## VIII. State Plans

As discussed in the Summary and Explanation section of this preamble, this proposed rule would revise the language in OSHA's Representatives of employers and employees regulation, found at 29 CFR 1903.8(c), to explicitly clarify that the representative(s) authorized by employees may be an employee of the employer or a third party for purposes of an OSHA walkaround inspection. Additionally, OSHA is proposing to further clarify that when the CSHO has good cause to find that a representative authorized by employees who is not an employee of the employer would aid in the inspection, for example because they have knowledge or experience with hazards in the workplace, or other skills that would aid the inspection, the CSHO may allow the employee representative to accompany the CSHO on the inspection.

Among other requirements, section 18 of the OSH Act requires OSHA-approved State Plans to enforce occupational safety and health standards in a manner that is at least as effective as Federal OSHA's standards and enforcement program, and to provide for a right of entry and inspection of all workplaces subject to the Act that is at least as effective as that provided in section 8 (29 U.S.C. 667(c)(2)–(3)). As described above and in the Summary and Explanation of this preamble, OSHA believes that these proposed clarifying revisions would enhance the effectiveness of OSHA's inspections and enforcement of occupational safety and health standards. Therefore, OSHA has preliminarily determined that, within six months of the promulgation of a final rule, State Plans would be required to adopt regulations that are identical or "at least as effective" as this rule, unless they demonstrate that such amendments are not necessary because their existing requirements are already "at least as effective" in protecting workers as the Federal rule. See 29 CFR 1953.4(b)(3).

Of the 29 States and Territories with OSHA-approved State Plans, 22 cover both public and private-sector employees: Alaska, Arizona, California, Hawaii, Indiana, Iowa, Kentucky, Maryland, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Puerto Rico, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, and Wyoming. The remaining seven States and Territories cover only state and local government employees: Connecticut, Illinois, Maine, Massachusetts, New Jersey, New York, and the Virgin Islands.

## IX. Unfunded Mandates Reform Act

OSHA reviewed this proposal according to the Unfunded Mandates Reform Act of 1995 ("UMRA"; 2 U.S.C. 1501 *et seq.*). As discussed above in Section V of this preamble, the agency preliminarily determined that this proposal would not impose costs on any private- or public-sector entity. Accordingly, this proposal would not require additional expenditures by either public or private employers.

As noted above, the agency's regulations and standards do not apply to State and local governments except in States that have elected voluntarily to adopt a State Plan approved by the agency. Consequently, this proposal does not meet the definition of a "Federal intergovernmental mandate." See Section 421(5) of the UMRA (2 U.S.C. 658(5)). Therefore, for the purposes of the UMRA, the agency certifies that this proposal would not mandate that State, local, or Tribal governments adopt new, unfunded regulatory obligations. Further, OSHA concludes that the rule would not impose a Federal mandate on the private sector in excess of $100 million (adjusted annually for inflation) in expenditures in any one year.

## X. Consultation and Coordination With Indian Tribal Governments

OSHA reviewed this proposed rule in accordance with Executive Order 13175 (65 FR 67249) and has preliminarily determined that it would not have "tribal implications" as defined in that order. The proposed clarifications to 29 CFR 1903.8(c), if promulgated, would not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes. OSHA seeks comment on its preliminary determination. Additionally, OSHA plans to consult with the appropriate tribal entities regarding its preliminary determination.

## XI. Environmental Impact Assessment

OSHA reviewed the proposed rule in accordance with the requirements of the National Environmental Policy Act (NEPA) (42 U.S.C. 4321 *et seq.*), the regulations of the Council on Environmental Quality (40 CFR parts 1500 through 1508), and the Department of Labor's NEPA procedures (29 CFR part 11). The agency finds that the revisions included in this proposal would have no major negative impact on air, water, or soil quality, plant or animal life, the use of land or other aspects of the environment.

## XII. Questions and Options

OSHA invites stakeholders to comment on all aspects of this proposal. In addition, OSHA is soliciting stakeholder input on regulatory options to allow for potential regulatory flexibility regarding the content of any final rule resulting from this rulemaking. In particular, OSHA seeks input on whether to maintain the existing requirement in 29 CFR 1903.8(c) for a third-party employee representative to be "reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace" given that Section 8(e) of the OSH Act more generally provides that employee representatives "shall be given an opportunity to accompany" the CSHO "during the physical inspection of any workplace . . . for the purpose of aiding such inspection." 29 U.S.C. 657(e).

Under OSHA's implementing regulations, OSHA defers to the employer's determination regarding which employer representative would aid the inspection. See 29 CFR 1903.8(a). On the other hand, currently, OSHA defers to the employees' determination regarding which representative would aid the inspection only if that representative is employed by the employer. See 29 CFR 1903.8(c). When the representative authorized by employees is a third party, the CSHO must determine that there is good cause why the third-party representative is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace. See 29 CFR 1903.8(c). If the CSHO makes that determination, the third-party employee representative may accompany the CSHO during the physical inspection of the worksite. Note that the CSHO is authorized to resolve any dispute as to who the employer's and employees' authorized representatives are and deny the right of accompaniment to any person whose conduct would interfere with a fair and orderly inspection. See 29 CFR 1903.8(b), (d).

OSHA solicits feedback regarding the "reasonably necessary" requirement in paragraph (c); the below questions do not affect CSHOs' authority under paragraphs (b) and (d).

1. Should OSHA defer to the employees' selection of a representative to aid the inspection when the representative is a third party (*i.e.,* remove the requirement for third-party representatives to be reasonably necessary to the inspection)? Why or why not? Please provide any relevant information, examples, considerations, and/or data to support your position.

2. Should OSHA retain the language as proposed, but add a presumption that a third-party representative authorized by employees is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace? Why or why not? Please provide any relevant information, examples, considerations and/or data to support your position.

3. Should OSHA expand the criteria for an employees' representative that is a third party to participate in the inspection to include circumstances when the CSHO determines that such participation would aid employees in effectively exercising their rights under the OSH Act? Why or why not? If so, should OSHA defer to employees' selection of a representative who would aid them in effectively exercising their rights?

## XIII. Public Participation

Inspection-related requirements promulgated under the Occupational Safety and Health Act of 1970 (OSH Act) are regulations, not standards. Therefore, this rulemaking is governed by the notice and comment requirements in the Administrative Procedure Act (APA), 5 U.S.C. 553, rather than by section 6(b) of the OSH Act (29 U.S.C. 655(b)) and 29 CFR part 1911 (both of which apply only to promulgating, modifying or revoking occupational safety or health standards). The OSH Act requirement for the agency to hold an informal public hearing on a proposed rule, when requested, does not apply to this rulemaking. See 29 U.S.C. 655(b)(3).

The APA, which governs this rulemaking, does not require a public hearing; instead, it states that the agency must "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. 553(c). To promulgate a proposed regulation, the APA requires the agency to provide the terms of the proposed rule (or a description of those terms) and specify the time, place, and manner of rulemaking proceedings. See 5 U.S.C. 553(b). The APA does not specify a minimum period for submitting comments.

In accordance with the goals of Executive Order 12866, OSHA is providing 60 days for public comment (see section 6(a)(1) of Executive Order 12866).

### A. Public Submissions

OSHA invites comments on all aspects of the proposed rule. OSHA will carefully review and evaluate any comments, information, or data received, as well as all other information in the rulemaking record, to determine how to proceed. When submitting comments, please follow the procedures specified in the sections titled **DATES** and **ADDRESSES** of this document. The comments should clearly identify the provision of the proposal being addressed, the position taken with respect to each issue, and the basis for that position. Comments, along with supporting data and references, submitted by the end of the specified comment period will become part of the rulemaking record, and will be available for public inspection at the Federal eRulemaking Portal (*http://www.regulations.gov*) and at the OSHA Docket Office, 200 Constitution Avenue NW—Room N–2625, Washington, DC 20210. (See the section titled **ADDRESSES** of this document for additional information on how to access these documents.)

## XIV. List of Subjects in 29 CFR Part 1903

Occupational safety and health, health, administrative practice and procedures, law enforcement.

## XV. Authority and Signature

Douglas L. Parker, Assistant Secretary of Labor for Occupational Safety and Health, U.S. Department of Labor, authorized the preparation of this document pursuant to 29 U.S.C. 657; 5 U.S.C. 553; Secretary of Labor's Order 8–2020, 85 FR 58393 (2020).

Signed at Washington, DC.

**Douglas L. Parker,**
*Assistant Secretary of Labor for Occupational Safety and Health.*

For the reasons stated in the preamble, OSHA proposes to amend 29 CFR part 1903 to read as follows:

## PART 1903—INSPECTIONS, CITATIONS AND PROPOSED PENALTIES [AMENDED]

■ 1. The authority citation for part 1903 is revised to read as follows:

**Authority:** 29 U.S.C. 657; Secretary of Labor's Order No. 8–2020 (85 FR 58393); and 5 U.S.C. 553.

■ 2. In § 1903.8 revise paragraph (c) to read as follows:

### § 1903.8    Representatives of employers and employees.

\*    \*    \*    \*    \*

(c) The representative(s) authorized by employees may be an employee of the employer or a third party. When the representative(s) authorized by

employees is not an employee of the employer, they may accompany the Compliance Safety and Health Officer during the inspection if, in the judgment of the Compliance Safety and Health Officer, good cause has been shown why their participation is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace (*e.g.,* because of their relevant knowledge, skills, or experience with hazards or conditions in the workplace or similar workplaces, or language skills).

*     *     *     *     *

[FR Doc. 2023–18695 Filed 8–29–23; 8:45 am]

**BILLING CODE 4510–26–P**

---

# ENVIRONMENTAL PROTECTION AGENCY

## 40 CFR Part 52

**[EPA–R05–OAR–2021–0477; FRL–9848–01–R5]**

## Air Plan Approval; Indiana; Volatile Organic Compounds; Cold Cleaner Degreasing

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is proposing to approve revisions to the volatile organic compound (VOC) rules contained in the Indiana State Implementation Plan (SIP). Indiana modified its rules to provide an additional option for compliance with the volatile organic compound (VOC) vapor pressure limit for solvents used in cold cleaning degreasing operations. In addition, rule language was updated for clarity and consistency.

**DATES:** Comments must be received on or before September 29, 2023.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2021–0477 at *https://www.regulations.gov,* or via email to *blakley.pamela@epa.gov.* For comments submitted at *Regulations.gov,* follow the online instructions for submitting comments. Once submitted, comments cannot be edited or removed from *Regulations.gov.* For either manner of submission, EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment.

The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). For additional submission methods, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section. For the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www2.epa.gov/dockets/commenting-epa-dockets.*

**FOR FURTHER INFORMATION CONTACT:** Matt Rau, Environmental Engineer, Control Strategies Section, Air Programs Branch (AR–18J), Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, (312) 886–6524, *rau.matthew@epa.gov.* The EPA Region 5 office is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays and facility closures due to COVID–19.

**SUPPLEMENTARY INFORMATION:** Throughout this document whenever "we," "us," or "our" is used, we mean EPA.

## I. Background

On July 14, 2021, Indiana submitted a request to revise the VOC rules in its SIP. The revisions are to the 326 Indiana Administrative Code (IAC) Article 8 Volatile Organic Compound rules. Indiana submitted revisions to the following: 326 IAC 8–3–1, "Applicability and exemptions"; 326 IAC 8–3–2, "Cold cleaner degreaser control equipment and operating requirements"; 326 IAC 8–3–3, "Open top vapor degreaser operation"; 326 IAC 8–3–4, "Conveyorized degreaser control equipment and operating requirements"; and 326 IAC 8–3–8, "Material requirements for cold cleaner degreasers".

Indiana's July 14, 2021, submission included a previous version of 326 IAC 8–3–1, effective on June 9, 2021. EPA found concerns with that version of 326 IAC 8–3–1(a)(1) as it added qualifying language so that the rules would only apply to sources "with the potential to emit VOC emissions of greater than or equal to fifteen (15) pounds per day." This would constitute a relaxation of the Clean Air Act (CAA) requirement for VOC reasonably available control technology.[1]

On January 23, 2023, Indiana submitted a revised version of 326 IAC 8–3–1, effective January 4, 2023, which removed the exemption language from 326 IAC 8–3–1(a)(1).

Indiana's current SIP VOC rules require sources operating cold cleaning degreasers to, among other things, use low vapor pressure solvent, not to exceed 1 millimeter of mercury (mm Hg) at 20 degrees Celsius, for cleaning or degreasing machine parts. These low vapor pressure solvents do not work well for some industries. These rules also allow sources to operate control systems that demonstrate equivalent or better emissions control with approval from both Indiana and EPA.

Indiana revised the control requirements for sources that use a solvent with a vapor pressure exceeding 1 mm Hg in 326 IAC 8–3–3, 326 IAC 8–3–4, and 326 IAC 8–3–8. The revised rules require VOC emission control with a capture efficiency of at least 90 percent. The control device must also either have at least a 90 percent destruction efficiency or have a VOC emission outlet concentration of less than 50 parts per million by volume. Indiana's rules also require compliance procedures. The changes replace the previously approved provision allowing an alternate VOC emission control system with approval of both Indiana and EPA in 326 IAC 8–3–3 and 326 IAC 8–3–4. This VOC control system requirement is an additional option in 326 IAC 8–3–8.

Indiana noted that, for some companies, the use of low vapor pressure solvents under 1 mm Hg results in poor performance and solvent contamination. Such sources cannot recycle the solvent because of the potential contamination. Such sources will thus often hand-clean machine parts, which results in all the solvent evaporating and thus being emitted into the air. Indiana further noted that hand-cleaning also produces a large amount of material that usually must be managed as hazardous waste, as the rags are contaminated with solvent and ink. Instead, the revised rules set parameters for control systems that specify standard VOC capture and control requirements for all users, which are expected to reduce the amount of solvent used and the amount of hazardous waste generated.

---

[1] EPA has made it clear that general exemptions for small cold cleaner degreasing operations are not allowed. See Memorandum from Richard Rhoads, EPA OAQPS, to Director, Air and Hazardous Materials Division, Regions I to X, Clarification of Degreasing Regulation Requirements, September 7, 1978. See 2–24, Solvent Metal Cleaning, in the "Issues Relating to VOC Regulation Cut Points, Deficiencies, And Deviations" guidance, as revised on January 11, 1990.

**OSHA**    English | Spanish

Find it in OSHA 🔍

A TO Z INDEX

ABOUT OSHA ▾  WORKERS ▾  EMPLOYERS ▾  REGULATIONS ▾  ENFORCEMENT ▾  TOPICS ▾  NEWS & PUBLICATIONS ▾  DATA ▾  TRAINING ▾

---

✪ Standard Interpretations - (Archived) Table of Contents

---

- **Standard Number:**    1903.8; 1903.11; 1952.10; 1903.20
- **Status:**    Archived

## *OSHA ARCHIVE*

**NOTICE:** This is an OSHA Archive Document, and may no longer represent OSHA Policy. It is presented here as historical content, for research and review purposes only.

FEB 21 2013

Mr. Steve Sallman
Health and Safety Specialist
United Steel, Paper and Forestry, Rubber, Manufacturing,
Energy, Allied Industrial and Service Workers International Union
Five Gateway Center
Pittsburgh, PA 15222

Dear Mr. Sallman:

Thank you for your December 18, 2012, letter to the Occupational Safety and Health Administration (OSHA). You ask whether workers at a workplace without a collective bargaining agreement may authorize a person who is affiliated with a union or a community organization to act as their representative under the Occupational Safety and Health Act (OSH Act). This would include "representing the employee(s) as a personal representative" and "accompanying the employee on an OSHA inspection" in a non-unionized workplace. You also inquire whether, under these circumstances, the individual who is filing an OSHA complaint on behalf of an employee could act as a "walkaround representative" during an OSHA inspection.

For clarity, we have paraphrased your inquiry as two questions.

**Question # 1 - May one or more workers designate a person who is affiliated with a union without a collective bargaining agreement at their workplace or with a community organization to act as their "personal representative" for OSH Act purposes?**

Yes. The OSH Act, the Secretary's regulations implementing it, and OSHA's Field Operations Manual (FOM) all recognize the role of an "employee representative," who may represent employees' interests in enforcement-related matters. For example, a representative may: (1) file complaints on behalf of an employee (29 U.S.C. § 657(f), 29 C.F.R. § 1903.11(a)); (2) request workplace inspections (29 U.S.C. § 657(f), 29 C.F.R. § 1952.10(a)); and (3) participate in informal conferences to discuss issues raised by citations (29 C.F.R. § 1903.20). An employee representative may also contest the abatement period in OSHA citations and participate in contest proceedings filed by an employer (29 U.S.C. § 659(c)). The Field Operations Manual explains that an employee representative may include any person acting in a bona fide representative capacity, including nonprofit groups or organizations (FOM Chapter 9, I.A),

**Question # 2 - May workers at a worksite without a collective bargaining agreement designate a person affiliated with a union or a community organization to act on their behalf as a walkaround representative?**

Yes. The OSH Act authorizes participation in the walkaround portion of an OSHA inspection by "a representative authorized by [the employer's] employees." 29 U.S.C. § 657(e). Therefore, a person affiliated with a union without a collective bargaining agreement or with a community representative can act on behalf of employees as a walkaround representative so long as the individual has been authorized by the employees to serve as their representative. This right, however, is qualified by the Secretary's regulations, which allow OSHA compliance officers (CSHOs) to exercise discretion over who participates in workplace inspections.

Section 8(e) of the OSH Act provides that, "[s]ubject to the Secretary's regulations, a representative of the employer and a representative authorized by his employees shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of any workplace . . . for the purpose of aiding such inspection." 29 U.S.C. § 657(e). This language makes plain that, subject to the Secretary's regulations, where employees have chosen a representative, they have a right to have that representative accompany the CSHO during a workplace inspection. The Secretary's regulations, 29 C.F.R. § 1903.8, qualify the walkaround right somewhat, but only in order to allow OSHA to manage its inspections effectively. They allow the Secretary or her authorized representative (the compliance officer) conducting the inspection to determine who can participate in an inspection. See 29 C.F.R. §§ 1903.8(a)-(d).

The legislative history of section 8 of the OSH Act shows Congress' intent to involve employees in workplace inspections. The October 6, 1970 Senate Report declared that an authorized representative of employees would "aid the inspection" and "provide an appropriate degree of involvement of employees. . ." *See* S. REP. No. 91-1282, 91sT CONG., 2D SESS. (1970), *reprinted in* 1970 U.S.C.C.A.N. 5177, 5187. One of the bill's sponsors, Senator Harrison A. Williams of New Jersey, stated that "[t]he opportunity to have the working man himself and a representative of other working men accompanying inspectors is manifestly wise and fair . . ." SUBCOMM. ON LABOR OF THE SENATE COMM. ON LABOR AND PUBLIC WELFARE, 92D CONG., 1ST SESS., LEGISLATIVE HISTORY OF THE OCCUPATIONAL SAFETY AND HEALTH ACT OF 1970, at 430 (Comm. Print 1971).

The OSHA regulation implementing section 8, 29 C.F.R. § 1903.8, likewise recognizes the value of participation by employee representatives in OSHA inspections. Although the regulation acknowledges that most employee representatives will be employees of the employer being inspected, it also makes clear that there may be times when the presence of an employee representative who is not employed by that employer will allow a more effective inspection. Thus, section 1903.8(c) explicitly allows walkaround participation by an employee representative who is not an employee of the worker when, in the judgment of the OSHA compliance officer, such a representative is "reasonably necessary to the conduct of an effective and thorough physical inspection." It is OSHA's view that representatives are "reasonably necessary" when they will make a positive contribution to a thorough and effective inspection.

And, as you point out, there are numerous ways that an employee representative who is neither an employee of the employer being inspected nor a collective bargaining agent could make an important contribution to a thorough and effective inspection. This could be because of the representative's experience and skill, for example because of experience evaluating similar working conditions in a different plant. There are also many instances where non-English speaking workers

want a representative of their own choosing and the employee and employer cannot agree on a representative, the CSHO will facilitate coordination of discussions with respect to conducting the inspection. Finally, workers in some situations may feel uncomfortable talking to an OSHA CSHO without the trusted presence of a representative of their choosing.

OSHA recognizes that there has been some confusion about these issues arising from a March 7, 2003, OSHA letter to Milan Racic. Although this letter addressed an issue related to your inquiry, it is important to explain the distinction between the situation discussed in that letter and your letter. The Racic letter merely states that a non-employee who files a complaint does not necessarily have a right to participate in an inspection arising out of that complaint. It does not address the right of workers at a facility without a collective bargaining agreement to have a representative of their own choosing participate in an inspection. To the extent it has been interpreted to prohibit such a right, it is inconsistent with the OSH Act and with OSHA's regulations. Because of the confusion it has engendered, OSHA is withdrawing the Racic letter.

Thank you for your interest in occupational safety and health. We hope you find this information helpful. OSHA requirements are set by statute, standards, and regulations. Our letters of interpretation do not create new or additional requirements but rather explain these requirements and how they apply to particular circumstances. This letter constitutes OSHA's interpretation only of the requirements discussed. To assure that you are using the correct information and guidance, please consult OSHA's website at http://www.osha.gov. If you have further questions, please contact the Directorate of Enforcement Programs at (202) 693-2100.

Sincerely,


Richard E. Fairfax
Deputy Assistant Secretary


## OSHA ARCHIVE

**NOTICE:** This is an OSHA Archive Document, and may no longer represent OSHA Policy. It is presented here as historical content, for research and review purposes only.

⊕ Standard Interpretations - (Archived) Table of Contents

UNITED STATES
DEPARTMENT OF LABOR

Occupational Safety and Health Administration
200 Constitution Ave., NW,
Washington, DC 20210
📞 800-321-6742 (OSHA)
TTY
www.OSHA.gov

**FEDERAL GOVERNMENT**

White House
Affordable Care Act
Disaster Recovery Assistance
USA.gov
Disability.gov
Plain Writing Act
Recovery Act
No Fear Act
U.S. Office of Special Counsel

**OCCUPATIONAL SAFETY AND HEALTH**

Frequently Asked Questions
A - Z Index
Freedom of Information Act
Read the OSHA Newsletter
Subscribe to the OSHA Newsletter
OSHA Publications
Office of Inspector General

**ABOUT THE SITE**

Freedom of Information Act
Privacy & Security Statement
Disclaimers
Important Web Site Notices
Plug-ins Used by DOL
RSS Feeds from DOL
Accessibility Statement

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.



# OSHA INSTRUCTION

**U.S. DEPARTMENT OF LABOR**

**Occupational Safety and Health Administration**

| DIRECTIVE NUMBER: CPL 02-00-163 | EFFECTIVE DATE: 09/13/2019 |
|---|---|

**SUBJECT:** Field Operations Manual (FOM)

## ABSTRACT

**Purpose:** To provide OSHA offices, State Plan programs and federal agencies with policy and procedures concerning the enforcement of occupational safety and health standards. Also, this instruction provides current information and ensures that occupational safety and health standards are enforced with uniformity.

**Scope:** OSHA-wide.

**References:** See Chapter 1, Section III.

**Cancellations:** See Chapter 1, Section IV.

**State Impact:** Notice of Intent and Equivalency required. See Chapter 1, Section VI.

**Action Offices:** National, Regional, and Area Offices.

**Originating Office:** Directorate of Enforcement Programs (DEP).

**Contact:** Director, Office of General Industry and Agricultural Enforcement
U.S. Department of Labor – OSHA
200 Constitution Avenue, N.W., Room N-3119
Washington, DC 20210
202-693-1850

By and Under the Authority of

Loren Sweatt
Principal Deputy Assistant Secretary

ABSTRACT-1

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

Case 6:24-cv-00271-ADA-DTG   Document 50   Filed 10/09/24   Page 16 of 118
* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

# Chapter 3

# INSPECTION PROCEDURES

I.      <u>General Inspection Procedures</u>.

The conduct of effective inspections requires judgment in the identification, evaluation, and documentation of safety and health conditions and practices. Inspections can vary considerably in scope and detail depending on the circumstances of each case.

II.     <u>Inspection Preparation and Planning</u>.

It is important that the Compliance Safety and Health Officer (CSHO) adequately prepare for each inspection.  Due to the wide variety of industries and associated hazards likely to be encountered, pre-inspection preparation is essential to the conduct of a quality inspection.

A. <u>Review of Inspection History</u>.

1. Compliance Officers will carefully review data available at the Area Office for information relevant to the establishment that is scheduled for inspection.  This can include inspection files and source reference due to possible company name changes and status (e.g., LLC, Inc.).  CSHOs shall document that the history review has been conducted in their case file, even if there is no prior inspection history.

2. If an establishment has an inspection history that includes citations received while performing work in a State Plan state, CSHOs should be aware of this information.  This inspection history can be used to document an employer's heightened awareness of a hazard and/or standard in order to support the development of a willful citation and can be considered in determining eligibility for the history penalty reduction. Relevant prior violations, together with other evidence, can also be used to support a warrant for inspection where necessary.  However, the State Plan citation **cannot** be used to support a repeat violation.

B. <u>Review of Cooperative Program Participation</u>.

CSHOs will access the Regional homepage to obtain information about employers who are currently participating in cooperative programs.  CSHOs will verify whether the employer is a current program participant during the opening conference.  CSHOs will be mindful of whether they are preparing for a programmed or unprogrammed inspection, as this can affect whether the inspection should be conducted and/or its scope.  See Section V.D of this chapter, Review of Voluntary Compliance Programs.

C. <u>Safety and Health Issues Relating to CSHOs</u>.

1. <u>Hazard Assessment</u>.

If the employer has a written certification that a hazard assessment has been performed pursuant to §1910.132(d), then the CSHO shall request a

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

copy. If the hazard assessment itself is not in writing, then the CSHO shall ask the person who signed the certification to describe all potential workplace hazards and then select appropriate protective equipment. If there is no hazard assessment, then the CSHO will determine potential hazards from sources such as the OSHA 300 Log of Work-Related Injuries and Illnesses and shall select personal protective equipment accordingly.

2. <u>Respiratory Protection</u>.

CSHOs must be medically certified and have completed suitable fit testing in accordance with the OSHA Respiratory Protection Standard (§1910.134 and CPL 02-02-054). They must wear respirators when and where required, and must care for and maintain respirators in accordance with the CSHO training provided.

a. CSHOs should conduct a pre-inspection evaluation for potential exposure to chemicals. Prior to entering any hazardous areas, the CSHO should identify those work areas, processes, or tasks that require respiratory protection. The hazard assessment requirement in §1910.132(d) does not apply to respirators; see CPL 02-02-054, *Respiratory Protection Program Guidelines*, July 14, 2000. CSHOs should review all pertinent information contained in the establishment file and appropriate reference sources to become knowledgeable about the industrial processes and potential respiratory hazards that may be encountered. During the opening conference, a list of hazardous substances should be obtained or identified, along with any air monitoring results. CSHOs should determine if they have the appropriate respirator to protect against chemicals present at the worksite.

b. CSHOs must notify their supervisor or the respiratory protection program administrator:

   ➢ If a respirator no longer fits well (CSHOs should request a replacement that fits properly);

   ➢ If CSHOs encounter any respiratory hazards during inspections or on-site visits that they believe have not been previously or adequately addressed during the site visit; or

   ➢ If there are any other concerns about the program.

3. <u>Safety and Health Rules and Practices</u>.

Section 1903.7(c) requires CSHOs to comply with all employer safety and health rules and practices at the establishment being inspected; CSHOs shall wear and use appropriate protective clothing and equipment.

4. <u>Restrictions</u>.

CSHOs will not enter any area where special entrance restrictions apply until the required precautions have been taken. It shall be the Area Director's responsibility to determine whether an inspection can be conducted without exposing the CSHO to hazardous situations and to

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 18 of 118
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

procure whatever materials and equipment are needed for the safe conduct of the inspection.

NOTE:  Also such restrictions apply 1) to facilities where incidents of workplace violence precipitated the inspections, and 2) in industries that OSHA has identified as having a high risk for workplace violence (specifically:  late-night retail, social service and health care settings, and correctional facilities).

5.  Workplace Violence – CSHO Training and Workplace Violence Prevention Programs.

a.  CSHO Training.

Prior to conducting an inspection in response to a complaint of workplace violence, a CSHO must have received training that addresses the issues of workplace violence.  Such training should include OSHA's 1000 Course, Area Office training, or other similar course work.

b.  DOL Workplace Violence Prevention Programs.

➢ CSHOs should be aware and familiar with the DOL workplace violence program, http://www.labornet.dol.gov/me/worklife/dol-workplace-violence-program.htm.

➢ CSHOs should also be aware and familiar with the OSHA Safety and Health Management System, ADM 04-00-002, (October 5, 2016).

c.  Establishment Workplace Violence Prevention Programs.

If the employer is in an industry that OSHA has identified as a high risk for workplace violence (such as late-night retail, social service and healthcare settings, and correctional facilities), then the CSHO should inquire about the existence of a workplace violence prevention program.  If such a program exists, then the CSHO shall ask the person responsible for the program to describe all the potential workplace hazards.  If there is no workplace violence prevention plan, then the CSHO will determine potential workplace violence hazards from sources such as the OSHA 300 log of injuries and illnesses and other relevant records.  See CPL 02-01-058, *Enforcement Procedures and Scheduling for Occupational Exposure to Workplace Violence*, January 10, 2017, for further guidance.

NOTE:  If training is provided to staff members on workplace violence, then the CSHO should conduct the inspection with a staff member who has received the training.  If the CSHO does not deem that the existing protections are sufficient, then the CSHO should not enter the facility or area within the facility that he or she considers dangerous.

d.  CSHOs must notify their supervisor if they experience or witness any incident of workplace violence.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

D. <u>Advance Notice of an Inspection</u>.

1. <u>Policy</u>.

Section 17(f) of the Act and §1903.6 contain a general prohibition against the giving of advance notice of inspections, except as authorized by the Secretary or the Secretary's designee.  The Act regulates many conditions that are subject to speedy alteration and disguise by employers.  To forestall such changes in worksite conditions, the Act prohibits unauthorized advance notice.

a. <u>Advance Notice Exceptions</u>.

There may be occasions when advance notice is necessary to conduct an effective investigation.  These occasions are narrow exceptions to the statutory prohibition against advance notice.  Advance notice of inspections can be given only with the authorization of the Area Director or designee and only in the following situations:

➢ In cases of apparent imminent danger to enable the employer to correct the danger as quickly as possible;

➢ When the inspection can most effectively be conducted after regular business hours or when special preparations are necessary;

➢ To ensure the presence of employer and employee representatives or other appropriate personnel who are needed to aid in the inspection; and

➢ When giving advance notice would enhance the probability of an effective and thorough inspection (e.g., in complex fatality investigations).

NOTE:  The regulation at 29 CFR 1903.6(b) says that, except in imminent danger situations and in other unusual circumstances, the advance notice authorized here "shall not be given more than 24 hours before the inspection is scheduled to be conducted."

b. <u>Delays</u>.

Advance notice exists whenever the Area Office sets up a specific date or time with the employer for the CSHO to begin an inspection.  Any delays in the conduct of the inspection shall be kept to an absolute minimum.  Lengthy or unreasonable delays shall be brought to the attention of the Area Director or designee.  Advance notice generally does not include non-specific indications of potential future inspections.

In unusual circumstances, the Area Director or designee can decide that a delay is necessary.  In those cases, the employer or the CSHO shall notify affected employee representatives, if any, of the delay and shall keep them informed of the status of the inspection.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

\* OSHA ARCHIVE DOCUMENT \*

Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 20 of 118

NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

2. <u>Documentation</u>.

   The conditions requiring advance notice and the procedures followed shall be documented in the case file.

E. <u>Pre-Inspection Compulsory Process</u>.

Section 1903.4(b) authorizes OSHA to seek a warrant in advance of an attempted inspection if circumstances are such that "pre-inspection process (is) desirable or necessary." Section 8(b) of the Act authorizes the Agency to issue administrative subpoenas to obtain evidence related to an OSHA inspection or investigation. See Chapter 15, Legal Issues.

F. <u>Personal Security Clearance</u>.

Some establishments have areas that contain material or processes that are classified by the U.S. Government in the interest of national security. Whenever an inspection is scheduled for an establishment containing classified areas, the Area Director or designee shall assign a CSHO who has the appropriate security clearances. The Regional Administrator shall ensure that an adequate number of CSHOs with appropriate security clearances are available within the Region and that the security clearances are current.

G. <u>Expert Assistance</u>.

1. The Area Director or designee shall arrange for a specialist and/or specialized training, preferably from within OSHA, to assist in an inspection or investigation when the need for such expertise is identified.

2. OSHA specialists may accompany CSHOs or perform their tasks separately. CSHOs must accompany outside consultants. OSHA specialists and outside consultants shall be briefed on the purpose of the inspection and personal protective equipment to be utilized.

III. <u>Inspection Scope</u>.

Inspections, either programmed or unprogrammed, fall into one of two categories, depending on the scope of the inspection:

A. <u>Comprehensive</u>.

A comprehensive inspection is a substantially complete and thorough inspection of all potentially hazardous areas of the establishment. An inspection can be deemed comprehensive even though, as a result of professional judgment, not all potentially hazardous conditions or practices within those areas are inspected.

B. <u>Partial</u>.

A partial inspection is one whose scope is limited to certain potentially hazardous areas, operations, conditions, or practices at the establishment.

1. Generally, unprogrammed inspections (i.e., inspections resulting from an employee complaint, referral, reported accident or incident, etc.) will be conducted as partial inspections. The scope of the partial inspection should be limited to the specific work areas, operations, conditions, or practices forming the basis of the unprogrammed inspection.

\* OSHA ARCHIVE DOCUMENT \*

NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

For example: An Area Office receives an employee complaint alleging that a specific machine in a manufacturing plant poses an amputation hazard to employees. If no other information is provided to OSHA, the resulting onsite inspection should be limited to the specific machine referenced in the employee's complaint.

2. A partial inspection can be expanded based on information gathered by the CSHO during the inspection process, including from injury and illness records found in both OSHA forms 300 and 301, employee interviews, and plain view observations. The CSHO should not expand a partial inspection based on 300 data *alone*. See note in Chapter 15, Section III.A.1.b.

3. CSHOs shall consult established written guidelines and criteria, such as Agency directives, REPs and LEPs, in conjunction with information gathered during the records or program review and walkaround inspection, to determine whether expanding the scope of an inspection is warranted. See also Chapter 15, Section III., Obtaining Warrants.

IV. Conduct of Inspection.
   A. Time of Inspection.
      1. Inspections shall be made during regular working hours of the establishment except when special circumstances indicate otherwise.
      2. The Area Director or designee and the CSHO shall determine if alternate work schedules are necessary for entry into an inspection site during other-than-normal working hours.
   B. Presenting Credentials.
      1. While conducting inspections, CSHOs are to present their credentials whenever making contact with management representatives, employees (to conduct interviews), or organized labor representatives.
      2. At the beginning of the inspection, the CSHO shall locate the owner representative, operator, or agent in charge at the workplace and present credentials. On construction sites this will most often be the representative of the general contractor.
      3. The inspection shall not be delayed unreasonably to await the arrival of the employer representative. If the employer representative is coming from off-site, the inspection should not be delayed in excess of one hour. If the workforce begins to depart from the worksite, the CSHO should contact the Area Director or designee for guidance. If the person in charge at the workplace cannot be determined, then the CSHO should record the extent of the inquiry in the case file and proceed with the physical inspection.
   C. Refusal to Permit Inspection and Interference.
      Section 8 of the Act specifies that CSHOs, without delay and at reasonable times, can enter any establishment covered under the Act for the purpose of conducting an inspection. Unless the circumstances constitute a recognized exception to the warrant requirement (e.g., consent, third-party consent, plain

3-6

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

view, open field, open construction site, or exigent circumstances), an employer has a right to require the CSHO to seek an inspection warrant prior to entering an establishment and the employer can refuse entry without such a warrant.

1. <u>Refusal of Entry or Inspection</u>.

    Please note that on a military base or other federal government facility, the following guidelines do not apply. Instead, a representative of the controlling authority shall be informed of the contractor's refusal and directed to take appropriate action to obtain cooperation.

    a. When the employer refuses to permit entry upon being presented proper credentials, or allows entry but then refuses to permit or hinders the inspection in some way, an attempt shall be made to obtain as much information as possible about the establishment. See Chapter 15, Obtaining Warrants for additional information.

    b. If the employer refuses to allow an inspection of the establishment to proceed, then the CSHO shall leave the premises and immediately report the refusal to the Area Director or designee. The Area Director shall notify the Regional Solicitor of Labor (RSOL).

    c. If the employer raises no objection to inspection of certain areas of the workplace but objects to inspection of other areas, then this shall be documented. The CSHO shall continue the inspection, confining it only to those certain areas to which the employer has raised no objections. If, however, during the limited scope inspection the CSHO becomes aware that there may be violative conditions in other portions of the workplace, then the CSHO shall inform the employer and request permission to inspect those areas. If the employer continues to object, then the CSHO shall report this refusal to the Area Director or designee. The Area Director shall then consult with the RSOL to determine if an inspection warrant is needed. See Chapter 15, Legal Issues, for additional information.

    d. In either case, the CSHO shall advise the employer that the refusal will be reported to the Area Director or designee and that the Agency may take further action, which may include obtaining legal process.

    e. On multi-employer worksites, valid consent can be granted by the owner, or another employer with employees at the worksite, for site entry.

2. <u>Employer Interference</u>.

    Where entry has been allowed but the employer interferes with or limits any important aspect of the inspection, the CSHO shall determine whether or not to consider this action as a refusal. See §1903.7(b).

    Examples of interference are employer refusals to permit:

    ➢ the walkaround;

    ➢ the examination of records essential to the inspection;

    ➢ the taking of essential photographs and/or video recordings;

3-7

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

\* OSHA ARCHIVE DOCUMENT \*

Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 23 of 118

NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

➢ the inspection of a particular part of the premises;

➢ private employee interviews; or

➢ the attachment of sampling devices.

3. <u>Forcible Interference with Conduct of Inspection or Other Office Duties</u>.

Whenever an OSHA official or employee encounters forcible resistance, opposition, or interference, or is assaulted or threatened with assault while engaged in the performance of official duties, all investigative activity shall cease.

a. If a CSHO is assaulted while attempting to conduct an inspection, then the CSHO shall contact the proper authorities such as the Federal Protective Services or local police and immediately notify the Area Director.

b. Upon receiving a report of such forcible interference, the Area Director or designee shall immediately notify the Regional Administrator.

c. If working at an off-site location, CSHOs should leave the site immediately pending further instructions from the Area Director or designee.

4. <u>Obtaining Compulsory Process</u>.

If it is determined, upon refusal of entry or refusal to produce evidence required by subpoena, that a warrant will be sought, then the Area Director shall proceed according to guidelines and procedures established in the Region for warrant applications.  See Chapter 15, Legal Issues.

D. <u>Employee Participation</u>.

CSHOs shall advise employers that Section 8(e) of the Act and §1903.8 specifies that an employee representative must be given an opportunity to participate in the inspection.

1. CSHOs shall determine as soon as possible after arrival whether the workers at the inspected worksite are represented and, if so, shall ensure that employee representatives are afforded the opportunity to participate in all phases of the inspection.

2. If an employer resists or interferes with participation by employee representatives in an inspection and if the interference cannot be resolved by the CSHO, then the resistance shall be construed as a refusal to permit the inspection and the Area Director or designee shall be contacted.

E. <u>Release for Entry</u>.

1. CSHOs shall not sign any form or release or agree to any waiver.  This includes any employer forms concerned with trade secret information.

2. CSHOs can obtain a pass or sign a visitor's register, or any other book or form used by the establishment to control the entry and movement of persons upon its premises.  Such signature shall not constitute any form of a release or waiver of prosecution for liability under the Act.

\* OSHA ARCHIVE DOCUMENT \*

NOTICE: This document is presented here as historical content, for research and review purposes only.

\* OSHA ARCHIVE DOCUMENT \*
Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 24 of 118
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

F. <u>Bankrupt or Out of Business</u>.

1. If the establishment scheduled for inspection is found to have ceased business and there is no known successor, the CSHO shall report the facts to the Area Director or designee.

2. If an employer, although bankrupt, is continuing to operate on the date of the scheduled inspection, then the inspection shall proceed.

3. An employer must comply with the Act until such time as the business actually ceases to operate.

G. <u>Employee Responsibilities</u>.

1. Section 5(b) of the Act states: "Each employee shall comply with occupational safety and health standards and all rules, regulations, and orders issued pursuant to the Act which are applicable to his own actions and conduct." The Act does not provide for the issuance of citations or the proposal of penalties against employees. Employers are responsible for employee compliance with the standards.

2. In cases where CSHOs determine that employees are systematically refusing to comply with a standard applicable to their own action and conduct, the matter shall be referred to the Area Director who shall consult with the Regional Administrator.

3. Under no circumstances are CSHOs to become involved in a worksite dispute involving labor management issues or interpretation of collective bargaining agreements. CSHOs are expected to obtain sufficient information to assess whether the employer is using its authority to ensure employee compliance with the Act. Concerted refusals to comply by employees will not bar the issuance of a citation if the employer has failed to exercise its control to the maximum extent reasonable, including discipline and discharge.

H. <u>Strike or Labor Dispute</u>.

Plants or establishments can be inspected regardless of the existence of labor disputes, such as work stoppages, strikes, or picketing. If the CSHO identifies an unanticipated labor dispute at a proposed inspection worksite, the Area Director or designee shall be consulted before any contact is made.

1. <u>Programmed Inspections</u>.

Programmed inspections can be deferred during a strike or labor dispute, either between a recognized union and the employer or between two unions competing for bargaining rights in the establishment.

2. <u>Unprogrammed Inspections</u>.

a. Unprogrammed inspections (complaints, fatalities, or referrals)will be performed during strikes or labor disputes. However, the credibility and veracity of any complaint shall be thoroughly assessed by the Area Director or designee prior to scheduling an inspection.

b. If there is a picket line at the establishment, CSHOs shall attempt to locate and inform the appropriate union official of the reason for the inspection prior to initiating the inspection.

\* OSHA ARCHIVE DOCUMENT \*
NOTICE: This document is presented here as historical content, for research and review purposes only.

Case 6:24-cv-00271-ADA-DTG * OSHA ARCHIVE DOCUMENT * Page 25 of 118
Document 50 Filed 10/09/24
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

     c. During the inspection, CSHOs will make every effort to ensure that their actions are not interpreted as supporting either party to the labor dispute.

I. Variances.

The employer's requirement to comply with a standard can be modified through granting of a variance, as outlined in Section 6 of the Act.

1. An employer will not be subject to citation if the observed condition is in compliance with an existing variance issued to that employer.

2. In the event that an employer is not in compliance with the requirement(s) of the issued variance, a violation of the applicable standard shall be cited with a reference in the citation to the variance provision that has not been met.

V. Opening Conference.

A. General.

CSHOs shall attempt to inform all affected employers of the purpose of the inspection, provide a copy of the complaint if applicable, and include any employee representatives, unless the employer objects. The opening conference should be brief so that the compliance officer can quickly proceed to the walkaround. Conditions of the worksite shall be noted upon arrival, as well as any changes that may occur during the opening conference. At the start of the opening conference, CSHOs will inform both the employer and the employee representative(s) of their rights during the inspection, including the opportunity to participate in the physical inspection of the workplace. Publications OSHA 3000, *Employer Rights & Responsibilities Following a Federal OSHA Inspection* and OSHA 3021, *Workers Rights* should be distributed. The CSHO should also remind the employer and employees that Section 11(c) provides redress for employees who exercise their rights under the Act.

CSHOs shall request a copy of the written certification that a hazard assessment has been performed by the employer in accordance with §1910.132(d). CSHOs should then ask the person who signed the certification about any potential worksite exposures and select appropriate personal protective equipment.

1. Attendance at Opening Conference.

     a. CSHOs shall conduct a joint opening conference with employer and employee representatives unless either party objects.

     b. If there is objection to a joint conference, the CSHO shall conduct separate conferences with employer and employee representatives.

2. Scope of Inspection.

CSHOs shall outline in general terms the scope of the inspection, including the need for private employee interviews, physical inspection of the workplace and records (including OSHA 300 logs, 300A summaries, and 301 incident reports), possible referrals, rights during an inspection,

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

discrimination complaints, and the closing conference(s). For partial inspections, the CSHO shall also disclose that he/she may seek to expand the scope of the inspection if there is evidence (e.g., from injury and illness records, plain view hazards, or employee interviews) that there may be violative conditions in other portions of the workplace.

3. <u>Video/Audio Recording</u>.

CSHOs shall inform participants that a video camera and/or an audio recorder can be used to provide a visual and/or audio record, and that the video and audio records can be used in the same manner as handwritten notes and photographs in OSHA inspections.

NOTE: If an employer clearly refuses to allow video recording during an inspection, CSHOs shall contact the Area Director to determine if video recording is critical to documenting the case. If it is, this can be treated as a denial of entry.

4. <u>Immediate Abatement</u>.

CSHOs should explain to employers the advantages of immediate abatement, including that there are no certification requirements for violations quickly corrected during the inspection. See Chapter 7, Post-Citation Procedures and Abatement Verification.

5. <u>Quick-Fix Penalty Reduction</u>.

CSHOs shall advise both the employer and employee representatives, if applicable, that the Quick-Fix penalty reduction can be applied to each qualified violation (i.e., those which meet the criteria noted in Chapter 6), that the employer immediately abates during the inspection and that is visually verified by the CSHO. CSHOs shall explain the Quick-Fix criteria and answer any questions concerning the program. See Chapter 6, Penalties and Debt Collection.

6. <u>Recordkeeping Rule</u>.

a. The recordkeeping regulation at §1904.40(a) states that once a request is made, an employer must provide copies of the required recordkeeping records within four (4) business hours.

b. Although the employer has four business hours to provide injury and illness records, the compliance officer is not required to wait until the records are provided before beginning the walkaround portion of the inspection. As soon as the opening conference is completed, the compliance officer is to begin the walkaround portion of the inspection.

NOTE: 29 CFR Part 1904 requires reporting work-related fatalities, hospitalizations, amputations or losses of an eye. The new rule, which also updates the list of employers partially exempt from OSHA record-keeping requirements, went into effect on January 1, 2015, for workplaces under federal OSHA jurisdiction. (See 79 FR 56129, Occupational Injury and Illness Recording and Reporting

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

Requirements – NAICS Update and Reporting Revisions, September 18, 2014.)

7. <u>Abbreviated Opening Conference</u>.

An abbreviated opening conference shall be conducted whenever the CSHO believes that circumstances at the worksite dictate that the walkaround should begin as promptly as possible.

a. In such cases, the opening conference shall be limited to:

➢ presenting credentials;

➢ stating the purpose of the visit;

➢ explaining employer and employee rights; and

➢ requesting employer and employee representatives.

All other elements shall be fully addressed during the closing conference(s).

b. Pursuant to §1903.8, employer and employee representatives shall be informed of the opportunity to participate in the physical inspection of the workplace.

B. <u>Review of Appropriation Act Exemptions and Limitations</u>.

CSHOs shall determine if the employer is covered by any exemptions or limitations noted in the current Appropriations Act. See CPL 02-00-051, *Enforcement Exemptions and Limitations under the Appropriations Act*, May 28, 1998.

C. <u>Review Screening for Process Safety Management (PSM) Coverage</u>.

CSHOs shall request a list of the chemicals on-site and their respective maximum intended inventories. CSHOs shall review the list of chemicals and quantities, and determine if there are highly hazardous chemicals (HHCs) listed in §1910.119, Appendix A or flammable liquids or gases at or above the specified threshold quantity. CSHOs can ask questions, conduct interviews, and/or conduct a walkaround to confirm the information on the list of chemicals and maximum intended inventories.

1. If there is an HHC present at or above threshold quantities, CSHOs shall use the following criteria to determine if any exemptions apply:

a. CSHOs shall confirm that the facility is not: a retail facility; oil or gas well drilling or servicing operation; or a normally unoccupied remote facility (§1910.119(a)(2)). If the facility is one of these types of establishments, PSM does not apply.

b. If management believes that the process is exempt, CSHOs shall ask the employer to provide documentation or other information to support that claim.

2. According to §1910.119 (a)(1)(ii), a process can be exempt if the employer can demonstrate that the covered chemical(s) are:

a. Hydrocarbon fuels used solely for workplace consumption as a fuel (e.g., propane used for comfort heating, gasoline for vehicle refueling);

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 28 of 118
* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

if such fuels are not a part of a process containing another highly hazardous chemical covered by the standard; or

b. Flammable liquids with a flashpoint below 100 ºF (37.8ºC) stored in atmospheric tanks or transferred, which are kept below their normal boiling point without the benefit of chilling or refrigeration.

NOTE:  Current Agency policies for applying exemptions are on the OSHA website.  See CPL 03-00-010, *Petroleum Refinery Process Safety Management National Emphasis Program*, August 18, 2009.

D. Review of Voluntary Compliance Programs.

Employers who participate in selected voluntary compliance programs may be exempted from programmed inspections.  CSHOs shall determine whether the employer falls under such an exemption during the opening conference.

1. OSHA On-Site Consultation Visits.

   a. In accordance with §1908.7 and Chapter VII., of CSP 02-00-003, *The Consultation Policies and Procedures Manual*, CSHOs shall ascertain at the opening conference whether an OSHA-funded consultation visit is in progress.  A consultation visit in progress extends, from the beginning of the opening conference to the end of the correction due dates (including extensions).

   b. An On-Site Consultation visit in progress has priority over programmed inspections except for imminent danger investigations, fatality/catastrophe investigations, complaint investigations, and other critical inspections as determined by the **Assistant Secretary**.  See §1908.7(b)(2).

2. Safety and Health Achievement Recognition Program (SHARP).

   a. Upon verifying that the employer is a current participant, the CSHO shall notify the Area Director or designee so that the company can be removed from the OSHA General Programmed Inspection Schedule for the approved exemption period, which begins on the date that the Regional Office approves the employer's participation in SHARP or Pre-SHARP.

   b. The initial exemption period is up to two years for SHARP and up to eighteen months for pre-SHARP.  The renewal exemption period is up to three years for SHARP.

3. Voluntary Protection Programs (VPP).

Inspections at a VPP site can be conducted in response to referrals, formal complaints, fatalities, and catastrophes.

NOTE:  A Compliance Officer who was previously a VPP on-site team member will generally not conduct an enforcement inspection at that VPP site for the following 2 years or until the site is no longer a VPP participant, whichever occurs first.  See CSP 03-01-003, *Voluntary Protection Programs (VPP):  Policies and Procedures Manual*, April 18, 2008.  On a case-by-case basis, the Regional Solicitor may override this provision.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

\* OSHA ARCHIVE DOCUMENT \*
Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 29 of 118
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

E. <u>Disruptive Conduct</u>.

CSHOs can deny the right of accompaniment to any person whose conduct interferes with a fair and orderly inspection.  See §1903.8(d).  If disruption or interference occurs, the CSHO shall contact the Area Director or designee as to whether to suspend the walkaround inspection or take other action.  The employee representative shall be advised that, during the inspection, matters unrelated to the inspection shall not be discussed with employees.

F. <u>Classified Areas</u>.

In areas containing information classified by an agency of the U.S. government in the interest of national security, only persons authorized to have access to such information can accompany a CSHO on the inspection.  See §1903.8(d).

VI. <u>Review of Records</u>.

A. <u>Injury and Illness Records</u>.

1. <u>Collection of Data</u>.

a. At the start of each inspection, the CSHO shall review the employer's injury and illness records (including the employer's OSHA 300 logs, 300A summaries, and 301 incident reports) for three prior calendar years, record the relevant information on a copy of the *OSHA-300* screen, and enter the employer's data into OIS.  This shall be done for all general industry, construction, maritime, and agriculture inspections and investigations.

b. CSHOs shall use these data to calculate the Days Away, Restricted, or Transferred (DART) rate and to observe trends, potential hazards, types of operations and work-related injuries.

c. If recordkeeping deficiencies or unsound employer safety incentive policies are discovered, the CSHO and the Area Director (or designee) can request assistance from the Regional Recordkeeping Coordinator.

2. <u>Information to be Obtained</u>.

a. CSHOs shall request copies of the *OSHA-300 Logs*, the total hours worked and the average number of employees for each year, and a roster of current employees, including a list of each employee's job classification, work hours, and assigned work area(s).

b. CSHOs shall request copies of the *OSHA-301 Incident Reports* or equivalent forms.

c. CSHOs shall check whether the establishment has an on-site medical, nursing, health, or first aid facility and/or the location of the nearest emergency room where employees can be treated.

NOTE:  The total hours worked and the average number of employees for each year can be found on the *OSHA-300A* for all past years.

\* OSHA ARCHIVE DOCUMENT \*
NOTICE: This document is presented here as historical content, for research and review purposes only.

\* OSHA ARCHIVE DOCUMENT \*
Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 30 of 118
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

3. <u>Automatic DART Rate Calculation</u>.

CSHOs will not normally need to calculate the Days Away, Restricted, or Transferred (DART) rate since it is automatically calculated when the *OSHA-300* data are entered into the OIS. If one of the three years is a partial year, so indicate and the software will calculate accordingly.

4. <u>Manual DART Rate Calculation</u>.

The DART rate includes cases involving days away from work, restricted work activity, and transfers to another job. If it is necessary to calculate rates manually, the CSHO will need to calculate the DART Rates individually for each calendar year using the following procedures.

The formula is:

***(N/EH) x (200,000)*** where:

  ➢ ***N*** is the number of cases involving days away and/or restricted work activity and job transfers.

  ➢ ***EH*** is the total number of hours worked by all employees during the calendar year; and

  ➢ ***200,000*** is the base number of hours worked for 100 full-time equivalent employees.

  **EXAMPLE 3-1**: Employees of an establishment (XYZ Company), including management and temporary workers, worked 645,089 hours at XYZ company. There were 22 injury and illness cases involving days away and/or restricted work activity and/or job transfer from the *OSHA-300 Log* (total of column H plus column I). The DART rate would be $(22 \div 645,089) \times (200,000) = 6.8$.

5. <u>Construction</u>.

For construction inspections/investigations, only the *OSHA-300* information for the prime/general contractor needs to be recorded (where such records exist and are maintained). It will be left to the discretion of the Area Director or the CSHO as to whether *OSHA-300 and 301* data should also be recorded for any of the subcontractors.

6. <u>Federal Agencies</u>.

Federal agency injury and illness recording and reporting requirements shall comply with the requirements under §1904, subparts C, D, E, and G, except that the definition of "establishment" found in §1960.2(h) will remain applicable to federal agencies.

B. <u>Recording Criteria</u>.

Employers must record new work-related injuries and illnesses that meet one or more of the general recording criteria or meet the recording criteria for specific types of conditions.

1. Death;

2. Days Away from Work;

3. Restricted Work;

\* OSHA ARCHIVE DOCUMENT \*
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

4.  Transfer to another job;

5.  Medical treatment beyond first aid;

6.  Loss of consciousness;

7.  Diagnosis of a significant injury or illness; or

8.  Meet the recording criteria for Specific Cases noted in §1904.8 through §1904.11.

C.  Recordkeeping Deficiencies.

1.  If recordkeeping deficiencies are suspected, the CSHO and the Area Director or designee can request assistance from the Regional Recordkeeping Coordinator.  If there is evidence that the deficiencies or inaccuracies in the employer's records impair the ability to assess hazards, injuries and/or illnesses at the workplace, a comprehensive records review shall be performed.

2.  Other information related to this topic:

    a.  See CPL 02-00-135, *Recordkeeping Policies and Procedures Manual*, December 30, 2004, and CPL 02-02-072, *Rules of Agency Practice and Procedure concerning OSHA Access to Employee Medical Records*, August 22, 2007.

    b.  Other OSHA programs and records will be reviewed, including hazard communication, lockout/tagout, emergency evacuation and personal protective equipment.  Additional programs will be reviewed as necessary.

    c.  Many standard-specific directives provide additional instruction to CSHOs requesting certain records and/or documents at the opening conference.

    d.  There are several types of workplace policies and practices that could discourage employee reports of injuries and could constitute a violation of section 11(c) of the OSH Act.  These policies and practices, otherwise known as employer safety incentive and disincentive policies and practices, can also violate OSHA's recordkeeping regulations.

VII.  Walkaround Inspection.

The main purpose of the walkaround inspection is to identify potential safety and/or health hazards in the workplace.  CSHOs shall conduct the inspection in such a manner as to avoid unnecessary personal exposure to hazards and to minimize unavoidable personal exposure to the extent possible.

A.  Walkaround Representatives.

Persons designated to accompany CSHOs during the walkaround are considered walkaround representatives, and will generally include those designated by the employer and employees.  At establishments where more than one employer is present or in situations where groups of employees have different representatives, it is acceptable to have a different employer/employee representative for different phases of the inspection.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.
Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 32 of 118

More than one employer and/or employee representative can accompany the CSHO throughout or during any phase of an inspection if the CSHO determines that such additional representatives will aid, and not interfere with, the inspection.  See §1903.8(a).

The importance of worker participation to an effective workplace safety and health inspection was clearly established in Section 8(e) of the OSH Act, 29 U.S.C. § 657 (e), which provides that "[s]ubject to regulations issued by the Secretary, a representative of the employer and a representative authorized by his employees shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of any workplace…for the purpose of aiding such inspection."

However, §1903.8(d) states that "Compliance Safety and Health Officers are authorized to deny the right of accompaniment under this section to any person whose conduct interferes with a fair and orderly inspection," which includes any activity not directly related to conducting an effective and thorough physical inspection of the workplace.

1. Employees Represented by a Certified or Recognized Bargaining Agent.

   During the opening conference, the highest ranking union official or union employee representative on-site shall designate who will participate in the walkaround.  OSHA regulation §1903.8(b) gives the CSHO the authority to resolve all disputes about the representative authorized by the employer and employees.  Section 1903.8(c) states that the representative authorized by the employees shall be an employee of the employer.  If in the judgement of the CSHO, good cause has been shown why accompaniment by a third party, who is not an employee of the employer (such as an industrial hygienist or a safety engineer), is reasonably necessary to conduct an effective and thorough physical inspection of the workplace, then such third party can accompany CSHOs during the inspection.

   Where employees are not represented by an authorized representative, there is no established safety committee, or employees have not chosen or agreed to an employee representative for OSHA inspection purposes (regardless of the existence of a safety committee), CSHOs shall determine if other employees would suitably represent the interests of employees on the walkaround.  If selection of such an employee is impractical, CSHOs shall conduct interviews with reasonable number of employees during the walkaround.

2. Safety Committee or Employees at Large.

   Employee members of an established workplace safety committee **_or_** employees at large can designate an employee representative for OSHA inspection purposes.

B. Evaluation of Safety and Health Management System.

   The employer's safety and health management system shall be evaluated to determine its good faith effort for the purposes of penalty calculation.  See Chapter 6, Penalties and Debt Collection.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

C. Record All Facts Pertinent to a Violation.

1. Safety and health violations shall be brought to the attention of employer and employee representatives at the time they are documented.

2. CSHOs shall record, at a minimum, the identity of the exposed employee, the hazard to which the employee was exposed, the employee's proximity to the hazard, the employer's knowledge of the condition, the manner in which important measurements were obtained, and how long the condition has existed.

3. CSHOs will document interview statements in a thorough and accurate manner; including names, dates, times, locations, types of materials, positions of pertinent articles and witnesses.

   NOTE:  If employee exposure to hazards is not observed, the CSHO shall document facts on which the determination can be made whether an employee has been or could be exposed.  See Chapter 4, Violations and Chapter 5, Case File Preparation and Documentation.

D. Testifying in Hearings.

CSHOs can be required to testify in hearings on OSHA's behalf, and shall be mindful of this fact when recording observations during inspections.  The case file shall reflect conditions observed in the workplace as accurately and detailed as possible.

E. Trade Secrets.

A trade secret, as referenced in Section 15 of the Act, includes information concerning or related to processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association.  See 18 USC 1905.

1. Policy.

   CSHOs and OSHA personnel shall preserve the confidentiality of trade secrets.

2. Restriction and Controls.

   At the commencement of an inspection, the employer may identify areas in the establishment that contain or that might reveal a trade secret.  If the CSHO has no clear reason to question such identification, information obtained in such areas, including all negatives, photographs, video recordings, environmental samples, and OSHA documentation forms, shall be labeled:

   "Confidential – Trade Secret"

   a. Under Section 15 of the Act, all information reported to or obtained by CSHOs in connection with any inspection or other activity that contains or that might reveal a trade secret shall be kept confidential. Such information shall not be disclosed except to other OSHA officials concerned with the enforcement of the Act or, when relevant, in any proceeding under the Act.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

    b.  Title 18 USC 1905 provides criminal penalties for Federal employees who disclose such information.  These penalties include fines of up to $1,000 or imprisonment for up to one year, or both, and removal from office or employment.

    c.  Trade secret materials shall not be labeled as "Top Secret," "Secret," or "Confidential," nor shall these security classification designations be used in conjunction with other words unless the trade secrets are also classified by an agency of the U.S. government in the interest of national security.

3.  If the employer objects to the taking of photographs and/or video recordings because trade secrets would or may be disclosed, CSHOs should advise the employer of the protection against such disclosure afforded by Section 15 of the Act and §1903.9.  If the employer still objects, CSHOs shall contact the Area Director or designee.

F.  Collecting Samples.

1.  CSHOs shall determine, early in the inspection, whether sampling (such as, but not limited to, air sampling and surface sampling) is required by using the information collected during the walkaround and from the pre-inspection review.  CSHOs are highly encouraged to conduct self-sampling.

2.  Summaries of sampling results shall be provided on request to the appropriate employees (including those exposed or likely to be exposed to a hazard), to employer representatives, and to employee representatives.

G.  Photographs and Video Recordings.

1.  Photographs and/or video recordings, shall be taken whenever CSHOs determine there is a need.

    a.  Photographs that support violations shall be properly labeled, and may be attached to the appropriate *Violation Worksheet*.

    b.  CSHOs shall ensure that any photographs relating to confidential trade secret information are identified as such and are kept separate from other evidence.

2.  All film and photographs or video recordings shall be retained in the case file.  If lack of storage space does not permit retaining the film, photographs or videotapes with the file, they may be stored elsewhere with a reference to the corresponding inspection.  Video recordings shall be properly labeled.  For more information regarding guidelines for case file documentation with video, audio and digital media, see OSHA Instruction CPL 02-00-098, *Guidelines for Case File Documentation for Use with Videotapes and Audiotapes*, October 12, 1993.

H.  Violations of Other Laws.

If a CSHO observes apparent violations of laws enforced by other government agencies, such cases shall be referred to the appropriate agency.  Referrals shall be made using appropriate regional procedures.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

I. <u>Interviews of Non-Managerial Employees</u>.

A free and open exchange of information between CSHOs and employees is essential to an effective inspection. Interviews provide an opportunity for employees to supply valuable factual information concerning hazardous conditions, including information on how long workplace conditions have existed, the number and extent of employee exposure(s) to a hazardous condition, and the actions of management regarding correction of a hazardous condition.

1. <u>Background</u>.

   a. Section 8(a)(2) of the Act authorizes CSHOs to question **any employee privately** during regular working hours or at other reasonable times during the course of an OSHA inspection. The purpose of such interviews is to obtain whatever information CSHOs deem necessary or useful in carrying out inspections effectively. The mandate to interview employees in private is OSHA's statutory right.

   b. Employee interviews are an effective means to determine if any advance notice of inspection has adversely affected the inspection conditions, as well as to obtain information regarding the employer's knowledge of the workplace conditions or work practices in effect prior to, and at the time of, the inspection. During interviews with employees, CSHOs should ask about these matters.

   c. CSHOs should also obtain information concerning the presence and/or implementation of a safety and health program to prevent or control workplace hazards.

   d. If an employee refuses to be interviewed, the CSHO shall use professional judgment, in consultation with the Area Director or designee, in determining the need for the employee's statement.

2. <u>Employee Right of Complaint</u>.

   CSHOs can consult with any employee who desires to discuss a potential violation. Upon receipt of such information, CSHOs shall investigate the alleged hazard, where possible, and record the findings.

3. <u>Time and Location of Interviews</u>.

   CSHOs are authorized to conduct interviews during regular working hours and at other reasonable times, and in a reasonable manner at the workplace. Interviews often occur during the walkaround, but can be conducted at any time during an inspection. If necessary, interviews can be conducted at locations other than the workplace. CSHOs should consult with the Area Director if an interview is to be conducted someplace other than the workplace. Where appropriate, OSHA has the authority to subpoena an employee to appear at the Area Office for an interview.

4. <u>Conducting Interviews of Non-Managerial Employees in Private</u>.

   CSHOs shall inform employers that interviews of non-managerial employees will be conducted in private. CSHOs are entitled to question

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 36 of 118
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

such employees in private regardless of employer preference. If an employer interferes with a CSHOs ability to do so, the CSHO should request that the AD consult with the RSOL to determine appropriate legal action. Interference with a CSHOs ability to conduct private interviews with non-managerial employees includes, but is not limited to, attempts by management officials or representatives to be present during interviews.

5. Conducting Employee Interviews.

  a. General Protocols.

  ➢ At the beginning of the interview CSHOs should identify themselves to the employee by showing their credentials, and provide the employee with a business card. This allows employees to contact CSHOs if they have further information at a later time.

  ➢ CSHOs should explain to employees that the reason for the interview is to gather factual information relevant to a safety and health inspection. It is not appropriate to assume that employees already know or understand OSHA's purpose. Particular sensitivity is required when interviewing a non-English speaking employee. In such instances, CSHOs should initially determine whether the employee's comprehension of English is sufficient to permit conducting an effective interview. If an interpreter is needed, CSHOs should contact the General Services Administration (GSA) tele-interpreter.

  ➢ Every employee should be asked to provide his or her name, home address and phone number. CSHOs should request identification and make clear the reason for asking for this information.

  ➢ CSHOs shall inform employees that OSHA has the right to interview them in private and of the protections afforded under Section 11(c) of the Act. See also, OSHA Fact Sheet: Filing Whistleblower Complaints under Section 11(c) of the OSH Act of 1970.

  ➢ In the event that an employee requests that a representative of the union to be present, CSHOs shall make a reasonable effort to honor the request.

  ➢ If an employee requests that his/her personal attorney be present during the interview, CSHOs should honor the request and, before continuing with the interview, consult with the Area Director for guidance.

  ➢ An attorney for the employer may claim that individual employees have also authorized the attorney to represent them. Such a situation creates a potential conflict of interest. CSHOs should ask the affected employees whether they have agreed to be represented by the attorney. If the employees indicate that they have, CSHOs should consult with the Area Director, who will contact the RSOL.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 37 of 118
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

b. <u>Interview Statements</u>.

Interview statements of employees or other persons shall be obtained whenever CSHOs determine that such statements would be useful in documenting potential violations. Interviews shall normally be reduced to writing and written in the first person in the language of the individual. Employees shall be encouraged to sign and date their statement.

➢ Any changes or corrections to the statement shall be initialed by the individual. Statements shall not otherwise be changed or altered in any manner.

➢ Statements shall include the words, "I request that my statement be held confidential to the extent allowed by law" and end with the following; "I have read the above, and it is true to the best of my knowledge."

➢ If the person making the declaration refuses to sign, then the CSHO shall note the refusal on the statement. The statement shall, nevertheless, be read back to the person in an attempt to obtain agreement and then noted in the case file.

➢ A transcription of any recorded statement shall be made when necessary to the case.

➢ Upon request, if a management employee requests a copy of his/her interview statement, one shall be given to them.

c. <u>The Informant Privilege</u>.

➢ The informant privilege allows the government to withhold the **identity** of individuals who provide information about the violation of laws, including OSHA rules and regulations. CSHOs shall inform employees that their statements will remain confidential to the extent permitted by law. However, each employee giving a statement should be informed that disclosure of his or her identity may be necessary in connection with enforcement or court actions.

NOTE: Whenever CSHOs make an assurance of confidentiality as part of an investigation (i.e., informs the person giving the statement that their identity will be protected), the pledge shall be reduced to writing and included in the case file.

➢ The privilege also protects the contents of statements to the extent that disclosure may reveal the witness identity. Where the contents of a statement will not disclose the identity of the informant (i.e., do not reveal the witness' job title, work area, job duties, or other information that would tend to reveal the individual's identity), the privilege does not apply. Interviewed employees shall be told that they are under no legal obligation to inform anyone, including employers, that

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 38 of 118
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

they provided information to OSHA. Interviewed employees shall also be informed that if they voluntarily disclose such information to others, it may impair the Agency's ability to invoke the privilege.

J.  Multi-Employer Worksites.

On multi-employer worksites (in all industry sectors), more than one employer can be cited for a hazardous condition that violates an OSHA standard. A two-step process must be followed to determine whether more than one employer is to be cited. See CPL 02-00-124, *Multi-Employer Citation Policy*, December 10, 1999, for further guidance.

K.  Administrative Subpoena.

Whenever there is a reasonable need for records, documents, testimony,and/or other supporting evidence necessary for completing an inspection scheduled in accordance with any current and approved inspection scheduling system or an investigation of any matter properly falling within the statutory authority of the Agency, the Regional Administrator, or authorized Area Director or designee, can issue an administrative subpoena. See Chapter 15, Legal Issues.

L.  Employer Abatement Assistance.

1.  Policy.

CSHOs shall offer appropriate abatement assistance during the walkaround to explain how workplace hazards might be eliminated. The information shall provide the employee with guidance to develop acceptable abatement methods or to seek appropriate professional assistance. CSHOs shall not imply OSHA endorsement of any product through use of specific product names when recommending abatement measures. The issuance of citations shall not be delayed.

2.  Disclaimers.

The employer shall be informed that:

a.  The employer is not limited to the abatement methods suggested by OSHA;

b.  The methods explained are general and may not be effective in all cases; and

c.  The employer is responsible for selecting and carrying out an effective abatement method, and maintaining the appropriate documentation.

VIII.  Closing Conference.

A.  Participants.

At the conclusion of an inspection, CSHOs shall conduct a closing conference with the employer and the employee representatives, jointly or separately, as circumstances dictate. The closing conference can be conducted on-site or by telephone as CSHOs deem appropriate. If the employer refuses to allow a closing conference, the circumstances of the refusal shall be documented in OIS and the case shall be processed as if a closing conference had been held.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

NOTE:  When conducting separate closing conferences for employers and labor representatives (where the employer has declined to have a joint closing conference with employee representatives), CSHOs shall normally hold the conference with employee representatives first, unless the employee representative requests otherwise.  This procedure will ensure that worker input is received before employers are informed of violations and proposed citations.

B. Discussion Items.

1.  CSHOs shall discuss the apparent violations and other pertinent issues found during the inspection and note relevant comments on the *Violation Worksheet*, including input for establishing correction dates.

2.  CSHOs shall give employers the publication, "Employer Rights and Responsibilities Following a Federal OSHA Inspection," (OSHA-3000) which explains the responsibilities and courses of action available to the employer if a citation is issued, including their rights under the Small Business Regulatory Enforcement Fairness Act (SBREFA).  (See SBREFA on OSHA's public webpage.)  CSHOs shall then briefly discuss the information in the booklet and answer any questions.  All matters discussed during the closing conference shall be documented in the case file, including a note describing printed materials distributed.

3.  CSHOs shall discuss the strengths and weaknesses of the employer's occupational safety and health program and any other applicable programs, and advise the employer of the benefits of an effective program and provide information, such as OSHA's website, describing program elements.

4.  Both the employer and employee representatives shall be advised of their rights to participate in any subsequent conferences, meeting or discussions, and their contest rights.  Any unusual circumstances noted during the closing conference shall be documented in the case file.

5.  Since CSHOs may not have all pertinent information at the time of the first closing conference, a second closing conference can be held by telephone or in person.

6.  CSHOs shall advise employee representatives that:

a.  Under 29 CFR 2200.20 of the Occupational Safety and Health Review Commission regulations, if an employer contests a citation, the employees have a right to elect "party status" before the Review Commission;

b.  The employer should notify them if a notice of contest or a petition for modification of abatement date is filed;

c.  They have Section 11(c) rights (See also, OSHA Fact Sheet: Filing Whistleblower Complaints under Section 11(c) of the OSH Act of 1970.); and

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

      d. They have a right to contest the abatement date.  Such contests must be in writing and must be postmarked within 15 working days after receipt of the citation.

C. <u>Advice to Attendees</u>.

    1. The CSHO shall advise those attending the closing conference that a request for an informal conference with the OSHA Area Director is encouraged, as it provides an opportunity to:

      a. Resolve disputed citations and penalties without the need for litigation, which can be time-consuming and costly;

      b. Obtain a more complete understanding of the specific safety or health standards that apply;

      c. Discuss ways to correct the violations;

      d. Discuss issues concerning proposed penalties;

      e. Discuss proposed abatement dates;

      f. Discuss issues regarding employee safety and health practices; and

      g. Learn more about other OSHA programs and services available.

    2. If a citation is issued, an informal conference or the request for one does not extend the 15-working-day period during which the employer or employee representatives can contest.

    3. Oral disagreement or expression(s) during an informal conference, of intent to contest a citation, penalty, or abatement date does not replace the requirement that the employer's Notice of Contest be in writing.

    4. Employee representatives have the right to participate in informal conferences or negotiations between the Area Director and the employer in accordance with the guidelines given in Chapter 7, Section II, Informal Conferences.

D. <u>Penalties</u>.

CSHOs shall explain that penalties must be paid within 15 working days after the employer receives a *Citation and Notification of Penalty (OSHA-2)*.  If, however, an employer contests the citation and/or the penalty, penalties need not be paid for the contested items until the date that the citation/notification of penalty becomes a final order.

E. <u>Feasible Administrative, Work Practice, and Engineering Controls</u>.

Where appropriate, CSHOs will discuss control methodology with the employer during the closing conference.

    1. <u>Definitions</u>.

      a. <u>Engineering Controls</u>:  Consist of substitution, isolation, ventilation and equipment modification.

      b. <u>Administrative Controls</u>:  Any procedure that significantly limits daily exposure by manipulation of the work schedule or altering the organization of accomplishing the work is considered an

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 41 of 118
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

administrative control.  The use of personal protective equipment is not considered an administrative control.

c. <u>Work Practice Controls</u>:  Methods such as changing work habits, improving sanitation and hygiene practices, or making other changes in the way the employee performs the job, in order to reduce or eliminate employee exposure to the hazard.

d. <u>Feasibility</u>:  Abatement measures required to correct a citation item are feasible when they are capable of being done.  The CSHO, following current directions and guidelines, shall inform the employer, where appropriate, that a determination will be made about whether engineering or administrative controls are feasible.

e. <u>Technical Feasibility</u>:  The existence of technical know-how about materials and methods available or adaptable to specific circumstances, which can be applied to a cited violation with a reasonable possibility that employee exposure to occupational hazards will be reduced.

f. <u>Economic Feasibility</u>:  This means that the employer is financially able to undertake the measures necessary to abate the citations received.

NOTE:  If an employer's level of compliance lags significantly behind that of its industry, an employer's claim of economic infeasibility will not be accepted.

2. <u>Documenting Claims of Infeasibility</u>.

a. CSHOs shall document the underlying facts that may support an employer's claim of infeasibility.

b. When economic infeasibility is claimed, the CSHO shall inform the employer that, although the cost of corrective measures to be taken will generally not be considered as a factor in the issuance of a citation, it can be considered during an informal conference or during settlement negotiations.

c. CSHOs should avoid discussing complex issues regarding feasibility. These should be referred to the Area Director or designee for determination.

F. <u>Reducing Employee Exposure</u>.

Employers shall be advised that, whenever feasible, engineering, administrative, or work practice controls must be instituted, even if they are not sufficient to eliminate the hazard completely (or to reduce exposure to or below the permissible exposure limit).  Such controls are required in conjunction with personal protective equipment to further reduce exposure to the lowest practical level.

G. <u>Abatement Verification</u>.

During the closing conference the Compliance Officer should thoroughly explain to the employer the abatement verification requirements.  See Chapter 7, Post Inspection Procedures and Abatement Verification.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 42 of 118
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

1. Abatement Certification.

   Abatement certification is required for each citation item(s) that the employer receives, except those identified as "Corrected During Inspection."

2. Corrected During Inspection (CDI).

   Violations that will reflect on-site abatement and will be identified in the citations as "Corrected During Inspection" shall be reviewed at the closing conference.

3. Abatement Documentation.

   Abatement documentation, the employer's physical proof of abatement, is required to be submitted along with each willful, repeat, and designated serious violation. To minimize confusion, the distinction between abatement certification and abatement documentation should be discussed.

4. Placement of Abatement Verification Tags.

   The required placement on movable equipment of either abatement verification tags or the citation must also be discussed at the closing conference, if it has not been discussed during the walkaround portion of the inspection. See §1903.19(i).

5. Requirements for Extended Abatement Periods.

   Where extended abatement periods are involved, the requirements for abatement plans and progress reports shall be discussed.

H. Employee Discrimination.

The CSHO shall emphasize that the Act prohibits employers from discharging or discriminating in any way against an employee who has exercised any right under the Act, including the right to raise safety concerns, request personal protective equipment, report work-related injuries or illnesses, make safety or health complaints, or to request or participate in an OSHA inspection.

IX. Special Inspection Procedures.

A. Follow-up and Monitoring Inspections.

The primary purpose of a follow-up inspection is to determine if the previously cited violations have been corrected. Monitoring inspections are conducted to ensure that hazards are being abated and employees protected, whenever a long period of time is needed for an establishment to come into compliance (or to verify compliance with the terms of granted variances). Issuance of willful, repeated, and high gravity serious violations; failure to abate notifications; and/or citations related to imminent danger situations are examples of candidates for follow-up or monitoring inspections. The Area Director has discretion to conduct a follow-up inspection where the employer fails to submit the required abatement certification or documentation within the time permitted by §1903.19, or where the employer submits abatement documentation that does not adequately demonstrate that the cited violations have been corrected. (See Chapter 7, Section X.C).

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

Case 6:24-cv-00271-ADA-DTG    Document 50    Filed 10/09/24    Page 43 of 118
* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

1. Failure to Abate.

   a. A failure to abate violation exists when a previously cited violation continues unabated and the abatement date (as issued or amended by a settlement agreement) has passed or the abatement date is covered under a settlement agreement, or the employer has not complied with interim measures within the allotted time specified in a long-term abatement plan.

   b. If previously cited items have not been corrected, a Notice of Failure to Abate Alleged Violation shall normally be issued.

      NOTE:  If the employer has demonstrated a good faith effort to comply, a late Petition for Modification of Abatement (PMA) can be considered in accordance with Chapter 7, Section III, Petition for Modification of Abatement (PMA).

   c. If an originally cited violation has at one point been abated but subsequently recurs, a citation for a repeated violation may be appropriate.

   d. If, after issuing a Failure to Abate Violation, a subsequent inspection indicates the condition has still not been abated, the RSOL shall be consulted for further guidance.

2. Follow-Up Inspections.

   a. For any items found to be abated, a copy of the previous *Violation Worksheet* or citation can be noted as "corrected," along with a brief explanation of the abatement measures taken.  This information can also be included in the narrative of the investigative file.

   b. In the event that any item has not been abated, complete documentation shall be included on a *Violation Worksheet.*  Failure to Abate violations are issued as a part of the inspection where the hazardous condition, practice, or non-complying equipment was previously cited.  Repeated violations, if any, are issued only in the follow-up inspection, although a reference to previous inspections should be made in the AVD (see Chapter 4, Sections VII.F and VII.G.5).

3. Monitoring Inspections.

   Monitoring Inspections shall be coded as such in OIS.  If monitoring inspections are part of a Corporate-Wide Settlement Agreement (CSA) or other settlement agreement, then notification shall be sent to the National Office through the respective Regional Offices where the monitoring inspections occur.

B. Construction Inspections.

   1. Standards Applicability.

      The standards published as 29 CFR Part 1926 have been adopted as occupational safety and health standards under Section 6(a) of the Act and §1910.12.  They shall apply to every employment and place of employment of every employee engaged in construction work, including non-contract construction.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This is an OSHA ARCHIVE Document, and may no longer represent OSHA policy.

2. <u>Definition</u>.

The term "construction work" as defined by §1926.32(g) means work for construction, alteration, and/or repair, including painting and decorating. These terms are also discussed in §1926.13. If any question arises as to whether an activity is deemed to be "construction" for purposes of the Act, the Director of the Directorate of Construction shall be consulted.

3. <u>Employer Worksite</u>.

a. Inspections of employers in the construction industry are not easily separable into distinct worksites. The worksite is generally the site where the construction is being performed (e.g., the building site, the dam site). Where the construction site extends over a large geographical area (e.g., road building), the entire job will be considered a single worksite. In cases when such large geographical areas overlap between Area Offices, generally only operations of the employer within the jurisdiction of any Area Office will be considered as the worksite of the employer.

b. When a construction worksite extends beyond a single Area Office and the CSHO believes that the inspection should be extended, the affected Area Directors shall consult with each other and take appropriate action.

4. <u>Upon Entering the Workplace</u>.

a. CSHOs shall ascertain whether there is a representative of a federal contracting agency at the worksite. If so, they shall contact the representative, advise him/her of the inspection and request that the representative attend the opening conference.

b. If the inspection is being conducted as a result of a complaint, a copy of the complaint should be given to the general contractor and any affected sub-contractors.

5. <u>Closing Conference</u>.

Upon completion of the inspection, the CSHO shall confer with the general contractor(s) and all appropriate subcontractors or their representatives, together or separately, and advise each one of all the apparent violations disclosed by the inspection to which each establishments employees were exposed, or violations which the employer created or controlled. Employee representatives participating in the inspection shall also be afforded the right to participate in the closing conference(s).

C. <u>Federal Agency Inspections</u>.

Policies and procedures for federal agencies are to be the same as those followed in the private sector. See Chapter 13, Federal Agency Field Activities.

* OSHA ARCHIVE DOCUMENT *
NOTICE: This document is presented here as historical content, for research and review purposes only.

**U.S. Department of Labor**　　　Occupational Safety and Health Administration
Washington, D.C. 20210

Reply to the attention of:

APR 2 5 2017

MEMORANDUM FOR:　　REGIONAL ADMINISTRATORS

THROUGH:　　　　　　*Dorothy Dougherty*
DOROTHY DOUGHERTY
Deputy Assistant Secretary for OSHA

FROM:　　　　　　　*Thomas Galassi*
THOMAS GALASSI
Director, Directorate of Enforcement Programs

SUBJECT:　　　　　　Rescission of February 21, 2013 letter to Mr. Steve Sallman and
Update to the OSHA Field Operations Manual

The memorandum replaces guidance provided in OSHA's February 21, 2013 letter to Mr. Steve
Sallman regarding workers at a worksite without a collective bargaining agreement designating a
person affiliated with a union or a community organization to act on their behalf as a walkaround
representative.

Section 8(e) of the OSH Act provides that, "[s]ubject to the Secretary's regulations, a
representative of the employer and a representative authorized by his employees shall be given
an opportunity to accompany the Secretary or his authorized representative during the physical
inspection of any workplace . . . for the purpose of aiding such inspection." 29 U.S.C. § 657(e).
In turn, 29 CFR 1903.8(c) clarifies that although generally "[t]he representative(s) authorized by
employees shall be an employee(s) of the employer," where good cause is shown and where
"reasonably necessary to the conduct of an effective and thorough physical inspection of the
workplace," a Compliance Safety and Health Officer (CSHO) may allow a third party who is not
an employee of the employer to accompany the CSHO during the inspection.

Given the express guidance in the statute and the applicable regulation, OSHA is withdrawing
the February 21, 2013 letter to Mr. Sallman as unnecessary. Likewise, the guidance in this
memorandum supersedes OSHA Instruction CPL 02-00-160, Field Operations Manual (FOM)
(8/2/2016), Chapter 3, Section VII.A, which will be revised accordingly. This memorandum
supersedes the memorandum dated April 12, 2017, on the same subject.



**Eric J. Conn**
econn@connmaciel.com
**202-909-2737**

November 13, 2023

Douglas Parker
Assistant Secretary of Labor for OSHA
U.S. Department of Labor – OSHA
200 Constitution Avenue, N.W.
Washington, DC 20210

**Re:  Docket No. OSHA-2023-0008**
**Proposed Rule – Worker Walkaround Representative Designation Process**

Dear Assistant Secretary Parker:

On behalf of the *Employers Walkaround Representative Rulemaking Coalition* ("Coalition"), we are pleased to submit comments addressing the Occupational Safety and Health Administration's ("OSHA" or "the Agency") August 30, 2023, proposal to amend 29 C.F.R. 1903.8(c) – the "Worker Walkaround Representative Designation Process" Rule (Docket No. OSHA-2023-0008) (hereafter "the Proposal" or "proposed rule").

The Coalition is composed of a broad and diverse group of employers and trade associations representing many industries, including retail, manufacturing, energy production, petroleum refining and pipeline/terminal operations, construction, logistics, food manufacturing and distribution, grain, feed and agricultural product processing, steel manufacturing, chemical manufacturing, environmental services, and more,[1] with millions of employees across thousands of workplaces in every state in the Nation. The common thread among our members is that they are or represent responsible and conscientious employers who care deeply about their employees' safety and health. As its members will be directly impacted by the proposed rule, the Coalition has a substantial interest in the outcome of this rulemaking.

**I.     Introduction and Summary**

For more than five decades, OSHA has partnered with employers to improve working conditions and increase safety and safety awareness in workplaces across the country. As a result, during that period, worker injuries, illnesses, and deaths have decreased dramatically.[2] While on its face, the Proposal seeks to change only a few words of a single regulation, under the surface, it represents a significant change to the OSHA's longstanding

---

[1] The federal government has affirmatively recognized many of the entities in our Coalition as essential critical infrastructure, crucial for community resilience and the continuity of significant functions including U.S. supply chains.

[2] OSHA notes that its efforts, and those of employers and others, "have had a dramatic effect on workplace safety." https://www.osha.gov/data/commonstats#:~:text=Worker%20fatalities,full%2Dtime%20equivalent%20workers).

approach to physical inspections of American workplaces and raises novel and complex issues of law. The Proposal represents a noteworthy and unwelcome change to the fifty plus years in which OSHA has focused on its mission – helping make American workplaces safer.

These comments address the lack of a documented workplace safety-related justification for the proposed change in regulatory language. The Proposal does not demonstrate that a single workplace inspection in OSHA's history has been insufficient in any way under the current regulatory scheme, and offers no explanation for how the proposed regulation will improve the quality or outcome of OSHA's workplace inspections.

The comments then address how the Proposal conflicts with various laws. At a fundamental level, we address the Coalition's serious concerns about the constitutionality of the proposed rule, and we note several ways the Proposal conflicts with the OSH Act and established statutory and regulatory interpretations (improperly changing the meaning of the OSH Act and exceeding OSHA's authority), as well as the National Labor Relations Act (ignoring established protocols for the selection of employee representatives). In that regard, the comments address concerns with OSHA inserting itself into an issue – labor union organizing – that has made the National Labor Relations Board a hotbed of contention and dissension, notorious for its partisan oscillation. Workplace safety should never be politicized, and the federal agency responsible for overseeing it should not be seen as pursuing political or ideological goals that distract that Agency from what should be a singular focus on workplace safety.

We then address the many unanswered questions about and practical challenges created by implementation of the amended rule; e.g., how the designation process will work, what standards apply to the various elements of the designation process, and what recourse employers may have if they oppose a particular third party's participation in an inspection.

Finally, we address how the Proposal reflects misguided policy, by failing to acknowledge the substantial risks and burdens on employers caused by the presence of third parties who are traditionally not allowed in workplaces by employers.

For all these reasons, the Coalition urges the Agency to reconsider this ill-advised rulemaking. At a minimum, the proposed rule should be revised consistent with the recommendations herein to promote workplace safety and address legal and operational concerns. Each of these issues is discussed more fully below.

## II.    OSHA Fails to Demonstrate the Problem that the Proposal Is Designed to Address or How the Proposal Will Improve Workplace Safety.

Executive Order 12866 establishes the guiding principles that executive agencies must follow when developing regulations. It begins with a recitation of "The Principles of Regulation," the very first of which is that "[e]ach agency shall identify the problem that it intends to address … as well as assess the significance of that problem."[3] The Supreme Court agrees, and has stated: "Agencies are free to change their existing policies as long as they

---

[3] Executive Order 12866, at Sec. 1(b)(1).

provide a reasoned explanation for the change."[4] In so doing, "of course the agency must show that there are good reasons for the new policy."[5] At a minimum, the Agency must establish the existence of a problem, support it with evidence and then show that its proposed solution will address the identified problem.[6] The Proposal falls far short of this basic standard.

The Proposal states at the outset that the Agency "has preliminarily determined that the proposed changes will aid OSHA's workplace inspections by better enabling employees to select a representative of their choice to accompany the CSHO during a physical workplace inspection."[7] Similarly, in Assistant Secretary Doug Parker's written statement before the U.S. House of Representatives' Subcommittee on Workforce Protections, he said: "This proposal aims to make inspections more effective and ultimately make workplaces safer *by increasing opportunities for employees to be represented in the inspection process*."[8] However, the Proposal presents no evidence of a single OSHA inspection that has been negatively impacted in any way, or that any employees have been thwarted in their opportunity or ability to be adequately represented during an OSHA inspection, under the existing regulation, much less explain how the Proposal will "better enable" such employees to select a representative in the future or how that will improve the effectiveness of OSHA inspections.

Under the existing standard, a CSHO already must determine that a third party employee representative's participation is reasonably necessary to the conduct of an effective and thorough inspection, and OSHA conducts, on average, more than 30,000 inspections every year for decades. Therefore, the regulated community should reasonably expect that a proposed rule like this will present data or even anecdotes demonstrating that employees have been prevented from selecting appropriate and effective representatives of under the existing regulatory scheme, or that OSHA's effectiveness in a non-marginal number of its inspections has been hampered by employees' supposed inability to do so. Nor does the Proposal include any information that would demonstrate that:

1. Employees have sought non-employee OSHA inspection representation and been denied;

2. Accompaniment by a non-employee third party benefits the conduct of an effective and thorough physical safety inspection of the workplace;

3. OSHA needs additional resources, personnel, or expertise to conduct effective and thorough physical inspections of the workplace; or

4. A third party is better equipped to provide such resources or expertise to promote workplace safety than OSHA itself, the agency statutorily charged with this mission.

---

[4] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

[5] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[6] *Encino Motorcars*, 579 U.S. at 221 ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions.").

[7] Federal Register, August 30, 2023 at p. 59826.

[8] https://www.osha.gov/news/testimonies/09272023 (emphasis added).

Absent evidence that OSHA inspections are being detrimentally affected by 1903.8(c) in its current form, the Proposal appears to be a solution in search of a problem.[9]

To be fair, OSHA does claim that for one inspection in 2012 (even before the Agency wrote the so-called "Fairfax Letter" in 2013 that was the precursor to this rulemaking), employees chose a community organization's attorney and a former employee as representatives, which was purportedly "very beneficial" to the inspection because many of the workers "were not fluent in English." The Agency asserts that in that instance, "having representatives who the workers trusted and facilitated communications with the CSHO enabled OSHA to conduct numerous workplace interviews and better investigate workplace conditions."[10] That one inspection took place more than ten years ago, and it proceeded with OSHA's and the employees' desired third party representative under the existing regulation, which again raises the question of why OSHA believes a change is necessary. The example suggests nothing more than a potential need for more or better-skilled language interpreters available to OSHA (or within OSHA). But if OSHA's concern is potential language barriers, it would be better to either hire bilingual CSHOs or directly engage translators as OSHA's agents for use during inspections.

OSHA's failure to identify a purported problem that this rulemaking intends to solve renders the Proposal unnecessary and contrary to the guiding principles of E.O. 12866, so the Agency should withdraw the Proposal.

### III.    The Proposal Conflicts with the OSH Act and Established Interpretations.

#### A.   The Proposal Conflicts with The OSH Act.

The OSH Act at 29 U.S.C. 657(e) allows for "a representative authorized by his employees" to be given an opportunity to "accompany" a CSHO during the physical inspection of the workplace "for the purpose of aiding such inspection." The term "*a* representative" conveys the straightforward meaning of a single individual. The term "accompany" is defined by the Black's Law Dictionary as "to go along with (another); to attend," in contrast to the term "participation," defined as "the act of taking part in something, such as a partnership, a crime, or a trial."[11] OSHA's proposed amendments to 29 C.F.R. § 1903.8(a) subvert these clear, simple terms in the OSH Act. Although it is established law that a regulation cannot change a statute,[12] the proposed rule attempts to do just that.

Whereas the OSH Act permits employees a single inspection representative, the current version of 29 C.F.R. § 1903.8(a) already purports to permit "additional representative*s*" where the CSHO determines that such additional representatives will further aid the inspection. The

---

[9] Doug Parker testified to Congress on September 27, 2023, that "what we have seen over the course of the 52 years since the signing of the OSH act, is that there is less and less worker participation," but OSHA has shown no evidence of this.

[10] Federal Register, August 30, 2023 at p. 59830.

[11] ACCOMPANY and PARTICIPATION, Black's Law Dictionary (11th ed. 2019)

[12] *Public Lands Council v. Babbitt*, 529 U.S. 728, 745 (2000).

Proposal would further amend the regulation to reference even more plural pronouns, indicating OSHA's intention to further improperly change the meaning of the OSH Act. The Proposal lacks any defined restrictions on the number of third party representatives that employees can "authorize" or the number that CSHOs can approve. OSHA exceeded its authority when it enacted the current regulation, and it should not compound that error by retaining the same language and adding plural pronouns in the Proposed rule, which only a single employee representative is permitted under the Act. Doing so directly conflicts with the OSH Act and makes the Proposed rule vulnerable to legal challenge.

In addition, the proposed change from "accompaniment" to "participation" implies that authorized representatives will take a more active role in the inspection process, which is not authorized by the OSH Act. The Proposal is silent on what "participation" entails, but the OSH Act and current regulations allow OSHA's CSHOs to "question privately" non-supervisory employees and "review records."[13] Does OSHA intend to permit authorized third party representatives to "participate" in private employee interviews? To ask their own questions during those interviews? To gain access to records that employers are compelled to produce to OSHA pursuant to the Agency's broad administrative subpoena authority? To make their own document requests to employers? This seems inconceivable, but there is no context why the word "participation" was written into the Proposal.

Section 8(e) of the OSH Act underscores that the purpose of allowing a representative authorized by employees to accompany a CSHO during a physical inspection is "for the purpose of aiding such inspection."[14] The intent was for someone familiar with the workplace and the workforce to aid CSHOs with their physical inspections. The OSH Act's legislative history also indicates that there has always been a concern about potential abuse, even when OSHA contemplated only employees and union representatives. "The potential abuse of this device as part of an organizing campaign or as part of an effort to ferment labor unrest is obvious."[15] To avoid such abuse, Congress' stated intent was to align the meaning of *authorized representative* with that term under the National Labor Relations Act ("NLRA"). Hence, in cases where no union had been elected at the workplace, CSHOs would consult with a reasonable number of employees regarding health and safety matters in the workplace, per 29 U.S.C. 657(e). The concern for potential abuse remains valid today, and expanding the scope of who can be designated as an authorized representative significantly exacerbates this concern.

The OSH Act further demonstrates that the designation by employees of an OSHA inspection representative must reflect the will of employees as a whole, not a lone employee or small, non-representative group of employees. Section 8(e) of the OSH Act provides that the walkaround representative must be "authorized by his *employees*[.]"[16] Congress' use of the plural "employees" indicates that the entire body of employees of an employer, acting *as*

---

[13] 29 C.F.R. § 1903.3(a).

[14] "Aid" means "help, assist, or support (someone or something) in the achievement of something." (Google "aid definition")

[15] *Legislative History of the Occupational Safety and Health Act of 1970*, U.S. Government Printing Office Washington, 1971, page 1224.

[16] 29 U.S.C. § 657(e) (emphasis added).

*a whole* must "authorize" the walkaround representative to act on their behalf. This is consistent with the fact that the plain language of Section 8(e) of the OSH Act permits only a single authorized representative: thus, "a representative" (singular) "authorized by [the] employees" (plural) "shall be given an opportunity to accompany [the CSHO] during the physical inspection[.]"[17] This statutory language precludes any one-off or ad hoc "authorization" by an individual employee or small group of employees. Instead, acting together, *the employees as a whole* must select and authorize *a single representative* to accompany the CSHO.[18]

### B.  The Proposal Conflicts with Long-Standing Regulations and Interpretations

As will be discussed below, since 1971 OSHA has defined "authorized employee representative" to mean "a labor organization that has a collective bargaining relationship with the cited employer and that represents affected employees."[19] Another regulation likewise defines "authorized employee representative" as "an authorized collective bargaining agent of employees."[20] Expanding the meaning of an "authorized employee representative" to any third party with relevant knowledge, skills, or experience with hazards or conditions in the workplace or similar workplaces, or language skills, directly conflicts with these well-established definitions.

Over five decades, a stable interpretation of the meaning of "authorized employee representative" has allowed employers, employees, unions, and OSHA to work efficiently and reasonably with each other, including, where applicable, through joint union-management safety committees. The long-standing interpretation reflects a considered and informed approach to workplace safety inspections. Expanding the definition will disrupt established practices, create substantial financial and operational burdens on companies, and lead to confusion. Because the original legislative intent behind the walkaround rule has not changed, a consistent interpretation that aligns with that intent should be maintained.

## IV.   The Proposal Conflicts with the National Labor Relations Act

### A.  The Proposal Undermines the NLRA's Principle of Majority Support

In non-union workplaces, allowing third parties who have not demonstrated majority support to assume and exercise representational rights over employees directly contradicts the NLRA. Section 8(e) of the OSH Act affords an opportunity for "a representative authorized by" the employees of an employer to accompany a CSHO "during the physical inspection" of

---

[17] 29 U.S.C. § 657(e).

[18] Because Section 8(e) provides for "a representative," the Proposal cannot allow more than one authorized representative. *See United States v. Larianoff*, 97 S.Ct. 2150, 2156 (1977) ("regulations, in order to be valid must be consistent with the statute under which they are promulgated.").

[19] *See* Footnote 24, *infra*.

[20] 29 C.F.R. § 1904.35(b)(2)(i).

that employer's workplace.[21] Since 1971, the relevant regulation has stated that a walkaround representative "shall be an employee(s) of the employer."[22] Despite this limiting language, where, at the time of a physical inspection, the employees are represented by a labor union certified pursuant to the NLRA, OSHA allows for an exception to the rule and defers to that union to select the walkaround representative, even where the union official or representative is not an employee of the employer.[23] OSHA's proposed amendments to 29 C.F.R. § 1903.8(a), however, would grant that same authority to unions even in workplaces where employees have not elected a union to represent them. In that regard, the Proposal directly contradicts the NLRA, as it would allow labor unions that have not demonstrated majority support to assume and exercise representational rights over employees.

Indeed, OSHA has long treated certified labor unions as the authorized representative of employees for walkaround purposes, operating under a consistent understanding that where the workers are lawfully represented by a labor union as certified pursuant to the NLRA, that certification in effect serves as a proxy for "authorization" within the meaning of the OSH Act's Section 8(e). In fact, OSHA's original procedural rules expressly defined "authorized employee representative" in terms of "certification" by the NLRB: "A labor organization *certified by the National Labor Relations Board* as a bargaining representative for the effected employees,"[24] and OSHA's current Field Operations Manual states that "the highest ranking union employee representative onsite shall designate who will participate in the walkaround."[25]

While Section 8(e) allows an authorized representative "an opportunity to accompany" the CSHO during the physical inspection, it notes that "[w]here there is no authorized employee representative," the CSHO "shall consult with a reasonable number of employees concerning matters of health and safety in the workplace."[26] This language suggests two options: (1) if the employees are represented by a *certified labor union*, that union must be given an opportunity to accompany the CSHO; but (2) where employees are not already represented by a certified labor union, the CSHO will instead consult directly with a reasonable number of employees about workplace conditions, not about inspection representatives. This approach is easy to understand and simple to enforce. Either the

---

[21] 29 U.S.C. § 657(e).

[22] 29 C.F.R. § 1903.8(c).

[23] The Proposal states that OSHA has encountered third party employee representatives "in union workplaces where employees have designated a union representative, such as an elected local union leader, business agent, or safety and health specialist, to be their representative for the walkaround inspection," and "[t]hese representatives are often employees of the union rather than the employer being inspected." Fed. Reg., August 30, 2023 at p. 59830. Deferring to the certification process under the NLRA may be consistent with Sec. 4(b)(1) of the OSH Act. *See* 29 U.S.C. § 653(b)(1).

[24] 29 C.F.R. § 2200.1(f) (1971) (emphasis added). Although slightly modified over the years, the core of the definition has remained the same. *See* 29 C.F.R. 2200.1(g) ("Authorized employee representative means a labor organization that has a collective bargaining relationship with the cited employer and that represents affected employees who are members of the collective bargaining unit.") (2019).

[25] *Field Operations Manual*, Ch. 3, Sec. VII(A)(1). (https://www.osha.gov/enforcement/directives/cpl-02-00-164).

[26] 29 U.S.C. § 657(e).

workplace being inspected by OSHA is unionized, or it is not. If there is a certified union at the workplace, a union representative may accompany the CSHO for purposes of aiding the inspection, but if not, the CSHO will consult with employees themselves about working conditions. The CSHO is not in charge of holding a representation election on the spot, or determining the myriad issues that consistently accompany such a designation. Speaking generally, most unionized employers will likely have little difficulty accepting that the "representative authorized by his employees" within the meaning of the OSH Act is the same labor union already certified under the auspices of the NLRA to represent those employees.[27]

The Proposal, however, asserts that third party representation "may also arise" in non-union workplaces "where employees have designated a representative from a … labor union to serve as their representative in an OSHA inspection."[28] But representation rights under the NLRA have always been premised on the concept of majority support.[29] OSHA's proposed rule directly contradicts this principle insofar as it would bestow representational rights on labor unions that have not demonstrated majority support by the employees.[30] Simply stated, labor unions that do not establish majority support do not have representation rights. Indeed, it is unlawful for an employer to recognize a minority union.[31] The Proposal fails to discuss how employees may "designate" a representative from a labor union at a non-union workplace, but if OSHA intends to permit any designation process short of the processes set forth under the NLRA, it would be unlawful.

In addition, the Proposal would violate the Section 7 rights of individual employees by imposing union representation on employees who do not wish to be represented. Except where a certified labor organization has a collective bargaining agreement with an employer requiring membership in the union, Section 7 provides every employee the "right to refrain" from being represented by a labor union for any purpose.[32] Accordingly, unless and until a labor union secures majority support and certification through the NLRA, employees retain the absolute right not to be "represented" or, more accurately, not to have representation thrust upon them by less than a majority of their fellow employees for any purpose, including for purposes of OSHA inspections.

---

[27] *See also* 29 U.S.C. § 159(a) (certified representatives "shall be the *exclusive* representatives of all the employees in such unit") (emphasis added).

[28] Federal Register, August 30, 2023 at p. 59830. There may be little distinction between the groups listed, for where a "worker advocacy group" or "community organization" "exists for the purpose, *in whole or in part,* of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work," that entity is a "labor organization" within the meaning of the NLRA. 29 U.S.C. § 152(5) (emphasis added).

[29] 29 U.S.C. § 159(a).

[30] 29 U.S.C. § 159(a) (representatives must be designated or selected "by the majority of employees").

[31] 29 U.S.C. § 158(a)(2).

[32] 29 U.S.C. § 157 ("Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, *and shall also have the right to refrain from any or all of such activities*[.]") (emphasis added).

The NLRA statutory definition of "employee" excludes supervisors, agricultural laborers, domestic workers, individuals employed by a parent or spouse, independent contractors, 29 U.S.C. § 152(3) excludes managers, guards, and confidential and clerical employees, and 29 U.S.C. § 159(a) limits the representation rights of even certified labor unions to "appropriate" bargaining units. In contrast, the OSH Act has no such limitations and includes all employees of an employer.[33] Because "authorization" under the OSH Act must come from a much broader group of employees, including supervisors, managers, clerical employees and guards, the showing to demonstrate majority support under the OSH Act is higher, not lower, than the standard under the NLRA.

Simply put, a CSHO cannot allow accompaniment by an employee walkaround representative unless that representative has been authorized by a majority of all employees of the employer. Accordingly, to the extent the Proposal would allow a walkaround representative (or, in contradiction with the OSH Act, more than one such representative) to be "authorized" or "designated" by less than a majority of the employer's employees, it marks a drastic and unlawful departure from the concept of majority support underlying both the NLRA and the text of Section 8(e) of the OSH Act.

### B. The Proposal Conflicts with the NLRA in Numerous Other Important Ways.

The NLRA states that certified representatives "shall be the *exclusive* representatives of all the employees in such unit[.]"[34] This raises serious questions about application of OSHA's proposed rule. For example, if employees in a unionized workforce authorize a representative from a different union or some other organization, which representative will the CSHO recognize? If a union seeks to persuade employees to vote for a particular union member to be the OSHA workaround representative, could they be considered to be attempting to "restrain or coerce" an employee in the exercise of Section 7 rights in a manner that constitutes an unfair labor practice?[35] If a certified union questions its members during that designation process, or maintains or enforces membership rules requiring members to "authorize" only that union's preferred walkaround representatives, would it be committing an unfair labor practice? Under the NLRA, an employer commits an unfair labor practice when it interrogates or questions employees about union activities or sympathies.[36] Would an employer commit an unfair labor practice under this provision merely by asking a CSHO for proof of which employees "authorized" the purported representative, or by questioning employees about their support for the supposedly authorized representative? In this context, the Proposal raises numerous troubling questions about the procedure (or more accurately, the lack of procedure) by which employees may "authorize" a representative for walkaround purposes.

---

[33] See 29 U.S.C. § 652(6) ("The term 'employee' means an employee of an employer who is employed in a business of his employer which affects commerce."); and 29 C.F.R. § 1910.02(d) (same)

[34] 29 U.S.C. § 159(a) (emphasis added).

[35] 29 U.S.C. § 158(b)(1)(A).

[36] 29 U.S.C. § 158(a)(1).

Whatever its other merits, the Agency's longstanding deferral to the certification process of the NLRA at least establishes certainty. In contrast, the Proposal would create uncertainty and chaos, placing CSHOs squarely in the middle of labor-management disputes, contrary to longstanding OSHA policy.[37] The further OSHA strays from the certification process under the NLRA, the more troubling is the absence of any formal process or standards in the Proposal by which an "authorized representative" is designated. The Proposal states without elaboration that "the CSHO considers a range of factors when determining who can participate in the walkaround inspection as a representative authorized by employees."[38] Who notifies the CSHO? Must the CSHO blindly accept any such notification? What if there are competing notifications? Who gets to authorize a representative? Is there a vote? When and where does that vote take place? Is there a secret ballot, or do employees have to declare their support publicly? Is there a paper ballot, or a show of hands? Do employees from other shifts, or those on vacation or medical leave have a vote? Who counts the votes and when and where does that happen? How are votes challenged, and who resolves those challenges?

Even the existing regulation obliquely recognizes the lack of a formal process for designating an employee representative, stating: "if the Compliance Safety and Health Officer is *unable to determine with reasonable certainty* who is such representative, he shall consult with a reasonable number of employees concerning matters of safety and health in the workplace."[39] Even worse, the Proposal (and especially the questions OSHA presents in the Proposal) treats the CSHO as largely a passive observer in the process, stating: "Once the CSHO *is notified* that the employees have authorized a third party to represent them during a walkaround inspection, the CSHO would allow the third party to participate in the inspection so long as the CSHO determines that they would be reasonably necessary to aid in the inspection."[40]

Finally, the Proposal conflicts with longstanding labor law precedent that employers may exclude union agents from their property, subject only to two very limited exceptions— where the union cannot access the employees through other reasonable means, or when the employer discriminatorily enforces its property rights.[41] While Section 7 of the NLRA provides certain access rights to employees for union purposes, non-employees of the employer, including union representatives, have no right to access an employer's private property. Under Supreme Court precedent in *NLRB* v. *Babcock & Wilcox Co.*, OSHA (or any other agency) cannot grant non-certified labor unions access to an employer's private

---

[37] *Field Operations Manual*, Ch. 3, Sec. IV(G)(3) ("Under no circumstances are CSHOs to become involved in a worksite dispute involving labor management issues or interpretation of collective bargaining agreements."). *See also Field Operations Manual*, Ch. 3, Sec. IV(H)(2)(c) ("During the inspection, CSHOs will make every effort to ensure that their actions are not interpreted as supporting either party to the labor dispute.")

[38] Federal Register, August 30, 2023 at p. 59830.

[39] 29 C.F.R. § 1903.8(b) (emphasis added).

[40] Federal Register, August 30, 2023 at p. 59830.

[41] *See NLRB* v. *Babcock & Wilcox Co.*, 351 U.S. 105 (1956) (upholding private property rights of owner against intrusion of nonemployee organizers); and *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992).

property. The access rights reflected in OSHA's proposed rule would upend decades of settled labor law under the NLRA.

## V.    The Proposal is Administratively Unworkable.

### A.  Scope of Proposed Amendments

In several ways, the Proposal significantly expands the scope of individuals who can be designated as third party authorized representatives, creating unworkable practical challenges for employers. One significant change is the removal of the specific requirement that the authorized representative must be an employee of the employer, with only *limited* exceptions. Instead, the Proposal explicitly states that "the representative(s) authorized by employees may either be an employee of the employer or a third party ...." The Proposal also amends the regulation to reference plural pronouns and lacks any defined restrictions on the number of third party representatives employees can "authorize" or the number that CSHOs can approve. The proposed rule no longer lists only industrial hygienists and safety engineers—credentialled, specially-educated technical safety experts—as the limiting examples of the type of acceptable authorized representatives. Finally, the proposed rule broadens the scope of third party representatives to include anyone having "good cause" to "participate" because of their "relevant knowledge, skills, or experience with hazards or conditions in the workplace *or similar workplaces*, or language skills." These amendments signify a shift away from emphasizing the authorized representative's technical expertise, toward a more generic relationship to the subject of the inspection that is not unique to technical experts or specific to the relevant workplace.

These changes leave room for a litany of third parties not expert in the employer's operations and who may never even have been to the subject workplace to "participate" in the inspection. There are many important concerns that arise from this shift. For example, as discussed above, the Proposal is silent regarding the process CSHOs will follow for making this determination. The Proposal fails to specify whether evidence must be provided to the CSHO before the determination, the required standard of proof CSHOs will apply in making their determinations, employers' avenues for contesting the designation or the CSHOs' determinations, and the existence of any appeal process. These seemingly minor proposed revisions have significant implications that will undoubtedly adversely impact employers and OSHA's inspections.

These changes create a system in which otherwise unauthorized third parties can gain access to employers' private workplaces and their workforces without providing employers any recourse to protect their rights, their employees, and their workplaces. The consequences of these changes are substantial. For instance, union representatives at non-union workplaces might use it to improperly solicit and campaign to employees during work hours on company property. Plaintiffs' attorneys (or their selected "experts") could potentially use this provision to conduct pre-litigation discovery in personal injury or wrongful death actions in a way that is not allowed under the Federal Rules of Civil Procedure. Worker advocacy groups and community organizations without applicable safety

expertise could similarly use it to organize employees in a non-union workplace or scrounge up potential litigation for plaintiff's attorneys. Competitors or security threats could gain access to proprietary or security information and cause great economic or physical harm. These scenarios underscore the potential risks and challenges that employers will encounter as a result of the proposed amendments.

Furthermore, the change from "accompaniment" to "participation" implies that authorized representatives will have a more active role in the OSHA inspection process than under the current rule. This change appears to conflict with the plain meaning of 29 U.S.C. 657, which explicitly states that "a representative authorized by his employees shall be given an opportunity to *accompany* the Secretary or his authorized representative during the physical inspection of any workplace ...."[42] The unacknowledged shift from "accompany" (as it is stated in the OSH Act and the existing regulatory text) to "participation" in the proposed rule raises crucial questions about the extent of the authorized representative's involvement, OSHA's authority to make such an amendment, and the legality of delegating CSHO inspection authority to private, non-governmental individuals.

### B.  Lack of Designation Process

Despite the Proposal being titled "Worker Walkaround Representative _Designation Process_," neither the proposed rule nor its brief preamble say anything about an actual process for selection, designation, and implementation of a third party employee inspection representative. This silence creates confusion regarding how the rule will be implemented in practice. The introduction of a broad array of potential designated representatives likely to be detrimental and prejudicial against employers, makes more pronounced the Proposal's lack of specificity and clarity about the designation process. Differing views on the walkaround requirements and process will ultimately lead to disputes between employers, employees and/or CSHOs, increased administrative and legal costs, inconsistency in application, an overall loss of trust by employers and employees alike, and a waste of OSHA's limited enforcement resources.

The current walkaround rule and the Proposal make clear that representatives are authorized by employees. Below are just a few of the questions that remain unanswered about how employees may engage in this authorization process, questions that are made even more important because of the significant proposed changes to the scope of potential third parties involved:

- Can a CSHO designate a non-employee third party as an employee representative to accompany the inspection without a request or designation by employees?

- Which and how many employees have authority to authorize an inspection representative?
  - Is it limited to employees in the same facility or department where the inspection will focus?

---

[42] 29 U.S.C. § 657(e) (emphasis added).

- o Does it include all employees within the company?
- o Must all or a majority of employees agree to the representative?
- o For workplaces that have both union and non-union employees, do unionized and non-unionized employees have a say in the designation?

- What is the process for employees to make the designation?

  - o Do employees vote, and if so, is it done through a secret ballot?
  - o Who administers the vote or selection process?
  - o When does the vote take place?

- When does the designation occur?

- How does the designation process work in the case of an unannounced inspection with no authorized representative already selected? Would employees need to conduct an election before the inspection can commence?

- Who will oversee the selection process to ensure that employees are not intimidated by other employees?

- What if certain employees oppose the representative designated by other employees?

- Can employees contest the outcome of the vote or the designation?

- What if different groups of employees designate different representatives?

- Is there a right for employees not to participate in the vote?

- Are employees prohibited from accompanying the CSHO during the inspection if other employees choose an "authorized representative" that they, as individuals, do not authorize?

- Is there a limit to the number of representatives that can be authorized to participate in an inspection? If that number is over one, how is this number determined and where does the authority to make that determination come from?

- How long does a "designation" as a worker representative for purposes of an OSHA inspection last? Is it just for a single inspection or a specific period of time? How is this time period determined and where does the authority to make that determination come from?

The Proposal also lacks a defined process indicating how CSHOs will make their determinations of whether "good cause has been shown" that designated representatives are "reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace." The following are just a few important questions about that process:

- What is the burden of proof? Is it beyond reasonable doubt, preponderance of the evidence, clear and convincing evidence, or the sole discretion of the CSHO?

- Who has the burden of proof? Does the representative or the employees carry this burden or is it the CSHO's or OSHA's burden or is the burden on employers to prove that good cause has not been shown?

- Is there a different standard to show good cause to "accompany" versus good cause to "participate" in the inspection?

- What is the standard for "reasonable necessity"?

- What is the process, standard, and/or unit of measure for CSHOs to determine what constitutes "relevant knowledge, skills or experience with hazards or conditions in the workplace or similar workplaces"?

- Must the designated representatives provide proof of their relevant knowledge? How will the CSHO verify that the designated representative has knowledge, skills or experience with "similar workplaces"?

- How does the CSHO verify the truthfulness of the evidence?

- Does the employer have access to the evidence and the opportunity to rebut the evidence? What is the timing to do so?

- Is there a process to appeal the CSHO's decision prior to the inspection, and prior to potentially being irrevocably harmed?

- Is there a process to appeal the CSHO's decision after the inspection, and if so, what is the remedy if the decision was incorrect?

There are also many unanswered questions about the role of the designated third party representative. For example:

- Non-supervisory employees already have a right to be questioned privately by CSHOs, but will the designated third parties have a right to participate in those interviews? To ask their own questions? What if the presence of the third party representative intimidates the interviewee or influences their responses to questions?

- Will there need to be an additional showing that the third party is reasonably necessary for the conduct of effective employee interviews (as a separate phase of an OSHA inspection from the walkaround)?

- Will designated third party representatives have access to a company's records?

- How will the Agency exercise oversight over designated third parties? What safeguards will the Agency put into place to protect employees and companies' trade secrets and confidential business information?

The lack of clarity in these processes and elements of the proposed rule will lead to disputes that will require some adjudicatory resolution process solely to ascertain the designated representatives' eligibility to participate in the inspection, causing significant

delays in the inspection process and defeating one of the regulation's intended purposes. We address the problems created by these unanswered questions more fully below.

### C.  Issues for Employers after Designation of the Representative

Significant liability concerns may arise when employers are compelled to allow non-governmental, non-employee third parties access to their workplaces. Workplaces often present potential hazards, prompting employers to invest in employee training to ensure a safe working environment. The Proposal, however, opens the door for third parties with no knowledge of the workplace's unique hazards. This raises questions about potential liability when a third party, who was not invited to the workplace by the employer, sustains an injury during an inspection. Additionally, allowing third parties with strong self-interest (e.g., union representatives, plaintiffs' attorneys or their experts, activists, terminated disgruntled employees, etc.) to participate in OSHA inspections increases the risk they might make false injury claims to further their agenda.

Employers will be forced to take burdensome and costly steps to mitigate such risks. For example, many employers will be required to provide training and/or special protective equipment to third party representatives. Alternatively, will OSHA assume such responsibility and liability for the actions of these third parties? Our Coalition members are also concerned that the Proposal will create logistical and coordination challenges delaying important workplace inspections and undermining the Agency's critically important safety mission. According to an OSHA report, "the average lapse time for all inspections was 36 days, and the average time per inspection for all inspections was 27.8 hours."[43] Coordinating with non-employee representatives is considerably more cumbersome than working with employees already present in the workplace who are already most knowledgeable about the health and safety concerns at their place of work.

### D.  Responses to Questions Posed by Agency

The concerns of the Coalition members are compounded by the fact that the wording and framing of the questions posed by the Agency appears to leave room for only one, predetermined outcome, namely, to solicit support for the Agency to move forward with the current proposed amendments. With this in mind, the following responses to the questions are provided based on the concerns of the Coalition members.

Question: *Should OSHA defer to the employees' selection of a representative to aid the inspection when the representative is a 3rd party (i.e., remove the requirement for 3rd party representatives to be reasonably necessary to the inspection)? Why or why not?"*

Response: No. Removing the requirement for third party representatives to be reasonably necessary to the inspection is completely contrary to the stated purpose of the proposed revisions and the purpose of the rule, in general. In a statement to the U.S. House of Representatives' Subcommittee on Workforce Protections Committee on Education and the

---

[43] *Revision to the OSHA Weighting System* (https://www.osha.gov/sites/default/files/CTS_7132_Whitepaper_FINAL_v2019_9_30.pdf).

Workforce, Assistant Secretary Parker stated: "[t]he proposed rule would clarify that employees may authorize an employee, as they may now do, *or within certain parameters authorize a non-employee*, to participate in the inspection to *help ensure it is effective and thorough*."[44] The Proposal itself states that "[t]he proposed revisions to paragraph (c) <u>*do not change the existing precondition that the CSHO <u>must</u> determine that any third-party employee representative's participation is reasonably necessary*</u> to the conduct of an effective and thorough inspection." Finally, 29 U.S.C. 657 explicitly states "a representative authorized by his employees shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of any workplace under subsection (a) *for the purpose of aiding such inspection*."

Removing the "*reasonably necessary*" requirement removes any and all parameters guaranteed by the OSH Act, and weakens the assurances provided by Assistant Secretary Parker. Additionally, the proposed new policy will undoubtedly impact employers' property rights as guaranteed by the US Constitution. Doing so in circumstances where it is not even necessary for OSHA to do its job effectively would be an unacceptable breach of those rights.

<u>Question</u>: *Should OSHA retain the language as proposed, but add a presumption that a third party representative authorized by employees is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace? Why or why not?*

<u>Response</u>: No. The response to the question above is applicable here. In addition, creating a presumption that a third party representative authorized by employees is reasonably necessary, shifts the burden of proof to the employer to show that the authorized representative is not reasonably necessary. Such a rule would change the existing precondition, which places the burden of proof on the employees or authorized representative by requiring good cause to be shown why the authorized representative should accompany the CSHO.

<u>Question</u>: *Should OSHA expand the criteria for an employees' representative who is a 3rd party to participate in the inspection to include circumstances when the CSHO determines that such participation would aid employees in effectively exercising their rights under the OSH Act? Why or why not? If so, should OSHA defer to employees' selection of a representative who would aid them in effectively exercising their rights?*

<u>Response</u>: No. The responses above apply here also. Further, the OSH Act authorizes an employee inspection representative only where such representation will aid the physical inspection of the workplace.[45] Nowhere does it authorize a representative to accompany the CSHO to aid *employees* in effectively exercising other rights under the OSH Act or any other laws (e.g., the NLRA).

---

[44] *Department of Labor announces proposed changes to clarify regulations on authorized employee representation during workplace inspections* (August 29, 2023).

[45] 29 U.S.C. 657.

## VI.    The Proposal Raises Constitutional Concerns

### A.    The Proposal Delegates Governmental Authority to Private Individuals

Under the United States Constitution, executive power belongs to the President.[46] This vested power is exclusive and absolute, and cannot be delegated to private entities.[47] As Justice Thomas stated: "When the Government is called upon to perform a function that requires an exercise of legislative, executive or judicial power, only the vested recipient of that power can perform it."[48] Accordingly, the Vesting Clauses "categorically preclude" a private entity or party from "exercising the legislative, executive, or judicial powers of the Federal Government."[49] The OSH Act gives the Secretary of Labor (and her government representatives; i.e., CSHOs) the sole authority to enter, inspect, and privately question employees.[50] Under the "private nondelegation doctrine," the Secretary of Labor – an executive department official – cannot redelegate this authority to a private individual.[51]

As noted, Section 8(a) of the OSH Act delegates to the Secretary of Labor the sole power "to enter" and "to inspect and investigate" a place of employment, and "to question privately" the individuals there.[52] The Proposal conflicts with this delegation of power, as it not only seeks to allow private individuals to enter the workplace, but subtle proposed changes vastly expand the role and authority of these third parties during OSHA inspections. The OSH Act carefully cabins the right of authorized representatives "to accompany the Secretary,"[53] and the existing regulation also speaks in terms of "accompaniment by a third party[.]"[54] However, the Proposal allows a third party representative where "good cause has been shown why their _participation_ is reasonably necessary" to the inspection.[55] While the statute's use of "accompany" implies merely walking along with a CSHO, the Proposal's use of "participate" implies an entirely different, more active, role – that of taking part or being involved in the inspection. Whatever standard is applied, no private individual may exercise the delegated power of the CSHO to

---

[46] Constitution, Art. II, Sec. 1, cl. 1.

[47] _Association of American Railroads_, 575 U.S. at 62 (Alito, J., concurring).

[48] _Id._ at 68 (Thomas, J., concurring).

[49] _Id._ at 88 (Thomas, J., concurring).

[50] 29 U.S.C. § 657(a).

[51] _Dept. of Transportation v. Association of American Railroads_, 575 U.S. 43, 68 (2015) (Thomas, J., concurring) ("When the Government is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, only the vested recipient of that power can perform it.").

[52] 29 U.S.C. § 657(a)(1)-(2).

[53] 29 U.S.C. § 657(e).

[54] 29 C.F.R. § 1903.8(c).

[55] Federal Register, August 30, 2023, at p. 59834 (emphasis added).

inspect the workplace. The Proposal would impermissibly delegate power reserved under the Constitution to the executive branch to private individuals.[56]

### B. The Proposal Results in a *Per Se* Taking Under the Fifth Amendment

Similarly, while OSHA may itself enter private workplaces for the purpose of carrying out physical inspections, it has no Constitutional authority to authorize private individuals to enter another's private property, nor can the Agency grant itself the right to authorize private parties to enter with the federal government's own investigators. Because the Proposal "appropriates for the enjoyment of third parties the owners' right to exclude," it cannot stand.[57]

Indeed, the Supreme Court in *Cedar Point Nursery v. Hassid*, struck down a California regulation that, like OSHA's proposed rule, granted labor unions access to private workplaces. In *Cedar Point*, the Supreme Court emphasized that "[t]he right to exclude is one of the most treasured rights of property ownership," a "fundamental element of the property right," and "one of the most essential sticks in the bundle of rights that are commonly characterized as property."[58] Because "government authorized invasions of property … are physical takings requiring just compensation," the government cannot grant any private party the right to enter another's property land, or workplace.[59] As in *Cedar Point*, no one can dispute that absent the proposed regulation, which will mandate third party access, the employer would have the right to exclude any unauthorized third parties (e.g., labor unions, attorneys, community activists and other third parties) from their property. The Proposal would take that constitutional right from them. Nor does it matter that access would be allowed only during an OSHA inspection. As the Supreme Court noted, "[t]he fact that the regulation grants access only to union organizers and only for a limited time does not transform it from a physical taking into a use restriction," or save it from its constitutional infirmity.[60]

The Proposal asserts that "[b]ecause OSHA's inspections are conducted in accordance with the Fourth Amendment, they do not constitute a physical taking under the Takings Clause of the Fifth Amendment."[61] Even if that statement were true (which we dispute), OSHA's supposed compliance with the Fourth Amendment (which we also dispute below) would not permit OSHA to violate the Fifth Amendment. In any event, the Agency's right to enter the worksite to conduct a physical inspection is not at issue, only the Agency's

---

[56] *Wellness Int'l Network Ltd. v. Sharif*, 135 S.Ct. 1932, 1957 (2015) (Roberts, C.J., dissenting) ("It is a fundamental principle that no branch of government can delegate its constitutional functions to an actor who lacks authority to exercise those functions.").

[57] *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2072 (2021). To the extent the statute or existing regulation authorizes such access, they also violate the Constitution.

[58] *Id.* at 2072. *See also In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985), *cert denied*, 474 U.S. 828 (1985) ("The essence of all property is the right to exclude[.]").

[59] *Id.* at 2074.

[60] *Cedar Point*, 141 S.Ct. at 2075.

[61] Federal Register, August 30, 2023 at p. 59829.

purported authority to compel employers to permit non-governmental third parties the same access. Like the regulation struck down in *Cedar Point*, the Proposal "grants labor organizations" and other unwelcome third parties, "a right to invade the [owners'] property.[62] "It therefore constitutes a *per se* physical taking."[63]

## C. The Proposal Violates the Fourth Amendment

While Section 8(a) of the OSH Act authorizes the Agency to enter and inspect a place of business, it does not allow the Agency to conduct warrantless searches.[64] As the Supreme Court stated in *Barlow's*, "[t]he owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of Government agents."[65] Accordingly, OSHA inspections must comply with the Fourth Amendment and be reasonable in all respects.[66]

Removing the current constraints on third party involvement in OSHA inspections or permitting the participation of a third party not deemed "reasonably necessary" for the execution of an effective and thorough physical inspection (indicated as a possible amendment in the Proposal) would contravene the Fourth Amendment's prohibition against unreasonable searches and seizures.[67] In fact, federal criminal law provides that a search warrant must be served and executed only by an officer mentioned therein and "by no other person, *except in aid of the officer*" executing the warrant.[68] This is consistent with Section 8(e) of the OSH Act, which only permits an authorized employee representative "during the physical inspection of any workplace under subsection (a) *for the purpose of aiding such inspection*."[69] In other words,

---

[62] *Cedar Point*, 141 S.Ct. at 2080. In this respect, it is interesting that the Agency "seeks input on whether to maintain the existing requirement … for a third-party employee representative to be 'reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace[.]'" Federal Register, August 30, 2023 at p. 59833. Whatever arguments might exist to allow the government to compel employers to permit on their property individuals who would otherwise be excluded are surely weakened when those would-be trespassers are admittedly not even "reasonably necessary" to the purpose for which the Agency has itself entered the property of the employer.

[63] *Id.*

[64] *Marshall v. Barlow's, Inc.*, 98 S.Ct. 1816, 1827 (1978) (holding Section 8(a) unconstitutional insofar as it purports to authorize warrantless inspections).

[65] *Id.* at 1822. *See also See v. City of Seattle*, 387 U.S. 541, 543 (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property.").

[66] *Ayeni v. Mottola*, 35 F.3d 680, 686 (2nd Cir. 1994) ("The reasonableness requirement of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of searches and seizures that are carried out.").

[67] *See Buonocore v. Harris*, 65 F.3d 347, 358 (4th Cir. 1995) (private individual must be "assisting or acting 'in aid of' an officer conducting a search authorized by warrant."); and *Hopgood v. Gunnlaugsson*, 284 Fed. Appx. 190, 190 (5th Cir. 2008) ("The presence of third parties in the execution of a warrant is unconstitutional where it is not 'in aid of' the execution of the warrant").

[68] 18 U.S.C. § 3105 (emphasis added).

[69] 29 U.S.C. § 657(e) (emphasis added).

under the OSH Act, federal criminal law, and the Fourth Amendment, before a third party representative may accompany the CSHO during the physical inspection, there must be some demonstrable aid to be provided to the CSHO by the third party for the third party's presence.

Numerous decisions have found that the government violates the Fourth Amendment when it permits private parties with no legitimate role in the execution of a warrant to accompany an officer during the search. For example, the Supreme Court has held that a civilian "ride along" with officers in furtherance of the individual's own private interest violated a defendant's Fourth Amendment rights.[70] Other courts have likewise held that allowing news media organizations to accompany officers makes a search *per se* unreasonable.[71] Other courts have made similar decisions in comparable contexts.[72]

*Matter of Establishment Inspection of Caterpillar* is not to the contrary. In that case, the authorized employee representative was *an employee* (albeit on strike), and the Court specifically noted "he was well positioned to assist OSHA, having been the UAW safety and health representative of a plant division for five years."[73] Moreover, the employer apparently argued the representative was *not* acting as a government agent.[74] "Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities[.]"[75] Where the government has knowledge of and authorizes the third party's participation, that private party is acting under color of law and is a state actor.[76] Indeed, a search by a civilian that occurs during a "joint operation" with government officials is a *governmental search*.[77]

---

[70] *Wilson v. Layne*, 526 U.S. 603, 613-14 (1999) (holding that officers violated a defendant's Fourth Amendment rights by inviting a news crew along on a search).

[71] *Ayeni*, 35 F.3d at 686 (noting "an objectively reasonable officer" could not have concluded that inviting a third party not providing assistance to law enforcement to participate in a search was in accordance with the Fourth Amendment).

[72] *See Bills v. Aseltine*, 958 F.2d 697, 704 (6th Cir. 1992) ("The warrant in this case implicitly authorized the police officers to control and secure the premises during their search for a generator. It did not implicitly authorize them to invite a private security officer to tour plaintiff's home for the purpose of finding General Motors property"); and *United States v. Sparks*, 265 F.3d 825, 832 (9th Cir. 2001) ("Police cannot invite civilians to perform searches on a whim; there must be some reason why a law enforcement officer cannot himself conduct the search and some reason to believe that postponing the search until an officer is available might raise a safety risk.").

[73] *Matter of Establishment Inspection of Caterpillar, Inc.*, 55 F.3d 334, 339, fn. 5 (7th Cir. 1995).

[74] *Caterpillar*, 55 F.3d at 337, fn. 2.

[75] *Skinner v. Railway Labor Executives Association*, 489 U.S. 602, 614 (1989).

[76] *See United States v. Price*, 383 U.S. 787, 794 (1966) (noting that private persons jointly engaged with state officials are acting under color of law).

[77] *See Lugar v. Edmondson Oil*, 457 U.S. 922, 941 (1982) ("[W]e have consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the 14th Am.."). See also *U.S. v. Jacobsen*, 466 U.S. 109, 113 (1984) (private citizen may be a police agent if acting "with the participation" of an officer).

Thus, while the presence of a third party *necessary to and assisting authorized officers* in a governmental inspection might not violate the Fourth Amendment's reasonableness requirement, absent the possession of some technical expertise lacking in the CSHO and necessary to the physical inspection of the workplace, the presence of a third party outsider (e.g., union organizer, plaintiff's attorney, etc.) with no connection to the workplace and acting in his own interests violates the Fourth Amendment's prohibition against unreasonable searches and seizures.[78] Simply put, if a third party's presence without the employer's consent would normally be considered trespass, that party's presence cannot be rendered lawful simply because OSHA is conducting an inspection and invited the third party along, nor can the employees "authorize" the Agency to violate their employer's constitutional rights.[79]

## VII.    The Proposal is Misguided.

### A.    The Proposal Fails to Acknowledge That the Presence of Third Parties Traditionally Barred by Employers Introduces Substantial Risks and Increases the Burdens and Costs on Employers.

Although the existing regulation includes an exception with narrow criteria (i.e., accompanying a CSHO to offer technical expertise), the proposed rule would greatly expand the involvement of third parties by putting third parties on equal footing with employees, and broadening their role from merely accompaniment to some form of participation. With that background, the Proposal does not sufficiently address the reality that introducing into workplaces non-governmental third parties who are not traditionally permitted creates additional risks for employers, employees, and the community alike. Employees have a statutory duty to comply with occupational safety and health standards, rules, regulations, and orders, while non-employees have no such duty.[80] In addition, allowing non-employees to enter and walk around an employer's premises will create obvious third party liability issues. Non-employees will not be familiar with potential workplace hazards, processes, or procedures, and could be injured even if the employer assigns personnel to accompany the walkaround. Employers should not be forced to assume responsibility for injury to a third party (or injuries to its employees caused by the third party) during the walkaround when OSHA itself required the employer to allow that third party on the employer's property.

Requiring employers to allow disgruntled former employees, individuals on strike against the company, or relatives of injured or deceased employees as authorized inspection

---

[78] Given that OSHA is authorized to "employ experts and consultants or organizations thereof," 29 U.S.C. § 656(c)(2), and to use the services and personnel of other agencies, both federal 29 U.S.C. § 656(c)(1), and state, 29 U.S.C. § 673(d), in carrying out its responsibilities, it will surely be the rare inspection which requires "outside" expertise or individuals.

[79] Employers subjected to violations of their Fourth Amendment rights could even bring civil suits for damages under Section 1983 or other theories. *Ayeni*, 35 F.3d at 686. In such a suit, both the Agency and the private third party could potentially be liable. Indeed, the private third party would likely be found to be a "state actor" simply because the Agency's own regulation and officials facilitated the access and the individual participated jointly in the violative inspection alongside the government officials.

[80] 29 U.S.C. § 654(b).

representatives is fraught with the potential for disruptive confrontations or even violent altercations. In fact, that exact scenario has already arisen for members of our Coalition, where former employees or employees on strike have attempted to gain access to the employer's workplace with intent to intimidate other employees, damage the employer's property or reputation, and/or to share information about the workplace and workers there on social media.

At a minimum, employers will have to put additional measures in place to protect their employees and other third parties from the increased risk of disruption, distraction, and injury from having unknown and potentially hostile personnel on their site, inflating the financial burden, especially on small business owners. In such situations, employers must also concern themselves with the possibility that a third party may be injured at their workplace and how to handle potential personal injury claims from individuals not covered by workers' compensation.

The presence of non-governmental third parties also creates a substantial risk to companies committed to protecting trade secrets and proprietary information at their worksite, as well as the national and community security interests that could be threatened. Such individuals would not be subjected to background checks (like OSHA and most employers do when they hire employees). As written, the proposed rule includes no limitations that would bar competitors invited by an aggrieved employee or corporate spies seeking to profit from their access. Indeed, the proposed rule, which endorses third parties with experience at "similar workplaces," makes it more likely that a corporate competitor would be allowed onsite by a CSHO. These third parties could use their time at the worksite to misappropriate and/or misuse or publicize proprietary information, causing untold economic damage to the employer. The proposed rule is silent about whether employers can condition entry of non-governmental third parties on signing NDA or similar agreements, but OSHA has long refused to sign such agreements when it enters private workplaces.[81] Even if using NDAs were a viable option, NDAs may not provide adequate protection to employers and would require companies to spend resources enforcing the NDAs in court.

Allowing third parties into an employer's workplace could pose significant security risks at facilities that handle hazardous substances. Nefarious third parties would present a particularly great risk to whole communities or broader supply chains from potential physical security events at workplaces that support energy production and distribution, as well as logistics and storage in many U.S. industries.

In addition, requiring employers to allow unvetted third parties into an employer's workplace to participate in an OSHA inspection raises a serious cybersecurity risk. Any ill-intentioned party including a corporate spy, former aggrieved employee, or unscrupulous

---

[81] The Agency affirms it is not seeking to alter or limit other protective regulations. Federal Register, August 30, 2023 at p. 59831. Accordingly, where an inspection involves an area containing trade secrets, a non-employee could not serve as representative. 29 C.F.R. §1903.9(d) ("Upon the request of an employer, any authorized representative of employees under §1903.8 in an area containing trade secrets *shall be an employee in that area or an employee authorized by the employer* to enter that area.") (emphasis added).

activist, need only insert a malware-infected USB drive into a computer connected to a company's network to allow hackers access to the network to conduct cyber espionage, steal sensitive information, or install ransomware or other malware. Such a breach of a company's cybersecurity protocols and procedures could cause extensive financial and operational damage.

The Proposal contemplates allowing attorneys to be designated as third party worker representatives. This inclusion of attorneys raises troubling issues. In most instances, contrary to the Proposal, parties are not allowed pre-suit discovery in civil litigation (e.g., personal injury actions). Federal Rule of Civil Procedure 34 allows only a "party" to civil litigation to serve a request on another party "to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it."[82] Most states have ethical rules that forbid attorneys from communicating with persons represented by counsel.[83] Thus, the Proposal would provide litigants with unintended advantages not otherwise permissible in civil litigation. Moreover, despite the Proposal's assumptions, it is not clear that allowing an attorney into the workplace will increase the employees' willingness to communicate with the CSHO during the walkaround inspection. Indeed, the presence of third party attorneys is much more likely to have the opposite effect—chilling discussions among and between OSHA, employees and employers.

In discussing the costs and burdens associated with the Proposal, the Agency repeatedly declares that the Proposal "imposes no new burdens on employers and does not require them to take any action to comply."[84] While it may be easy for the Agency to minimize costs it will not bear, the OSH Act itself requires that "[a]ny information" obtained by the Agency "shall be obtained with a *minimum burden* upon employers, especially those operating small businesses."[85]

In fact, OSHA's conclusion that there are no costs associated with the proposed rule is not supported by the facts. The fact is that as written, the Proposal will impose new and increased direct costs on employers. These include costs related to preparing or updating policies to deal with mandated non-employee third parties as part of OSHA inspections, pre-entry screening and site-specific safety awareness training, increased costs associated with escorting a potentially hostile third party, legal fees for managing more complex and fraught inspection interactions, evaluating and/or supplying PPE or sanitation equipment, getting NDAs or other agreements prepared and executed, increased insurance costs, and even additional parking fees. Employers will also need to train employees to educate them on the new rule, and either train existing

---

[82] Fed. R. Civ. Pro. 34(a)(2).

[83] *See* Rule 4.2, Model Rules of Professional Conduct.

[84] Federal Register, August 30, 2023 at p. 59831. The Agency further claims that "[t]he proposed clarification does not impose any costs on employers," "there would be no real cost to an employer to have an additional visitor on site," and "OSHA has preliminarily determined that this proposed rule does not impose costs on employers." *Id.*

[85] 29 U.S.C. § 657(d) (emphasis added).

employees or hire security personnel to screen and escort third parties. Finally, there could be increased costs for liability or workers compensation insurance.

Despite these numerous direct costs, as well as the potentially huge indirect costs discussed above (e.g., liability for injuries to third parties, theft of proprietary information, increased risk of workplace violence, etc.), the Agency asserts that the Proposal "is not significant under section 3(f)(1) of Executive Order 12866."[86] Whether or not the Agency's assessment is correct, that section establishes four alternate ways in which a regulatory action may be deemed significant. In particular, a regulatory action is significant where it "may … [r]aise novel legal or policy issues arising out of legal mandates[.]"[87] As shown above, that is the case here, as the Proposal raises serious constitutional and statutory issues that arise out of the mandate to allow non-employee third parties, who would otherwise be considered trespassers, to enter into private property of another. Accordingly, the Coalition urges the Agency to re-engage with OMB and undertake all aspects of a full EO 12866 review, including stakeholder meetings and a proper analysis of the impacts of its rulemaking.

## B. Inserting Unions at Non-Union Workplaces or Other Third Party "Representatives" Into OSHA Inspections Will Reduce OSHA's Effectiveness as a Workplace Safety Agency.

It is no secret that the Biden Administration holds itself out as labor's biggest ally. As President Biden stated more than two years ago, "I intend to be the most pro-union President leading the most pro-union administration in American history."[88] Rather than focusing on enhancing workplace safety, it appears that the Proposal is primarily intended to advance the Biden Administration's pro-labor agenda. Just weeks after the Proposal was published in the Federal Register, Assistant Secretary Parker asserted that "Unions play a critical role in representing workers in health and safety matters and have demonstrated repeatedly that workers who have a voice at work through effective representation have safer working conditions. We strongly encourage employer and union partnership in addressing workplace hazards and building a mutual commitment to safety and health on the job."[89]

However, it is not OSHA's statutory mission to "strongly encourage employer and union partnership." Rather, the Agency's authorizing statute requires OSHA "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources[.]"[90] However, as discussed above, the Proposal provides no basis or evidence that the proposed rule will improve workplace safety. The Agency should not let its focus on "encouraging" unions distract it from its statutory purpose.

---

[86] Federal Register, August 30, 2023, at p. 59831.

[87] Executive Order 12866 at Section 3(f)(4).

[88] "Remarks by Pres. Biden in Honor of Labor Unions," September 8, 2021. (available at https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/08/remarks-by-president-biden-in-honor-of-labor-unions)

[89] https://www.osha.gov/news/testimonies/09272023#

[90] 29 U.S.C. § 651(b).

The decision to be represented by a labor union must be made by a majority of employees in a bargaining unit. OSHA's labor/management neutrality, and therefore its effectiveness as a workplace safety agency, is damaged when its actions appear to be based on political considerations rather than safety. OSHA need look no farther than the National Labor Relations Board, whose policy oscillations with every new Administration strain labor/management relations and are a burden on economic efficiency. Respectfully, politicized agencies lack credibility, and are contrary to OSHA's stated goal of "ensuring that [OSHA's] actions are not interpreted as supporting either party."[91] OSHA's mission promoting workplace safety is too important to risk politicization.

The Assistant Secretary recently stated that the Agency's "goal is to develop rules that are highly protective of workers, are workable for employers, and provide predictability and clarity for both."[92] For fifty years, the walkaround rules have done just that, and the Proposal has failed to demonstrate the need to change anything. The Agency should reconsider this rulemaking.

### C. The Proposal Will Harm OSHA's Enforcement Program in Individual Inspections and the Volume of Inspections It Conducts.

OSHA's ability to achieve its mission of helping to ensure safe workplaces depends in part on its ability to maximize the number of workplace inspections that it conducts, and therefore, the efficiency with which it conducts each workplace inspection. One of the reasons OSHA is able to conduct tens of thousands of inspection every year, is that most employers engage collaboratively and cooperatively with OSHA; i.e., employers rarely demand that OSHA obtain an inspection warrant or go to court to fight over the scope of such warrants. Similarly, employers rarely demand or quibble over subpoenas for records or employee interviews, and employers rarely require formal processes for the collection of evidence and testimony. As a result, OSHA is able to move efficiently from an Opening Conference through an inspection, limiting the manhours required for each inspection.

The Proposal, however, will undoubtedly result in greater contention between employers and OSHA and result in vastly more instances of employers demanding and challenging OSHA inspection warrants, and requiring and challenging subpoenas for records and testimony. Look no further than the blogs of every serious law firm with an OSHA practice, and you will see that they all advise that if OSHA arrives to begin an inspection with an unwelcome and potentially hostile non-governmental third party participant, employers should consent only to entry by the OSHA compliance officer, and insist on and move to quash a warrant that would include the third party. The process for OSHA to obtain, defend, and enforce inspection warrants adds significant delay to the start of OSHA's inspections and consumes significant time and resources that will necessarily result in OSHA conducting fewer workplace inspections. It is not uncommon for it to take weeks for OSHA to obtain a warrant and return to start an inspection after an employer refuses to consent to the inspection. If the employer engages in litigation to challenge the warrant, weeks can become

---

[91] Field Operations Manual, Ch. 3, Sec. IV(H)(2)(c).

[92] https://www.osha.gov/news/testimonies/09272023#

months before OSHA can even begin the inspection. During that interval, hazards may continue unabated or the conditions that OSHA could have observed to enforce its standards more effectively may change, making the compliance officer's job much more difficult. In addition, the inspection will, from the outset, take on an adversarial posture, further straining the compliance officer's chances for an efficient, effective inspection.

According to OSHA's enforcement data (*see* below), in FY 2022, the average number of manhours OSHA dedicated per inspection was only 20 hours, and OSHA was able to complete five workplace inspection per 100 manhours.

| Inspection Summary | | Total |
|---|---|---|
| Avg Insp Hrs | Health | 25.47 |
| | Safety | 18.56 |
| Total | | 20.00 |

| | | Total |
|---|---|---|
| Insp per 100 Insp Hrs | Health | 3.93 |
| | Safety | 5.39 |
| Total | | 5.00 |

Getting turned away at the initial visit to a workplace, preparing the pleadings and declarations associated with a warrant application, the court time associated with that, and then returning to the worksite, possibly to be turned away again to begin a warrant challenge, would surely consume more than the average number of hours for an inspection, before even laying eyes on the working conditions at the workplace or conducting any inspection activities. If warrant demands and challenges become pervasive, as we expect they would in this context, OSHA could easily see the average manhours per inspection double or worse, and without commensurate increase in OSHA's budget, that will mean many fewer inspection.

## VIII.    Recommendations

The foregoing comments establish that the Proposal should be withdrawn immediately and fully, and that is what our Coalition recommends. However, should the Agency press forward, we recommend that OSHA correct its mistaken certification that this is Not a Significant Rule. OSHA has ignored (and caused OMB to ignore) the Section 3(f)(4) element of E.O. 128666. This Proposal clearly raises novel legal or policy issues arising out of a legal mandate. Accordingly, OSHA should address all of the rulemaking process provided for by E.O. 12866, including ensuring stakeholder meetings with OMB, and a thorough (and more accurate) analysis of the impacts of the rulemaking. Also, because of the unique impacts the proposed rule would have on small businesses, we encourage OSHA to voluntarily establish a SBREFA Panel, and hear directly from small businesses.

Beyond that, if OSHA ultimately chooses to finalize this Rule, at the very least, we recommend the following changes:

1) Permit non-employee inspection representatives only by consent of the employer.

2) Establish a clear process for employees to manifest their designation of an inspection representative, which process involves a majority vote of the relevant workforce.

3) Establish a limit of a single employee walkaround representative (regardless of the employment status of the representative) as required by Section 8(e) of the OSH Act.

4) Exclude from eligibility as a third party employee walkaround representative any person with a potential litigation interest or potential litigation interest adverse to the employer (e.g., potential plaintiffs' or third party attorneys or their experts, family members of an injured or deceased worker, terminated disgruntled employees, etc.).

5) Exclude from eligibility as a third party employee walkaround representative any attorney who is potentially on a fishing expedition for evidence to bring a lawsuit.

6) Exclude from eligibility as a third party employee walkaround representative any person with the reasonable potential to commit an act of workplace violence (e.g., family members of an injured or deceased worker, terminated disgruntled employees, etc.).

7) Define clear standards CSHOs must apply for findings of "reasonable necessity" as well as the credentials or expertise of the designated third party representative.

8) Establish employers' rights to access the evidence considered by CSHOs when determining that a third party's accompaniment is reasonably necessary and a mechanism to challenge that evidence.

9) Establish a mechanism for employers to challenge the designation or the CSHO's determination that the third party's accompaniment is reasonably necessary.

10) Clarify that the third party's role is limited only to accompaniment during the physical walkaround and does not include any other aspects of the OSHA inspection, excluding specifically any right to accompany or participate in employee interviews (whether in private or not) or to access to the Employer's records and physical evidence (e.g., monitoring data, physical samples, etc.).

11) Clarify that the third party's right to accompany the CSHO does not extend to any area in the workplace identified by the employer as containing or revealing a trade secret, confidential business information, or sensitive security information.

## IX.    Conclusion

For the foregoing reasons, the Coalition respectfully urges the Agency to withdraw the Proposal. It is neither necessary nor prudent and will serve only to create confusion and contention around the important issue of workplace safety. In the alternative, we request

that the Agency engage in a more complete rulemaking process, pursuant to E.O. 128666, and adopt the recommended changes proposed above. We appreciate this opportunity and your consideration of these important issues.

Thank you for your consideration of these comments. If you have any questions or need further information, please do not hesitate to contact us at econn@connmaciel.com / 202-909-2737 and/or mtrapp@connmaciel.com or (312) 809-8122.

Sincerely,

Eric J. Conn
Chair, OSHA Practice Group – Conn Maciel Carey LLP

Mark Trapp
Partner, Labor & Employment Practice – Conn Maciel Carey LLP

*Counsel to the Employers Walkaround Representative Rulemaking Coalition*

## DEPARTMENT OF LABOR

**Occupational Safety and Health Administration**

**29 CFR Part 1903**

**[Docket No. OSHA–2023–0008]**

**RIN 1218–AD45**

**Worker Walkaround Representative Designation Process**

**AGENCY:** Occupational Safety and Health Administration (OSHA), Labor.

**ACTION:** Final rule.

**SUMMARY:** In this final rule, OSHA is amending its Representatives of Employers and Employees regulation to clarify that the representative(s) authorized by employees may be an employee of the employer or a third party; such third-party employee representative(s) may accompany the OSHA Compliance Safety and Health Officer (CSHO) when, in the judgment of the CSHO, good cause has been shown why they are reasonably necessary to aid in the inspection. In the final rule, OSHA also clarified that a third party may be reasonably necessary because of their relevant knowledge, skills, or experience with hazards or conditions in the workplace or similar workplaces, or language or communication skills. OSHA concluded that these clarifications aid OSHA's workplace inspections by better enabling employees to select representative(s) of their choice to accompany the CSHO during a physical workplace inspection. Employee representation during the inspection is critically important to ensuring OSHA obtains the necessary information about worksite conditions and hazards.

**DATES:**

*Effective date:* This final rule is effective on May 31, 2024.

*Docket:* To read or download comments or other information in the docket, go to Docket No. OSHA–2023–0008 at *https://www.regulations.gov*. All comments and submissions are listed in the *https://www.regulations.gov* index; however, some information (*e.g.,* copyrighted material) is not publicly available to read or download through that website. All comments and submissions, including copyrighted material, are available for inspection through the OSHA Docket Office. Contact the OSHA Docket Office at (202) 693–2350 (TDY number 877–889–5627) for assistance in locating docket submissions.

When citing exhibits in the docket in this final rule, OSHA includes the term

"Document ID" followed by the last four digits of the Document ID number. Citations also include, if applicable, page numbers (designated "p."), and in a limited number of cases a footnote number (designated "Fn."). In a citation that contains two or more Document ID numbers, the Document ID numbers are separated by semi-colons (*e.g.,* 0001; 0002).

**FOR FURTHER INFORMATION CONTACT:**

*Press inquiries:* Frank Meilinger, Director, OSHA Office of Communications, telephone: (202) 693–1999; email: *meilinger.francis2@dol.gov*.

*General and technical inquiries:* Scott Ketcham, OSHA Directorate of Construction, telephone: (202) 693–2020; email: *ketcham.scott@dol.gov*.

*Copies of this* **Federal Register** *notice and news releases:* Electronic copies of these documents are available at OSHA's web page at *https://www.osha.gov*.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
II. Background
  A. The OSH Act and OSHA's Inspection Authority
  B. Regulatory History and Interpretive Guidance
  C. Litigation and Subsequent Agency Enforcement Actions
III. Legal Authority
IV. Summary and Explanation of the Rule
  A. The Need for and Benefits of Third-Party Representation
  1. Comments Supporting Third-Party Representation
  2. Comments Opposed to Third-Party Representation
  3. Conclusion on the Need for and Benefits of Third-Party Representatives
  B. The "Good Cause" and "Reasonably Necessary" Requirement
  1. Comments That Supported Removing the CSHO's "Good Cause" and "Reasonably Necessary" Determination Requirement in Some Form
  2. Comments That Generally Supported Retaining the Existing "Good Cause" and "Reasonably Necessary" Requirement and Opposed the NPRM's Alternatives
  3. Conclusion on the "Good Cause" and "Reasonably Necessary" Requirement
  C. Role of the Employee Representative in the Inspection
  D. Constitutional Issues
  1. First Amendment Issues
  2. Fourth Amendment Issues
  3. Fifth Amendment Issues
  4. Due Process Issues
  5. Tenth Amendment Issues
  E. National Labor Relations Act and Other Labor-Related Comments
  F. Administrative Issues
  1. Administrative Procedure Act
  a. Consistency With the OSH Act
  b. Consistency With Other OSHA Regulations
  c. Basis for the Rule
  d. Specificity of the Rule
  2. Public Hearing
  G. Practical and Logistical Issues
  H. Liability Issues
  I. Other Issues
V. Final Economic Analysis and Regulatory Flexibility Act Certification
  A. Introduction
  B. Costs
  1. Rule Familiarization
  2. Training
  3. Providing PPE
  4. Policy Development, Revisions, and Planning
  5. Legal Advice and Consultations
  6. Insurance and Liability Costs
  7. Protecting Trade Secrets and Confidential Business Information
  8. Hiring Experts
  9. Costs to State Plan States
  10. Societal Costs
  C. Benefits
  D. Regulatory Flexibility Certification
  E. Small Business Regulatory Enforcement Fairness Act
VI. Office of Management and Budget (OMB) Review Under the Paperwork Reduction Act
VII. Federalism
VIII. State Plans
IX. Unfunded Mandates Reform Act
X. Consultation and Coordination With Indian Tribal Governments
XI. Environmental Impact Assessment
XII. List of Subjects
XIII. Authority and Signature

### I. Executive Summary

Since the Occupational Safety and Health Act of 1970 (OSH Act or Act) was passed in 1970, section 8(e) of the OSH Act has required that, subject to regulations issued by the Secretary of Labor (via OSHA), a representative of the employer and a representative authorized by employees "shall" each have the opportunity to accompany OSHA during the physical inspection of the workplace (*i.e.,* "the walkaround") for the purpose of aiding OSHA's inspection. One of section 8(e)'s implementing regulations, at 29 CFR 1903.8(c), provided that a representative authorized by employees "shall be an employee(s) of the employer." However, that regulation also created an exception for "a third party who is not an employee of the employer" when, "in the judgment of the Compliance Safety and Health Officer, good cause has been shown" why the third party was "reasonably necessary to the conduct of an effective and thorough inspection of the workplace. . . ." 29 CFR 1903.8(c) (1971). The regulation pointed to two non-exhaustive examples—a safety engineer and an industrial hygienist.

While OSHA has long permitted employee representatives to be third parties pursuant to 29 CFR 1903.8(c), in

2017, a district court concluded that interpretation was not consistent with the regulation. Because the first sentence of 1903.8(c) explicitly stated that employee representatives "shall be employees of the employer," it rejected OSHA's interpretation as "flatly contradict[ing]" the regulation. *Nat'l Fed'n of Indep. Bus.* v. *Dougherty,* No. 3:16–CV–2568–D, 2017 WL 1194666, at *11 (N.D. Tex. Feb. 3, 2017) (*NFIB* v. *Dougherty*). However, the district court also recognized that OSHA's interpretation that third parties could be employee representatives was a "persuasive and valid" reading of section 8(e) of the OSH Act. Id. at 12. The court concluded that "the Act merely provides that the employee's representative must be authorized by the employees, not that the representative must also be an employee of the employer." Id.

This final rule has a narrow purpose and makes two changes to 1903.8(c). First, in response to the district court's decision, it clarifies that consistent with Section 8(e) of the OSH Act, employee representatives may either be an employee of the employer or a third party. Second, consistent with OSHA's longstanding practice, it clarifies that a third-party representative authorized by employees may have a variety of skills, knowledge, or experience that could aid the CSHO's inspection. The latter revision clarifies that employees' options for third-party representation during OSHA inspections are not limited to only those individuals with skills and knowledge similar to that of the two examples (industrial hygienist or safety engineer) provided in the prior regulatory text. OSHA has retained the longstanding requirement in 1903.8(c) that third-party representatives may accompany the CSHO when good cause has been shown why they are reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace.

These revisions to 1903.8(c) do not change the CSHO's authority to determine whether good cause has been shown why an individual is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace. See 29 CFR 1903.8(b). The revisions also do not affect other provisions of section 1903.8, such as the CSHO's authority to deny the right of accompaniment to any individual whose conduct interferes with a fair and orderly inspection (29 CFR 1903.8(d)), the requirement that the conduct of inspections preclude unreasonable disruption of the operations of the employer's establishment (29 CFR 1903.7(d)), or the employer's right to

limit entry of employee authorized representatives into areas of the workplace that contain trade secrets (29 CFR 1903.9(d)).

As discussed below, OSHA's revisions will better align the language in 1903.8(c) with the language and purpose in section 8(e) of the OSH Act, 29 U.S.C. 657(e). By clarifying who can serve as employees' walkaround representative, the rule facilitates improved employee representation during OSHA inspections. Employee representation is vital to thorough and effective OSHA inspections, and OSHA finds these changes will improve the effectiveness of OSHA inspections and benefit employees' health and safety. OSHA determined that the rule appropriately recognizes employees' statutory right to a walkaround representative and OSHA's need for thorough and effective inspections while still protecting employers' privacy and property interests. Additionally, OSHA has concluded that this rule will not increase employers' costs or compliance burdens.

## II. Background

### A. The OSH Act and OSHA's Inspection Authority

The OSH Act was enacted "to assure so far as possible every working [person] in the Nation safe and healthful working conditions and to preserve our human resources" (29 U.S.C. 651(b)). To effectuate the Act's purpose, Congress authorized the Secretary of Labor to promulgate occupational safety and health standards (see 29 U.S.C. 655). The Act also grants broad authority to the Secretary to promulgate rules and regulations related to inspections, investigations, and recordkeeping (see 29 U.S.C. 657).

Section 8 of the OSH Act states that OSHA's inspection authority is essential to carrying out the Act's purposes and provides that employers must give OSHA access to inspect worksites "without delay" (29 U.S.C. 657(a)). Section 8(e) of the Act provides specifically that "[s]ubject to regulations issued by the Secretary, a representative of the employer and a representative authorized by [its] employees shall be given an opportunity to accompany [the CSHO] for the purpose of aiding such inspection" (29 U.S.C. 657(e)). Section 8(g) further authorizes the Secretary to promulgate such rules and regulations as the agency deems necessary to carry out the agency's responsibilities under this Act, including rules and regulations dealing with the inspection of an employer's establishment (29 U.S.C. 657(g)).

### B. Regulatory History and Interpretive Guidance

On May 5, 1971, OSHA proposed rules and general policies for the enforcement of the inspection, citation, and penalty provisions of the OSH Act. (36 FR 8376, May 5, 1971). OSHA subsequently issued regulations for inspections, citations, and proposed penalties at 29 CFR part 1903. (36 FR 17850, Sept. 4, 1971).

The OSH Act and 29 CFR part 1903 provide CSHOs with significant authority to conduct OSHA's inspections. Part 1903 contains specific provisions that describe the CSHO's authority and role in carrying out inspections under the OSH Act. For example, the CSHO is in charge of conducting inspections and interviewing individuals and has authority to permit authorized employer representatives and representative(s) authorized by employees to accompany the CSHO during the physical inspection of the workplace. See 29 CFR 1903.8(a). In addition, the CSHO has the authority to resolve any disputes about who the employer and employee representatives are and to deny any person the right of accompaniment if their conduct interferes with a fair and orderly inspection. See 29 CFR 1903.8(b), (d). The CSHO also has authority to use various reasonable investigative methods and techniques, such as taking photographs, obtaining environmental samples, and questioning individuals while carrying out their inspection. 29 CFR 1903.7(b); see also 1903.3(a).

Section 1903.8(c), the subject of this rulemaking, authorizes the CSHO to determine whether third-party representatives would aid OSHA's physical inspection of a workplace. Prior to this rulemaking, section 1903.8(c) provided: "The representative(s) authorized by employees shall be an employee(s) of the employer. However, if in the judgment of the Compliance Safety and Health Officer, good cause has been shown why accompaniment by a third party who is not an employee of the employer (such as an industrial hygienist or a safety engineer) is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace, such third party may accompany the Compliance Safety and Health Officer during the inspection." 29 CFR 1903.8(c) (1971). This paragraph, which primarily addresses employer and employee representatives during inspections, had not been revised since it was adopted in 1971.

Since issuing its inspection-related regulations, OSHA has provided guidance on its interpretation of section 1903.8(c) and the meaning of ''representative authorized by employees'' for purposes of the OSHA walkaround inspection. For example, on March 7, 2003, OSHA issued a letter of interpretation to Mr. Milan Racic (Racic letter), a health and safety specialist with the International Brotherhood of Boilermakers (Document ID 0002). Mr. Racic asked whether a union representative who files a complaint on behalf of a single worker could then also act as a walkaround inspection representative in a workplace that has no labor agreement or certified bargaining agent (Document ID 0002). In its response letter, OSHA stated that there was no ''provision for a walkaround representative who has filed a complaint on behalf of an employee of the workplace'' (Document ID 0002).

On February 21, 2013, OSHA issued a letter of interpretation to Mr. Steve Sallman (Sallman letter) of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (Document ID 0003). Mr. Sallman asked whether workers at a worksite without a collective bargaining agreement could designate a person affiliated with a union or a community organization to act on their behalf as a walkaround representative. OSHA responded in the affirmative, explaining that such person could act on behalf of employees as long as they had been authorized by employees to serve as their representative.

OSHA further explained that the right is qualified by 29 CFR 1903.8, which gives CSHOs the authority to determine who can participate in an inspection. OSHA noted that while 1903.8(c) acknowledged that most employee representatives will be employees of the employer being inspected, the regulation also ''explicitly allows walkaround participation by an employee representative who is not an employee of the employer when, in the judgment of the OSHA compliance officer, such representative is 'reasonably necessary to the conduct of an effective and thorough physical inspection' '' (Document ID 0003). OSHA explained that such representatives are reasonably necessary when they will make a positive contribution to a thorough and effective inspection (Document ID 0003).

OSHA gave several examples of how an authorized employee representative who was not an employee of the employer could make an important contribution to the inspection, noting that the representative might have a particular skillset or experience evaluating similar working conditions in a different facility. OSHA also highlighted the usefulness to workers and to the CSHO of an employee representative who is bilingual or multilingual to better facilitate communication between employees and the CSHO during an inspection.

Additionally, OSHA noted that the 2003 Racic letter had inadvertently created confusion among the regulated community regarding OSHA's interpretation of an authorized employee representative for walkaround inspection purposes. OSHA explained that the Racic letter merely stated that a non-employee who files a complaint does not necessarily have a right to participate in an inspection arising out of that complaint, but that it did not address the rights of workers without a certified or recognized collective bargaining agent to have a representative of their own choosing participate in an inspection. OSHA withdrew the Racic letter to eliminate any confusion and then included its interpretation of 29 CFR 1903.8(c) as to who could serve as an authorized employee representative when it updated its Field Operations Manual (FOM) CPL 02–00–159 on October 1, 2015 (Document ID 0004). The FOM explained that ''[i]t is OSHA's view that representatives are 'reasonably necessary', when they make a positive contribution to a thorough and effective inspection'' and recognized that there may be cases in which workers without a certified or recognized bargaining agent would authorize a third party to represent the workers on the inspection (Document ID 0004). OSHA noted that ''[t]he purpose of a walkaround representative is to assist the inspection by helping the compliance officer receive valuable health and safety information from workers who may not be able or willing to provide such information absent the third-party participants'' (Document ID 0004)

### C. Litigation and Subsequent Agency Action

In September 2016, several years after OSHA issued the Sallman letter, the National Federation of Independent Business (NFIB) filed a suit in the district court for the Northern District of Texas challenging the Sallman letter, arguing it should have been subject to notice and comment rulemaking and that it conflicted with OSHA's regulations and exceeded OSHA's statutory authority. *NFIB* v. *Dougherty,*

2017 WL 1194666. On February 3, 2017, the district court concluded that OSHA's interpretation as stated in the Sallman letter was not consistent with 29 CFR 1903.8(c) and such a change to a regulation could not be made without notice and comment rulemaking. Id. at *11. The district court held that the letter ''flatly contradicts a prior legislative rule as to whether the employee representative must himself be an employee.'' Id.

Nevertheless, the court rejected NFIB's claim that the Sallman letter conflicted with the OSH Act, finding that OSHA's Sallman letter of interpretation was ''a persuasive and valid construction of the Act.'' Id. at *12. The court concluded that ''the Act merely provides that the employee's representative must be authorized by the employees, not that the representative must also be an employee of the employer.'' Id.

Following this decision, on April 25, 2017, OSHA rescinded the Sallman letter (Document ID 0006). OSHA also revised the Field Operations Manual to remove language that incorporated the Sallman letter (CPL 02–00–163 (09/13/2019), Document ID 11544).

On August 30, 2023, OSHA published a notice proposing revisions of 29 CFR 1903.8(c) to clarify who may serve as a representative authorized by employees for the purpose of OSHA's walkaround inspection (88 FR 59825).

### III. Legal Authority

The OSH Act authorizes the Secretary of Labor to issue safety and health ''standards'' and other ''regulations.'' See, *e.g.,* 29 U.S.C. 655, 657. An occupational safety and health standard, issued pursuant to section 6 of the Act, prescribes measures to be taken to remedy an identified occupational hazard. See 29 U.S.C. 652(8) (an occupational safety and health standard ''requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment.''). In contrast, a ''regulation'' is issued pursuant to general rulemaking authority found, inter alia, in section 8 of the Act, and establishes an ''enforcement or detection procedure designed to further the goals of the Act generally.'' *Workplace Health and Safety Council* v. *Reich,* 56 F. 3d 1465, 1468 (D.C. Cir. 1995). Although the U.S. Chamber of Commerce (Chamber of Commerce) suggested that this rule should be subject to the requirement that ''occupational safety and health standards'' be ''reasonably necessary''

under section 3(8) of the OSH Act, (Document 1952, p. 2), inspection-related requirements, such as the requirements in 1903.8(c), are properly characterized as regulations because they do not require "conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. 652(8).

In this rulemaking, OSHA is revising its existing regulation at 1903.8(c) pursuant to OSHA's authority under section 8 of the OSH Act. See 29 U.S.C. 657(e) (describing the Secretary's authority to promulgate regulations related to employer and employee representation during an inspection); 657(g)(2) (describing the Secretary of Labor's and the Secretary of Health and Human Services' authority to "each prescribe such rules and regulations as [they] may deem necessary to carry out their responsibilities under this Act, including rules and regulations dealing with the inspection of an employer's establishment"). This rule clarifies employees' statutory right to a walkaround representative under section 8 of the OSH Act and does not impose any new substantive inspection-related requirements.

Several provisions of the OSH Act underscore OSHA's authority to promulgate inspection-related requirements, including those that relate to the rights of employees to have an authorized representative accompany OSHA during a physical inspection of their workplace. Section 2 of the OSH Act states that the Act's express purpose is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. 651(b). To effectuate that purpose, Congress provided OSHA with broad authority under section 8 to conduct inspections of workplaces and records, to require the attendance and testimony of witnesses, and to require the production of evidence. See generally 29 U.S.C. 657. OSHA's ability to carry out workplace inspections is critical to the OSH Act's entire enforcement scheme. See 29 U.S.C. 658 (authorizing OSHA to issue citations for violations following an inspection or investigation); 659 (citations shall be issued within a reasonable time after inspection or investigation). Moreover, any approved State occupational safety and health plan must provide for an OSHA inspector's right of entry and inspection that is at least as effective as the OSH Act. See 29 U.S.C. 667(c)(3).

In addition to granting OSHA broad authority to conduct workplace

inspections and promulgate regulations to effectuate those inspections, Congress also recognized the importance of ensuring employee participation and representation in the inspection process. The legislative history of section 8 of the OSH Act shows Congress' intent to provide representatives authorized by employees with an opportunity to accompany the inspector in order to benefit the inspection process and "provide an appropriate degree of involvement of employees." S. Rep. No. 91–1282 91st Cong., 2nd Sess. (1970), reprinted in Legislative History of the Occupational Safety and Health Act of 1970 at 151 (Comm. Print 1971). Senator Harrison B. Williams of New Jersey, who was a sponsor of the bill that became the OSH Act, explained that the opportunity for workers themselves and a representative of their choosing to accompany OSHA inspectors was "manifestly wise and fair" and "one of the key provisions of the bill." Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational Safety and Health Act of 1970, at 430 (Comm. Print 1971).

The OSH Act's legislative history further indicates that Congress considered potential concerns related to the presence of a representative authorized by employees at the inspection and ultimately decided to expressly include this right in section 8(e) of the Act. Congressional debate around this issue included concern from some members of Congress that the presence in the inspection of a representative authorized by employees would cause an undue burden on employers or be used as "an effort to ferment labor unrest." See Comments of Congressperson William J. Scherle of Iowa, 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational Safety and Health Act of 1970, at 1224 (Comm. Print 1971); see also Comments of Congressperson Michel of Illinois, id. at 1057. Similarly, Senator Peter Dominick of Colorado proposed an amendment to the Senate bill that would have removed the right of a representative authorized by the employees to accompany the CSHO and instead would have only required that the CSHO consult with employees or their representative at "a reasonable time." Proposed Amendment No. 1056, 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational Safety and Health Act of 1970, at 370 (Comm. Print 1971). One of the stated reasons for the proposed amendment was a concern that "[t]he mandatory

'walk-around' provisions now in the bill could . . . lead to 'collective bargaining' sessions during the course of the inspection and could therefore interfere both with the inspection and the employer's operations." Id. at 372. This proposed amendment was rejected, and section 8(e) of the OSH Act reflects Congress' considered judgment of the best way to strike the balance between employers' concerns about workplace disruptions and the critical importance of employee representation in the inspection process.

And while section 8(e) underscores the importance of employer and employee representation in OSHA's workplace inspection, the Act places only one criterion on who can be an employer or employee representative and that is that the representative "aid[ ] such inspection." 29 U.S.C. 657(e). It does not state that the representative must be an employee of the employer. See *Matter of Establishment Inspection of Caterpillar Inc.,* 55 F.3d 334, 338 (7th Cir. 1995) ("[T]he plain language of § 8(e) permits private parties to accompany OSHA inspectors[.]"); *NFIB* v. *Dougherty,* 2017 WL 1194666, at *12 ("[T]he Act merely provides that the employee's representative must be authorized by the employee, not that the representative must also be an employee of the employer."). Instead, the Act authorizes the Secretary of Labor (via OSHA) to issue regulations and determine who may be a representative for purposes of the OSHA inspection. 29 U.S.C. 657(e). Congress intended to give the Secretary of Labor the authority to issue regulations related to determining the specifics and resolving the question of who could be a representative for purposes of the walkaround inspection. See Legislative History of the Occupational Safety and Health Act of 1970, at 151 (Comm. Print 1971) ("Although questions may arise as to who shall be considered a duly authorized representative of employees, the bill provides the Secretary of Labor with authority to promulgate regulations for resolving this question.").

The National Retail Federation (NRF) argued that the "Saxbe Amendment" to the OSH Act demonstrates that an "authorized" representative must be "one selected through the NLRA selection process" (Document ID 1776, p. 8). The Saxbe Amendment sought to "clarif[y] and protect[ ] from abuse" the right of accompaniment by adding "provisions making such right clearly subject to regulations of the Secretary, defining the purpose of such accompaniments as aid of the inspection, and extending mandatory consultation rights to a reasonable

**22562** **Federal Register** / Vol. 89, No. 63 / Monday, April 1, 2024 / Rules and Regulations

number of employees where there is no 'authorized' representative of employees.'' Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational Safety and Health Act of 1970, at 197–98 (Comm. Print. 1971). NRF points to the reason given for this amendment, which was to avoid scenarios in which the Secretary would have to ''resolve union organizing issues which have no relationship to this legislation.'' (Document ID 1776, p. 9) (citing Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational Safety and Health Act of 1970, at 198 (Comm. Print 1971)).

This reference to union organizing simply reflects Congress's acknowledgement that in some workplaces there may be disputes concerning union representation. However, it cannot be read to deny accompaniment rights to employees in non-union workplaces. See Comments of Congressperson William J. Scherle of Iowa, 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational Safety and Health Act of 1970, at 1224 (Comm. Print 1971) (''The bill provides that union representatives *or any employee representative* be allowed to accompany inspectors on their plant tours.'' (emphasis added)). Moreover, the concern raised about union organizing has been addressed both through OSHA policy and regulations. As discussed in Section IV.E, National Labor Relations Act and Other Labor-Related Comments, it is OSHA's longstanding policy to avoid being interjected into labor relations disputes. See also OSHA Field Operations Manual, Chapter 3, Sections IV.G–H (''Under no circumstances are CSHOs to become involved in a worksite dispute involving labor management issues or interpretation of collective bargaining agreements''). OSHA's regulations also provide that the inspection shall ''preclude unreasonable disruption of the employer's establishment,'' 29 CFR 1903.7(d), and that the CSHO may deny the right of accompaniment to any person whose conduct ''interferes with a fair and orderly inspection.'' 29 CFR 1903.8(d). Further, where there is a dispute that prevents the CSHO from determining with reasonable certainty who is the authorized employee representative, the CSHO will consult with a reasonable number of employees concerning matters of safety and health in the workplace. 29 CFR 1903.8(b).

This final rule does not infringe on employer's Fourth Amendment rights.

The Fourth Amendment protects employers against ''unreasonable searches and seizures,'' and, absent consent from an employer, OSHA is required to obtain a warrant to conduct a physical inspection of their workplace. See *Marshall* v. *Barlow's Inc.,* 436 U.S. 307 (1978). Where the government has sought and obtained a search warrant supported by probable cause and acted within its scope, the resulting search is presumptively reasonable under the Fourth Amendment. See *Sims* v. *Labowitz,* 885 F.3d 254, 268 (4th Cir. 2018). ''And for the search to be reasonable, it does not have to be conducted flawlessly nor by the least intrusive means.'' Id. (citing *Skinner* v. *Ry. Labor Executives' Ass'n,* 489 U.S. 602, 629 n.9 (1989)). This rule comports with the Fourth Amendment's prohibition against ''unreasonable searches and seizures'' because all OSHA inspections, including those in which employees authorize a third-party walkaround representative under this final rule, will be carried out either with the employer's consent or pursuant to a duly issued inspection warrant. Furthermore, while the OSH Act grants the Secretary of Labor broad authority to inspect workplaces ''without delay'' to find and remedy safety and health violations, 29 U.S.C. 657(a)(1), these inspections must be carried out ''during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner.'' Id. at 657(a)(2); see also 29 CFR 1903.7(d) (''The conduct of inspections shall be such as to preclude unreasonable disruption of the operations of the employer's establishment.'').

Some commenters argued that allowing a third-party employee representative to accompany OSHA during the walkaround inspection would make OSHA's search unreasonable (see, *e.g.,* Document ID 1976, p. 19). However, as discussed in Section IV.D.2, Fourth Amendment Issues, the mere presence of a third-party employee representative on the employer's premises does not render OSHA's inspection unreasonable for Fourth Amendment purposes. See *Bills* v. *Aseltine,* 958 F.2d 697, 703 (6th Cir. 1992) (noting that a third party's entry onto subject's private property may be ''justified if he had been present to assist the local officers''); see also *Wilson* v. *Layne,* 526 U.S. 603 (1999) (holding that bringing members of the media into a home during the execution of a search warrant violated the Fourth Amendment when the presence of the third parties in the home was *not* in aid of the execution of the warrant).

Additionally, contrary to the concerns expressed by some commenters opposed to the rule, this rulemaking does not grant third parties ''unfettered access'' to an employer's private property (see, *e.g.,* Document ID 0040, p. 4; 0045; 0235, p. 2; 0528; 1757, p. 3; 1762, p. 3; 1974, p. 2; 9316). Rather, as explained in Sections IV.A, IV.C, and IV.D.II, the role of the third-party representative is limited to aiding the inspection; they are only permitted to accompany the CSHO, and they may not stray from the CSHO or conduct their own searches.

This final rule preserves the requirement that the CSHO must first determine ''good cause has been shown'' why the accompaniment by a third party is ''reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace.'' 29 CFR 1903.8(c). And, under OSHA's existing regulations, the CSHO is authorized to deny the right of accompaniment to any person whose conduct interferes with a fair and orderly inspection. 29 CFR 1903.8(d). Accordingly, OSHA inspections conducted pursuant to this rule will comport with the Fourth Amendment's reasonableness requirement because the role of the third-party employee representative will be limited to aiding OSHA's inspection. Indeed, the CSHO will ensure the inspection is conducted in a reasonable manner per section 8(a)(2) of the Act and 29 CFR 1903.3(a). See *Matter of Establishment Inspection of Caterpillar Inc.,* 55 F.3d at 339 (''[T]he Act and its regulations establish a number of administrative safeguards that adequately protect the rights of employers and limit the possibility that private participation in an inspection will result in harm to the employer.'').

Moreover, because OSHA's inspections are conducted in accordance with the Fourth Amendment, they do not constitute a ''physical taking'' under the Takings Clause of the Fifth Amendment. Under the Fifth Amendment's Takings Clause, the government must provide just compensation to a property owner when the government physically acquires private property for public use. See *Tahoe-Sierra Pres. Council, Inc.* v. *Tahoe Reg'l Plan. Agency,* 535 U.S. 302, 321 (2002). However, the Supreme Court has recognized that ''[b]ecause a property owner traditionally [has] had no right to exclude an official engaged in a reasonable search, government searches that are consistent with the Fourth Amendment and state law cannot be said to take any property right from landowners.'' *Cedar Point Nursery* v. *Hassid,* 141 S. Ct. 2063, 2079 (2021).

Nonetheless, some commenters argued that the rule would affect an unconstitutional *per se* taking under *Cedar Point Nursery* because it would grant third parties access to the employer's property (Document ID 0043, p. 2–3; 1952, p. 8–9; 1976, p. 18–19). As discussed more fully in Section IV.D.3, Fifth Amendment Issues, this rule does not constitute a *per se* taking because the presence of third-party employee representatives on the employer's property under this rule will be limited to accompanying the CSHO during a lawful physical inspection of the workplace and their sole purpose for being on the employer's premises will be to aid the inspection. See 29 CFR 1903.7(d), 1903.8(b); see also *Matter of Establishment Inspection of Caterpillar Inc.,* 55 F.3d at 339.

Based on the foregoing, OSHA has determined that it has legal authority for its revisions to OSHA's existing regulation at 29 CFR 1903.8(c).

## IV. Summary and Explanation

On August 30, 2023, OSHA proposed amending its existing rule for the Representatives of Employers and Employees at 29 CFR 1903.8(c) to clarify who may serve as a representative authorized by employees during OSHA's walkaround. 88 FR 59825. OSHA provided sixty days for public comment and subsequently extended the comment period for an additional two weeks. 88 FR 71329. By the end of the extended comment period, OSHA had received 11,529 timely comments on the proposed rule that were posted to the docket.

Prior to this rulemaking, the rule stated that a representative authorized by employees "shall be an employee(s) of the employer." However, that regulation also created an exception for "a third party who is not an employee of the employer" when, "in the judgment of the Compliance Safety and Health Officer, good cause has been shown" why the third party was "reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace. . . ." 29 CFR 1903.8(c) (1971). The regulation also listed two non-exhaustive examples of such third parties—a safety engineer and an industrial hygienist.

OSHA proposed two revisions of 29 CFR 1903.8(c). First, the agency proposed to clarify that the representative(s) authorized by employees may be an employee of the employer or a third party. Second, OSHA proposed that a third-party representative authorized by employees may be reasonably necessary to the conduct of an effective and thorough

physical inspection of the workplace by virtue of their knowledge, skills, or experience. This proposed revision was intended to clarify that the employees' options for third-party representation during OSHA inspections are not limited to only those individuals with skills and knowledge similar to that of the two examples provided in prior regulatory text: Industrial Hygienist or Safety Engineer.

OSHA noted in the Notice of Proposed Rulemaking (NPRM) that the proposed revisions to section 1903.8(c) would not change the CSHO's authority to determine whether an individual is a representative authorized by employees (29 CFR 1903.8(b)). Also, the proposed revisions would not affect other provisions of 29 CFR part 1903 that limit participation in walkaround inspections, such as the CSHO's authority to prevent an individual from accompanying the CSHO on the walkaround inspection if their conduct interferes with a fair and orderly inspection (29 CFR 1903.8(d)) or the employer's right to limit entry of employee authorized representatives into areas of the workplace that contain trade secrets (29 CFR 1903.9(d)). As always, the conduct of OSHA's inspections must preclude unreasonable disruption of the operations of employer's establishment. See 29 CFR 1903.7(d).

OSHA sought public comment on all aspects of the rule, including why employees may wish to be represented by a third-party representative and examples of third-party representatives who have been or could be reasonably necessary to the conduct of an effective and thorough walkaround inspection. OSHA also sought examples and information about any other unique skills that have been helpful or added safety and health value to OSHA's inspection. Additionally, OSHA solicited input on regulatory options, such as whether the agency should maintain the "good cause" and "reasonably necessary" requirement.

OSHA received comments in favor of the rule and opposed to it, ranging from requests to withdraw the rule entirely to criticism that the rule does not go far enough to ensure that employees are able to select a representative of their choice. Many organizations representing employers contended that the rule represents a significant change to OSHA's procedures and will facilitate union organizing. Among other arguments, these organizations generally argued that the rule: (1) conflicts with the OSH Act and existing OSHA regulations; (2) infringes on employers' Constitutional rights, particularly

property rights; (3) imposes substantial costs, particularly for small businesses; and (4) will be difficult for OSHA to administer. Conversely, organizations representing employees praised the rule for encouraging employee representation, ensuring thorough and effective inspections, and promoting workers' safety and health. Some organizations representing employees also argued that OSHA should eliminate the "good cause" and "reasonably necessary" requirement for third parties.

OSHA considered all issues raised, and, as explained in depth below, determined that revising 1903.8(c) more clearly aligns with the language and purpose of section 8(e) of the OSH Act, 29 U.S.C. 657(e). Moreover, OSHA's revisions to 1903.8(c) better ensure employee involvement in an OSHA inspection, which is a critical component to conducting an effective and thorough inspection. As explained further below, OSHA has decided to retain the existing "good cause" and "reasonably necessary" requirement in the final rule. Additionally, because of commenter concerns that the use of the word "participation" in the NPRM suggested the employee representative had a role in conducting OSHA's inspection, OSHA removed that term in favor of "accompaniment" in the final rule.

### A. The Need for and Benefits of Third-Party Representation

The text of the OSH Act provides that, "[s]ubject to regulations issued by the Secretary, a representative of the employer and *a representative authorized by his employees* shall be given an opportunity to accompany the Secretary or his authorized representative during" physical workplace inspections. 29 U.S.C. 657(e) (emphasis added). There is nothing in the OSH Act to suggest that employee (or employer) representatives must be employees of the employer. The only criterion the statute imposes is that the representative will "aid[] such inspection." In the NPRM, OSHA explained that, based on its experience, there are a variety of third parties who might serve as representatives authorized by employees who could aid the OSHA walkaround inspection. 88 FR at 59829–30. As an example, OSHA highlighted an inspection where a worker for a company removing asbestos at a worksite reported safety concerns to OSHA and a third party. The third party contacted OSHA and a community organization on behalf of the workers to ensure their safety and health concerns were fully communicated to and understood by the

CSHO. The community organization's attorney and a former employee of the workplace were chosen as the employees' representatives to participate in the walkaround inspection. OSHA found the presence of both individuals to be very beneficial to the inspection because the representatives were able to clearly identify and communicate safety concerns to the CSHO during the walkaround. Many of the exposed workers on this worksite were not fluent in English and having representatives who the workers trusted and could facilitate communication with the CSHO enabled OSHA to conduct numerous worker interviews and better investigate the workplace conditions. 88 FR 59830.

In the NPRM, OSHA sought public comment on any other examples where third parties benefitted OSHA inspection, the reasons why employees may desire a third-party representative, and any data or anecdotal examples of individuals who may serve as third parties, among other questions. In response, many commenters, both for and against the proposed rule, commented on the need for third-party employee representatives and the benefits they bring to OSHA's inspections.

After reviewing the comments, as summarized below, OSHA has concluded that third-party representatives authorized by employees may have a variety of skills, knowledge, or experience that could aid the CSHO's inspection. This includes, but is not limited to, knowledge, skills, or experience with particular hazards or conditions in the workplace or similar workplaces, as well as any relevant language or communication skills a representative may have to facilitate better communication between workers and the CSHO. OSHA has therefore deleted the two enumerated examples in the current regulation—industrial hygienists and safety engineers—to clarify that different types of individuals may be reasonably necessary to OSHA's inspection. These revisions do not preclude an industrial hygienist or safety engineer from serving as an employee representative; instead, the revisions more properly focus the CSHO's determination on factors such as the knowledge, skills, or experience of the third party rather than the third party's professional discipline. 88 FR 59829.

1. Comments Supporting Third-Party Representation

OSHA received numerous comments demonstrating the importance and benefits of third-party representation—many of which included real-life examples of how third-party representatives have assisted OSHA over the years. Commenters supporting the rule emphasized the benefits of third parties' technical and/or subject matter expertise. They also appreciated OSHA's effort to clarify that various types of third parties, and not just those with the above expertise, can aid OSHA's inspections based on a variety of knowledge, skills, or experience (see, e.g., Document ID 1972, p. 3–4). As one commenter noted, third-party representatives need not be "certified expert[s]" to meaningfully contribute to an inspection (Document ID 0022).

In particular, commenters supporting third-party representation pointed out that: (1) third parties can possess helpful technical and/or subject-matter expertise with hazards, industries, and OSHA's investigation process; (2) third parties can provide critical language skills and related cultural competencies; (3) third parties can facilitate employee cooperation by increasing employees' trust in the inspection process; (4) third-party representation greatly benefits inspections involving multi-employer worksites; and (5) third-party representation empowers workers and appropriately balances the rights and needs of all parties during the inspection process.

First, numerous commenters emphasized that third parties can possess helpful technical and/or subject-matter expertise with particular hazards, industries, or the investigation process (see, e.g., Document ID 1753, p. 5–7). The United Steelworkers Union (USW) noted that it has brought in technical experts to serve as designated employee representatives in OSHA inspections involving issues related to combustible dust, combustion safety, electrical safety, and occupational medicine (Document ID 1958, p. 5). The Amalgamated Transit Union also stated that its union officials, including those in the Health and Safety Department, have transit safety and health knowledge that could be relevant to an OSHA investigation, such as technical expertise regarding transit vehicle designs, transit maintenance equipment, and a "big-picture view" of the hazard; it also pointed to union officials' ability to assemble workers for interviews, identify relevant evidence, and bring a level of familiarity and comfort in speaking with government agents that employees might lack (Document ID 1951, p. 1–2).

Similarly, the USW provided examples of where its familiarity with OSHA inspections was beneficial. In one such example involving an explosion and fatalities at a USW-represented workplace, a USW safety representative from the union's headquarters traveled to the site to assist (Document ID 1958, p. 4–5). Because access to the area at issue was initially restricted to OSHA and others, the safety representative assisted OSHA with determining who should be interviewed and what information OSHA should request from the employer; the third-party union representative was also needed to help the local union and OSHA obtain employees' involvement during interviews and the walkaround (Document ID 1958, p. 4–5).

In addition, the USW commented that "[w]orkplaces that do not have a collective bargaining representative may be especially vulnerable to safety hazards, and employees in these workplaces benefit from the expertise and advocacy experience that a community group, safety expert, or labor organization can provide in a walkaround inspection" (Document ID 1958, p. 3). Farmworker Justice agreed, recognizing that third parties such as union representatives and worker advocates have industry-specific or workplace safety expertise that they can use to help workers identify and communicate workplace safety concerns to OSHA (Document ID 1763, p. 3–4).

Several commenters emphasized the benefits of third parties' industry-specific expertise in particular. For example, the Utility Workers Union of America (UWUA) noted that, in recent years, the UWUA national union provided a walkaround representative in numerous incidents that "have proven the difference between a fair investigation and one that unfairly weighs in the employer's balance" (Document ID 1761, p. 1). UWUA described one inspection in Pennsylvania involving the death of an overhead lineman who had been working with a crew operating a bucket truck when that truck unexpectedly rolled downhill and overturned in the road (Document ID 1761, p. 1). UWUA explained that the national union representative was able to inform the CSHO about technological and work practice changes in the industry, including the use of an inclinometer, that were not immediately apparent even to the workers themselves due to inadequate training (Document ID 1761, p. 1). OSHA's inspection benefitted from the national union representative's industry-specific expertise (Document ID 1761, p. 1).

Similarly, the USW also highlighted an OSHA inspection that benefitted

**Federal Register** / Vol. 89, No. 63 / Monday, April 1, 2024 / Rules and Regulations    **22565**

from a third-party representative who had industry-specific expertise (Document ID 1958, p. 3). In that inspection, where a USW mechanic died in a flash fire involving a dust collection system, a USW safety representative from the union's headquarters accompanied the CSHO along with local union representatives who had never been part of an OSHA inspection or a fatality investigation (Document ID 1958, p. 3). The USW safety representative's experience in the industry, experience serving on one of the National Fire Protection Agency's combustible dust committees, and experience with prior OSHA inspections and fatality investigations benefitted the inspection (Document ID 1958, p. 3–4). According to the USW, the CSHO confirmed that the third-party's assistance made the inspection more "through[] and complete" (Document ID 1958, p. 3).

In the healthcare industry, one commenter, a former director of the safety and health program for the American Federation of State, County and Municipal Employees (AFSCME), provided examples of where this commenter was able to assist CSHOs during past inspections with hazards that were not well-known at the time (Document ID 1945, 2–3). This commenter stated that they were able to provide guidance to CSHOs regarding workplace violence and bloodborne pathogens and what similar facilities were doing to abate similar problems and hazards (Document ID 1945, p. 2–3).

In addition, the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada, ("IATSE") asserted that third-party representation can also benefit inspections in their industry, as "[t]erminology, specific job functions, equipment, and procedures might be unfamiliar to an industry outsider" (Document ID 1970, p. 1). As an example, IATSE explained that, if a worker was injured in a remote location during a motion picture production, a third-party walkaround representative could explain the industry practice of equipment rentals, camera placement, crew positions, and other industry-standard procedures (Document ID 1970, p. 1).

Several of these commenters explained that the expertise of third parties is helpful to OSHA because CSHOs cannot be expected to have knowledge or expertise with every industry, craft, task, hazard, occupation, or employer (Document ID 1969, p. 14; see also 1753, p. 5–7). Commenters

noted that third parties can assist when hazards are hidden or not immediately apparent to the CSHO (see, *e.g.*, Document ID 1753, p. 7).

Second, many commenters, including the National Employment Law Project (NELP), also identified a need for third-party representatives with language skills when CSHOs interact with workers from a linguistic or other background with which the CSHO is unfamiliar (see, *e.g.*, Document ID 1972, p. 4). Numerous commenters noted the importance of third-party representatives who can interpret for limited-English proficient workers (see, *e.g.*, Document ID 0030; 0037; 0526, p. 1–2; 1958, p. 2). For example, the USW explained that "employees can offer significantly more information when they can comfortably communicate in a language in which they are fluent" (Document ID 1958, p. 2). MassCOSH described the importance of having a "respected, culturally and linguistically competent" employee representative to ensure the CSHO obtains information needed for a complete and thorough inspection (Document ID 1750, p. 3). MassCOSH provided an example where several Central American immigrant workers suffered from lead poisoning at a lead recycling facility in Massachusetts (Document ID 1750, p. 3). The CSHO did not speak Spanish and could not communicate with Spanish-speaking workers, and so was unable to identify areas of lead contamination (Document ID 1750, p. 3). Workers subsequently contacted MassCOSH, which contacted OSHA and provided a Spanish-speaking representative to accompany the CSHO on a second inspection (Document ID 1750, p. 3). The representative was able to facilitate communication between the CSHO and workers, who pointed the CSHO to the areas that were particularly contaminated with lead but were not easily found (Document ID 1750, p. 3).

Similarly, Justice at Work described how a worker organization it collaborates with in Massachusetts, Centro Comunitario de Trabajadores (CCT), works with workers who face significant language barriers because many in the community do not speak English, and some are not fluent in Spanish and need K'iche' interpretation (Document ID 1980, p. 2). Justice at Work noted that a CCT leader was selected by workers to assist OSHA during a fatality investigation several years ago and workers were "immediately comfortable to see a member of their community there; they spoke freely with the CCT leader and pointed out the danger areas in the worksite" (Document ID 1980, p. 2).

United Brotherhood of Carpenters and Joiners of America (UBC) explained that union representatives may be aware of languages spoken by a workforce in a specific geographic area and have the language skills necessary to communicate with these workers (Document ID 1753, p. 6–7). UBC further noted that when serving as a third-party representative, these union representatives can bring these skills to assist CSHOs who may lack such a familiarity with the languages spoken by workers in that specific geographic area, such as Polish in the Chicago-area (Document ID 1753, p. 6–7). Nebraska Appleseed, which partners with hundreds of immigrant community members in advocating for safer working conditions, explained that workers in meat and poultry processing facilities often speak Spanish, Somali, Karen,[1] Vietnamese, and other languages not typically spoken by local OSHA staff (Document ID 1766, p. 1–3). Similarly, United Food and Commercial Workers (UFCW) explained that many union members struggle with language barriers, noting that in Nebraska and South Dakota, the immigrant population makes up over half the working staff (Document ID 1023, p. 3–4). Project WorkSAFE noted that, in Vermont, there is an increasing need to have individuals at a worksite who speak Spanish and English for translation purposes, but, in their experience, none of the CSHOs in Vermont OSHA speak Spanish (Document ID 0037).

A third-party's language skills can prevent situations "where employers or 'ad hoc' interpreters are the go-betweens for the CSHO and the worker" (Document ID 0526, p. 2). Justice at Work Pennsylvania explained that when supervisors translate for workers, flawed interpretations or even full fabrications may result, and a translator can facilitate "an accurate and complete" conversation between CSHOs and workers (Document ID 0526, p. 2). NELP stated that "poor communication between workers onsite and OSHA inspectors is not solely a function of language access. OSHA compliance officers may lack the cultural competence, community knowledge, and existing relationships with workers that are necessary to facilitate trust and frank communication" (Document ID 1972, p. 4). The USW also added that third-party representatives can provide "language justice" by ensuring "cultural competency, trust and knowledge" (Document ID 1958, p. 2). Even when a CSHO has the requisite language skills

---

[1] Karen languages are spoken in parts of Burma and Thailand.

**22566** **Federal Register** / Vol. 89, No. 63 / Monday, April 1, 2024 / Rules and Regulations

or access to an interpreter, third-party representatives can provide needed "language and cultural competency skills" or have a prior relationship with workers, (Document ID 1972, p. 4–5; see also 1969, p. 18), and thereby bridge the gap between workers and CSHOs (see Document ID 1763, p. 4; 1972, p. 4). The AFL–CIO provided such an example when immigrant workers chose a faith leader from their community to be a representative during an OSHA inspection (Document ID 1969, p. 14). This faith leader helped the workers overcome their fear of speaking to the CSHO by drawing upon a prior relationship with the workers and by interpreting for them (Document ID 1969, p. 14).

Third, commenters explained that, in addition to technical expertise, third-party representatives may also benefit inspections by increasing employees' trust in the inspection process and thereby their cooperation (see, e.g., Document ID 1972, p. 5–6). Commenters identified several reasons that employees may be reluctant to speak to an OSHA official, such as unfamiliarity with OSHA and their rights under the OSH Act, fears of retaliation, negative immigration consequences, language or cultural barriers, or their age, among other reasons (see, e.g., Document ID 0526, p. 3; 1031; 1763, p. 2–4). The AFL–CIO explained that many employers discourage workers from engaging with OSHA, noting that workers have shared that their employer threatened them with getting in trouble, personally fined, or losing their job as a result of an OSHA inspection (Document ID 1969, p. 13). The AFL–CIO noted that vulnerable workers, including immigrant workers and refugees, may fear that speaking with OSHA will jeopardize their ability to stay and work in the United States (Document ID 1969, p. 13). Similarly, Justice at Work Pennsylvania shared that, in one client's workplace, employees were too fearful to cooperate with OSHA after their employer called U.S. Immigration and Customs Enforcement on a co-worker (Document ID 0526, p. 3). Several commenters noted that employees "may feel unsafe speaking to OSHA inspectors without a trusted representative. . . ." such as worker centers, unions, community organizations, and attorneys (see, e.g., Document ID 0031; 0034; 1031).

Commenters identified several ways that such third-party representation can promote employee trust and cooperation. For instance, commenters explained that a trusted employee representative can help workers understand OSHA's inspection process

(see, e.g., Document ID 0042). Commenters also stated that third-party representatives can guide and support workers through the inspection process, providing assurances that it is safe and worthwhile to provide information and encouraging employees to communicate openly with OSHA (see, e.g., Document ID 0526, p. 3; 1969, p. 13). The AFL–CIO noted several examples of situations where workers were willing to speak with OSHA when a trusted representative was present, including the example described above where workers chose a faith leader who they knew personally and trusted (Document ID 1969, p. 14).

Additionally, commenters noted that third-party representatives can also serve as a buffer between the employer and employees who fear retaliation (see, e.g., Document ID 0014; 0022; 0089; 0120; 0526, p. 3; 1023, p. 5; 10725) and can communicate employees' concerns for them (see, e.g., Document ID 1728, p. 3). As the National Black Worker Center explained, "We understand the layered experience of Black workers on the job, including the fear of reporting health and safety issues due to employer retaliation. We are uniquely suited to support workers who may have reservations about calling out issues on the job" (Document ID 1767, p. 2–3). The National Black Worker Center explained that allowing worker centers to provide a third-party employee representative will ensure that "the specific concerns and experiences of workers, including those who have been historically underserved and underrepresented, are given due consideration during inspections" (Document ID 1767, p. 3).

Some commenters also mentioned that a third-party representative can be especially helpful during fatality investigations, which are "particularly sensitive" (Document ID 1969, p. 17) and "stressful" for employees (1958, p. 3–5). In these situations, third-party representatives can put employees at ease and enable them to feel more comfortable interacting with CSHOs (See, e.g., 1958, p. 3–5; 1969, p. 17).

Several commenters also referenced an OSHA investigation in Palmyra, Pennsylvania where third-party representatives from the National Guestworkers Alliance (NGA), a workers' advocacy group, had developed a relationship with the foreign students who worked at the inspected facility and assisted them by filing an OSHA complaint and accompanying OSHA during the inspection (see, e.g., Document ID 1945, p. 4–5; 1958, p. 3; 1978, p. 4–6). Commenters explained that OSHA

benefitted from NGA's representation of these workers in identifying and understanding workplace safety issues (see, e.g., Document ID 1945, p. 4–5).

Fourth, several commenters pointed out the benefits of third-party representation on multi-employer worksites (see, e.g., Document ID 1747, p. 2; 1969, p. 16; 1970, p. 2). For example, the AFL–CIO pointed to an inspection involving a multi-employer worksite with union and non-union workers; the non-union workers designated a union agent who represented other workers on site as their walkaround representative (Document ID 1969, p. 16). The union agent assisted OSHA by providing information on the workplace respiratory procedures, which revealed violations of the respiratory protection standard and recordkeeping requirements (Document ID 1969, p. 16). In addition, IATSE stated that third-party representation can be helpful for inspections involving multi-employer worksites in the entertainment industry; IATSE explained that touring workers may be unfamiliar with worksite-based hazards and a location-based representative may better aid the CSHO during an inspection (Document ID 1970, p. 2).

Fifth, and last, commenters also expressed support for allowing third-party employee representatives on walkaround inspections because there is a need to balance employee and employer rights under the OSH Act. As the UWUA explained, "[a]lthough the value of having a worker's chosen representatives involved in the investigation process cannot be mathematically quantified, . . . [a] worker representative brings the possibility of worker trust, subject matter expertise, language justice, empowerment, and protection to a situation that can otherwise simply devolve into the meting out of blame by an employer seeking only to protect itself" (Document 1761, p. 2). As another commenter similarly noted, third party representation can empower workers and thereby minimize the employer's ability to control what information is shared by employees, which enables CSHOs to gather more accurate information (Document ID 0526, p. 2). Other commenters also pointed to employers' "unrestricted ability" to select their workaround representative and argued that OSHA should go beyond the current proposal and provide employees that same right without qualification and employer interference (see, e.g., Document ID 1958, p. 5–6). A commenter asserted that when workers are allowed to

designate their own representatives, workers have increased trust in OSHA, and inspections are more efficient, complete, and accurate (Document ID 1958, p. 1–2).

2. Comments Opposed to Third-Party Representation

Many commenters disputed the need for and benefits of third parties and raised numerous arguments to support their positions. These arguments included: (1) that OSHA has not presented evidence demonstrating a need for third parties; (2) third parties cannot aid OSHA's inspections when they are unfamiliar with the particular worksite being inspected; (3) industry-specific concerns should preclude third-party representation; (4) third parties may discourage employer cooperation; (5) third-party representatives will disenfranchise employees; (6) the use of third parties will lower the qualifications to be a CSHO; (7) third parties may have ulterior motives and could engage in conduct unrelated to the inspection; (8) the potential disclosure of confidential business information and trade secrets outweighs the need for third-party representation; and (9) alternatively, if third parties are allowed to serve as employee representatives, they should be limited to individuals with technical experience or language skills.

First, commenters argued that OSHA has failed to demonstrate a need for third-party representation during the walkaround. For example, some commenters asserted that OSHA did not provide evidence that the rule will facilitate more efficient inspections, aid CSHOs during the walkaround inspection, or otherwise promote the safety and health of workers (see, *e.g.,* 1776, p. 10; 1939, p. 4; 1953, p. 4; 1976, p. 4 fn. 9). Commenters questioned why CSHOs were not capable of handling inspections on their own and needed third parties to assist them or were passing off their inspection responsibilities to others (see, *e.g.,* Document ID 0046; 1938, p. 1; 1974, p. 3–4; 3347). The Pacific Legal Foundation also asked why OSHA needed third parties on an employer's premises when third parties could accomplish their activities, such as communicating with employees, offsite (Document ID 1768, p. 5).

Relatedly, other commenters argued that OSHA does not need third-party employee representatives during its inspections because OSHA's current inspection procedures are sufficient (see, *e.g.,* Document ID 1960, p. 1). For example, one commenter stated that employees are already empowered to participate in OSHA's inspections since they can file anonymous complaints and speak with CSHOs in private (Document ID 1955, p. 3). Similarly, commenters asserted that the FOM already accounts for situations where CSHOs need third-party translation and that the current regulation allows for third parties with technical expertise to accompany CSHOs in ''limited situations'' (Document ID 1960, p. 3–4; see also 1952, p. 2). Ultimately, commenters asserted that ''OSHA is improperly seeking to address a nonexistent issue'' (Document ID 1955, p. 3; see also 1976, p. 4) and that ''[t]here is no pressing need for this change'' (Document ID 9002).

Second, commenters expressed skepticism that third parties who are unfamiliar with a specific worksite could have anything meaningful to contribute to an OSHA inspection (see, *e.g.,* Document ID 0033). For example, the American Chemistry Council asserted that each chemical manufacturing facility and its hazards are unique and that merely having a general understanding of hazards is insufficient to truly aid an OSHA inspection (Document ID 1960, p. 2). Commenters argued that employees of the employer, and not third parties, are better suited to be representatives because employees understand the specific tasks at issue by virtue of their employment and may have received job-specific training (see, *e.g.,* Document ID 1960, p. 2). NFIB also took issue with the type of knowledge, skills, or experience that OSHA indicated could aid the inspection, asserting that ''[w]hat constitutes relevant knowledge or skills is left vague'' and that it is unclear whether the phrase ''with hazards or conditions in the workplace or similar workplaces'' modifies ''experience'' or also ''relevant knowledge'' and ''skills'' (Document ID 0168, p. 5).

Third, commenters also raised a number of industry-specific safety and security concerns. For instance, in the manufacturing industry, the Illinois Manufacturer's Association raised safety concerns, asserting that third-party representatives were unnecessary because they could pose safety risks to themselves or others, or to the employer's products due to their lack of expertise and/or training (see, *e.g.,* Document ID 1762, p. 2–3; 1770, p. 4; 1774, p. 4; 1937, p. 2; 1974, p. 2–3; 1946, p. 7; 1942, p. 5). In addition, commenters raised safety and security-related concerns for their industries. The National Council of Farmer Cooperatives explained that some agriculture employers are required to restrict access to their facilities to only authorized personnel who are trained in practices of ensuring food safety; this commenter expressed concerns that the proposed rule could result in noncompliance with that requirement (Document ID 1942, p. 5). The Food Industry Association asserted that the presence of third parties could create serious food safety hazards in food production and warehousing, noting the need for following strict sanitation protocols (Document ID 1940, p. 3). The American Chemistry Council similarly raised concerns about third parties in the chemical industry who have not undergone background checks or who lack credentials through the Chemical Facility Anti-Terrorism Standards program or the Transportation Worker Identification Credential program (Document ID 1960, p. 5).

Commenters also raised concerns in the healthcare context (see, *e.g.,* Document ID 0234, p. 2). Hackensack Meridien Health shared two examples: (1) at one of its hospitals, a union brought in a third party to provide feedback on a workplace safety issue and shared information with OSHA that was not scientifically sound (though OSHA did not ultimately use the information); and (2) employees brought in an expert for a walkaround who did not recognize a patient safety concern, which the employer's internal team later identified and remediated (Document ID 0234, p. 2). According to Hackensack Meridian Health, both instances could have resulted in harm to patients or team members because the third party did not possess the requisite expertise (Document ID 0234, p. 2).

Fourth, commenters expressed concerns that third parties could discourage cooperation from employers. Commenters argued that third parties could ''discourage[ ] employer cooperation in the inspection process'' (see, *e.g.,* Document ID 1938, p. 1). One commenter asserted that most employers currently cooperate with inspections by not requiring warrants; however, it predicted that more employers will request warrants if employee representatives can be third parties, including due to the fear of union organizing (Document ID 1938, p. 9; see also 1772, p. 1).

Fifth, some commenters also asserted that third-party representation would ''disenfranchise'' employees by replacing employee representatives with third-party representatives (see, *e.g.,* Document ID 1120; 1123; 1163). A commenter asked, ''Would you like for someone off the street to come in and tell you to 'pack up your stuff and leave,

I'm replacing you?' I wouldn't think so'' (Document ID 1163).

Sixth, commenters also asserted that third-party representation could result in lowering the qualifications to be a CSHO. For example, some commenters, such as Larson Environmental, expressed concern that the proposal would result in ''soften[ing] or water[ing] down the need for technical expertise and training of OSHA employees'' (Document ID 1109; see also 0033).

Seventh, commenters argued that third parties may not benefit OSHA's inspections because third parties may have ulterior motives and be engaged in conduct unrelated to the inspection (see, *e.g.,* Document ID 1775, p. 6; 1937, p. 5). For example, commenters suggested that third parties could engage in union organizing (Document ID 0168, p. 5–6; see also 1964, p. 2). Commenters also expressed concerns that attorneys or experts serving as third-party representatives could use the walkaround to conduct pre-litigation discovery in personal injury or wrongful death actions (Document ID 1938, p. 5; 1976, p. 11–12) or that attorneys could use the walkaround to solicit clients (Document ID 1953, p. 5). Others also worried about disgruntled former employees engaging in workplace violence or causing conflict (see, *e.g.,* Document ID 1762, p. 3–4; 1781, p. 2), and raised concerns about the conduct of other third parties such as competitors, relatives or friends of injured or deceased employees, job applicants who did not a receive a job, or individuals with ideological differences (see, *e.g.,* Document ID 1272; 1533; 1701; 1762, p. 3–4; 1937, p. 5; 1976, p. 11–12). For example, the American Family Association asserted that ''[a]llowing facility access to a third-party representative who might hold views antithetical to AFA's mission could easily disrupt the current requirement that OSHA conduct a 'fair and orderly inspection''' (Document ID 1754, p. 3).

Eighth, commenters also argued that the need to protect trade secrets and other confidential information outweighs the need for third parties. For example, commenters voiced concerns that a third-party representative, such as competitor or someone who is hostile to the employer being inspected, could obtain and disclose trade secrets or other confidential business information (see, *e.g.,* Document ID 0040, p. 4; 0175, p. 2; 11515) or relatedly, pose antitrust issues (Document ID 1937, p. 3; 1960, p. 6). With regard to the manufacturing industry in particular, commenters explained that ''the manufacturing

process itself constitutes proprietary trade secrets that would be impossible to protect from disclosure'' (Document ID 0175, p. 2) and that ''[e]ach manufacturing process may have unique or specialized features that give them a competitive edge'' (Document ID 1937, p. 3).

Commenters also raised concerns about the unauthorized disclosure of confidential business information generally; as examples of such information, they pointed to an employer's operations, customer and supplier data, intellectual property, or employees' sensitive information (see, *e.g.,* Document ID 1774, p. 3, 6; 11487). The International Foodservice Distributors Association (IFDA) provided additional examples of confidential information, including: ''the layout of the facility, staffing, large pieces of equipment, materials used, and other information that cannot be easily kept away from a third-party representative'' (Document ID 1966, p. 3). Commenters argued that the unauthorized disclosure of confidential information could occur due to the NPRM's ''lack of a set definition of 'trade secrets''' (Document ID 1774, p. 3) and the fact that OSHA's existing regulation at 1903.9 is limited to trade secrets (Document ID 1966, p. 3).

In addition, the Utility Line Clearance Safety Partnership argued that while OSHA is not permitted to disclose trade secrets or other confidential business information, which it notes is protected from disclosure in a Freedom of Information Act request, the rule fails to prevent third parties from disclosing the same information (Document ID 1726, p. 7). NRF recommended that the rule ''provide authority for injured employers to bring claims against the Secretary for monetary remedies and other sanctions'' if a third-party representative obtains trade secrets and proprietary information (Document ID 1776, p. 3–4). The Workplace Policy Institute likewise asserted that disclosure of confidential information and trade secrets to competitors or the public would result in litigation requiring OSHA staff testimony (Document ID 1762, p. 3).

Ninth, and lastly, several commenters argued that, if the final rule ultimately permitted third-party employee representatives, the rule should be narrow and limit third-party representatives to certain professions. Some commenters asserted that third parties should be limited to the enumerated examples in the current regulation—industrial hygienists and safety engineers—or to individuals with technical expertise or certain

professional certifications (see, *e.g.,* Document ID 1384; 1937, p. 2). For example, the American Family Association commented that the rule should require third-party representatives to ''possess demonstrable safety and health expertise, relevant to the workplace being inspected'' (Document ID 1754, p. 2).

Several commenters, including U.S. Representative Virginia Foxx and the U.S. Apple Association, contended that the previous regulation only permitted third-party employee representatives with technical or safety expertise (see, *e.g.,* Document ID 1756, p. 2; 1936, p. 1; 1939, p. 1–2; see also 1966, p. 4–5). The North American Insulation Manufacturers Association asserted that under the previous regulation, a third-party employee representative ''must normally have specialized safety knowledge'' (Document ID 1937, p. 2). According to a coalition of state-based think tanks and public interest litigation groups (the State Policy Network), the inclusion of industrial hygienists and safety engineers as examples was intended to ''establish minimum floor threshold qualifications'' for third-party representatives; the State Policy Network further argued that, according to ''historical OSHA policy manuals,'' such individuals ''must have minimum levels of education, experience, and certification granted by professional organizations and/or State-level administrative agencies'' (Document ID 1965, p. 13). The Mom and Pop Alliance of SC also expressed concern that the proposal would ''eliminate the requisite technical credentials necessary for non-employees to participate'' in the inspection (Document ID 0528).

Other commenters supported limiting the universe of potential third parties but were open to both technical experts and interpreters serving as third parties (see, *e.g.,* Document ID 10797; 1782, p. 3). For example, the Flexible Packaging Association explained that it did not necessarily object to a third-party representative participating in a walkaround inspection, particularly if that representative was a translator, industrial hygienist, or safety engineer, but expressed concern that the proposal would permit a ''seemingly unlimited variety of people'' who can serve as third-party representatives, and urged OSHA to limit third-party representatives to technical experts and translators (Document ID 1782, p. 3). A private citizen commented that industrial hygienists and safety engineers should not be deleted, but ''language expert'' should be added as an additional example to ''help the

focus of inspections to remain on health and safety and clear communication of such'' (Document ID 10797).

3. Conclusion on the Need for and Benefits of Third-Party Representatives

After reviewing the comments, OSHA has decided to adopt its proposed revisions because allowing third-party representatives as discussed in this rule better comports with the OSH Act. Nothing in section 8(e) expressly requires ''a representative authorized by . . . employees'' to be an employee of the employer. 29 U.S.C. 657(e). Rather, the statute merely states that the representative must ''aid[ ] the inspection.'' Id. The revisions adopted by this final rule better conform with section 8(e)'s requirement by eliminating the text in the regulation requiring employee representatives to be an employee of the employer. In addition, the revisions ensure employees are able to select trusted and knowledgeable representatives of their choice, leading to more comprehensive and effective OSHA inspections. Through the agency's own enforcement experience and based on numerous comments, particularly those with real-life examples, OSHA has determined that there are a wide variety of third parties who can aid OSHA's inspection. OSHA has therefore concluded that it is appropriate to delete the examples of industrial hygienists and safety engineers in the prior rule to make it clear that a third party is not reasonably necessary solely by virtue of their professional discipline. Rather, the focus is on how the individual can aid the inspection, *e.g.,* based on the individual's knowledge, skills, or experience. The final rule, however, does not change the requirement that, once the CSHO is notified that employees have authorized a third party to represent them during a walkaround inspection, the third party may accompany the CSHO only if the CSHO determines that good cause has been shown that the third party is reasonably necessary to an effective and thorough inspection.

In deciding to adopt its proposed revisions, OSHA agreed with commenters who explained how third-party employee representatives can greatly aid OSHA inspections. In a variety of ways, third parties can assist OSHA in obtaining information and thereby ensuring comprehensive inspections. For example, the comments submitted in support of the proposed rule demonstrated that third parties can provide valuable technical expertise and support to CSHOs during walkaround inspections. This includes inspections

involving workplace hazards that do not fall under a specific standard and worksites that contain hazards that are not readily apparent to the CSHO.

Third parties also may be more likely to understand industry standards than an employee of the employer, and many comments demonstrated the benefits of having a third-party representative with industry-specific expertise. Several commenters provided compelling examples of this, such as the UWUA's national representative providing guidance to a CSHO about changes in the utility industry, including the use of an inclinometer (Document ID 1761, p. 1), and the USW safety representative's contribution to a fatality inspection involving a dust collection system due to that representative's experience in the industry and service on a combustible dust committee of the National Fire Protection Association (Document ID 1958, p. 3–4). A former director of AFSCME also provided a first-hand example of how he, as a third-party employee representative, was able to draw from his knowledge and experience in the healthcare industry not only to provide guidance to the CSHO on less well-known hazards but also to share how other workplaces in the industry had addressed similar hazards (Document ID 1945, p. 2–3).

While several commenters opposed to the rule argued that third parties will lack industry-specific expertise and pose safety risks to themselves or others, or to the employer's products, comments supporting the rule demonstrate that many third parties can and do in fact possess industry-specific knowledge expertise and that such expertise has assisted OSHA's inspections. However, even if a third party lacked such industry-specific knowledge or expertise, it does not necessarily mean they will pose a risk or cause harm, as Hackensack Meridien Health contended.

Hackensack Meridien Health asserted that employees or patients could have been harmed on two separate occasions—once, when a third party provided safety feedback to OSHA that Hackensack Meridien Health did not feel was scientifically sound and, on another occasion, when an expert did not recognize a patient safety concern. However, in the first example, which does not indicate whether the third party was a walkaround representative, Hackensack Meridien Health acknowledged that OSHA did not rely on the advice. In addition, in the second example, a walkaround representative is not expected or required to identify patient concerns or replace the CSHO, as the representative's role is to aid

OSHA's inspection into workplace hazards that could harm employees. Furthermore, these examples do not show that a third party caused any harm or that OSHA's inspection procedures related to employee representation were inadequate.

Concerns about risks that third parties pose in certain industries are speculative and ignore the roles of both the third party and the CSHO during the inspection. Third-party representatives have a specific purpose—to aid OSHA's inspection. Therefore, they must stay near the CSHO and are not permitted to wander away from the inspection or into unauthorized areas. While some commenters in the chemical industry discussed the need for third parties to follow the facility's sanitation protocols, and some commenters in the chemical industry discussed the need for third parties to have certain credentials, OSHA has ample experience conducting investigations in worksites with such requirements. During the opening conference, the CSHO inquires about any such work rules or policies, such as policies related to PPE, areas requiring special precautions, whether any safety briefings are necessary, and any other policies relevant to the inspection. CSHOs have long adhered to such policies in conducting inspections in facilities with unique requirements, and any third party would generally need to as well, as long as those rules and policies apply equally to all visitors and are not implemented or enforced in a way that interferes with an employee representative's right to accompany the CSHO. OSHA will consider facility-specific concerns on a case-by-case basis, but anticipates that the agency's existing inspection procedures adequately address concerns about potential harm from third parties in any given industry.

In addition to certain types of expertise third parties may have, third parties can also offer interpretation skills for employees with limited English proficiency and provide greater language access by using their cultural competence and prior relationships with workers. With regard to interpretation, third parties can help ensure employees are able to have accurate and complete conversations with CSHOs and that employees do not have to rely on supervisors to interpret or on ad hoc interpreters. This can prevent situations where supervisors or ad hoc interpreters provide flawed or fabricated versions of employees' statements. While commenters have argued that OSHA could instead use bilingual CSHOs or hire outside interpreters, these comments ignore an

**22570** **Federal Register** / Vol. 89, No. 63 / Monday, April 1, 2024 / Rules and Regulations

important component of third parties' interpretation assistance—their cultural competencies. Employees may not be as comfortable when the interpreter is a law enforcement official, such as a CSHO, or when the interpreter is unknown to them. In contrast, as commenters supporting the rule explained, if an interpreter is from a workers advocacy group or union designated by the employees, employees may trust the interpreter more and, as a result, be more willing to provide information.

Likewise, third parties can increase worker involvement in the inspection by facilitating communication between workers and OSHA. Multiple commenters submitted examples of situations where third-party representatives were trusted by workers and successfully encouraged them to speak more openly with CSHOs. Several commenters argued that employees may fear retaliation if they speak to an OSHA official, and both comments in the record and OSHA's own enforcement experience demonstrate that workers are more likely to speak openly and participate in an OSHA inspection if they have a representative whom they trust. Several commenters noted that workers are the ''eyes and ears of a workplace, and are in the best position to provide OSHA with the inspection information it needs regarding the presence of hazards, the frequency and duration of worker exposure to them, and the employer's awareness of both hazards and exposures'' (Document ID 1934, p. 2; see also 1031; 1769, p. 3). Without employee cooperation and participation, OSHA may not be able to gather all the relevant information during a workplace inspection. Ensuring that workers have a trusted representative so that they are able to cooperate in an OSHA inspection is critical.

In addition, third parties may have cultural competency skills that can facilitate communication not only with employees who need interpreters but also for a number of other employees. Employees may not trust or understand government processes, and third parties, particularly third parties known to the employees, allow the employees to be more at ease or forthcoming during the OSHA inspection. The presence of third parties can also be beneficial in workplaces where employees fear retaliation or intimidation by their employer and are afraid to speak up. Employees may either feel more empowered to participate or may feel more comfortable relying on the third party to represent their interests without revealing a particular employee's identity.

Third parties may also aid inspections that are complex, include multiple employers, or involve fatalities or serious injuries. While third-party representatives do not need to be safety engineers or industrial hygienists to aid an inspection, representatives can often possess important technical or safety expertise necessary for a thorough inspection even if they are not specifically employed as safety and health professionals. In support of this, commenters asserted that union officials and worker advocates often have industry-specific or workplace safety expertise that is helpful to a CSHO's inspection and, most important, helps to facilitate a CSHO's communication with workers about workplace safety.

OSHA has revised the final rule to make explicit that a representative may be reasonably necessary if they facilitate communication between workers and the CSHO. As explained above, there are a number of reasons, other than language skills, why a third party may be able to facilitate communication between workers and the CSHO, including because of their trusted relationship with workers, their cultural competence, or because they can put employees at ease and enable them to speak more candidly with the CSHO. Ensuring that employees have a voice during the inspection and have the ability to speak openly and candidly with the CSHO is critical to ensuring that OSHA obtains the necessary information about worksite conditions and hazards to conduct a thorough inspection. Accordingly, OSHA has revised paragraph (c) to add communication skills to the exemplar skills that could be reasonably necessary to an effective and thorough inspection. Several commenters incorrectly asserted that the previous regulation only permitted third-party representatives with technical or safety expertise (see, *e.g.,* Document ID 1756, p. 2; 1936, p. 1; 1939, p. 1–2; see also 1966, p. 4–5), and the State Policy Network referenced an OSHA guidance document in support of its arguments that representatives ''must have minimum levels of education, experience, and certification granted by professional organizations and/or State-level administrative agencies'' (Document ID 1965, p. 13).

These comments are misguided; OSHA did not previously limit 1903.8(c) to technical or safety experts, nor do those commenters point to any evidence to support their claims. The only OSHA document referenced by the State Policy Network is an OSHA booklet titled ''The Occupational Health Professional's Services and Qualifications: Questions and Answers'' (Occupational Health Q & A), *available at https://www.osha.gov/sites/default/files/publications/osha3160.pdf.* This guidance document relates to how employers select health care professionals to ''assist the employer in achieving a safe and healthful work environment'' (Occupational Health Q & A, p. 7). Although the guidance document references occupational health care professionals' education and training, it has nothing to do with who employees may select as their walkaround representative under 1903.8(c).

Industrial hygienists and safety engineers were included in the prior regulation as examples of individuals who *may* be reasonably necessary to an inspection but were not intended to limit employees' ability to authorize the participation of third-party representatives with other skills or expertise. And the examples provided by unions and worker advocates, discussed above, show that OSHA applied paragraph (c) to allow third-party employee representatives to accompany the CSHO on the walkaround where they aid the inspection even though they were not industrial hygienists or safety engineers. The record is replete with examples of how third parties with a variety of knowledge, skills, or experience beyond technical expertise made them reasonably necessary to the conduct of an effective and thorough physical inspection. OSHA emphasizes that the examples in paragraph (c) are illustrative and not exhaustive; while the phrase ''with hazards or conditions in the workplace or similar workplaces'' modifies ''knowledge, skills, and experience,'' there may be other types of knowledge or skills that could be reasonably necessary to the conduct of an effective and thorough inspection.

OSHA also rejects comments asserting that permitting third-party employee representatives to accompany the CSHO indicates that OSHA is not competent to conduct inspections. In explaining why an employee representative must be given the opportunity to accompany the CSHO on an inspection under section 8(e) of the OSH Act, Senator Williams explained that ''no one knows better than the working [person] what the conditions are, where the failures are, where the hazards are, and particularly where there are safety hazards.'' Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational

**Federal Register** / Vol. 89, No. 63 / Monday, April 1, 2024 / Rules and Regulations    **22571**

Safety and Health Act of 1970, at 430 (Comm. Print. 1971). While CSHOs have significant expertise, training, and experience in identifying safety and health hazards, it is not reasonable to expect every CSHO to have comprehensive knowledge of every aspect of site-specific equipment, materials, work practices, and safety requirements without assistance from employees. By permitting employees to designate representatives of their choice, OSHA will be better able to obtain information from employees that is necessary to conduct a comprehensive inspection. More comprehensive OSHA inspections will be more protective of worker safety and health.

Likewise, contrary to some commenters' arguments, this rule will not result in OSHA lowering its qualifications for CSHOs or decreasing the amount or quality of training provided to CSHOs. This rule will not diminish the CSHO's role in an OSHA inspection. CSHOs will continue to be in charge of conducting inspections and have the authority to use various reasonable investigative methods and techniques, such as taking photographs, obtaining environmental samples, and questioning individuals while carrying out their inspection. See 29 CFR 1903.3(a); 1903.7(b); 1903.8(a). Rather than weakening the CSHO's role, this rule will enable CSHOs to obtain more comprehensive information during an inspection.

Commenters additionally argued that OSHA's current procedures (such as anonymous complaints and CSHO's private interviews with workers) are sufficient and that third parties can conduct all activities offsite; however, many other comments demonstrated otherwise and established that third-party representatives are critically important during the walkaround portion of the inspection. OSHA also finds that third-party representatives, including those from unions or worker advocacy groups, are needed to accompany CSHOs during inspections because representatives explaining OSHA processes or protections against retaliation before or after the inspection would not be sufficient to adequately assure workers. The physical inspection is a key part of OSHA's investigation; it is often difficult to obtain information from workers after the inspection because workplace conditions change, or workers leave employment or recall less about the circumstances of an incident that was the subject of the inspection. Having third-party representatives accompany a CSHO during the inspection can reassure

workers during this vital step and allow the CSHO to gather information more effectively and efficiently. Additionally, even if workers are reassured about OSHA processes outside of the physical inspection, workers could still be intimidated or confused when faced with a CSHO without the presence of an authorized third-party representative.

In addition, OSHA disagrees with comments that asserted that employees, and not third parties, are always better suited to serve as employee representatives due to employees' familiarity with the worksite and job tasks. These comments ignore the variety of knowledge, skills, or experience third parties offer, as well as the particularities of different inspections, and the fact that employees may sometimes prefer to have nonemployee representatives accompany the CSHOs. They also disregard the many reasons employees may be reluctant or scared to participate in an inspection, much less as the employee representative. While employees who are willing to be a walkaround representative certainly aid OSHA's inspections and are entitled to be the representative if authorized by employees, OSHA disagrees with the suggestion that only employees, and never third parties, could contribute to an OSHA inspection.

OSHA does, however, recognize that there may be situations where a third-party representative will not aid OSHA's inspection during the walkaround. By maintaining the requirement that good cause be shown that the third-party representative is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace, OSHA will allow third-party representatives to accompany the CSHO only when they will aid the inspection. Concerns about potential misconduct, injury, or malfeasance from third-party representatives, and how OSHA would respond, are discussed in more detail herein, including in Sections IV.E, IV.G, IV.H.

In addition, OSHA disagrees with commenters that argued that the protection of trade secrets or other confidential business information outweighs the need for third parties. These concerns can be addressed while still allowing third parties to serve as walkaround representatives. OSHA's existing regulations expressly afford employers the right to identify areas in the workplace that contain or might reveal a trade secret, and request that, in any area containing trade secrets, the authorized employee representative shall be an employee in that area or an

employee authorized by the employer to enter that area. See 29 CFR 1903.9(c), (d). Although one commenter criticized the NPRM for not defining "trade secrets," this term is defined in section 15 of the OSH Act by reference to 18 U.S.C. 1905, as information concerning or related to "processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association." See also OSHA Field Operations Manual, Chapter 3, Section VII.E.

If an employer identifies something as a trade secret, OSHA will treat it as a trade secret if there is "no clear reason to question such identification." See 29 CFR 1903.9(c); OSHA Field Operations Manual, Chapter 3, Section VII.E. Accordingly, OSHA finds that existing requirements and policies are sufficient to protect employers' trade secrets and propriety information, but will address any unique circumstances on an inspection-by-inspection basis.

While two commenters asserted that a third-party walkaround representative from a competitor could raise antitrust or anticompetition concerns, this assertion appears highly improbable. First, any third-party must be authorized by the employer's employees, and it seems unlikely that employees would authorize a competitor who would then engage in anticompetitive conduct to represent them. Further, the CSHO must find good cause has been shown that a third party is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace. This requirement ensures that the representative will aid the inspection. Additionally, if a third party engages in conduct that is unrelated to the inspection, the CSHO has the authority to terminate the third party's accompaniment.

OSHA also disagrees with commenters that argued third parties are not needed because third parties can discourage employer cooperation or disenfranchise employees. Concerns about diminished employer cooperation and an increase in warrants are discussed in more detail in Sections IV.G. Further, commenters have also failed to show how workers will be disenfranchised by allowing third-party representatives because workers still have the right to designate employee representatives. Because third-party representatives must be authorized by workers, they cannot "disenfranchise" workers. Rather, they can facilitate worker participation during inspections.

Finally, comments arguing that the purpose of this rule is to facilitate union organizing are incorrect. Employee representation during the inspection is critically important to ensuring OSHA obtains the necessary information about worksite conditions and hazards. In addition, the rule does not limit third-party representatives to union representatives but clarifies that varying types of third parties may serve as employee representatives based on their knowledge, skills, or experience. Third-party representatives' sole purpose onsite is to aid OSHA's inspection, 29 U.S.C. 657(e), and CSHOs have authority to deny the right of accompaniment to third parties who do not do that or who interfere with a fair and orderly inspection. 29 CFR 1903.8(a)–(d).

Ultimately, as evidenced herein, OSHA disagrees with commenters that assert that there is no need or not a pressing need for this rulemaking. The district court's decision in *NFIB* v. *Dougherty* necessitated this rulemaking to explain OSHA's "persuasive and valid construction of the Act." 2017 WL 1194666, *12. Moreover, neither the plain text of the OSH Act nor its legislative history support arguments that OSHA is required to show that there is a "pressing need" to clarify who is eligible to be a third-party representative. For a fuller discussion of OSHA's rulemaking authority, see Section III, Legal Authority.

For the reasons discussed above, OSHA has determined that permitting employees to select trusted and knowledgeable representatives of their choice, including third parties, facilitates the CSHO's information gathering during OSHA inspection, which will improve the effectiveness of OSHA inspections and benefit employees' health and safety. Employee representatives can ensure that CSHOs do not receive only the employer's account of the conditions in the workplace. As National COSH explained, employees are a key source of information as to specific incidents, and they also may possess information related to an employer's history of past injuries or illnesses and an employer's knowledge of or awareness of hazards (Document ID 1769, p. 2). By obtaining comprehensive information, OSHA can not only better and more timely identify dangerous hazards, including hazards that may be hidden or hard to detect, but ensure the hazards are abated quickly and do not injure or kill employees. Accordingly, OSHA concludes that its rule is necessary. See 29 U.S.C. 657(g)(2).

## B. The "Good Cause" and "Reasonably Necessary" Requirement

In the NPRM, OSHA proposed to revise 29 CFR 1903.8(c) to clarify that the representative(s) authorized by employees may be a third party and that third parties are not limited to the two examples listed in the existing rule. However, as the NPRM explained, the proposed revisions would not alter the regulation's existing requirement for the CSHO to determine that "good cause" had been shown why the third party was "reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace." The NPRM requested public input regarding the "good cause" and "reasonably necessary" requirement for third-party employee representatives. The NPRM also set forth the following three questions, suggesting alternatives to OSHA's proposed revisions.

1. Should OSHA defer to the employees' selection of a representative to aid the inspection when the representative is a third party (*i.e.,* remove the requirement for third-party representatives to be reasonably necessary to the inspection)?

2. Should OSHA retain the language as proposed, but add a presumption that a third-party representative authorized by employees is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace?

3. Should OSHA expand the criteria for an employees' representative that is a third party to participate in the inspection to include circumstances when the CSHO determines that such participation would aid employees in effectively exercising their rights under the OSH Act? Why or why not? If so, should OSHA defer to employees' selection of a representative who would aid them in effectively exercising their rights?

OSHA received many comments both for and against the "good cause" and "reasonably necessary" requirement, and many commenters specifically addressed the possible alternatives. After reviewing the comments, summarized below, OSHA has decided to retain the existing "good cause" and "reasonably necessary" requirements in the final rule. Therefore, if the representative authorized by employees is a third party, the third party may accompany the CSHO during the physical inspection of the workplace if in the judgment of the CSHO, good cause has been shown why the third party's accompaniment is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace (including, but not limited

to, because of their relevant knowledge, skills, or experience with hazards or conditions in the workplace or similar workplaces, or language or communication skills).

1. Comments That Supported Removing the CSHO's "Good Cause" and "Reasonably Necessary" Determination Requirement in Some Form

A number of commenters asserted that OSHA should abandon the existing "good cause" and "reasonably necessary" requirement for third-party employee representatives and adopt one of the proposed alternatives in the NPRM. For example, some commenters requested that OSHA pursue the first proposed alternative—removing the CSHO's "reasonably necessary" determination, with the CSHO deferring entirely to the employees' selection of a representative (*e.g.,* Document ID 1023, p. 3; 1763, p. 5–6, 7–8; 1769, p. 4–5; 1777, p. 3–4; 1934, p. 4–5; 1948, p. 2; 1958, 8–9, 13; 1969, p. 2–8; 1972, p. 7–8; 1978, p. 1–2; 11231). According to these commenters, the "good cause" and "reasonably necessary" requirement is contrary to the text of the OSH Act, infringes upon workers' rights, and impairs the Act's safety and health goals.

First, several commenters argued that the "good cause" and "reasonably necessary requirement" is contrary to the language of the OSH Act. For example, National COSH contended that requiring employees to demonstrate "good cause" as to why a representative is "reasonably necessary" is an "extra hurdle the employees' representative needs to clear before qualifying" that is not supported by the language of the Act (Document ID 1769, p. 5). According to National COSH, section 8 of the Act "properly determines when the employees' selected representative has a right to participate in the inspection: that is, when their purpose is to aid the inspection" (Document ID 1769, p. 5). Likewise, the AFL–CIO stated that "[w]orkers' belief that their chosen representative will support them is sufficient reason to find that the representative will aid the investigation" (Document ID 1969, p. 6). In the AFL–CIO's view, "there is no distinction between deferring to workers' choice of representatives and finding that the workers' choice is reasonably necessary to aid the OSHA investigation" (Document ID 1969, p. 6).

In addition, commenters argued that section 8 does not authorize CSHOs to decide whether good cause has been shown that a third-party employee representative is "reasonably necessary." For example, Farmworker

**Federal Register** / Vol. 89, No. 63 / Monday, April 1, 2024 / Rules and Regulations    **22573**

Justice argued that employees' right to a representative "should not depend on a determination by the CSHO" (Document ID 1763, p. 8). Additionally, the AFL–CIO asserted that "giving a CSHO discretion to exclude an employee's third-party representative as not 'reasonably necessary' is contrary to the plain terms of the Act" (Document ID 1969, p. 3–4), and that "the Secretary does not have authority to impose limitations on employees' rights that are inconsistent with the Act." (Document ID 1969, p. 4). Similarly, National COSH argued that under section 8, employees' selected representative has a right to participate in the inspection regardless of whether the representative's "participation is 'reasonably necessary to the conduct of an effective and thorough inspection,' as determined in the judgment of the CSHO" (Document ID 1769, p. 4). The AFL–CIO recommended that OSHA remove the "good cause" and "reasonably necessary" requirement to "ensure that the full benefits of the workers' choice is not limited by misinterpretation or CSHO variability, aligning with the purpose and language of the OSH Act" (Document ID 1969, p. 6). Similarly, Sur Legal Collaborative recommended "OSHA remove the proposed language in 1903.8(c) that 'in the judgment of the Compliance Safety and Health Officer, good cause' must be shown" (Document ID 11231). Additionally, U.S. Representative Robert "Bobby" Scott advocated for an unqualified right for workers' lawyers to act as "representatives in all phases of OSHA inspection, enforcement, and contest" (Document ID 1931, p. 8).

Second, various commenters contended that requiring good cause be shown that a third-party employee representative is "reasonably necessary" infringes upon workers' rights by imposing a higher burden for employee representatives than for employer representatives. The AFL–CIO argued that although "the plain language of the Act places no greater restriction on who employees may choose as their representative than it does on who the employer may choose," the "existing regulation and the new, proposed rule, on the other hand, only place restrictions on employees' choice of representative, creating unequal access to the right granted both parties by the OSH Act" (Document ID 1969, p. 3) (emphasis omitted). Similarly, National Nurses United argued that because employers are not required to demonstrate "good cause" at "any part of the investigation process, OSHA should not require employees to justify

their choice of representative" (Document ID 1777, p. 3).

The American Federation of Teachers (AFT) argued that this language allows CSHOs too much discretion to reject a third-party representative that employees have selected and that disallowing third-party certified bargaining agents "is incongruent with rights secured by the [NLRA] or public sector labor relations laws" (Document ID 1957, p. 2). National COSH argued that OSHA should defer to employee choice because the "presence of a representative chosen by workers helps ensure workers can participate in the process without experiencing retaliation" (Document ID 1769, p. 3). According to National COSH, "when workers are accompanied by a trusted community, labor, or legal representative, they can more easily overcome the threat of retaliation and other barriers to give OSHA the information it needs for a comprehensive inspection" (Document ID 1769, p. 3). More generally, UFCW asserted that OSHA should defer to employee choice because "limiting the employee's ability to choose representation for a matter as serious as an OSHA inspection is unfairly restrictive of the workers basic rights" (Document ID 1023, p. 4).

Third, other commenters asserted that the inclusion of the "good cause" and "reasonably necessary" requirement impairs the safety and health goals of the OSH Act. For example, the AFL–CIO stated that "[i]t is inarguable that worker participation improves OSHA investigations by increasing the CSHO's knowledge of the workplace and hazards" and that "[w]orker participation is enhanced by the presence of a worker advocate through increasing trust, increasing knowledge and expertise, providing language justice, protecting workers from retaliation, and empowering workers in the investigation process to create a safer workplace" (Document ID 1969, p. 6).

In addition to commenters that supported eliminating the "good cause" and "reasonably necessary" requirement altogether, the Texas RioGrande Legal Aid (TRLA) supported the second alternative proposed in the NPRM and advocated for adding a presumption that a third-party representative authorized by employees is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace (Document ID 1749, p. 2). TRLA suggested that employers can rebut the presumption by "show[ing] good cause to the contrary" (Document ID 1749, p. 2).

Farmworker Justice supported the third alternative proposed in the NPRM, arguing that "OSHA should expand the criteria for an employees' representative that is a third party to participate in the inspection to include circumstances when the CSHO determines that such participation would aid employees in effectively exercising their rights under the OSH Act, and OSHA should defer to employees' selection of a representative who would aid them in effectively exercising their rights" (Document ID 1763, p. 8). The Strategic Organizing Center stated that no "additional criteria should be imposed on the workers' process for selecting their representatives, nor on the CSHOs for interpreting or approving of that process" (Document ID 1978, p. 2). However, the Strategic Organizing Center stated that if OSHA were to adopt "any criteria regarding worker selection of representation, it should be used only to help inform workers of their right to choose a designee" (Document ID 1978, p. 3).

2. Comments That Generally Supported Retaining the Existing "Good Cause" and "Reasonably Necessary" Requirement and Opposed the NPRM's Alternatives

In contrast, many commenters who were otherwise opposed to this rule responded that OSHA should not remove the "good cause" and "reasonably necessary" requirement for a third party to accompany the CSHO during the walkaround (e.g., Document ID 1754, p. 2; 1762, p. 4–5; 1770, p. 3; 1954, p. 5; 1966, p. 4–5; 1974, p. 5).

Several commenters argued that the "good cause" and "reasonably necessary" standard ensures that the third party has a legitimate inspection purpose for being on-site (see, e.g., Document ID 1762, p. 4–5; 1770, p. 3). For example, the American Petroleum Institute argued that the "good cause" and "reasonably necessary" requirement ensures that "the third party has a defined and accepted interest in the inspection," which "help[s] reduce the risk of potential security issues their participation could raise" (Document ID 1954, p. 5). The Chamber of Commerce stated that OSHA should retain the "good cause" and "reasonably necessary" requirement because providing employees discretion to authorize any third-party as a representative "will turn OSHA inspections into an opportunity for individuals or groups with grievances or an agenda against the employer to advance their interests by gaining full access to the employer's property" (Document ID 1952, p. 3). The

**22574** **Federal Register** / Vol. 89, No. 63 / Monday, April 1, 2024 / Rules and Regulations

Employers Walkaround Representative Rulemaking Coalition also emphasized that because the purpose of a third-party representative is to aid the inspection, not to aid employees, OSHA should not defer to employee choice alone (Document ID 1976, p. 15–16).

Some commenters supported retaining the existing the "good cause" and "reasonably necessary" requirement without modification (*e.g.*, Document ID 1974, p. 5), while other commenters had questions about how OSHA will determine whether good cause has been shown why employees' chosen third-party representative is reasonably necessary and recommended that OSHA revise the requirement by providing further guidance (*e.g.*, Document ID 1762, p. 4–5; 1770, p. 4; 1775, p. 4–6; 1776, p. 5–6; 1938, p. 2–3; 1954, p. 5; 1956, p. 3–4; 1965, p. 11–16; 1974, p. 5–7; 1976, p. 11–14).

Some of these commenters disapproved of the "discretion" afforded to CSHOs under the proposed rule and contended that the proposed rule lacked sufficient specificity and a "defined process" to determine the employee representative (Document ID 1976, p. 11–15; see also 0040, p. 4–5). For example, the State Policy Network contended that further guidance is necessary because "[t]he lack of measurable criteria, authoritative definitions, or concrete examples of what constitutes 'good cause,' 'positive contribution,' or 'reasonably necessary' delegates inappropriate and broad discretionary authority to the CSHO," which it argued will "result[ ] in confusion, inconsistencies, potential financial and safety risks in workplaces, and overall uncertainty in the outworking of state plans" (Document ID 1965, p. 1, 11).

Along the same lines, many commenters asserted that the vagueness of the "good cause" and "reasonably necessary" requirement will result in disparate application (*e.g.*, Document ID 1754, p. 2–3; 1762, p. 4–5; 1770, p. 4; 1775, p. 6–8; 1776, p. 5–6; 1938, p. 2–3, 11; 1956, p. 2–4; 1965, p. 1, 11–16). For instance, the Coalition of Worker Safety expressed concern that the rule "contains no mechanisms to enforce the 'good cause' or 'reasonably necessary' requirements beyond the CSHO's discretion," which it contends "puts employers at the mercy of the CSHO's unfettered subjective decision making about the meaning of 'good cause' or 'reasonable necessity' [and] provides employers no recourse—aside from the warrant process—to challenge the CSHOs['] determinations" (Document ID 1938, p. 2).

Commenters also critiqued a lack of employer input in the determination process (Document ID 1726, p. 3) or asked whether there was any oversight over OSHA's inspections (Document ID 0040, p. 4–5) and what "recourse [ ] a business owner h[as] to challenge the selection process" (Document ID 1771, p. 1). One individual critiqued the rule for "not provid[ing] any clear definition or rubric" for CSHOs to follow in their determinations (Document ID 11524). Some commenters, such as the National Association of Wholesaler-Distributors, expressed concern that CSHOs will be put "in a very unfair position" by an alleged lack of guidance in the proposed rule creating "additional burdens'" on CSHOs which "are unrelated to their training and expertise" (Document ID 1933, p. 3). Another individual commenter asserted that employers are "at the mercy of the OSHA employees who will pick anyone they decide on" (Document ID 1116). Additionally, the State Policy Network submitted a report from the Boundary Line Foundation, which stated that the proposed rule "neglects to provide direction to the CSHO in the event a proffered third-party employee representative is disqualified by the CSHO" (Document ID 1965, p. 15). This comment suggested incorporating section 8(e)'s language to "consult with a reasonable number of [employees] concerning matters of health and safety in the workplace" where there is no authorized employee representative (Document ID 1965, p. 15).

Some commenters opposed the second alternative presented in the NPRM and stated that OSHA should not create a presumption that a third-party representative is reasonably necessary to aid an inspection. For example, the Employers Walkaround Representative Rulemaking Coalition argued that creating a presumption would "shift[ ] the burden of proof to the employer to show that an authorized representative is not reasonably necessary," which they contended is not supported by the text of the Act (Document ID 1976, p. 16). Labor Services International (LSI) argued that a presumption should not be added because it would result in increased complexity and a question of who is responsible to overcome the presumption—the employer or the CSHO (Document ID 1949, p. 4).

Other commenters opposed the third alternative presented in the NPRM and stated that OSHA should not expand the criteria to allow for a third party to serve as employees' walkaround representative when the CSHO determines that such participation would aid employees in effectively

exercising their rights under the OSH Act (Document ID 1974, p. 5). For example, LSI argued that this alternative proposal is "superfluous" because "the existing version of 29 CFR 1903.8(c) affords employees a role in the inspection procedure" (Document ID 1949, p. 4).

3. Conclusion on the "Good Cause" and "Reasonably Necessary" Requirement

OSHA has considered all arguments in favor and against each of the options and has decided to retain the existing "good cause" and "reasonably necessary" requirement in the final rule. Therefore, if the representative authorized by employees is a third party, the third party may accompany the CSHO during the physical inspection of the workplace if in the judgment of the CSHO, good cause has been shown why the third party's accompaniment is reasonably necessary to the conduct of an effective and thorough inspection of the workplace (including, but not limited to, their relevant knowledge, skills, or experience with hazards or conditions in the workplace or similar workplaces, or language or communication skills).

OSHA has determined that the existing "good cause" and "reasonably necessary" requirement continues to be the appropriate criteria for determining when a third-party will aid an inspection. This requirement is supported by the broad authority granted to the Secretary to promulgate rules and regulations related to inspections, investigations, and recordkeeping. See 29 U.S.C. 657(e), (g)(2); see also Section III, Legal Authority. As many commenters noted, the right of employees to authorize a representative to accompany them during the inspection of the workplace is qualified by the statutory requirement that the representative be authorized "for the purpose of aiding such inspection." 29 U.S.C. 657(e). In other words, an authorized employee representative may accompany the CSHO only for the purpose of aiding the inspection. The requirement for the CSHO to determine that "good cause" has been shown why the third party is "reasonably necessary" to aid an effective and thorough inspection is consistent with the Act and ensures that an authorized representative aid in the inspection. See 29 U.S.C. 657(e), (g)(2). Thus, OSHA disagrees with commenters who suggested that OSHA lacks the authority to determine if a third party will aid an inspection.

OSHA's interpretation of section 8(e) as requiring a showing of good cause and reasonable necessity is consistent

with the authority vested in the CSHO and OSHA's other longstanding regulations. CSHOs are "in charge of inspections" and "shall have authority to resolve all disputes as to who is the representative authorized by the employer and employees for the purpose of this section." 29 CFR 1903.8(a), (b). The Workplace Policy Institute stated that a third-party representative should only be "allowed on site when doing so will actually positively assist in the inspection, not simply because a third party wants to be there. The individual must have a reason for attending that is actually related to the inspection, and not some ulterior motive" (Document ID 1762, p. 4–5). OSHA agrees and believes that the existing "good cause" and "reasonably necessary" requirement assures that this will be so. Third-party representatives are reasonably necessary if they will make a positive contribution to aid a thorough and effective inspection.

While some commenters took issue with the terms "good cause," "reasonably necessary," and "positive contribution," OSHA notes that the "good cause" and "reasonably necessary" requirement is a single requirement and OSHA does not intend the regulation to require a separate "good cause" inquiry. OSHA considered deleting the term "good cause" from the regulation and using only the term "reasonably necessary" as the criterion for determining whether a third party could accompany the CSHO. OSHA rejected that approach because it could lead to unnecessary confusion. OSHA has implemented the "good cause" and "reasonably necessary" requirement, and it has been known to employees and employers, for more than fifty years. As such, OSHA finds no compelling reason to delete the term "good cause" from the revised regulation. Some commenters suggested that the "good cause" and "reasonably necessary" standard places a higher burden on third-party employee representatives than it does on third-party employer representatives. This is true, and OSHA has determined that a different standard is appropriate in the case of third-party employee representatives. As many commenters noted, the presence of such persons in the workplace raises property and privacy concerns that are not present where the employer has identified a third party as its representative. The "good cause" and "reasonably necessary" requirement protects against impermissible infringement of these interests by ensuring that third-party employee representatives will be present only

when they aid the inspection. And this requirement ensures that the third party's presence meets the reasonableness requirements of the Fourth Amendment (see Section IV.D.2, Fourth Amendment Issues). These property and privacy concerns are not implicated where the employee representative is an employee, or when the employer selects a third party to represent it in the walkaround.

Additionally, OSHA has determined that the "good cause" and "reasonably necessary" requirement does not infringe upon employee rights. Although some commenters asserted that this language gives CSHOs too much discretion to reject employees' third-party representative, including one who is the recognized bargaining agent (such as from a union's national or international office), CSHOs have the expertise and judgment necessary to determine, on an inspection-by-inspection basis, whether a third party will aid OSHA's inspection. Moreover, several unions provided examples where representatives from the national or international union were permitted to accompany the CSHO and aided the inspection (see, *e.g.*, Document ID 1761, p. 1; Document ID 1958, p. 3–8). While CSHOs have the authority to deny the right of accompaniment to any representative that interferes with—and thus does not aid—the inspection, (see 29 CFR 1903.8(d)), OSHA anticipates that third-party recognized bargaining agents in a unionized workplace would generally be "reasonably necessary" to the inspection. Cf. OSHA Field Operations Manual, Chapter 3, Section VII.A.1 (explaining that "the highest ranking union official or union employee representative onsite shall designate who will participate in the walkaround"). OSHA's discussion of how this rule interacts with the NLRA is explained in detail in Section IV.E, National Labor Relations Act and Other Labor-Related Comments. Accordingly, OSHA does not believe that the "good cause" and "reasonably necessary" requirement infringes upon or is in tension with employee rights under the NLRA or public sector labor relations laws.

Likewise, OSHA disagrees with comments that there should be a rubric for CSHOs to follow in making their determination or that CSHOs need a defined process to determine whether good cause has been shown that a third-party walkaround representative is reasonably necessary. The statute provides that an employee representative is allowed if they aid the inspection. And the regulation provides further explanation of how OSHA will

implement that requirement. The regulation contains factors for the CSHO to consider in making the "good cause" and "reasonably necessary" determination, and the preamble describes numerous examples of the types of third parties who have made a positive contribution to OSHA's inspections. Accordingly, OSHA rejects the argument that the "good cause" and "reasonably necessary" requirement is too subjective, will result in disparate application, or that a rubric or defined process for determining whether a representative is reasonably necessary would be appropriate.

The OSH Act grants employees the right to a walkaround representative "for the purpose of aiding such inspection." 29 U.S.C. 657(e). As explained above, OSHA has determined that third parties can aid OSHA's inspections in a variety of different scenarios. However, not all third-party representatives will necessarily aid OSHA's inspection simply because employees have selected the individual. Several commenters raised concerns that some individuals may have motivations unrelated to safety or the inspection, such as unionizing a facility or "looking for lawsuit opportunities" (Document ID 1953, p. 5; see also 1775, p. 7–8; 1938, p. 2–3; 1975, p. 18–21). Maintaining the "good cause" and "reasonably necessary" requirement ensures that OSHA's inspection comports with section 8(e) of the OSH Act because the CSHO has determined that the representative will in fact aid the inspection. As such, this requirement does not conflict with the text of the Act or undermine the goals of the Act.

Contrary to several commenters' claims, the "good cause" and "reasonably necessary" requirement does not place a high burden on employees. Rather, the CSHO will determine whether a representative is reasonably necessary. To determine whether "good cause" has been established why a third-party representative is "reasonably necessary," the CSHO will inquire about how and why the representative will benefit the inspection, such as because of the representative's knowledge, skills, or experience with hazards or conditions in the workplace or similar workplaces, relevant language skills, or other reasons that the representative would facilitate communication with employees, such as their cultural competency or relationship with employees. For example, this may include the representative's familiarity with the machinery, work processes, or hazards that are present in the

workplace, any specialized safety and health expertise, or the language or communication skills they have that would aid in the inspection. The CSHO will speak with employees and the employees' walkaround representative to determine whether good cause has been shown that the representative is reasonably necessary. This requirement is not a ''hurdle'' that employees must overcome, but rather better enables OSHA to ensure that a third-party employee representative will aid OSHA's inspection.

While the State Policy Network suggested additional guidance to CSHOs in the event a proffered third-party employee representative is disqualified by the CSHO (Document ID 1965, p. 16–17), this suggestion is unnecessary. Section 1903.8(b) already instructs CSHOs what to do if there is no authorized employee representative or the CSHO cannot determine who is the authorized employee representative with reasonable certainty. See 29 CFR 1903.8(b) (''If there is no authorized representative of employees, or if the Compliance Safety and Health Officer is unable to determine with reasonable certainty who is such representative, he shall consult with a reasonable number of employees concerning matters of safety and health in the workplace.'').

OSHA concludes that retaining the existing requirement also strikes the appropriate balance between workers' rights and employers' property and privacy concerns. Employees, like employers, have a statutory right to a representative to aid in the inspection. See 29 U.S.C. 657(e). OSHA has determined that this requirement enables sufficient flexibility for OSHA to realize the potential benefits that third parties may provide to an inspection while remaining consistent with Fourth Amendment reasonableness requirements. If a third-party representative engages in activity unrelated to the inspection, OSHA will attempt to resolve any potentially interfering conduct and retains the authority to deny individuals the right of accompaniment if their conduct ''interferes with a fair and orderly inspection.'' 29 CFR 1903.8(d).

Finally, it is OSHA's intent that the general presumption of severability should be applied to this regulation; *i.e.,* if any portion of the regulation is held invalid or unenforceable or is stayed or enjoined by any court of competent jurisdiction, the remaining portion remains workable and should remain effective and operative. It is OSHA's intent that all portions be considered severable. In this regard, the agency intends that: (1) in the event that any

portion of the regulation is stayed, enjoined, or invalidated, all remaining portions of the regulation shall remain effective and operative; and (2) in the event that any application of the regulation is stayed, enjoined, or invalidated, the regulation shall be construed so as to continue to give the maximum effect to the provision permitted by law.

## C. Role of the Employee Representative in the Inspection

In response to comments received, OSHA has slightly revised the regulatory text in the final rule. OSHA's proposed revision to section 1903.8(c) stated that a third party representative could accompany the CSHO during the inspection ''if, in the judgment of the Compliance Safety and Health Officer, good cause has been shown why their participation is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace (*e.g.,* because of their relevant knowledge, skills, or experience with hazards or conditions in the workplace or similar workplaces, or language skills).'' 88 FR 59833–34.

The use of the word ''participation'' in the proposed regulation prompted several commenters to question whether the term reflected a change in the role served by the employee representative (see, *e.g.,* Document ID 1781, p. 2–3; 1941, p. 5; 1964, p. 3; 1974, p. 3–4), while a number of commenters observed that the revision could overly broaden the role of third-party representatives (see, *e.g.,* Document ID 1964, p. 3–4; 1974, p. 3; 1976, p. 21; 6991). Other commenters described scenarios in which third-party representatives could take advantage of ambiguity resulting from the revision by performing acts not authorized by the OSH Act, *i.e.,* acts that do not aid the inspection (see, *e.g.,* Document ID 1755, p. 1; 1964, p. 4; 1974, p. 3–4; 1976, p. 5; 6991).

Some commenters expressed concern that the revision could permit representatives to participate in private employee or management interviews, independently interview employees, or gain unauthorized access to employers' private records (see, *e.g.,* Document ID 1765, p. 2; 1774, p. 6; 1964, p. 3–4; 1976, p. 5). Commenters also opposed allowing representatives to make unauthorized image, video, or audio recordings during inspections and to use such recordings for purposes other than furthering the inspection (see, *e.g.,* Document ID 1762, p. 5; 1774, p. 6; 1966, p. 2). Relatedly, one commenter suggested that employee representatives should be subject to nondisclosure requirements and only be allowed to

share information with CSHOs (Document ID 8120). Commenters further asked whether third-party employee representatives could ''weigh[ ] in with their own commentary,'' and ''opin[e] on what is and is not safe,'' (Document ID 1762, p. 5). Additionally, the Office of Advocacy of the U.S. Small Business Administration asked what ''participation'' would entail and how it would affect small entities (Document ID 1941, p. 5).

While the terms ''participate'' and ''accompany'' are often used interchangeably in discussing employee walkaround rights (see, *e.g.,* OSHA Field Operations Manual, CPL 02–00– 164, Chapter 3, Sections IV.D; VII.A), OSHA did not intend to change the role of the walkaround representative. Based on stakeholder comments, OSHA has determined that using the term ''accompaniment'' rather than ''participation'' maintains consistency with the OSH Act and other related OSHA regulations. See, *e.g.,* 29 U.S.C. 657(e); 29 CFR 1903.4 (establishing procedures upon objection to an inspection, including upon refusal to permit an employee representative to accompany the CSHO during the physical inspection of a workplace in accordance with 29 CFR 1903.8); 29 CFR 1908.6 (explaining procedures during an onsite consultative visit for an employee representative of affected employees to accompany the consultant and the employer's representative during the physical inspection of a workplace); 29 CFR 1960.27 (providing that a representative of employees shall be given an opportunity to accompany CSHOs during the physical inspection of any workplace, and that a CSHO may deny the representative's right of accompaniment if their participation interferes with a fair and orderly inspection). Accordingly, OSHA has removed the term ''participation'' in the final rule to clarify that the employee representative may accompany the CSHO when good cause has been shown why ''accompaniment'' is reasonably necessary to an effective and thorough workplace inspection.

OSHA received many comments related to what a third-party representative can or cannot do during the inspection (see, *e.g.,* Document ID 0234, p. 1–2; 1935, p. 1; 1937, p. 1, 4– 5; 1938, p. 2–6). This rulemaking does not change the role of the third-party representative authorized by employees; the representative's role is to accompany the CSHO for the purpose of aiding OSHA's physical inspection of the workplace. The representative is permitted to accompany the CSHO

during the walkaround inspection, attend the opening and closing conferences (see OSHA Field Operations Manual, CPL 02–00–164, Chapter 3, Sections V.A, VII.A, and VIII.A), and ask clarifying questions to ensure understanding of a specific item or topic of discussion. While the representative may informally ask clarifying questions during the walkaround, private employees interviews conducted during the inspection are conducted by the CSHO in private unless the employee requests the presence of the representative.

One commenter urged that OSHA ensure that the third-party walkaround representative not be allowed to review physical and electronic records, including procedures, injury and illness logs, diagrams, emergency plans, and floor plans, along with the CSHO (Document ID 1765, p. 2). Although CSHOs may preliminarily review employer-provided documents such as safety and health manuals or injury and illness records during the walkaround inspection, in-depth review typically occurs away from the inspected worksite. However, this rule does not alter in any way the requirement that employers provide access to injury and illness records to "employees, former employees, their personal representatives, and their authorized employee representatives," as those terms are defined in OSHA's Recordkeeping and Reporting regulation (29 CFR 1904.35). Additionally, the third-party representative may review records that relate to work processes, equipment, or machines at the CSHO's discretion if their review during the walkaround will aid the CSHO's inspection.

Further, during an inspection, the CSHO will ensure an employee representative's conduct does not interfere with a fair and orderly inspection. OSHA considers conduct that interferes with the inspection to include any activity not directly related to conducting an effective and thorough physical inspection of the workplace. OSHA Field Operations Manual, CPL 02–00–164, Chapter 3, Section VII.A. The FOM instructs the CSHO to advise the employee representative that, during the inspection, matters unrelated to the inspection shall not be discussed with employees. See OSHA Field Operations Manual, CPL 02–00–164, Chapter 3, Section V.E. Under section 1903.8(d), a CSHO may deny a representative the right to accompany the CSHO on an inspection if their conduct interferes with a fair and orderly inspection. Last, matters concerning the authorized representative's conduct outside the

walkaround inspection is beyond the scope of this regulation or this rulemaking, and OSHA declines to add a nondisclosure requirement or other limitations to the sharing of information.

### D. Constitutional Issues

1. First Amendment Issues

OSHA received several hundred comments asserting that this rule could adversely affect religious liberty, such as by permitting someone opposed to a church to be a third-party employee representative (see, *e.g.,* Document ID 1076; 1151; 1724; 1739; 6800). Other commenters suggested that churches should not be inspected (see, *e.g.,* Document ID 1360). OSHA believes that the concerns expressed in these comments are unfounded.

First, under this rule and pursuant to the OSH Act, any third-party employee representative must be authorized by the employees. Employees do not have to designate a third-party representative if they do not want to. Thus, only a third party selected by the employees of the church or other religious organization will be eligible to accompany the CSHO on the inspection. Second, a third-party employee representative may accompany the CSHO only if the CSHO concludes that good cause has been shown that the third party is "reasonably necessary" to conduct a thorough and effective inspection. Third, the CSHO has the authority to deny the right of accompaniment to any third-party employee representative "whose conduct interferes with a fair and orderly inspection." 29 CFR 1903.8(d).

While OSHA accommodates religious practices in carrying out its responsibilities under the OSH Act, see, *e.g.,* OSHA Exemption for Religious Reason from Wearing Hard Hats, STD 01–06–005 (1994), *available at https://www.osha.gov/enforcement/directives/std-01-06-005;* Sikh American Legal Defense and Education Fund, OSHA Interpretive Letter (Aug. 5, 2011), *available at https://www.osha.gov/laws-regs/standardinterpretations/2011-08-05,* coverage of religious institutions is not at issue in this rulemaking. OSHA does conduct inspections at religious worksites, *see, e.g., Absolute Roofing & Constr., Inc.* v. *Sec'y of Labor,* 580 F. App'x 357, 359 (6th Cir. 2014) (involving OSHA's inspection of a jobsite where a worker was injured while performing repair work on a church), but for the reasons stated above OSHA finds that this rule does not adversely affect religious liberty or

change OSHA's long-exercised authority to do so.

Additionally, OSHA received a few comments asserting that this rule infringed on free speech rights (see, *e.g.,* Document ID 1754, p. 2; 8781). However, these commenters did not explain why or how this rule limits free speech. This rule neither requires nor prohibits speech, and OSHA finds no merit to the argument that it limits the First Amendment right to freedom of speech.

2. Fourth Amendment Issues

While the OSH Act grants the Secretary of Labor broad authority to inspect workplaces "without delay" to find and remedy safety and health violations, 29 U.S.C. 657(a)(1)–(2), there are constitutional and statutory components of reasonableness that an OSHA inspection must satisfy. The Fourth Amendment of the U.S. Constitution protects employers against "unreasonable searches and seizures." See U.S. Const. amend. IV; *Barlow's,* 436 U.S. 311–12. Under *Barlow's,* a warrant is constitutionally necessary for nonconsensual OSHA inspections and, therefore, if an employer refuses entry, OSHA must obtain a warrant to proceed with the inspection. 436 U.S. at 320–21; see also 29 CFR 1903.4. Contrary to the concerns expressed by the Pacific Legal Foundation (Document ID 1768, p. 6–7), this rule will not disturb employers' right under the Fourth Amendment, including their right to withhold or limit the scope of their consent, and employers will not be subject to a citation and penalty for objecting to a particular third-party representative. Moreover, both the Fourth Amendment and section 8(a) of the OSH Act require that OSHA carry out its inspection in a reasonable manner. See, *e.g., L.R. Willson & Sons, Inc.* v. *OSHRC,* 134 F.3d 1235, 1239 (4th Cir. 1998); *Donovan* v. *Enter. Foundry, Inc.,* 751 F.2d 30, 36 (1st Cir. 1984). Indeed, section 8(a) of the Act requires that OSHA's on-site inspections be conducted at "reasonable times, and within reasonable limits and in a reasonable manner." 29 U.S.C. 657(a)(2).

Some commenters have argued that allowing a third-party employee representative to accompany OSHA during its physical inspection of a workplace would not be a "reasonable" search under the Fourth Amendment (see, *e.g.,* Document ID 1976, p. 19). For example, some commenters have asserted that the rule will force them to admit any third-party representative onto their property (see, *e.g.,* Document ID 1976, p. 21; Document ID 1952, p. 3) with others arguing that OSHA is

attempting to create a "new . . . right" for third parties to access private property (see, *e.g.,* Document ID 1952, p. 8). However, as an initial matter, the purpose of the Fourth Amendment is "to safeguard the privacy and security of individuals against arbitrary Invasions by *government officials.*" *Camara* v. *Mun. Ct. of City & Cnty. of San Francisco,* 387 U.S. 523, 528 (1967) (emphasis added). Third-party employee representatives are not governmental officials and are not performing their own searches. Their presence on the employer's premises—consistent with the terms of Section 8(e)—will be limited to aiding *OSHA's* inspection (*i.e.,* search). Additionally, this rule does not create any new rights; instead, it simply clarifies the already-existing right that employees have under section 8(e) of the OSH Act to select authorized representatives for *OSHA's* walkaround inspection.

The reasonableness of OSHA's search will initially turn on whether OSHA had administrative probable cause to initiate the inspection in the first place (such as responding to a complaint or conducting a programmed inspection). See *Barlow's,* 436 U.S. at 320–21. Where the government has sought and obtained a search warrant supported by probable cause and acted within its scope, the resulting search is presumptively reasonable. See *Sims,* 885 F.3d at 268. This rule does not diminish or alter the legal grounds that are required for OSHA to initiate an on-site inspection. Instead, it merely clarifies the type of employee representative who can accompany OSHA during a lawful inspection.

Additionally, this rule, as well as OSHA's existing regulations concerning the conduct of inspections, provides sufficient administrative safeguards to ensure the reasonableness of OSHA's inspections, even when a private party accompanies the CSHO during the walkaround inspection. See *Matter of Establishment Inspection of Caterpillar Inc.,* 55 F.3d at 339. For instance, the rule maintains the provision that the CSHO must first determine good cause has been shown why accompaniment by a third party is reasonably necessary to an effective and thorough physical inspection of the workplace. 29 CFR 1903.8(c). This rule also does not diminish or alter administrative safeguards contained in other OSHA regulations. For instance, CSHOs still have the authority to resolve all disputes about who the authorized employee representatives are and to deny the right of accompaniment to any person whose conduct interferes with a fair and orderly inspection. 29 CFR

1903.8(b), (d). Section 1903.7(d) also mandates that "[t]he conduct of inspections shall be such as to preclude unreasonable disruption of the operations of the employer's establishment." 29 CFR 1903.7(d). Furthermore, employers have the right to identify areas in the workplace that contain or might reveal a trade secret, and may request that, in any area containing trade secrets, the authorized employee representative shall be an employee in that area or an employee authorized by the employer to enter that area. See 29 CFR 1903.9(c), (d).

In the NPRM, OSHA sought comment on whether it should add a presumption that a third-party representative authorized by employees is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace. 88 FR 59833. In response, the Employers Walkaround Representative Rulemaking Coalition commented that "[r]emoving the current constraints on third party involvement in OSHA inspections or permitting the participation of a third party not deemed 'reasonably necessary' . . . would contravene the Fourth Amendment's prohibition against unreasonable searches and seizures" (Document ID 1976, p. 19). The Employers Walkaround Representative Rulemaking Coalition noted that in the criminal law context, the government violates the Fourth Amendment when it permits private parties with no legitimate role in the execution of a warrant to accompany an officer during the search (Document ID 1976, p. 19–20). As an initial matter, the requirements of administrative probable cause for OSHA inspections are less stringent than those governing criminal probable cause. *Barlow's,* 436 U.S. at 320–21. Moreover, as explained in Section IV.B, The "Good Cause" and "Reasonably Necessary" Requirement, OSHA has retained the requirement that the CSHO first determine that good cause has been shown that accompaniment by a third-party is reasonably necessary to an effective and thorough inspection.

Indeed, criminal law cases demonstrate that third parties may aid or assist the government official in their investigation. For example, criminal law provides that a search warrant must be served and executed by an officer mentioned therein and by no other person "except in aid of the officer" executing the warrant. 18 U.S.C. 3105; see also *Wilson* v. *Layne,* 526 U.S. 603 (1999). In *Wilson* v. *Layne,* the Supreme Court held that "although the presence of third parties during the execution of a warrant may in some circumstances be

constitutionally permissible," the presence of a news crew during the execution of an arrest warrant at a defendant's home was unconstitutional. 526 U.S. at 613–14. The Court reasoned that the Fourth Amendment requires that police actions in execution of a warrant be related to the objectives of the authorized intrusion and because the news crew was on the premises to advance their own private purposes (and not to assist the police) their presence in defendant's home was unreasonable. Id. at 611–12. In other cases involving third parties who are involved in police searches, courts have similarly held that "the civilian's role must be to aid the efforts of the police. In other words, civilians cannot be present simply to further their own goals." *United States* v. *Sparks,* 265 F.3d 825, 831–32 (9th Cir. 2001), *overruled on other grounds by United States* v. *Grisel,* 488 F.3d 844 (9th Cir. 2007).

The criminal caselaw also contains examples of searches involving third parties that courts have found to be reasonable under the Fourth Amendment. For instance, in *Sparks,* the court found reasonable a warrantless search conducted with the aid of a civilian, in part, because the police officer was in need of assistance. 265 F.3d at 831–32. Similarly, in *United States* v. *Clouston,* the court held that the presence of the telephone company employees during the execution of a search warrant was reasonable where the telephone company employees were present on the premises to aid officers in identifying certain electronic devices owned by their employer and their role in the search was limited to identifying such property. 623 F.2d 485, 486–87 (6th Cir. 1980). Like in the foregoing cases, OSHA's rule—consistent with the plain text of the statute—also requires third-party employee representatives to benefit the inspection. Accordingly, the rule will maintain the language in the regulation that requires that good cause be shown why the third-party representative's accompaniment is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace.

The Employers Walkaround Representative Rulemaking Coalition also expressed concern that "absent the possession of some technical expertise lacking in the CSHO and necessary to the physical inspection of the workplace, the presence of a third party outsider (*e.g.,* union organizer, plaintiff's attorney, etc.) with no connection to the workplace and acting in his own interests violates the Fourth Amendment's prohibition against

**Federal Register**/Vol. 89, No. 63/Monday, April 1, 2024/Rules and Regulations    **22579**

unreasonable searches and seizures'' (Document ID 1976, p. 21). The purpose of this rule is to clarify that, for the purpose of the walkaround inspection, the representative(s) authorized by employees may be an employee of the employer or, when they are reasonably necessary to aid in the inspection, a third party. For third-party representatives, the rule will require a showing of ''good cause'' for why they are reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace (including, but not limited to, because of their relevant knowledge, skills, or experience with hazards or conditions in the workplace or similar workplaces, or language or communication skills). OSHA has determined that this rule best effectuates the text and purpose of section 8(e) of the Act, consistent with Fourth Amendment reasonableness requirements, without imposing an overly burdensome and restrictive ''technical expertise'' requirement on employees who want a representative to accompany the CSHO during an inspection of their workplace.

The Ohio Manufacturers' Association expressed concern that the rule will ''expand the plain view doctrine'' and ''convert a targeted inspection based on a complaint to an unnecessarily comprehensive and time-consuming 'wall-to-wall' inspection'' because the third party will ''constantly scan other parts of the employer's facility to find potential violations of the OSH Act'' (Document 0040, p. 3). The Chamber of Commerce also asked whether employee representatives' observations could satisfy the ''plain view'' doctrine (Document ID 1952, p. 14). On the other hand, the National Council for Occupational Safety and Health and the Sur Legal Collaborative asserted that some employers have attempted to limit the scope of OSHA inspections by preventing CSHOs from seeing hazards that are otherwise in plain view and noted that employee representatives can point out other areas in the worksite where there are hazards (Document ID 1769, p. 2; 11231). Similarly, Worksafe described an inspection in California where the Cal/OSHA inspector did not observe areas where janitorial employees worked with bloodborne pathogens and did not inspect a garbage compactor that had serious mechanical failure because the employer was able to obscure the hazardous conditions (Document ID 1934, p. 3–4). Had Worksafe not intervened by sending Cal/OSHA videos and photos of the hazards, these hazards could have gone unabated, and employees could have

been seriously injured, become ill, or died on the job (Document ID 1934, p. 4).

The ''plain view'' doctrine allows the warrantless ''seizure'' of evidence visible to a government official or any member of the general public while they are located where they are lawfully allowed. *Wilson* v. *Health & Hosp. Corp. Of Marion Cnty.,* 620 F.2d 1201, 1210 (7th Cir. 1980). The rationale of the plain view doctrine is that once evidence is ''in open view'' and is observed by the government or a member of the public from a lawful vantage point, ''there has been no invasion of a legitimate expectation of privacy'' and thus the Fourth Amendment's privacy protections do not apply. *Minnesota* v. *Dickerson,* 508 U.S. 366, 375 (1993); see also *Donovan* v. *A.A. Beiro Const. Co., Inc.,* 746 F.2d 894, 903 (D.C. Cir. 1984). Hence, third-party representatives may lawfully aid the inspection by informing the CSHO about hazards they observe in plain view during the walkaround. However, the authority to inspect areas in plain view ''does not automatically extend to the interiors of every enclosed space within the area.'' *A.A. Beiro Const. Co.,* 746 F.2d at 903. Because their role is to aid in ''the conduct of an effective and thorough physical inspection of the workplace,'' 29 CFR 1903.8(c), the third-party representative is only permitted to accompany the CSHO, and they are not permitted to stray from the CSHO or to conduct their own searches.

Moreover, the Ohio Manufacturers' Association's concerns about the inspection becoming a ''wall to wall'' inspection are overstated. The CSHO will conduct the walkaround inspection in accordance with the law and FOM and will inspect those areas where there are reasonable grounds to believe a violation could be found. Generally, OSHA conducts unprogrammed inspections (*i.e.,* inspections resulting from an employee complaint, referral, reported accident or incident) as partial inspections, which are limited to the specific work areas, operations, conditions, or practices forming the basis of the unprogrammed inspection. As explained in the FOM, however, the scope of an OSHA inspection can be expanded for a number of reasons, including employee interviews, among other reasons. OSHA Field Operations Manual, (CPL 02–00–164), Chapter 3, Section III.B.2. Hence, just like employee representatives employed by the employer, third-party employee representatives may communicate to the CSHO conditions they are aware of or observe in plain view while accompanying the CSHO on the

walkaround inspection. ''The effectiveness of OSHA inspections would be largely eviscerated if compliance officers are not given some nominal right to follow up on observations of potential violations.'' *A.A. Beiro Const. Co.,* 746 F.2d at 903.

Several comments also expressed concern that the rule would violate state laws against trespass (see, *e.g.,* Document ID 1780, p. 2; 1938, p. 6–7). For example, the Coalition for Workplace Safety cited the ''local-interest exception'' to the NLRA in arguing that state trespass laws allow employers to exclude individuals from their property (Document ID 1938, p. 6–7). The local-interest exception allows states to regulate certain conduct that is arguably NLRA-protected without being preempted by the NLRA. See *Loc. 926 Int'l Union of Operating Eng'rs* v. *Jones,* 460 U.S. 669, 676 (1983). This exception typically applies when the state regulates ''threats to public order such as violence, threats of violence, intimidation and destruction of property [or] acts of trespass.'' See *Pa. Nurses Ass'n* v. *Pa State Educ. Ass'n,* 90 F.3d 797, 803 (3d Cir. 1996) (collecting cases). These cases are inapposite here both because they do not arise under the OSH Act and deal solely with the actions of private parties such as labor organizations.

Under the final rule, an authorized employee representative would accompany the CSHO, a government official, for the purpose of aiding a lawful inspection under the OSH Act. Moreover, courts apply the local-interest exception when, among other factors, the conduct at issue is only a ''peripheral concern'' of the NLRA. See *Loc. 926,* 460 U.S. at 676. Application of the exception here with respect to the OSH Act would be inappropriate because the right under section 8(e) for an authorized employee representative to accompany the CSHO is intended to increase the effectiveness of the walkaround inspection, an essential element of the OSH Act's enforcement scheme. Thus it is ''one of the key provisions'' of the Act. See Subcomm. on Lab. of the S. Comm. on Lab. and Pub. Welfare, 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational Safety and Health Act of 1970, at 430 (Comm. Print 1971).

### 3. Fifth Amendment Issues

Some commenters argued that the rule constitutes a *per se* taking under the Fifth Amendment by allowing employee representatives to be non-employees (see, *e.g.,* Document ID 0043, p. 2–4; 0168, p. 3–4; 1768, p. 7–8; 1779, p. 2–3; 1952, p. 8–9; 1976, p. 18). These

commenters asserted that the rule will deny employers the right to exclude unwanted third parties from their property (see, *e.g.,* Document ID 0043, p. 3; 1952, p. 8–9; 1976, p. 18). Under the Fifth Amendment's Takings Clause, the government must provide just compensation to a property owner when the government physically acquires private property for a public use. See *Tahoe-Sierra Pres. Council,* 535 U.S. at 321. However, the Supreme Court has recognized that "[b]ecause a property owner traditionally [has] had no right to exclude an official engaged in a reasonable search, government searches that are consistent with the Fourth Amendment and state law cannot be said to take any property right from landowners." *Cedar Point Nursery,* 141 S. Ct. at 2079. Despite this important distinction, commenters raised various arguments in support of their assertion that a taking will occur, focusing on the identity of the employee representative and the nature of their activity onsite.

For example, some commenters asserted that a *per se* taking would occur because the rule authorizes a third party who is not a government official to access private property (see, *e.g.,* Document ID 0168, p. 3–4; 1952, p. 8–9; 1976, p. 18). OSHA's rule provides that employees can select either a third party or another employee of the employer to accompany the CSHO. However, only the CSHO, as the government official, will conduct the inspection. Contrary to the argument made by some commenters (see, *e.g.,* Document ID 1768, p. 8), OSHA is not delegating its inspection authority to third parties. The purpose of employee and employer representation during the walkaround is to aid—not conduct—OSHA's inspection. See 29 U.S.C. 657(e). If OSHA is engaged in a reasonable search under the Fourth Amendment, the mere presence of such a third-party employee representative does not result in a taking. See *Bills,* 958 F.2d at 703 (noting that a third party's entry onto subject's private property may be "justified if he had been present to assist the local officers").

Other commenters argued that the rule conflicts with the Supreme Court's decision in *Cedar Point Nursery* because it would allow union representatives to accompany the CSHO (see, *e.g.,* Document ID 0043, p. 2–3; 1952, p. 8–9; 1976, p. 18–19). In *Cedar Point Nursery,* the Supreme Court invalidated a California regulation that granted labor organizations a "right to take access" to an agricultural employer's property for the sole purpose of soliciting support for unionization. 141 S. Ct. at 2069, 2080. The Supreme Court held that the

regulation appropriated a right to invade the growers' property and therefore constituted a *per se* physical taking. Id. at 2072. The Court reasoned that "[r]ather than restraining the growers' use of their own property, the regulation appropriates for the enjoyment of third parties the owners' right to exclude." Id. The circumstances in *Cedar Point Nursery* are not present in this rule, however. *Cedar Point Nursery* involved a regulation that granted union organizers an independent right to go onto the employer's property for purposes of soliciting support for the union for up to three hours per day, 120 days per year. This rule does not. Rather, consistent with section 8(e) of the OSH Act, this rule—like the regulation that has been in effect for more than fifty years—recognizes a limited right for third parties to "accompany" CSHOs during their lawful physical inspection of a workplace solely for the purpose of aiding the agency's inspection.

Additionally, the Supreme Court in *Cedar Point Nursery* stated that "many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights." Id. at 2079. "For example, the government owes a landowner no compensation for requiring him to abate a nuisance on his property, because he never had a right to engage in the nuisance in the first place." Id. Here, OSHA's rule will not constitute a physical taking because, as discussed in Section IV.D.2, Fourth Amendment Issues, OSHA's inspections are conducted in accordance with the Fourth Amendment and the OSH Act. Unlike the union organizers in *Cedar Point Nursery,* the presence of third-party employee representatives on the employer's property will be strictly limited to accompanying the CSHO during a lawful physical inspection of the workplace and their sole purpose for being there will be to aid the inspection.

One commenter stated OSHA's rule does not fit within any of the Supreme Court's recognized exceptions permitting government-authorized physical invasions because (1) access by third parties is not rooted in any "longstanding background restrictions on property" and "these searches [do not] comport with the Fourth Amendment," and (2) "even if the [rule] could be characterized as a condition imposed in exchange for a benefit, the third-party tag-along is not germane to risks posed to the public" (Document 1768, p. 8) (citing *Cedar Point Nursery,* 141 S. Ct. at 2079). First, as discussed in Section IV.D.2, Fourth Amendment

Issues, an OSHA inspection can be reasonable under the Fourth Amendment even when it is conducted with the aid of a third-party. See, *e.g., Sparks,* 265 F.3d at 831–32 (finding warrantless search conducted with the aid of a civilian reasonable under the Fourth Amendment). Second, in *Cedar Point Nursery,* the Supreme Court stated that the government may require property owners to cede a right of access as a condition of receiving certain benefits, such as in government health and safety inspection regimes, without causing a taking so long as "the permit condition bears an 'essential nexus' and 'rough proportionality' to the impact of the proposed use of the property," *Cedar Point Nursery,* 141 S. Ct. at 2079–2080 (citing *Dolan* v. *City of Tigard,* 512 U.S. 374, 386, 391 (1994) and *Koontz* v. *St. Johns River Water Management Dist.,* 570 U.S. 595, 599 (2013)). However, OSHA is not required to demonstrate the elements of "essential nexus" and "rough proportionality" because it does not condition the grant of any benefit such as a grant, permit, license, or registration on allowing access for any of its reasonable safety and health inspections.

Accordingly, OSHA has determined that this rule does not constitute a taking requiring just compensation under the Fifth Amendment. OSHA inspections conducted under this rule will be consistent with the Fourth Amendment and any third-party employee representatives that accompany the CSHO on their physical inspection of the workplace will be on the employer's premises solely to aid the inspection.

## 4. Due Process Issues

Some commenters argued that this rule would deprive employers of due process because of substantive or procedural deficiencies or because it is unconstitutionally vague (see, *e.g.,* Document ID 1762, p. 4; 1776, p. 5; 1942, p. 4; 1955, p. 3, 8–9; 8124). For example, NRF asserted, "A CSHO's decision to authorize a third-party representative to enter an employer's property is a violation of substantive due process that an employer has no pre-entry/pre-enforcement means to address." (Document ID 1776, p. 5). Other commenters asserted that employers' due process rights are violated because there are not procedures for employers to challenge the CSHO's "good cause" and "reasonably necessary" determination, object to the selection of employees' third-party walkaround representative, or verify the third-party representative's qualifications before the third party

enters their property (see, *e.g.,* Document ID 1776, p. 2, 5, 6–7; 1955, p. 3, 8–9). OSHA does not find any merit to commenters' due process challenges.

NRF inaccurately asserts that permitting a third-party to enter an employer's property violates that employer's substantive due process rights (see Document ID 1776, p. 5). As discussed in Section IV.D.3, Fifth Amendment Issues, OSHA inspections do not result in the deprivation of property. Instead, they are law enforcement investigations to determine whether employers at the worksite are complying with the OSH Act and OSHA standards. And, as explained in Section IV.D.2, Fourth Amendment Issues, a third party may accompany OSHA during its inspection for the purpose of aiding such inspection, just as other law enforcement officials do, depending on the nature of the inspection.

This rule also does not change employers' ability to object to employees' choice for their walkaround representative. Employees have a right under section 8(e) of the Act to a walkaround representative, and, if an employer has concerns about the particular representative that employees choose, nothing in the Act or the rule precludes employers from raising objections to the CSHO. The CSHO may consider those objections when conducting an inspection in accordance with Part 1903, including when judging whether good cause has been shown that the employee representative's participation is reasonably necessary to conduct an effective and thorough inspection of the workplace.

Furthermore, as discussed in Section IV.D.2, Fourth Amendment Issues, OSHA's inspections are conducted with the employer's consent or via a warrant. If an employer denies or limits the scope of its consent to OSHA's entry because it does not believe a particular third party should enter, the CSHO will consider the reason(s) for the employer's objection. The CSHO may either find merit to the employer's objection or determine that good cause has been shown that the third party is reasonably necessary to a thorough and effective inspection. In the latter scenario, the CSHO would follow the agency's procedures for obtaining a warrant to conduct the physical inspection, and a judge would consider whether the search, including the third-party's accompaniment, is reasonable under the Fourth Amendment. See, *e.g., Matter of Establishment Inspection of Caterpillar Inc.,* 55 F.3d at 336 (employer objected to striking employee serving as walkaround representative and denied

OSHA entry, moved to quash OSHA's warrant granting entry, and then appealed district court decision denying employer's motion). Neither NRF nor the Construction Industry Safety Coalition have suggested that this process is constitutionally inadequate.

Other commenters argued that the rule is unconstitutionally vague. For instance, the Construction Industry Safety Coalition argues the rule "does not provide requisite notice of what is required to comply and will be unconstitutionally vague on its face and as applied." (Document ID 1905, p. 3, 8–9). Several commenters argued "the regulated community has no notice as to what the standards, procedures, and their rights will be under this proposed regulation and thus cannot meaningfully comment." (Document ID 1779, p. 2; see also 1751, p. 2; 1942, p. 2).

Constitutional due process requires regulations to be sufficiently specific to give regulated parties adequate notice of the conduct they require or prohibit. See *Freeman United Coal Mining Co.* v. *Fed. Mine Safety & Health Review Comm'n,* 108 F.3d 358, 362 (D.C. Cir. 1997) ("[R]egulations will be found to satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require."); see also *AJP Const., Inc.* v. *Sec'y of Lab.,* 357 F.3d 70, 76 (D.C. Cir. 2004) (quoting *Gates & Fox Co.* v. *OSHRC,* 790 F.2d 154, 156 (D.C. Cir. 1986)) ("If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation).

Contrary to CISC's assertion, this rule is not unconstitutionally vague. As explained in Section IV.F, Administrative Issues, this rule provides greater clarity than the prior regulation by more explicitly stating that employees' walkaround representative may be a third party and that third parties are not limited to the two examples in the previous regulation. Accordingly, OSHA has determined that this rule does not infringe on employers' due process rights.

5. Tenth Amendment Issues

Some commenters raised Tenth Amendment concerns (see Document ID 1545; 7349). For instance, one

commenter stated they oppose the rule "because it violates the 10th amendment of the US Constitution, which reserves all powers to the states and the people that are not explicitly named in the Constitution" (Document ID 7349). Another commenter expressed concern over "federal law overruling established state law concerning OSHA rules" (Document ID 1545). However, OSHA's authority to conduct inspections and to issue inspection-related regulations is well-settled and has been long exercised. See 29 U.S.C. 657(e) (describing the Secretary's authority to promulgate regulations related to employer and employee representation during an inspection); 657(g)(2) (describing the Secretary of Labor's and the Secretary of Health and Human Services' authority to "each prescribe such rules and regulations as he may deem necessary to carry out their responsibilities under this Act, including rules and regulations dealing with the inspection of an employer's establishment"); *Barlow's,* 436 U.S. at 309 (section 8(a) of the OSH Act "empowers agents of the Secretary of Labor (Secretary) to search the work area of any employment facility within the Act's jurisdiction."). Accordingly, OSHA concludes that this rule does not violate the 10th Amendment. For a discussion on how this rule will affect states, see Sections VII, Federalism and VIII, State Plans.

*E. National Labor Relations Act and Other Labor-Related Comments*

Several commenters opposed to the proposed rule discussed the National Labor Relations Act (NLRA). These commenters mainly asserted that the rule circumvents or conflicts with the NLRA by allowing union officials to be employee representatives in non-union workplaces (see, *e.g.,* 1933, p. 4; 1955, p. 7–8). For example, commenters argued that under the NLRA, a non-union employer generally has the right to exclude union representatives engaged in organizing activity from their property (see, *e.g.,* Document ID 1938, p. 6–7; 1955, p. 6–7; 1976, p. 10–11). The Chamber of Commerce also contended that non-union employers that allow a union official to serve as employees' walkaround representative could violate section 8(a)(2) of the NLRA by appearing to show favoritism to that union (Document ID 1952, p. 7). In addition, some commenters argued that representation rights under the NLRA are based on the concept of majority support, and therefore, a CSHO cannot allow an individual who lacks support from a majority of employees to serve as the employees' walkaround

**22582** **Federal Register**/Vol. 89, No. 63/Monday, April 1, 2024/Rules and Regulations

representative during OSHA's inspection (see, *e.g.,* Document ID 1939, p. 3; 1976, p. 8).

Relatedly, several commenters, including the Utility Line Clearance Safety Partnership, Coalition for Workplace Safety, and National Association of Manufacturers asserted that determining whether a third party is an authorized representative of employees is exclusively under the jurisdiction of the National Labor Relations Board (NLRB) (Document ID 1726, p. 4–5; 1938, p. 3; 1953, p. 5). The Coalition for Workplace Safety also argued that the NLRB alone has the authority to address the relationship between employees and their authorized representative and that "OSHA does not have the expertise or authority to meddle in the relationship" between employees and any authorized representative (Document ID 1938, p. 3–4). Lastly, some commenters raised the question of whether the rule would allow employees of one union to select a different union as their walkaround representative and asserted that this would conflict with the NLRA's requirement that a certified union be the exclusive representative of all employees in the bargaining unit (see, *e.g.,* Document ID 1976, p. 9).

Conversely, other commenters, such as a group of legal scholars who support the proposed rule, denied that the rule implicated the NLRA and cited the legislative history of the OSH Act to show that the phrase "for the purpose of aiding such inspection" was added to section 8(e) of the OSH Act to limit potential conflict with the NLRA (Document ID 1752, p. 3–4). U.S. Representative Robert "Bobby" Scott compared section 8(e) of the OSH Act with section 103(f) of the Mine Safety and Health Act (Mine Act), which authorizes employee representatives during inspections, and noted that Federal courts of appeals have determined that allowing non-employee representatives under the Mine Act does not violate the NLRA (Document ID 1931, p. 9–10, citing *Thunder Basin Coal Co.* v. *FMSHRC,* 56 F.3d 1275 (10th Cir. 1995) and *Kerr-McGee Coal Corp.* v. *FMSHRC,* 40 F.3d 1257 (D.C. Cir. 1994)). The American Federation of Teachers, who commented in support of the proposed rule, noted that disallowing union representatives in unionized workplaces would be incongruent with the NLRA because union representatives are the legally authorized representatives of employees concerning terms and conditions of employment under the NLRA (Document ID 1957, p. 2).

OSHA concludes that the rule does not conflict with or circumvent the NLRA because the NLRA and the OSH Act serve distinctly different purposes and govern different issues, even if they overlap in some ways. Cf. Representative of Miners, 43 FR 29508 (July 7, 1978) (meaning of the word "representative" in the Mine Act "is completely different" than the meaning of the word in the NLRA). The NLRA concerns "the practice and procedure of collective bargaining" and "the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. 151. To effectuate this, the NLRB conducts elections to certify and decertify unions and investigates alleged unfair labor practices, among other activities. See 29 U.S.C. 159.

In contrast, the purpose of the OSH Act is to "assure . . . safe and healthful working conditions." 29 U.S.C. 651. To effectuate this purpose, the OSH Act authorizes OSHA to conduct safety and health inspections and mandates that "a representative authorized by [an employer's] employees shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of [the workplace] for the purpose of aiding such inspection." 29 U.S.C. 657(e). The NLRA contains no analogous provision. Further, the OSH Act does not place limitations on who can serve as the employee representative, other than requiring that the representative aid OSHA's inspection, and the OSH Act's legislative history shows that Congress "provide[d] the Secretary of Labor with authority to promulgate regulations for resolving this question." 88 FR 59825, 59828–59829 (quoting Legislative History of the Occupational Safety and Health Act of 1970, at 151 (Comm. Print 1971)). As such, OSHA—not the NLRB—determines if an individual is an authorized representative of employees for the purposes of an OSHA walkaround inspection. OSHA's FOM instructs that in workplaces where workers are represented by a certified or recognized bargaining agent, the highest-ranking union official or union employee representative on-site shall designate who will participate as the authorized representative during the walkaround. OSHA Field Operations Manual, CPL 2–00–164, Chapter 3, Section VII.A.I. While some commenters questioned OSHA's expertise and authority to make such determinations,

OSHA has the statutory and regulatory authority to determine who is an authorized walkaround representative and has done so for more than fifty years. See 29 U.S.C. 657(e), (g)(2); 29 CFR 1903.8(a)–(d).

Because of the different nature of each statute and the different activities they govern, OSHA does not find any merit to the arguments about potential conflicts or circumvention of the NLRA. For example, some commenters pointed to Supreme Court cases, including *NLRB* v. *Babcock & Wilcox Co.,* 351 U.S. 105 (1956) and *Lechmere, Inc.* v. *NLRB,* 502 U.S. 527 (1992), for the proposition that employers have a right to exclude unions from their property. (see, *e.g.,* Document ID 1952, p. 8–9; 1955, p. 7; 1976, p. 9–11). However, those decisions did not bar unions from ever accessing worksites for any reason. Instead, the decisions concerned unions' ability to access employer property for the specific purpose of informing non-union employees of their rights under NLRA Section 7 to form, join, or assist labor organizations. See *Lechmere, Inc.,* 502 U.S. at 538 ("only where such access [to non-union employees by union organizers] is infeasible that it becomes necessary and proper to take the accommodation inquiry to a second level, balancing the employees' and employers' rights"); *Babcock,* 351 U.S. at 114 ("[The NLRA] does not require that the employer permit the use of its facilities for organization when other means are readily available"). In reaching these decisions, the Supreme Court noted that the NLRA affords organizing rights to *employees* and not to unions or their nonemployee organizers, and therefore, the employer is generally not required to admit nonemployee organizers onto their property. *Lechmere,* 502 U.S. at 532; *Babcock,* 351 U.S. at 113.

Conversely, the OSH Act explicitly affords employees the right to have a representative accompany OSHA "for the purpose of aiding" the inspection and does not require that representative to be an employee of the employer. 29 U.S.C. 657(e). If employees in a non-union workplace choose a nonemployee representative affiliated with a union as their walkaround representative during OSHA's inspection, OSHA will allow that individual to be the employees' walkaround representative only if good cause has been shown that the individual is reasonably necessary to the conduct of an effective and thorough inspection. That third-party walkaround representative will be onsite solely to aid OSHA's inspection. If the representative deviates from that role, OSHA's existing regulations afford the

CSHO the authority to terminate the representative's accompaniment. See 29 CFR 1903.8(d).

Additionally, in interpreting the Mine Act, which contains an analogous employee representative walkaround right, 30 U.S.C. 813(f), courts have rejected arguments that allowing a nonemployee union representative to accompany a Mine Safety and Health Administration (MSHA) investigator as the miners' representative during an inspection violates an employer's rights under the NLRA. See *U.S. Dep't of Lab.* v. *Wolf Run Mining Co.*, 452 F.3d 275, 289 (4th Cir. 2006) ("While a union may not have rights to enter the employer's property under the NLRA, miners do have a right to designate representatives to enter the property under the Mine Act."); *Thunder Basin Coal Co.*, 56 F.3d at 1281 (rejecting argument that allowing non-union workers to designate union representatives for MSHA inspections violated *Lechmere*); see also *Kerr-McGee Coal Corp.*, 40 F.3d at 1265 (rejecting the *Lechmere* standard because the Mine Act "defines the rights of miners' representatives and specifies the level of intrusion on private property interests necessary to advance the safety objectives of the Act."). Accordingly, NLRA case law does not prevent employees from authorizing nonemployee representatives under the OSH Act, including those affiliated with unions.

In addition, comments regarding the NLRA's requirements for majority support are misplaced. One commenter argued that because an employer can only bargain with a union representative who was designated or selected by a "majority of the employees" under the NLRA, unions must also have majority support to be the employees' representative under the OSH Act (Document ID 1976, p. 6–11). Relatedly, this commenter suggested that the showing to demonstrate majority support is higher under the OSH Act because the OSH Act does not exclude as many individuals from the definition of "employee" as the NLRA (Document ID 1976, p. 9). However, the OSH Act contains no requirement for majority support, nor has OSHA ever imposed one in determining who is the employees' walkaround representative. Cf. OSHA Field Operations Manual, Chapter 3, Section VII.A (noting that members of an established safety committee can designate the employee walkaround representative). Furthermore, the NLRA's requirements for majority support would not apply to a union representative accompanying OSHA in a non-union workplace as this representative would not be engaged in

collective bargaining. Their purpose, like any other type of employee representative, is to aid OSHA's inspection.

This rule also does not conflict with sections 7 and 8(a)(2) of the NLRA, contrary to the assertions of several commenters (see, *e.g.*, Document ID 1776, p. 9–10; 1946, p. 6; 1952, p. 7). Section 7 of the NLRA grants employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection" as well as "the right to refrain from any or all of such activities[.]" 29 U.S.C. 157. This rule has no effect on employees' section 7 right to engage in or refrain from concerted activity, contrary to the assertions of NRF that this rule violates employees' section 7 rights by denying them a right to vote for or against an authorized representative (Document ID 1776, p. 9–10). Again, this rule has no effect on employees' rights under the NLRA to select a representative "for the purposes of collective bargaining." 29 U.S.C. 159(a). The purpose of the employees' walkaround representative is to aid OSHA's inspection, not engage in collective bargaining.

One commenter raised several hypothetical situations that could occur and asked whether these situations would be considered unfair labor practices under sections 8(a)(1) and 8(b)(1)(A) of the NLRA (Document ID 1976, p. 9). The question of whether certain conduct could violate another law is beyond the scope of this rulemaking and OSHA's authority. The NLRB, not OSHA, determines whether such conduct would constitute an unfair labor practice.

OSHA has determined this rule does not conflict with section 8(a)(2) of the NLRA, which prohibits employers from "dominat[ing] or interfer[ing] with the formation or administration of any labor organization or contribut[ing] financial or other support to it[.]" 29 U.S.C. 158(a)(2). NRF asserted that an employer providing a union organizer with access to its property during an OSHA inspection may be providing unlawful support to the union in violation of 8(a)(2) of the NLRA (Document ID 1952, p. 7). However, employees, and not the employer, select their representative, and the CSHO must also determine that good cause has been shown that this representative is reasonably necessary. Given that OSHA, not an employer, has the ultimate authority to determine which

representatives may accompany the CSHO on the walkaround inspection, see 29 CFR 1903.8(a)–(d), an employer that grants access to an employee representative affiliated with a union as part of an OSHA workplace inspection would not run afoul of section 8(a)(2) of the NLRA, even assuming that such access could conceivably implicate Section 8(a)(2).

Commenters also raised concerns about unionized employees selecting a different union to accompany OSHA because the NLRA recognizes certified representatives as the "exclusive representative" of the bargaining unit employees (see, *e.g.*, Document ID 1976, p. 9). Other commenters raise concerns that the final rule inserts OSHA into "jurisdictional disputes between unions" (Document ID 11220; 11211). If employees at a worksite already have a certified union, OSHA does not intend to replace that union with a different walkaround representative. According to the FOM, "the highest ranking union official or union employee representative onsite shall designate who will participate in the walkaround." OSHA Field Operations Manual, CPL 02–00–164, Chapter 3, Section VII.A.1. However, the CSHO may permit an additional employee representative (regardless of whether such representative is affiliated with a union) if the CSHO determines the additional representative is reasonably necessary to the conduct of an effective and thorough inspection and will further aid the inspection. See 29 CFR 1903.8(a), (c).

Finally, even where the two statutes overlap at times, such as both the NLRA and OSH Act protecting employees' right to voice concerns to management about unsafe or unhealthful working conditions, there is no conflict between the two statutes when employees authorize a third-party affiliated with a union to accompany a CSHO on an inspection of a non-union workplace. As evidence that this intersection of statutes does not lead to conflict, OSHA and the NLRB have had Memoranda of Understanding (MOUs) since 1975 to engage in cooperative efforts and interagency coordination. Accordingly, OSHA finds no merit to the arguments that this regulation conflicts or circumvents the NLRA.

Comments Related to Labor Disputes, Organizing, and Alleged Misconduct

In addition to comments about the NLRA, some commenters expressed concerns that, by allowing a union representative to accompany OSHA at a non-union worksite, OSHA would give the appearance of endorsing a union

representative in a particular worksite or endorsing unions generally and thus departing from OSHA's longstanding policy of neutrality in the presence of labor disputes (see, *e.g.,* Document ID 1976, p. 24–25; 1946, p. 6–7). Another commenter claimed that OSHA's 2023 MOU with the NLRB could pressure CSHOs "to allow non-affiliated union representatives to join their walkaround inspections" (Document ID 1762, p. 5).

These concerns are unfounded. OSHA does not independently designate employee representatives. Employees select their representative, and OSHA determines if good cause has been shown that the individual is reasonably necessary to the inspection. That inquiry does not depend on whether the representative is affiliated with a union. And a finding of good cause does not indicate that OSHA is favoring unions. Additionally, the FOM provides guidance to CSHOs to avoid the appearance of bias to either management or labor if there is a labor dispute at the inspected workplace. See OSHA Field Operations Manual, CPL 02–00–164, Chapter 3, Sections IV.G.3, IV.H.2.c ("Under no circumstances are CSHOs to become involved in a worksite dispute involving labor management issues or interpretation of collective bargaining agreements"); ("During the inspection, CSHOs will make every effort to ensure that their actions are not interpreted as supporting either party to the labor dispute."). Neutrality has been OSHA's longstanding policy, and OSHA rejects arguments that the final rule displays favoritism towards unions or will improperly pressure CSHOs to allow authorized representatives.

Finally, OSHA's MOU with the NLRB relates to interagency cooperation and coordination, and there is no basis for assuming that this interagency cooperation will interfere with OSHA inspections or neutrality. As explained previously, third-party employee representatives will accompany the CSHO on an inspection only when the CSHO determines good cause has been shown that the third-party employee representatives are reasonably necessary to an effective and thorough inspection. OSHA concludes that existing safeguards and the requirement for third party representatives to be reasonably necessary to the inspection will prevent such an appearance of bias or endorsement of unionization or particular unions.

Commenters in opposition to the proposed rule also voiced the possibility that third-party employee representatives from unions or other advocacy organizations would use the walkaround inspection for organizing (see, *e.g.,* Document ID 0021; 0040, p. 3). The National Federation of Independent Business discussed these concerns and alleges that third-party employee representatives "would gain access to information otherwise not available and could interact with employees in a way that could facilitate union organizing campaigns, political activity, mischief, and litigation" (Document ID 0168 p. 7). The North American Insulation Manufacturers Association claimed that "unions would monitor OSHA complaint filings, contact employees, and attempt to receive authorization to attend walkarounds so they can access the site to solicit for employee support" (Document ID 1937, p. 5).

Additionally, some commenters asserted that permitting union representatives in workplaces without a collective bargaining agreement is part of an "'all-of-government' approach to union expansion" (see, *e.g.,* Document ID 1776, p. 2). Similarly, some commenters argued that this rule is "designed to give union supporters access to company facilities that they would otherwise not be granted" and that it "promote[s] unions and collective bargaining" (Document ID 0033; 1030). Certain commenters in support of the proposed believed that the proposed rule was about ensuring union representation in inspected workplaces (see, *e.g.,* Document ID 0056; 10725).

Alleged union misconduct is another concern of several commenters in opposition to the proposed rule. NRF alleges that they "have learned of anecdotal incidents wherein union business agents have relationships with CSHOs from some local area offices" and that these CSHOs have "pursued unjustifiable citations against companies during critical times" (Document ID 1776, p. 6–7). Some commenters also expressed concerns that third-party representatives affiliated with one union would "poach" employees from employees' existing union (see, *e.g.,* Document ID 11275). Other comments raise misconduct of third parties generally as a basis for their opposition to the proposed rule. For example, the American Road & Transportation Builders Association (ARTBA) claims "ARTBA members have shared past experiences with bad actors attempting to access their job sites for reasons unrelated to worker safety and health" (Document ID 1770, p. 3).

NRF referenced amendments to the NLRA and the Landrum-Griffin Act, also known as the Labor-Management Reporting and Disclosure Act (LMRDA), which, according to NRF, "provides a mechanism through which employees and employers can challenge the status of an Authorized Representative" (Document ID 1776, p. 6). NRF asserted that this "pre-enforcement mechanism" allows "an appeal and remedy before employees and employers must submit to representation by the Authorized Representative." (Document ID 1776, p. 6). NRF asserted that the policy rationale of limiting union misconduct was behind the amendments to the NLRA and passage of the LMRDA and suggested that the final rule should include similar safeguards to further the same policy rationale (Document ID 1776, p. 6).

U.S. Representative Virginia Foxx asserted that unions "weaponized the OSHA inspection process" after OSHA issued the Sallman letter, referencing four inspections where a representative affiliated with a union accompanied OSHA as the employee walkaround representative (Document ID 1939, p. 2–3). One commenter asserted that this rule could lead to compromised inspections and quoted an unnamed "Occupational Safety and Operational Risk Management Professional" who claimed to witness inspections where union officials allegedly argued with CSHOs and stated that CSHOs could not write a citation without the union's consent (Document ID 11506). No information about the date, location, employer, union, OSHA staff, or the witness was included.

Some commenters, including U.S. Senator Bill Cassidy, MD, called attention to the potential that the "presence of a union organizer, especially in a non-union workplace, could very well cause an employer to deny OSHA access" (Document ID 0021, p. 2; see also 1772, p. 1). Senator Cassidy stated that this would delay the inspection while OSHA seeks a warrant, which would be detrimental to worker safety and health (Document ID 0021, p. 1–2; see also 1772, p. 1). Winnebago Industries, Inc. stated their concerns about worker privacy when a third-party union representative accompanies an OSHA inspector (Document ID 0175, p. 2).

Those in support of the proposed rule, including UFCW, stated that third-party representatives from their union have not used OSHA inspections as pretext for organizing (Document ID 1023, p. 2). A former director of the safety and health program for AFSCME stated that when he served as a third-party representative in workplaces that AFSCME was attempting to organize that "no union issues were raised" (Document ID 1945, p. 3). Representative Scott, citing to a

**Federal Register** / Vol. 89, No. 63 / Monday, April 1, 2024 / Rules and Regulations    **22585**

prominent union organizer, noted that union organizing was unlikely to happen during a walkaround inspections because of the need for in-depth, one-on-one conversations between the organizer and workers during a campaign (Document ID 1931, p. 10–11). Representative Scott concluded that walkaround inspections do not allow for such conversations.

In response to these comments both for and against the rule, OSHA first reiterates that the purpose of this rulemaking is to allow CSHOs the opportunity to draw upon the skills, knowledge, or experience of third-party representatives and ensure effective inspections, not to facilitate union organizing or ensure union representation. OSHA strongly disagrees with NRF's suggestion that CSHOs have pursued unjustifiable citations due to union influence. Further, NRF provided no specific details to enable OSHA to evaluate these allegations. For the same reason, OSHA finds little support for the allegation that CSHOs have been improperly influenced by union officials and that this rule will lead to further improper influence. Assertions of general misconduct of third parties raised by commenters such as ARTBA do not appear linked to OSHA's inspections and lack specific details.

OSHA also disagrees with the notion that this rule allows the OSHA inspection to be "weaponized." Because any third-party representative, including those from unions or advocacy organizations, would need to be reasonably necessary for a thorough and effective inspection, the OSHA inspection cannot be "weaponized" against employers. Further, OSHA complaints are not publicly available, so is there no way for a union to "monitor" them and contact employees, contrary to the North American Insulation Manufacturers Association's claim.

While third-party employee walkaround representatives may observe workplace conditions, they only have access to this information for the specific purpose to aid an OSHA inspection. And, as explained above, they are not permitted to engage in any conduct that interferes with a fair and orderly inspection. See 29 CFR 1903.8(d). If a representative engages in conduct that interferes with a fair and orderly inspection, such as union organizing or any type of misconduct, OSHA will deny the representative the right of accompaniment and exclude the representative from the walkaround inspection. See 29 CFR 1903.8(d). CSHOs have extensive experience maintaining fair and orderly inspections, and, given the CSHO's

command over the inspection, OSHA finds that union organizing, political activity, or misconduct are unlikely during a walkaround. Furthermore, any union solicitation, such as handing out union authorization cards, would not aid the inspection and would be grounds to deny accompaniment.

OSHA concludes that this rule, along with existing procedural and regulatory safeguards, are adequate to protect continued inspections from interference, union organizing, or misconduct. See 29 CFR 1903.7(d); 1903.8(a)–(d). Additionally, as discussed in Section IV.A, The Need for and Benefits of Third-Party Representation, any inspection with a third-party representative is subject to OSHA regulations on the protection of trade secrets. See 29 CFR 1903.9(a)–(d).

OSHA also disagrees with Winnebago Industries' suggestion that allowing authorized third-party representatives from unions will have a noticeable impact on worker privacy. Since 1971, OSHA has permitted employees to have a third-party walkaround representative, and no comment has provided a specific example of when a worker's privacy was adversely impacted by the actions of a third-party representative. In fact, one commenter noted that a representative selected by workers can offer workers more privacy to reveal issues away from surveillance by an employer (Document ID 1728, p. 3–4).

OSHA disagrees with NRF's comment that this rule should include procedures similar to the NLRB "before employees and employers must submit to representation by the Authorized Representative" (Document ID 1776, p. 6). It is unknown exactly which mechanism this comment is referring to, such as situations where an employer declines to sign an election agreement and proceeds to a formal hearing before an NLRB Hearing Officer or situations where employees vote against a union in an NLRB-held election. Under the NLRA, an employer has a limited right to challenge a candidate bargaining representative, pre-election, by filing a petition with the NLRB. See 29 U.S.C. 159(c)(1)(B).

In either case, the NLRB processes for union recognition are completely inapposite to the framework of the OSH Act. First, OSHA inspections are to be conducted "without delay," 29 U.S.C. 657(a)(1), and delaying an inspection to hold a hearing on who can be the employees' walkaround representative is antithetical to section 8(a) of the OSH Act. Second, as explained previously, nothing in the OSH Act requires majority support for a representative the way the NLRA does. Third, unlike the NLRA, the OSH Act does not include a

process by which employers object to employees' representative—or for employees to object to the employer's representative, for that matter. Nevertheless, employers may raise concerns related to the authorized employee representative with the CSHO, who will address them at the worksite. Where the employer's concerns cannot be resolved, the CSHO will construe the employer's continued objection as to the authorized employee representative as a refusal to permit the inspection and shall contact the Area Director, per Chapter 3, Section IV.D.2 of the FOM. OSHA will obtain a warrant when necessary to conduct its inspections. See *Barlow's,* 436 U.S. at 313; see also 29 CFR 1903.4(a).

Finally, because any third-party walkaround representative is subject to the good cause and reasonably necessary requirement, OSHA anticipates that the vast majority of employers will not deny entry simply because the employees' walkaround representative is a third party. However, OSHA will obtain a warrant when necessary to conduct its inspections. See *Barlow's,* 436 U.S. at 313; *see also* 29 U.S.C. 657(a)(1)–(2); 29 CFR 1903.4(a). In situations where the employer's past practice either implicitly or explicitly puts the Secretary on notice that a warrantless inspection will not be allowed, OSHA may seek an anticipatory warrant in order to conduct its inspection without delay. See 29 CFR 1903.4(b)(1). As such, OSHA does not believe that this rule will result in further delays that would be detrimental to worker safety and health.

## F. Administrative Issues.

### 1. Administrative Procedure Act

Some commenters argued that the proposal conflicted with the Administrative Procedure Act (APA) (See, *e.g.,* Document ID 1776, p. 8, 10; 1953, p. 1, 3, 5; 1954, p. 2, 4). The APA requires an agency to provide notice of a proposed rulemaking and to include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. 553(b)(3). A final rule must be a logical outgrowth of the proposed rule and must allow affected parties to anticipate that the final rule was possible. See *Allina Health Servs.* v. *Sebelius,* 746 F.3d 1102, 1107 (D.C. Cir. 2014). In issuing a final rule an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of*

*U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines* v. *United States,* 371 U.S. 156, 168 (1962)).

Several commenters asserted that the proposed rule was arbitrary and capricious under the APA because it was inconsistent with the OSH Act, other OSHA regulations, lacked a rational basis for adoption, lacked sufficient clarity on third-party qualifications, invited chaos, or because it gave CSHOs too much discretion (see, *e.g.,* Document ID 0168, p. 4–6; 1754, p. 2–3; 1776, p. 2–3; 1782, p. 3–5; 1952, p. 12–13; 1953, p. 5; 1954, p. 3). As discussed below, OSHA has determined that this rule is consistent with APA and OSH Act rulemaking requirements.

a. Consistency With the OSH Act

Several commenters asserted that the proposed rule is arbitrary and capricious because it was not a valid construction of the OSH Act (see, *e.g.,* Document ID 0168, p. 6; 1946, p. 4–5; 1952, p. 11–13). Some commenters asserted that the term "authorized employee representative" in section 8(e) of the OSH Act is limited to employees of the employer (see, *e.g.,* Document ID 1768, p. 4; 11506). Others argued that the term is reserved for unions that represent employees for collective bargaining purposes (see, *e.g.,* Document ID 1952, p. 6–7; 10808). Commenters further argued that defining this term to include all employee walkaround representatives, including non-union third parties, would directly conflict with existing OSHA regulations and procedural rules issued by the Occupational Safety and Health Review Commission ("Commission") interpreting the same or similar terms (*e.g.,* Document ID 1937, p. 4; 1946 p. 4–5; 1952, p. 6–8, 9–11; 1976, p. 6). OSHA has determined that this regulation is consistent with the plain language and legislative history of the OSH Act and finds that other, unrelated regulations do not require OSHA to limit its interpretation of "employee representative" in section 8(e) of the OSH Act to employees of the employer or unions that represent employees for collective bargaining purposes.

As explained in Section III, Legal Authority, the Act does not place restrictions on who can be a representative authorized by employees—other than requiring that they aid the inspection—and permits third parties to serve as authorized employee representatives. See *Matter of Establishment Inspection of Caterpillar Inc.,* 55 F.3d at 338 ("[T]he plain language of § 8(e) permits private parties to accompany OSHA inspectors[.]"); *NFIB* v. *Dougherty,* 2017 WL 1194666, at *12 ("[T]he Act merely provides that the employee's representative must be authorized by the employee, not that the representative must also be an employee of the employer."). Likewise, nothing in the OSH Act or its legislative history suggests that Congress intended to extend employee accompaniment rights only to unionized workplaces. See Comments of Congressperson William J. Scherle of Iowa, 92d Cong. 1st Sess., reprinted in Legislative History of the Occupational Safety and Health Act of 1970, at 1224 (Comm. Print 1971) ("The bill provides that union representatives *or any employee representative* be allowed to accompany inspectors on their plant tours.") (emphasis added). Section 8(e) uses "representative authorized by his employees" and "authorized employee representative" as equivalents, and certainly employees can authorize an employee representative to accompany a walkaround inspection even if they are not unionized. There is no reason to think that Congress intended anything more.

Thus, section 8(e)'s plain meaning permits employees to select a walkaround representative, irrespective of whether that representative is employed by the employer, to serve as an "authorized employee representative." Contrary to some commenters' claims, section 8(e) does not limit the scope of authorized employee representatives to "only lawfully recognized unions" (Document ID 1952, p. 6). Furthermore, sections 8(e) and 8(g), respectively, expressly authorize the Secretary to issue regulations related to employee and employer representation during OSHA's walkaround inspection as well as "regulations dealing with the inspection of an employer's establishment." 29 U.S.C. 657(e), (g)(2).

Furthermore, as discussed in Section III, Legal Authority, this rule is consistent with Congress's expressed intent because Congress clearly intended to give the Secretary of Labor the authority to issue regulations to resolve the question of who could be an authorized employee representative for purposes of the walkaround inspection. See 29 U.S.C. 657(e); Legislative History of the Occupational Safety and Health Act of 1970, at 151 (Comm. Print 1971) ("Although questions may arise as to who shall be considered a duly authorized representative of employees, the bill provides the Secretary of Labor with authority to promulgate regulations for resolving this question.").

Other commenters argued that this regulation is consistent with the plain language of the OSH Act (see, *e.g.,* Document ID 1752, p. 1–3; 1969, p. 4). For example, the AFL–CIO argued that the Secretary's interpretation "is strongly supported by judicial construction of the almost identical provision of the Federal Mine Health and Safety Act of 1977, 30 U.S.C. 813(f)" (Document ID 1969, p. 4). OSHA agrees.

The Mine Act contains nearly identical language conferring miners the right to have an authorized representative accompany the inspector as the OSH Act. Compare 30 U.S.C. 813(f) ("Subject to regulations issued by the Secretary, a representative of the operator and a representative authorized by his miners shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of any coal or other mine[.]") with 29 U.S.C. 657(e) ("Subject to regulations issued by the Secretary, a representative of the employer and a representative authorized by his employees shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of any workplace[.]"). Courts have long held that this language in the Mine Act does not limit who can be employees' representative. See *Utah Power & Light Co.* v. *Sec'y of Labor,* 897 F.2d 447 (10th Cir. 1990) (Section 103(f) of the Mine Act "confers upon the miners the right to authorize a representative for walkaround purposes without any limitation on the employment status of the representative.").

As with the Mine Act, the nearly identical language in the OSH Act "does not expressly bar non-employees from serving as" authorized employee representatives. *Kerr-McGee Coal Corp.,* 40 F.3d at 1262. In *Kerr-McGee Coal Corp.,* the D.C. Circuit held that the Secretary's interpretation of the Mine Act's virtually identical language as allowing the "involvement of third parties in mine safety issues . . . is consistent with Congress's legislative objectives of improving miner health and mine safety." Id. at 1263; see also id. ("Obviously, if Congress had intended to restrict the meaning of 'miners' representatives' in the 1977 Act, it could have done so in the statute or at least mentioned its views in the legislative history. It did neither. Consequently, in view of Congress' clear concern about miners' safety, the Secretary's broad interpretation of the term is consistent with congressional objectives.").

**Federal Register** / Vol. 89, No. 63 / Monday, April 1, 2024 / Rules and Regulations **22587**

Moreover, Congress gave the Secretary of Labor the authority to issue regulations related to walkaround inspections and to resolve the question of who could be an authorized employee representatives for purposes of section 8(e) of the OSH Act. See 29 U.S.C. 657(e); Legislative History of the Occupational Safety and Health Act of 1970, at 151 (Comm. Print 1971). Given the nearly identical language in section 103(f) of the Mine Act, which was passed shortly after the OSH Act, and the similar purposes of the two statutes, here too the plain language of the OSH Act confers upon employees the right to authorize a representative irrespective of the representative's employment status. See *Smith* v. *City of Jackson, Miss.,* 544 U.S. 228, 233 (2005) (plurality opinion) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

The Chamber of Commerce also asserted that the plain meaning of the term "authorized" employee representative requires a legal delegation (see Document ID 1952, p. 10). In support, the Chamber cites two cases—*Anderson* v. *U.S. Dep't of Labor,* 422 F.3d 1155, 1178–79 (10th Cir. 2005) and *United States* v. *Stauffer Chemical Co.,* 684 F.2d 1174, 1190–91 (6th Cir. 1982), *aff'd,* 464 U.S. 165 (1984) (Document ID 1952, p. 10). However, these cases are distinguishable and do not support the Chamber's proposition that a legal delegation of authority is required.

In *Anderson,* the Tenth Circuit addressed whether a whistleblower complainant's position as a political appointee precluded her from being an "authorized representative of employees" under the employee protection provisions of the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 (CERCLA) and other related environmental statutes. 422 F.3d at 1157. The Department of Labor's Administrative Review Board (ARB) held that the complainant (Anderson) lacked standing to sue under CERCLA because the meaning of "authorized representative" under that statute requires "some tangible act of selection by employees in order for one to be an 'authorized representative of employees.' " Id. at 1180. The ARB concluded that Anderson could not as a matter of law "represent" employees in her position as a political appointee under state law and, even if she was permitted to serve as an "authorized

representative," she failed to establish that municipal employees or union officials "authorized" her to be their representative during her tenure." Id. at 1178, 1180. On appeal, the Tenth Circuit held that, based on the statutory language and the legislative history of the applicable statutes, the ARB construction of " 'authorized representative' to require some sort of tangible act of selection is a permissible one." Id. at 1181.

The Chamber of Commerce argues that *Anderson* stands for the proposition that that an employee representative is "authorized" under the OSH Act only where there is some "legal authority, rather than merely a request by employees to represent them." (Document ID 1952, p. 10) (citing *Anderson,* 422 F.3d at 1178–79). However, this is an incorrect reading of *Anderson.* The court in *Anderson* did not hold—as the Chamber suggests— that "legal authority" is required for an employee representative to be "authorized" under any statute. Further, the holding in *Anderson* was limited to the meaning of "authorized representative of employees" as used in CERCLA (and other related environmental statutes). OSHA has never required an employee representative to have "legal authority" as a precondition to serving as a walkaround representative in the more than fifty years of implementing section 8(e) of the OSH Act, nor has any court. For example, OSHA's FOM has long instructed that employee members of an established workplace safety committee or employees at large can designate a walkaround representative, see OSHA Field Operations Manual, CPL 02–00– 164, Chapter 3, Section VII, A.1–A.2, even though that representative does not have "legal authority."

Likewise, *Stauffer Chemical* is inapplicable to this rule. In that case, the U.S. Court of Appeals for the Sixth Circuit held that the term "authorized representative" of the EPA Administrator under the Clean Air Act's provision governing pollution inspections means "officers or employees of the EPA" and cannot include employees of private contractors. *Stauffer Chem. Co.,* 684 F.2d at 1189–90. The Sixth Circuit, after reviewing the language of the Clean Air Act and its legislative history, determined that "[c]onstruing authorized representatives under section 114(a)(2) to include private contractors would lead to inconsistencies between that section and other parts of the Clean Air Act." Id. at 1184. Contrary to the Chamber's contention, *Stauffer Chemical* does not

hold that "an 'authorized representative' of an employee cannot be a third party but must be a fellow employee of the EPA." (Document ID 1952, p. 10). That issue was not before the court. As discussed above, the court's holding in *Stauffer Chemical* was limited to who is permitted to serve as an "authorized representative" of the EPA Administrator under the Clean Air Act and whether that includes private contractors or only officers and employees of the EPA. It has no bearing on the meaning of "authorized employee representative" in the context of 8(e) of the OSH Act.

The National Federation of Independent Business argued "[t]he proposed rule fails to incorporate properly the statutory requirement that any participation in an inspection by persons other than the OSHA inspector must be solely for the purpose of 'aiding such inspection,' and OSHA's position that virtually any activity by a walking-around individual aids an inspection is arbitrary and capricious" (Document ID 0168, p. 6). OSHA rejects the premise that any activity by a third-party will aid the inspection under the final rule. The existing regulation contains a provision, which will remain in this final rule, requiring that the CSHO first determine that "good cause has been shown why accompaniment by a third party . . . is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace." 29 CFR 1903.8(c); see also 1903.8(a) (representatives of employer and employees shall be given an opportunity to accompany the CSHO during the physical inspection "for the purpose of aiding such inspection").

b. Consistency With Other OSHA Regulations

Some commenters asserted that this rule conflicts with other OSHA regulations (see, *e.g.,* Document ID 1938, p. 4; 1946, p. 4–5). One commenter argued that this regulation directly conflicts with the definition of "authorized employee representative" in OSHA's Recordkeeping and Reporting regulation at § 1904.35(b)(2)(i) (Document ID 1976, p. 6).

OSHA's Recordkeeping and Recording regulation provides that "an employee, former employee, personal representative, and authorized employee representative" may obtain copies of the OSHA 300 Logs and defines the term "authorized employee representative" as "an authorized collective bargaining agent of employees." 29 CFR 1904.35(b)(2), (b)(2)(i). That regulation also provides for access to OSHA 301 Incident

Reports; however, "employees, former employees, and their personal representatives" may only access OSHA 301 Incident Reports "describing an injury or illness to *that* employee or former employee." 29 CFR 1904.35(b)(2)(v)(A) (emphasis added). Only "authorized employee representatives" for an establishment where the agent represents employees under a collective bargaining agreement have access to OSHA 301 Incident Reports for the entire establishment (and only the section titled "Tell us about the case"). See 29 CFR 1904.35(b)(2)(i), (b)(2)(v)(B).

"Authorized employee representative" is defined narrowly in the Recordkeeping and Reporting regulation because of employee privacy interests and the role a union serves in safety and health matters when employees have an authorized collective bargaining agent. In the preamble to the 2001 Recordkeeping Rulemaking, OSHA explained the agency's decision to grant expanded access to the OSHA 301 Incident Reports by extensively discussing the importance of protecting employees' private injury and illness information while also recognizing the value of analyzing injury and illness data to improve injury and illness prevention programs. See 66 FR 6053–54, 6057. OSHA noted that the records access requirements were intended as a tool for employees and their representatives to affect safety and health conditions at the workplace, not as a mechanism for broad public disclosure of injury and illness information. See id. at 6057. OSHA also explained that granting access to unions serves as a useful check on the accuracy of the employer's recordkeeping and the effectiveness of the employer's safety and health program. See id. at 6055.

Therefore, in defining "authorized employee representative" as "an authorized collective bargaining agent of employees," OSHA sought to strike a reasonable balance between employees' privacy interests and a union representative's more comprehensive role representing employees on safety and health matters in the workplace. See id. (describing the need to apply a "balancing test" weighing "the individual's interest in confidentiality against the public interest in disclosure."). Employee privacy concerns are not present in the context of this rule and, thus, a more inclusive definition to include any representative authorized by employees, regardless of whether the employees have a collective bargaining agent, is appropriate to effectuate the Act's goal of ensuring

employee representation to aid the inspection.

Moreover, in exercising its authority to issue regulations implementing the walkaround rights granted to employees under section 8 of the Act, OSHA is not bound by the definition in the Recordkeeping and Reporting regulation. See, *e.g., Env't Def.* v. *Duke Energy Corp.,* 549 U.S. 561, 575–76 (2007) (EPA could interpret term "modification" differently in two different regulations dealing with distinct issues). Unlike 29 CFR 1903.8(c), the Recordkeeping and Reporting regulation, including 29 CFR 1904.35(b)(2)(i), was promulgated under a different provision of the Act (section 8(c)). Accordingly, OSHA is permitted to define the same term differently in the Recordkeeping and Walkaround regulations because they implicate different regulatory, compliance, and privacy interests.

Several commenters also contended that this rule conflicts with the Commission's existing regulation that defines "authorized employee representative" as "a labor organization that has a collective bargaining relationship with the cited employer and that represents affected employees who are members of the collective bargaining unit," 29 CFR 2200.1(g) (*e.g.,* Document ID 1938, p. 4; 1946, p. 4–5; 1976, p. 7). Some of these commenters incorrectly stated that 29 CFR 2200.1(g) is an OSHA regulation (*e.g.,* Document ID 1976, p. 6). As an initial matter, the Commission is an independent agency and 29 CFR 2200.1(g) is a procedural rule promulgated by the Commission, not OSHA. Indeed, Congress delegated adjudicated authority to the Commission and delegated enforcement and rulemaking authority under the OSH Act to the Secretary. See *Martin* v. *Occupational Safety & Health Rev. Comm'n,* 499 U.S. 144, 151 (1991) (describing the "split enforcement" structure of the OSH Act). The Commission's procedural regulations at 29 CFR 2200.1(g) were promulgated under 29 U.S.C. 661(g), which authorizes the Commission to promulgate rules only as are necessary for the orderly transaction of its proceedings. Under the "split enforcement" structure of the OSH Act, the Commission's procedural rules apply only to its adjudicatory proceedings, and thus the Commission's interpretation of "authorized employee representative" has no bearing on the Secretary's authority to interpret and issue regulations on the meaning of "authorized employee representative" in Section 8(e) of the OSH Act. Notably, the term "authorized employee

representative" is not used in the Commission rules in an exclusionary way, as commenters have argued. Under Commission rules, employee representatives may participate in Commission proceedings even if they are not associated with a collective bargaining unit. See 29 CFR 2200.1(h); 2200.20(a); 2200.22(c).

The Chamber of Commerce argued that the proposed rule contradicts the Commission's procedural rule at 29 CFR 2200.53 by allegedly allowing OSHA and "'experts' deemed qualified by OSHA inspectors alone" access to a worksite before the beginning of a Commission proceeding to engage in discovery (Document ID 1952, p. 15–17). There is no such contradiction as the Commission's discovery rules have no applicability to OSHA's investigation. OSHA has clear authority to access a worksite in order to conduct inspections. See 29 U.S.C. 657(a)(1)–(a)(2), (b).

### c. Basis for the Rule

Some commenters argued that OSHA "proposed [the rule] without the reasoned explanation that is required" (Document ID 1952, p. 13), "failed to consider obvious and critical issues" (Document ID 1954, p. 4), failed to provide technical data that supports its reasonings (Document ID 1776, p. 10), and failed to provide a rational basis why the regulation will advance the agency's mission (Document ID 1953, p. 3).

The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Air Transp. Ass'n of Am., Inc.* v. *U.S. Dep't of Agric.,* 37 F.4th 667, 675 (D.C. Cir. 2022) (internal citations omitted). If an agency relies on technical studies, those studies "must be revealed for public evaluation." *Chamber of Com. of U.S.* v. *SEC,* 443 F.3d 890, 899 (D.C. Cir. 2006) (quoting *Solite Corp.* v. *EPA,* 952 F.2d 473, 484 (D.C. Cir. 1991)).

OSHA complied with APA rulemaking requirements by discussing and outlining its policy considerations and determinations in making this clarification via this rule. OSHA did not rely on any technical studies, but examined the record and based its determination that this rule will aid OSHA's workplace inspections on evidence in the record and decades of enforcement experience. For example, commenters stated that this rule would particularly aid OSHA inspections involving vulnerable working populations in the farming industry and

meatpacking industry as well as specialized workplaces such as airports that involve several different employers and contractors (see, *e.g.,* Document ID 1023, p. 3–4; 1728, p. 8–9; 1763, p. 2–3; 1980, p. 3).

Some commenters also argued the rule represents a departure from OSHA's prior position and its policy reasons are insufficient to support the change (see, *e.g.,* Document ID 1952, p. 14; 1954, p. 4). The Chamber of Commerce, for example, contended that OSHA failed to acknowledge "that it is changing position" and failed to show "good reasons for the new policy." (Document ID 1952, p. 14). As explained throughout this final rule, by clarifying OSHA's interpretation of the OSH Act that third parties can serve as employee representatives for the purposes of the OSHA walkaround inspection, the revised regulation more closely aligns with the text of Section 8(e) and serves several beneficial purposes. Several commenters provided examples of third-party representatives who accompanied OSHA on walkaround inspections (Document ID 1750, p. 3; 1761, p. 1; 1945, p. 3; 1958, p. 3; 1980, p. 2). For example, one commenter who served as the director of AFSCME's safety and health program discussed serving as a third-party employee walkaround representative accompanying CSHOs on inspections of health care facilities in the 1980s (Document ID 1945, p. 3). Furthermore, OSHA's letter of interpretation to Mr. Steve Sallman (Sallman letter) clarified OSHA's interpretation that a third party may serve as a representative authorized by employee (Document ID 0003).

### d. Specificity of the Rule

Some commenters argued the rule is overly broad and will invite chaos (Document ID 1113; 1779, p. 2, 3, 5; 1942, p. 1–2, 3, 5; 1952, p. 13; 1953, p. 1, 5). Some argued that the rule will leave "open-ended which individuals can be considered 'authorized representatives'" (Document ID 1952, p. 13; see also 1782, p. 3–5; 1953, p. 4–5). And they argued that, as a result, the rule is arbitrary and capricious because it will allow a "multitude of third parties" as representatives or a "seemingly unlimited variety of people who can represent employees during a plant walkaround" thereby leaving "employers unable to prepare for which individuals may enter their facilities during inspections and what such individuals may do while on their property" (Document ID 1782, p. 3–5; 1952, p. 13; 1953, p. 4–5). Finally, some commenters argued that the rule is arbitrary and capricious because it lacks

sufficient specificity of third-party qualifications and provides CSHOs too much discretion (Document ID 1754, p. 2; 1776, p. 2–3).

OSHA disagrees with these concerns. First, the final rule provides greater clarity and specificity regarding who may serve as a third-party representative than the prior regulation. OSHA's prior regulation included only two, non-exhaustive examples with no guiding criteria for determining if good cause had been shown that a third party was reasonably necessary. As explained in the NPRM, third-party representatives are reasonably necessary if they will make a positive contribution to a thorough and effective inspection. And, as discussed in Section IV.A, The Need for and Benefits of Third-Party Representation, there are many types of knowledge, skills, and experience that can aid the inspection. Therefore, the final rule provides several factors for a CSHO to consider when determining if good cause has been shown that a third-party employee representative is reasonably necessary to the conduct of an effective and thorough physical inspection.

Further, third-party representatives are subject to other inspection-related regulations, which allows the CSHO to deny access if the representative unreasonably disrupts the employer's operations or interferes with the inspection. See 29 CFR 1903.7(d), 1903.8(d). While some commenters asserted that this rule leaves them unable to "prepare" for the individuals who may come to the workplace, inspections under the OSH Act are unannounced and employers are not entitled to advanced notice to "prepare" for inspections. See 29 U.S.C. 657(a) (authorizing Secretary of Labor to enter, inspect, and investigate workplaces without delay); 29 U.S.C. 666(f) (providing for criminal penalties for "[a]ny person who gives advanced notice of any inspection"); see also *Marshall* v. *Shellcast Corp.,* 592 F.2d 1369, 1371 (5th Cir. 1979) (Congress considered the "'element of surprise' a crucial component" of OSHA inspections).

As such, OSHA finds that this rule is consistent with APA and the OSH Act.

### 2. Public Hearing

Some commenters asserted that OSHA should have held public hearings (see, *e.g.,* Document ID 1774, p. 6–7; 1955, p. 10). As OSHA explained in the proposal, because this rulemaking involves a regulation rather than a standard, it is governed by the notice and comment requirements in the APA (5 U.S.C. 553) rather than section 6 of

the OSH Act (29 U.S.C. 655) and 29 CFR 1911.11. Therefore, the OSH Act's requirement to hold an informal public hearing (29 U.S.C. 655(b)(3)) on a proposed rule, when requested, does not apply to this rulemaking.

Section 553 of the APA does not require a public hearing. Instead, it states that the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation" (5 U.S.C. 553(c)). In the NPRM, OSHA invited the public to submit written comments on all aspects of the proposal and received thousands of comments in response. OSHA extended its initial 60-day comment period by two weeks in response to requests from the public (88 FR 71329). No commenter identified any information that might have been submitted at a public hearing that was not, or could not have been, submitted during the written comment period. Accordingly, OSHA finds that interested parties had a full and fair opportunity to participate in the rulemaking and comment on the proposed rule through the submission of written comments.

### G. Practical and Logistical Issues

Commenters raised various questions and concerns regarding how OSHA will implement and administer this rule. Many of these questions are beyond the scope of this rulemaking, while others are addressed by other regulations or enforcement guidance. While OSHA cannot anticipate every possible scenario, OSHA has provided responses below or otherwise herein. CSHOs will also continue to conduct inspections in accordance with OSHA's other regulations and the FOM. Further, OSHA intends to issue additional guidance for its CSHOs on administering this rule.

Commenters' questions and concerns can be grouped as follows: (1) how employees will authorize their walkaround representative(s); (2) how many employee walkaround representatives are permitted to accompany the CSHO; (3) whether advance notice of inspections will be provided; (4) how delays may impact inspections; and (5) how OSHA intends to respond to third-party interference or disruptions during the walkaround.

First, many commenters had questions about the process by which employees would authorize a walkaround representative (see, *e.g.,* Document ID 1726, p. 3–4; 1748, p. 6; 1751, p. 4; 1759, p. 2; 1762, p. 2–3; 1763, p. 5–6, 8; 1775, p. 4–6; 1779, p. 2; 1782, p. 2–3, 6; 1936, p. 3; 1955, p.

4–6, 8–9; 1976, p. 12–14). For example, one commenter stated, "[a]s proposed, there are no established procedures for an employer's making a designation of an authorized representative that is not an employee of the employer" (Document ID 1779, p. 2). Several commenters asked how many employees are required to designate a representative (see, *e.g.,* Document ID 1748, p. 6; 1751, p. 1; 1779, p. 5; 1936, p. 3; 1942, p. 4–5; 1946, p. 3, 7; 1953, p. 5; 1966, p. 5; 1976, p. 12–13), what the designation process entails (see Document ID 1030; 1759, p. 2; 1946, p. 3, 7; 1966, p. 5; 1976, p. 12–14; 9901; 11524; 11275), and whether the designation process would include a vote (see, *e.g.,* Document ID 1976, p. 10, 13). Further, the Construction Industry Safety Coalition asserted that the rule also "fails to address how a CSHO is to identify if the employees have designated a third-party representative, or when" (Document ID 1955, p. 5). Commenters also asked whether OSHA would require evidence when determining that a representative is authorized (see, *e.g.,* Document ID 1726, p. 3–4).

Other commenters also asked what OSHA would do if faced with requests for third-party representatives from competing unions (Document ID 1952, p. 3; 11275) as well as non-unionized worksites or worksites with unionized and non-unionized employees (Document ID 1782, p. 4; 1933, p. 3; 1960, p. 4–5; 1976, p. 8, 12–13; 11275). Some commenters asserted that the "rule does not provide clear guidance on how multiple Walkaround Representatives should be selected, especially when chosen by different employees or groups within the organization" (Document ID 1954, p. 3) and on multi-employer worksites (Document ID 1960, p. 2–3; 1774, p. 5).

Neither the OSH Act nor any OSHA regulations specify when or how employees should authorize their walkaround representative(s). As such, there is no single or required process by which employees can designate a walkaround representative. OSHA has never had a rigid designation process or required documentation to show that a representative is authorized. As explained above, OSHA has long permitted nonemployees to serve as employee walkaround representatives, and OSHA has not encountered issues with the ways employees may authorize their representative. Thus, because OSHA does not believe such measures are necessary and seeks to provide flexibility for employees' designation process, OSHA declines to adopt specific procedures.

Likewise, there is no single way for employees to inform OSHA that they have a walkaround representative (whether that representative is an employee or a third party). For example, OSHA's FOM provides that in workplaces where employees are represented by a certified or recognized bargaining agent, the highest-ranking union official or union employee representative on-site would designate who participates in the walkaround. See OSHA Field Operations Manual, CPL 002–00–164, Chapter 3, Section VII.A.1. Employees could also designate an authorized employee representative when they authorize them to file an OSHA complaint on their behalf. Additionally, employees may inform the CSHO during the walkaround inspection itself or during employee interviews, or they may contact the OSHA Area Office. This is not an exhaustive list but rather some examples of ways employees may designate their walkaround representative(s).

As explained previously, the OSH Act contains no requirement for majority support, nor has OSHA ever imposed one in determining who is the employees' walkaround representative. Cf. OSHA Field Operations Manual, CPL 002–00–164, Chapter 3, Section VII.A.2 (noting that members of an established safety committee can designate the employee walkaround representative). The OSH Act does not require that a specific number or percentage of employees authorize an employee representative, and OSHA declines to do so through this rulemaking. However, in a workplace with more than one employee, more than one employee would be needed to authorize the walkaround representative pursuant to the language in section 8(e) of the OSH Act, which uses the phrase "representative authorized by [the employer's] employees." 29 U.S.C. 657(e). If the CSHO is unable to determine with reasonable certainty who is the authorized employee representative, the CSHO will consult with a reasonable number of employees concerning matters of safety and health in the workplace. See 29 CFR 1903.8(b).

Second, several commenters asserted that the number of third-party representatives that employees may authorize for a single inspection is unclear or stated their opposition to having multiple representatives during an inspection (Document ID 1937, p. 4; 1946, p. 3, 7; 1953, p. 5; 1966, p. 5; 1976, p. 12–13; 9901). For example, the Air Conditioning Contractors of America claimed that the rule "lacks clear parameters regarding the number

of third-party representatives allowed during a single inspection and fails to provide guidance on the management and prioritization of multiple requests from employees for different representatives. This has the potential to result in impractical and chaotic inspection processes with a multitude of third-party participants" (Document ID 1935, p. 1; see also 1030; 11313). Similarly, the International Foodservice Distributors Association asserted the rule "lacks guidance or proposed language on how third-party representatives may be selected by the employees and any limiting principles on the number of representatives who may be selected. This will lead to confusion for both employees and employers" (Document ID 1966, p. 5).

Other commenters noted that the number of permitted representatives is complicated by unique worksites. For instance, the National Association of Home Builders (NAHB) questioned how "OSHA [will] identify who the 'employee representative' is of a general contractor who may only have one employee on the particular jobsite, while multiple trade subcontractors and their employees are also present?" (Document ID 1774, p. 5; see also 1960, p. 2–3). Within the packaging and manufacturing industry, the Flexible Packaging Association proposes that because the rule presents several issues and threats "for a large party of employees and their representatives, the CSHO, the employer, and his/her representatives on the manufacturing floor," "each employee should be limited to no more than one representative, and the employer should be limited to one representative" with an exception for translators (Document ID 1782, p. 2–3).

Under OSHA's existing regulations, a representative of the employer and a representative authorized by its employees can accompany the CSHO on the inspection, but the CSHO may permit additional employer representatives and additional authorized employee representatives if the additional representatives will further aid the inspection. See 29 CFR 1903.8(a). A different employer and employee representative may accompany the CSHO during each different phase of an inspection if this will not interfere with the conduct of the inspection. Id. OSHA's FOM further explains that where more than one employer is present or in situations where groups of employees have different representatives, it is acceptable to have a different employer/employee representative for different phases of the inspection. OSHA Field Operations

Manual, CPL 002–00–164, Chapter 3, Section VII.A. However, if the CSHO determines that multiple representatives would not aid the inspection or if the presence of multiple representatives interferes with the inspection, the CSHO retains the right to deny the right of accompaniment to representatives. See 29 CFR 1903.8(a), (d).

Third, some commenters questioned whether, due to this rule, OSHA would begin providing advance notice of an inspection to employers, employee representatives, or both. For example, some commenters, like the American Trucking Association, stated that the proposed rule did not indicate whether OSHA would provide an employer with advance notice, prior to arriving at a worksite, that a third-party employee representative would be accompanying OSHA during the walkaround portion of its inspection (Document ID 1773, p. 3). The Flexible Packing Association recommended that OSHA give employers advance notice that a third-party representative will be accompanying the CSHO, "justify why the third-party would assist in an effective walkaround," and then give an employer "10 days to respond to OSHA on such request" (Document ID 1782, p. 5).

Several commenters also addressed advance notice to employee representatives. For example, the AFT urged that in inspections where OSHA gives advance notice to the employer that "the complainant, union or other employee representative must be notified at the same time" (Document ID 1957, p. 6). In addition, the Service Employees International Union (SEIU) suggested that OSHA can give advance notice to third parties prior to the inspection of airports for the purpose of seeking assistance with industry-specific issues such as jurisdiction and security clearance, although it is unclear if that third party's assistance would be limited to pre-inspection activity or if the SEIU also envisioned the third party being an employee walkaround representative (Document ID 1728, p. 8–9). The Office of Advocacy of the U.S. Small Business Administration asserted that "it appears to naturally flow from the proposed regulation that these non-employee third-party representatives will, for purposes of planning, be given advance notice of the inspection so they can arrange to meet the inspector at the workplace, when notice of the inspection is supposed to be strictly confidential" (Document ID 1941, p. 5 fn. 23; see also 1955, p. 5).

The OSH Act generally forbids advance notice of OSHA inspections; indeed, any person who gives advance notice without authority from the Secretary or the Secretary's designees is subject to criminal penalties. See 29 U.S.C. 666(f). However, OSHA regulations provide certain exceptions to this general prohibition. See 29 CFR 1903.6(a); OSHA Field Operations Manual, CPL 02–00–164, Chapter 3, Section II.D (discussing advance notice of OSHA inspections). These exceptions include: (1) "cases of apparent imminent danger" (29 CFR 1903.6(a)(1)); (2) "circumstances where the inspection can most effectively be conducted after regular business hours or where special preparations are necessary for an inspection (29 CFR 1903.6(a)(2)); (3) "[w]here necessary to assure the presence of representatives of the employer and employees or the appropriate personnel needed to aid in the inspection" (29 CFR 1903.6(a)(3)); and (4) "other circumstances where the Area Director determines that the giving of advance notice would enhance the probability of an effective and thorough inspection" (29 CFR 1903.6(a)(4)).

Given the OSH Act's general prohibition against advance notice and limited exceptions, OSHA declines to further amend the rule to guarantee advance notice of inspections to either employers or third-party employee representatives. Whether or not an exception applies depends on the particular needs and circumstances of the inspection.

Fourth, and related to advance notice, some commenters also asserted that the proposed rule could result in delays to OSHA's inspection (see, *e.g.,* Document ID 1964, p. 5–6; 1966, p. 3; 1972, p. 8; 1976, p. 15). Reasons given for potential delays include: CSHO difficulty in determining who the authorized representative is among various vying third-party representatives (Document ID 1964, p. 5–6), fewer employers consenting to OSHA inspections if the CSHO is accompanied by a third-party employee representative (Document ID 0040, p. 4–5; 1933, p. 2–3; 1966, p. 3), employers failing to notify authorized employee representatives after being given advance notice of an inspection by OSHA (Document ID 1761, p. 3), representatives conferring with workers on personal issues (Document ID 1782, p. 3–4), workers needing to advocate to OSHA that their representative is reasonably necessary (Document ID 1972, p. 8), employers subjecting third-party representatives to background checks or other requirements for entry to employer property (Document ID 1960, p. 5), expansion of the inspection resulting from third-party representative involvement (Document ID 0040, p. 3), employers asserting that their property contains proprietary information when faced with a third-party representative (Document ID 0040, p. 4), and CSHOs struggling to exercise their discretion because of a lack of guidelines in the proposed rule (Document ID 1976, p. 14–15).

The issues that have been raised are issues that CSHOs have long addressed in conducting inspections, and CSHOs are experienced and adept at conducting inspections without delay and in a reasonable manner. See 29 U.S.C. 657(a). OSHA will use its authority under 29 CFR 1903.8(b) to resolve potential disputes about third-party representatives expeditiously. As explained previously, OSHA anticipates that the vast majority of employers will not deny entry simply because the employees' walkaround representative is a third party. However, OSHA will obtain a warrant when necessary to conduct its inspections. See *Barlow's,* 436 U.S. at 313; see also 29 U.S.C. 657(a)(1)–(2); 29 CFR 1903.4(a). And, if the Secretary is on notice that a warrantless inspection will not be allowed, OSHA may seek an anticipatory warrant to conduct its inspection without delay. See 29 CFR 1903.4(b)(1). Accordingly, OSHA does not believe that this rule will result in further inspection delays that would be detrimental to worker safety and health.

Last, many commenters had questions about how OSHA would handle situations where a third party deviated from their role as the employees' walkaround representative and engaged in conduct unrelated to the inspection— particularly conduct that interfered with OSHA's inspection and/or disrupted the employer's operations (see, *e.g.,* Document ID 1762, p. 5). As discussed in Sections IV.A, IV.C, and IV.H, commenters raised a number of potential scenarios where third parties may have ulterior motives. Commenters also raised scenarios where third-party representatives may not have ulterior motives but nevertheless interfere with an inspection by engaging in conduct such as "[having] lengthy discussions of process equipment and safety designs, or products." (Document ID 1782, p. 3–4).

Many commenters questioned CSHOs' ability to stay in charge of such inspections (see, *e.g.,* Document ID 1030; 1935, p. 1; 1938, p. 5), while others offered various suggestions. For example, one commenter stated that "once third parties are identified, they should be governed by the same inspection standards as the CSHO" (Document ID 1762, p. 5). In addition, the NRF requested that OSHA "define what constitutes appropriate conduct

for an Authorized Representative and give the employer the express authority to remove an Authorized Representative from the premises'' (Document ID 1776, p. 4). The NRF also requested that OSHA ''mandate a dress code for third parties'' for the protection of employer products and equipment and to prevent clothing with ''inappropriate messaging, language, campaign information.'' (Document ID 1776, p. 4).

Commenters' concerns about the CSHOs' ability to address potential interference or disruptions to the workplace are unfounded. CSHOs have extensive experience conducting inspections and handling any interference or disruptions that may arise. During inspections, CSHOs will set ground rules for the inspection to ensure all representatives know what to expect. While OSHA declines to anticipate and categorize every type of conduct as appropriate or inappropriate or mandate specific rules, such as dress codes, OSHA intends to issue further guidance to the extent specific issues arise.

In addition, and as explained in Chapter 3 of the FOM, the employee representative shall be advised that, during the inspection, matters unrelated to the inspection shall not be discussed with employees. OSHA Field Operations Manual, CPL 02–00–164, Chapter 3, Section V.E. CSHOs will also ensure the conduct of inspections will not unreasonably disrupt the operations of the employer's establishment. See 29 CFR 1903.7(d). If disruption or interference occurs, CSHOs will promptly attempt to resolve the situation. Depending on the severity and nature of the behavior, a warning may suffice in some instances. In other instances, the CSHO may need to terminate the third party's accompaniment during the walkaround. As the FOM explains, the CSHO will contact the Area Director or designee and discuss whether to suspend the walkaround inspection or take other action. See OSHA Field Operations Manual, Chapter 3, Section V.E.

*H. Liability Issues*

Several commenters raised questions concerning liability. Specifically, they questioned who would be liable if a representative authorized by employees is injured, causes injury to others, or engages in misconduct (see *e.g.* Document ID 0527, p. 2; 1030; 1762, p. 2–3; 10253; 11228; 11482), or discloses trade secrets (Document ID 1953, p. 7). For example, the International Foodservice Distributors Association asserted that third-party representatives who are not affiliated with the

workplace and/or lack an appropriate level of industry experience or adequate safety training could be easily injured or cause injury during an inspection (Document ID 1966, p. 2). The Workplace Policy Institute also raised concerns about the conduct of third-party representatives, who are ''likely'' not state actors and not limited by due process requirements (Document ID 1762, p. 4). Some commenters asked if OSHA would bear any liability in these circumstances (see, *e.g.,* Document ID 1976, p. 15; 1835), while other commenters asserted that the proposed rule would increase employers' liability (see, *e.g.,* Document ID 1933, p. 3). In addition, NRF requested that the rule be further amended to indemnify an employer against any ''violent or damaging conduct committed by'' the third-party representative while on site or provide for ''felony prosecution of any CSHO that abuses their authority under the proposed rule'' (Document ID 1776, p. 4, 7). Black Gold Farms argued that OSHA should train representatives on general and industry-specific topics, show the employer proof of this training, and then assume liability for the representative's actions if they violate the employer's policy or the law (Document ID 0046).

For several reasons, OSHA has determined it is unnecessary to amend the rule to assign liability or indemnify employers. As an initial matter, the OSH Act does not seek to ''enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees.'' 29 U.S.C. 653(b)(4). Varying bodies of law, including tort and criminal law, already regulate the scenarios that commenters have raised, and any regulation from OSHA on liability or indemnification would potentially upend those other laws. In fact, commenters identified worker's compensation, tort law, 42 U.S.C. 1983, and 18 U.S.C. 202(a) as potentially relevant (Document ID 1762, p. 3; 1954, p. 4; 1955, p. 2–3; 1976, p. 21 fn. 79).

OSHA generally is not liable for the conduct of authorized employee representatives, who are not themselves officers or employees of a Federal agency. And, to the extent that any claim relates to OSHA's conduct during an inspection, under the Federal Tort Claims Act (FTCA), the United States is not liable for ''[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary

function or duty on the part of a Federal agency or an employee of the Government, whether or not the discretion involved be abused.'' 28 U.S.C. 2680(a). A number of U.S. Circuit Court of Appeals have held that general administrative inspections conducted by OSHA compliance officers fall under this ''discretionary function'' exception to the FTCA. See, *e.g., Irving* v. *U.S.,* 162 F.3d 154, 164 (1st Cir. 1998). OSHA declines to opine on the merits of other legal bases for liability because determining liability is a fact-specific inquiry and it is beyond the scope of this rulemaking.

Commenters raised several hypothetical scenarios of injury or misconduct but failed to identify any specific or substantiated examples of when such scenarios have occurred during OSHA inspections. OSHA therefore anticipates that these scenarios involving injury or misconduct will be rare, and declines to adopt any training requirement for third parties.

Moreover, this regulation and OSHA's other inspection-related regulations contain safeguards to reduce the likelihood of any misconduct. This final rule places limitations on who can serve as the employee walkaround representative. Per the rule, the CSHO must determine whether a potential third-party employee walkaround representative will aid the inspection. The CSHO will determine whether good cause has been shown why the individual is reasonably necessary to an effective and thorough OSHA inspection. The CSHO has authority to deny the right of accompaniment to any individual who is not reasonably necessary to the inspection. Moreover, the CSHO has authority to deny accompaniment to an employee walkaround representative who is disrupting the inspection. Further, OSHA's regulation at 29 CFR 1903.9(d) provides employers the option to request that, in areas containing trade secrets, the employee walkaround representative be an employee in that area or an employee authorized by the employer to enter that area, and not a third party. OSHA has determined that the existing regulatory framework provides sufficient protection for the hypotheticals that commenters raised. In addition, at least one commenter, the Utility Line Clearance Safety Partnership, noted that some employers have existing policies and waivers for third parties that enter their sites, though OSHA declines to opine on the legal sufficiency of such documents (Document ID 1726, p. 5).

Finally, potential abuse of the walkaround provision does not

necessitate excluding walkaround rights for third parties altogether. In cases involving the Mine Act, which the Secretary of Labor also enforces, courts have rejected hypothetical arguments that third-party walkaround representatives may cause harm or abuse their position during an MSHA inspection. See *Thunder Basin Coal Co.,* 56 F.3d at 1281 (noting the potential for abuse "appears limited" as designation as the miners' representative does not "convey 'an uncontrolled access right to the mine property to engage in any activity that the miners' representative wants'") (quoting *Thunder Basin Coal Co.* v. *Reich,* 510 U.S. 200, 217 (1994)); *Kerr-McGee Coal Corp.,* 40 F.3d at 1264 ("The motivations of a miners' representative are irrelevant so long as the representative, through its actions, does not abuse its designation and serves the objectives of the Act."); *Utah Power & Light Co.,* 897 F.2d at 452 (recognizing mine's concern that walkaround rights may be abused by nonemployee representatives but holding that potential abuse "does not require a construction of the Act that would exclude nonemployee representatives from exercising walkaround rights altogether"). OSHA agrees. Because an authorized employee representative does not have uncontrolled access to the employer's property and the CSHO is in control of the inspection, the risk of misconduct, damage, or injury appears limited.

*I. Other Issues*

Renner Bros. Construction, Inc. asked if they would need to fire or reassign their current safety representatives because of this rule (Document ID 1091). Third-party employee representatives are not employees or representatives of the employer being inspected, nor do they have a duty to the employer, and thus they should not be a consideration when employers make staffing decisions related to their safety representatives.

Additionally, the State Policy Network and other commenters that submitted a report from the Boundary Line Foundation asserted that OSHA presented a prior version of the Field Operations Manual, CPL 02–00–159 (10/1/2015) (Document ID 0004) "as a document integral to the development of and justification for the" rule (Document ID 1965, p. 22–28; see also 1967; 1968; 1973; 1975). It next claimed that OSHA's submission of another prior Field Operations Manual, CPL 02–00–160 (Document ID 0005) into the docket misrepresented this FOM as the current FOM (see, *e.g.,* Document ID 1965, p. 26–28). Next, it asserted that the FOM has no "color of authority" for

rulemaking purposes (Document ID 1965, p. 28–29; see also 1967; 1968; 1973; 1975). It finally argued that OSHA erred in failing to submit into the docket the two most recent FOMs (CPL 02–00–163 and CPL 02–00–164) (Document ID 1965, p. 27–28; see also 1967; 1968; 1973; 1975).

These comments are unsupported. As explained in Section II.B, Regulatory History and Interpretive Guidance, OSHA submitted into the docket two versions of the FOM (CPL 02–00–159 (10/1/2015), Document ID 0004 and CPL 02–00–160 (8/2/2016), Document ID 0005) to explain OSHA's practice and interpretation of 29 CFR 1903.8(c). OSHA neither stated nor indicated the 2016 FOM was submitted as the most recent and effective FOM. The two most recent versions of the FOM are posted on OSHA's website, available for any interested party to review if it so wished. See *https://www.osha.gov/enforcement/directives/cpl-02-00-164* and *https://www.osha.gov/enforcement/directives/cpl-02-00-163.* Furthermore, the FOM is merely guidance and does not create any duties, rights, or benefits. There is no merit to the Boundary Line Foundation's argument that the fact that the record does not contain OSHA's two most recent FOMs rendered the public "incapable of meaningful participation during the public comment period of this rulemaking process" (Document ID 1965, p. 27).

## V. Final Economic Analysis and Regulatory Flexibility Act Certification

*A. Introduction*

As described above, OSHA is revising 29 CFR 1903.8(c) to clarify that the representative(s) authorized by employees may be either an employee of the employer or, when reasonably necessary to aid in the inspection, a third party. Additionally, OSHA's revisions further clarify that third parties may be reasonably necessary to an OSHA inspection due to skills, knowledge, or experience that they possess. OSHA has determined that, while these revisions may impose societal costs and that some employers may decide to undertake actions not directly required to comply with any requirements in this rule, the revisions impose no new direct cost burden on employers.[2]

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of the intended regulation and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Executive Order 14094 reaffirms, supplements, and updates Executive Orders 12866 and 13563 and further directs agencies to solicit and consider input from a wide range of affected and interested parties through a variety of means.

Under section 6(a) of Executive Order 12866, Regulatory Planning and Review, 58 FR 51735 (Sept. 30, 1993), the Office of Management and Budget's ("OMB") Office of Information and Regulatory Affairs ("OIRA") determines whether a regulatory action is significant and, therefore, subject to the requirements of the Executive Order and review by OMB. Section 3(f) of Executive Order 12866, as amended by section 1(b) of Executive Order 14094, Modernizing Regulatory Review, 88 FR 21879 (Apr. 6, 2023), defines a "significant regulatory action" as an action that is likely to result in a rule that may: (1) have an annual effect on the economy of $200 million or more in any 1 year (adjusted every 3 years by the Administrator of OIRA for changes in gross domestic product), or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, territorial, or tribal governments or communities; (2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise legal or policy issues for which centralized review would meaningfully further the President's priorities or the principles set forth in this Executive order, as specifically authorized in a timely manner by the Administrator of OIRA in each case. OIRA has determined that

---

[2] Executive Order 12866 requires agencies to consider costs that the regulated community may undertake regardless of whether those actions are directly required by a standard or regulation. OSHA's requirements under the OSH Act and related court decisions require the agency to show that an occupational safety and health standard is economically feasible. While this analysis is not being undertaken to show the feasibility of this rule,

because it is not a standard, OSHA's approach to this finding does not generally consider activities voluntarily undertaken to be costs of a rule for the purposes of showing feasibility or, in the context of the Regulatory Flexibility Analysis, a significant economic impact. The agency has clarified in this analysis that some unquantified costs as considered by Executive Order 12866 may be incurred and that these differ from direct costs of a rule typically considered in an OSHA economic feasibility analysis.

this final rule is a significant regulatory action under section 3(f) but not under section 3(f)(1) of Executive Order 12866, as amended by Executive Order 14094. Therefore, a full regulatory impact analysis has not been prepared.

This Final Economic Analysis (FEA) addresses the costs and benefits of the rule and responds to comments on those topics. The agency also evaluates the impact of the rule on small entities, as required by the Regulatory Flexibility Act (5 U.S.C. 605).

*B. Costs*

This final rule imposes no new direct cost burden on employers and does not require them to take any action to comply. This rule merely clarifies who can be an authorized employee representative during OSHA's walkaround inspection. As explained in the Summary and Explanation above, this rule does not require or prohibit any employer conduct, and an employer cannot ''violate'' this regulation. Any costs of a rule are incremental costs— meaning, the cost of a change from the future (projected from the current situation) without the final rule to a world where the final rule exists.

In the NPRM's Preliminary Economic Analysis, OSHA preliminarily determined that the proposal did not impose direct costs on employers and welcomed comments on this determination and information on costs that OSHA should consider. Many commenters stated their belief that the final rule will impose additional costs. Some commenters, even those who expressed concerns about potential costs of the rule, acknowledged that OSHA's prior rule allowed third parties to accompany OSHA inspectors if good cause had been shown that they were reasonably necessary to the inspection (see, *e.g.,* Document ID 0168, p. 2; 1941, p. 3; 1952, p. 2). Many commenters that stated the final rule will impose additional costs did not articulate exactly what changes this rule would introduce that would result in cost increase, and no commenter provided concrete evidence of actual costs it would incur because of the rule.

1. Rule Familiarization

OSHA considers the cost of rule familiarization in many cases as part of the economic impact analysis. However, it is not necessary for employers to read or become familiar with this rule as there are no requirements that the employer must undertake to be in compliance with the rule. If an employer does not become familiar with this rule, there is no risk of being out of compliance or violating the rule.

Furthermore, this rule is a clarification of OSHA's longstanding practice with which employers are already familiar. Finally, the regulatory text is very brief. Even if employers did choose to read the revised regulation, it would take no more than a few minutes to do so.

Here, relying on the U.S. Census's Statistics of U.S. Businesses for 2017, it is estimated that the final rule will apply to inspections at approximately 7.9 million establishments. If familiarization takes, at most, five minutes per establishment and is performed by Safety Specialists (SOC 19–5011 [3]) or comparable employees, the total rule familiarization costs, assuming the unlikely event that all employers covered by OSHA will read this rule, will be approximately $40.5 million (= 7.9 million × [5/60] hour × $37.77 × [100% + 46% + 17%]), or about $5 per employer. This quantitative estimate portrays an unlikely upper bound assuming all employers will decide to read this regulation.

2. Training

Commenters suggested that employers would be required to provide safety training for third-party representatives and would accordingly incur costs for such training (see, *e.g.,* Document ID 1762, p. 2–3; 1782, p. 2–3, 5–6; 1974, p. 4; 1952, p. 4; 1774, fn. 17; 1976, p. 15). For example, NAHB suggested that OSHA's regulations require employers to train employees before they may use certain equipment, including personal protective equipment (PPE) (Document ID 1774, fn. 17), and the Phylmar Regulatory Roundtable stated that OSHA failed to consider the employer's need to provide third-party representatives with appropriate safety training ''for their personal safety, the safety of the workplace, and mitigation of liability'' (Document ID 1974, p. 4).

OSHA disagrees that employers will incur training costs as a result of this final rule. Training of third-party representatives is not required by the rule. OSHA's rules on training require an employer to train their employees. Because a third-party employee representative is not an employee of the employer undergoing an OSHA inspection, the employer has no

obligation to train those individuals. Additionally, as stated in the NPRM, employers may have policies and rules for third parties to ''participate in a safety briefing before entering'' a jobsite. Given that such briefings would be given to the CSHO, OSHA finds there would be no further cost to an employer to have an additional visitor present during any potential safety briefing since any potential briefing would be given regardless of the number of individuals present. See 88 FR 59831. Commenters did not provide information that suggested otherwise. Based on this, and because such policies are not required by this rule, OSHA reaffirms that there are no costs attributable to this final rule for this activity.

Similarly, some commenters, including the Employers Walkaround Representative Rulemaking Coalition and the Chamber of Commerce, also said they would need to train employees to educate them on this final rule, or communicate with employees regarding the role of any non-employee third-party representative (see, *e.g.,* Document ID 1782, p. 5–6; 1976, p. 23–24; 1952, p. 5). As explained above, this rule includes no requirement that employers provide training and, therefore, any associated costs are not attributable to this final rule. Since this rule creates no new obligations for employers, training should be unnecessary. Accordingly, OSHA does not attribute costs for training to this rule.

3. Providing PPE

Several commenters were concerned that they would incur costs to provide PPE to third-party representatives (see, *e.g.,* Document ID 1774, p. 5; 1782, p. 3; 1937, p. 3; 1938, fn. 2; 1940, p. 3–4; 1941, p. 4–5; 1952, p. 5; 1976, p. 23). For example, NAHB said that general contractors do not have ''extra PPE to address every potential situation requiring PPE on a jobsite,'' and ''small businesses will rarely have enough extra PPE or extra equipment that would enable all relevant parties to take part in an inspection on a moment's notice'' (Document ID 1774, p. 5). This commenter also raises the issue of proper PPE fit for third-party representatives in light of OSHA's current rulemaking addressing correctly fitting PPE in construction (Document ID 1774, p. 5). That rulemaking addresses how the PPE that employers provide to their employees must fit properly but it does not introduce any obligation regarding the fit of PPE loaned or provided to non-employees who may be present on the worksite. Additionally, UFCW commented that

---

[3] The median hourly base wage is $37.77 (per Occupational Employment and Wages, May 2022, *https://www.bls.gov/oes/current/oes195011.htm#nat* *https://www.bls.gov/oes/current/oes195011.htm#nat*). A fringe benefits ratio (46 percent of earnings) is derived from Bureau of Labor Statistics Employer Costs for Employee Compensation data using variables CMU102000000000D and CMU1030000000000D. Also, overhead costs are assumed to be 17 percent of the base wage.

the cost of providing PPE to third-party representatives "is minimal when considering the price of PPE and the number of OSHA inspections taking place in one specific facility" (Document ID 1023, p. 8).

In the NPRM, OSHA considered that employers may have policies and rules for third parties, such as requiring visitors to wear PPE on site, but preliminarily concluded that this would not impose costs to employers because "PPE could be supplied from extra PPE that might be available on site for visitors or could be supplied by the third party." 88 FR 59831. This final rule does not require employers to have policies that require visitors to wear PPE on jobsites and, therefore, any associated costs are not attributable to this final rule. However, where employers have such policies, it is likely that they would have extra PPE available for visitors in accordance with their own policies. OSHA's enforcement experience indicates that where employers have policies, it is generally the case that those employers make PPE available to visitors. Nonetheless, while employers may provide any extra PPE they have to the third-party, the employer is under no obligation to provide PPE to third-party representatives during the walkaround inspection, nor would the employer be responsible to ensure proper PPE fit for third parties. If the employer does not have PPE available for the third-party representative, the third party would need to supply their own PPE. If the third-party representative does not have PPE that would allow them to safely accompany the CSHO, the representative would be unable to accompany the CSHO in any area where PPE is required. Accordingly, OSHA has determined that employers will incur no costs associated with the provision of PPE to third-party representatives as a result of this rule.

## 4. Policy Development, Revisions, and Planning

Some commenters, including the Office of Advocacy of the U.S. Small Business Administration and the Employers Walkaround Representative Rulemaking Coalition, said that this rule would impose costs related to preparing or updating policies and procedures around third-party visitors (see, *e.g.,* Document ID 1782, p. 5–6; 1941, p. 4–5; 1974, p. 4; 1976, p. 23). As stated above, this final rule merely clarifies longstanding OSHA practice to permit third-party representatives to accompany CSHOs on inspections. Since this rule creates no new obligations for employers, it should be

unnecessary for employers to revise any policies or procedures that are currently in place.

## 5. Legal Advice and Consultations

Some commenters said that they would need to obtain additional legal advice or consult with legal counsel, or otherwise would incur legal costs related to this rule (see, *e.g.,* Document ID 1776, p. 7; 1782, p. 5–6; 1952, p. 5). For example, NAHB said that "employers may accumulate additional and unanticipated costs for consulting with counsel on how they and their respective employees should handle these interactions [with third-party representatives]" (Document ID 1774, p. 4), and the Employers Walkaround Rulemaking Coalition stated that employers would incur "legal fees for managing more complex and fraught inspection interactions" (Document ID 1976, p. 23). This commenter offered no evidence to support its assertion that interactions during inspections would be more difficult as a result of this rule.

As stated above, this final rule simply clarifies who can be an authorized employee representative during OSHA's walkaround inspection. The rule creates no new obligations for employers, and OSHA disagrees with the assertion that the rule creates a need for employers to consult with legal counsel. Furthermore, as discussed in other sections, the rule creates no obligation for employers to consult with legal counsel and therefore, OSHA attributes no costs to this voluntary activity.

## 6. Insurance and Liability Costs

Some commenters, including the Flexible Packaging Association, the Alliance for Chemical Distribution, and the Workplace Policy Institute said that this rule would raise their insurance premiums, necessitate purchasing additional liability or workers' compensation insurance to cover injuries to non-employees, or otherwise create liability risks for employers (see, *e.g.,* Document ID 1726, p. 8; 1762, p. 2–3; 1774, p. 3; 1974, p. 4–5; 1976, p. 21; 1781, p. 3; 1782, p. 5–6; 1952, p. 5). The Workplace Policy Institute stated that OSHA's liability insurance, rather than the employer's insurance, should cover injuries to third-party representatives to avoid imposing significant additional burden on employers (Document ID 1762, p. 3).

OSHA has determined that, as a result of this rule, employers will not incur costs associated with insurance and liability for several reasons. First, because employers already have third parties who may come onto their worksites for a variety of reasons

unrelated to an OSHA inspection, employers' insurance policies should already account for risks related to the presence of third parties. Second, given that there is an extremely low likelihood that an average employer would be inspected by OSHA,[4] that a third-party representative would be present during that inspection, and that that third party would be injured on the employer's premises, insurers would not see that as something necessitating additional insurance coverage or higher premiums. Finally, as OSHA explained in the Summary and Explanation, the CSHO has the authority to deny accompaniment to an employee walkaround representative who is disrupting the inspection, and would exclude a representative from the walkaround if they are acting in a manner that creates a dangerous situation for themselves or others (see Section III, Summary and Explanation). No commenter provided any data or information other than speculation that premiums would increase. Accordingly, OSHA has determined that employers will incur no new costs associated with insurance and liability as a result of this final rule.

## 7. Protecting Trade Secrets and Confidential Business Information

Some commenters, including the Chamber of Commerce, expressed concern that they would incur costs associated with protecting trade secrets or confidential business information during an inspection where a third-party representative was present, or from the harm resulting from their disclosure (see, *e.g.,* Document ID 1952, p. 5). Similarly, some commenters, such as the Flexible Packaging Association and the Office of Advocacy of the U.S. Small Business Administration, said that they would incur costs associated with preparing and executing nondisclosure agreements (see, *e.g.,* Document ID 1976, p. 23; 1782, p. 5–6; 1941, p. 4–5).

OSHA has determined that, as a result of this rule, employers will not incur costs associated with the protection of trade secrets or the preparation of nondisclosure agreements. As explained in the NPRM, under 29 CFR 1903.9(d), employers maintain the right to request that areas of their facilities be off-limits to representatives who do not work in that particular part of the facility. See 88

---

[4] In Fiscal Year 2023, OSHA conducted about 34,000 inspections of the more than 8 million employers covered by the OSH Act, which means the average employer has about a 0.43 percent chance of being inspected in a given year. Commonly Used Statistics, *available at https://www.osha.gov/data/commonstats.*

FR 59826, 59830–31. This final rule does not alter or limit employers' rights under section 1903.9(d) and, therefore, employers should not incur costs related to the protection of trade secrets or confidential business information. To the extent employers choose to take additional action to protect trade secrets, including the use of nondisclosure agreements, the ensuing costs would be the result of voluntary actions taken by the employer.

### 8. Hiring Experts

Some commenters were concerned about incurring additional costs associated with hiring experts (see, *e.g.*, Document ID 1941, p. 4–5; 1782, p. 5–6). For example, the Office of Advocacy of the U.S. Small Business Administration stated that employers may incur costs from ''providing additional staff and experts (including possible outside experts) to correspond to the variety of non-employee third-party participants during inspections and related activities'' (Document ID 1941, p. 5). As explained above, this final rule clarifies longstanding OSHA practice. The final rule creates no new obligations for employers, so it should be unnecessary for employers to hire experts or other staff in response to the rule. Additionally, the final rule does not require employers to hire experts or other staff, so if employers choose to do so, the costs of such would derive from the employer's voluntary action.

### 9. Costs to State Plan States

The State Policy Network commented that State Plan states would need to update their rules on third-party representation (Document ID 1965, p. 9). While this is true, OSHA-approved State Plans must routinely adopt standards and other regulations in order to remain at least as effective as Federal OSHA, which is a condition of the State Plan's continued existence. See also the discussion of State Plan obligations in Section VIII. State Plans take on a variety of forms and the method for each to adopt a rule varies widely. As a result, OSHA is unable to determine what, if any, opportunity costs are associated with State Plans adopting Federal OSHA rules. The agency believes these activities are already an anticipated part of the State Plan's budget (part of which is provided by the Federal Government) and will not represent spending above a State Plan's established budget.[5]

### 10. Societal Costs

As explained in the NPRM, this rule does not require the employer make a third party available, nor does it require the employer to pay for that third party's time. 88 FR 59831. There is an opportunity cost to the third party insomuch as their time is being spent on an inspection versus other activities they could be engaged in. Id. This opportunity cost is not compensated by the employer undergoing the OSHA inspection and it is not a monetary burden on that employer. Id.

The American Petroleum Institute (API) commented that it was not reasonable for OSHA to conclude that the rule does not impose costs on employers because that would mean either third-party representatives will provide their services at no cost, or OSHA intends either employees or taxpayers to pay for their time (Document ID 1954, p. 1–2; see also 1091). In an attempt to calculate the cost of compensating third-party representatives for time spent accompanying CSHOs on walkaround inspections, API pointed to OSHA's FY 2022 Congressional Budget Justification, in which OSHA requests $63,500,000 for Compliance Assistance-State Consultation to provide a total of 20,139 visits performed by all Consultation programs (Document ID 1954, p. 2). Based on these data, API concluded that OSHA's cost for providing onsite consultation services is approximately $3,153 per engagement and, ''[u]sing this information as a proxy for third-party walkaround representative(s), participating in 90,000 inspections [per year],'' the cost impact is $238.8 million (Document ID 1954, p. 2).

As an initial matter, this final rule does not require a third-party representative to be selected or participate in an inspection, nor does it require employees or taxpayers to pay for third-party representatives' time. Third-party representatives are generally employees of another organization (*e.g.*, labor union, advocacy group, worker justice coalition, etc.) who are paid by that group. Third-party representatives' job duties would include providing employee representation, assistance, or support during OSHA inspections and in other situations. Therefore, third-party representatives are not paid by the employer under inspection, the employer's employees, or the U.S. Government; rather, they are paid by the organizations that employ them. Similarly, it is not true that OSHA will need to expend resources to train CSHOs on ''new responsibilities'' under the rule (see, *e.g.*, Document ID 1938, p. 10), because any CSHO training will be integrated into existing ongoing training curriculum and not impose any new resource requirements on the agency. Accordingly, OSHA's conclusion that the final rule will not impose direct costs on employers does not mean that employees or taxpayers will bear the cost instead.

Furthermore, API's interpretation of OSHA's FY 2022 Congressional Budget Justification and the application of those figures is incorrect for several reasons. First, the Congressional Budget Justification does not represent the actual budget of the agency and should not be interpreted as such. In this case, the FY 23 budget for State Compliance Assistance programs is $62,661,000—$839,000 less than OSHA's request in FY 22.

Second, some of the budget of the State Consultation program is spent on activities other than the salaries of the consultants. The funding includes the administrative costs of running the program, training and travel costs for the consultants, outreach and educational support, the administration of OSHA's Safety and Health Recognition Program, and other activities. There are no centralized administrative costs of third-party representation. To use the full budget of the State Consultation programs as the numerator in this equation would grossly overstate the costs of a third-party representative's participation by including irrelevant costs.

Third, the activities of an OSHA consultant and a third-party representative are different and not directly comparable. A consultant does work both before the consultation visit and after. They prepare a summary report about their visit and provide follow up services to the employers they are working with. On the other hand, a third-party representative simply accompanies the CSHO during an inspection. Even if one derived a per-engagement cost that stripped out unrelated administrative costs, the consultant would dedicate more hours to each engagement than would a third-party representative.

Finally, it is not correct to assume a third-party representative would participate in every OSHA inspection. While OSHA does not collect data on the frequency of third-party representative participation in OSHA

[5] State Plan participation is voluntary, and states are aware of the requirements—including those to adopt standards and other regulations in order to remain at least as effective as Federal OSHA— before undertaking the process to establish a State Plan. The continued participation by states in the OSHA State Plan program indicates that any costs associated with complying with the requirements of participation do not outweigh the benefits a state anticipates realizing as a result of participation in the program.

inspections, based on anecdotal evidence from CSHOs, employees are more typically represented by another employee during the walkaround inspection. When preparing a regulatory impact analysis, the cost of a rule is measured as incremental costs—the cost to go from the state of the world in the absence of a rule to the state of the world if the rule were promulgated. Under the previous rule, third-party representatives were already permitted to participate in OSHA inspections. So, the incremental costs of the rule would be the additional inspections that third-party representatives will now participate in that they would not have participated in before. OSHA does not collect data on the frequency of third-party participation in inspections and so is unable to determine the number of inspections that would newly involve third-party representatives. But, since this rule clarifies existing rights and does not expand or grant new rights, the number is likely to be very small.

In sum, OSHA does not collect data on the frequency of third-party participation in inspections, nor has the agency attempted to estimate how many inspections a third-party representative might participate in as a result of this rule. Because these data are not available, OSHA acknowledged the existence of, but has not attempted to estimate, societal costs for this analysis. As discussed above, OSHA also acknowledges that there are potentially some unquantified costs of activities that employers may voluntarily undertake as a result of this rule. However, the agency finds that this final rule does not impose any new direct cost burden on employers.

*C. Benefits*

While there are no new costs borne by employers associated with this final rule, amending section 1903.8(c) will reinforce the benefits of the OSH Act. Third-party representatives—given their knowledge, expertise, or skills with hazardous workplace conditions—can act as intermediaries and improve communication about safety issues between employees and the CSHO. Improved communication can reduce workplace injuries and related costs such as workers' compensation or OSHA fines. As discussed in more detail in Section III, Summary and Explanation, this final rule will enable employees to select trusted and knowledgeable representatives of their choice, which will improve worker representation during OSHA inspections. Employee representation is critical to ensuring OSHA inspections are thorough and effective.

As illustrated by the examples set forth in Section III, Summary and Explanation, this final rule has important benefits on the effectiveness of OSHA's inspections and worker safety and health. Indeed, the record demonstrates that some of these benefits accrue in particular to underserved communities that are likely to benefit from third-party representatives with language or cultural competencies or trusted relationships with workers. These benefits are not the result of actions taken or not taken by employers necessarily, but instead, from the nonquantifiable societal costs of the third-party representatives' time. OSHA has not attempted to quantify these benefits since—unlike injuries avoided and fatalities prevented—they are relatively intangible. Executive Order 12866, as amended by Executive Order 14094, encourages agencies to quantify benefits to the extent reasonably possible, but to articulate them in detail, qualitatively, when they are not. As outlined throughout the preamble, OSHA has provided extensive explanation and information to support the agency's belief that the benefits of the rule, while unquantified, are substantial.

*D. Regulatory Flexibility Certification*

In accordance with the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.,* OSHA examined the regulatory requirements of the final rule to determine if they would have a significant economic impact on a substantial number of small entities. As indicated in Section V, Final Economic Analysis, the final rule may have familiarization costs of approximately $5 per establishment where employers are aware of and decide to read this regulation. The rule does not impose any additional direct costs of compliance on employers, whether large or small. Accordingly, the final rule will not have a significant impact on a substantial number of small entities.

Some commenters, including the Office of Advocacy of the U.S. Small Business Administration and the National Federation of Independent Business, disagreed (see, *e.g.,* Document ID 0047; 0168, p. 6–7; 1774, p. 4–5; 1941, p. 3–6; 1952, p. 5; 5793). For example, the Office of Advocacy of the U.S. Small Business Administration stated that OSHA's certification that the proposed rule would not have a significant impact on a substantial number of small entities was "improper" because OSHA failed to provide a "factual basis" for certification (Document ID 1941, p. 4).

For the reasons explained in detail above, OSHA estimates that this rule potentially imposes an optional one-time cost for familiarization of approximately $5 per establishment. Otherwise, the rule has no direct requirements for employers and no more than de minimis costs of activities employers may voluntarily undertake as a result of the final rule. The agency considered "direct and foreseeable costs" in the NPRM and this final rule and commenters offered nothing more than speculative costs that are neither required by the rule nor are they reasonable activities for employers to undertake. As explained in the NPRM and this final rule, the rule clarifies who can be an authorized representative during OSHA's walkaround inspection. It does not impose new cost burdens on employers or require them to take any action apart from the potential rule familiarization cost of $5 per employer that decides to read it. Therefore, the final rule will not have a significant economic impact on a substantial number of small entities.

For the purposes of illustrating the threshold cost necessary for a rule to have a significant economic impact (costs that are equal to or greater than one percent of revenue), the agency presents the following. Table 1 below shows revenue per average establishment based on 2017 County Business Patterns and Economic Census (the most recent year that reports data at the level necessary to perform this analysis) and the one percent threshold in dollars for selected industries and size classes. OSHA looked at construction, manufacturing, and healthcare as industries that may be more likely to be inspected by OSHA or where there may be higher impacts. The agency also looked at both establishments with fewer than 500 employees (which roughly corresponds to or captures all small entities as defined by the U.S. Small Business Administration) as well as those with fewer than 20 employees, since some construction and healthcare employers are more likely to be very small. The table below also shows the hours that would need to be spent on compliance activities by a supervisor with a loaded wage of about $94 (using the wage of Standard Occupation Classification code 11–1021 General and Operations Managers from the U.S. Bureau of Labor Statistics Occupational Employment and Wage Survey) in order to meet that threshold. Based on these calculations, a small entity would need to dedicate from nearly 100 hours to as many as 2,900 hours to compliance activities in

order to exceed that threshold, depending on the industry. For reference, this is the equivalent of more than two weeks of full-time work (assuming a 40-hour work week) up to one and a half full-time employees dedicating all of their work time to compliance activities. For employers with fewer than 20 employees, those figures range from 35 hours—nearly a full week of work—to more than 1,000 hours—equal to half of one full-time employee's work time in a year.

TABLE 1—HOURS TO REACH SIGNIFICANT ECONOMIC IMPACT, SELECT INDUSTRIES BY NAICS INDUSTRY, <500 EMPLOYEES

| NAICS | NAICS description | Establishments | Revenue ($1,000) | Revenue per establishment ($1,000) | 1% of revenue per establishment | Manager per hour wages | Hours to exceed 1% |
|---|---|---|---|---|---|---|---|
| 2361 | Residential Building Construction | 171,322 | $253,139,895 | $1,478 | $14,776 | $93.71 | 158 |
| 2362 | Nonresidential Building Construction | 41,400 | 324,165,303 | 7,830 | 78,301 | 93.71 | 836 |
| 2371 | Utility System Construction | 17,634 | 79,475,796 | 4,507 | 45,070 | 93.71 | 481 |
| 2372 | Land Subdivision | 4,874 | 8,476,481 | 1,739 | 17,391 | 93.71 | 186 |
| 2373 | Highway, Street, and Bridge Construction | 8,971 | 83,786,185 | 9,340 | 93,397 | 93.71 | 997 |
| 2379 | Other Heavy and Civil Engineering Construction. | 4,165 | 14,777,633 | 3,548 | 35,481 | 93.71 | 379 |
| 2381 | Foundation, Structure, and Building Exterior Contractors. | 92,477 | 161,721,189 | 1,749 | 17,488 | 93.71 | 187 |
| 2382 | Building Equipment Contractors | 180,621 | 321,134,919 | 1,778 | 17,779 | 93.71 | 190 |
| 2383 | Building Finishing Contractors | 115,503 | 122,271,617 | 1,059 | 10,586 | 93.71 | 113 |
| 2389 | Other Specialty Trade Contractors | 69,138 | 137,034,126 | 1,982 | 19,820 | 93.71 | 212 |
| 311 | Food Manufacturing | 23,740 | 174,677,989 | 7,358 | 73,580 | 93.71 | 785 |
| 312 | Beverage and Tobacco Product Manufacturing. | 8,518 | 31,557,244 | 3,705 | 37,048 | 93.71 | 395 |
| 313 | Textile Mills | 1,749 | 11,059,006 | 6,323 | 63,230 | 93.71 | 675 |
| 314 | Textile Product Mills | 5,544 | 10,384,706 | 1,873 | 18,731 | 93.71 | 200 |
| 315 | Apparel Manufacturing | 5,686 | 8,368,242 | 1,472 | 14,717 | 93.71 | 157 |
| 316 | Leather and Allied Product Manufacturing | 1,131 | 2,775,454 | 2,454 | 24,540 | 93.71 | 262 |
| 321 | Wood Product Manufacturing | 12,960 | 50,791,296 | 3,919 | 39,191 | 93.71 | 418 |
| 322 | Paper Manufacturing | 2,592 | 37,676,474 | 14,536 | 145,357 | 93.71 | 1,551 |
| 323 | Printing and Related Support Activities | 24,189 | 45,426,490 | 1,878 | 18,780 | 93.71 | 200 |
| 324 | Petroleum and Coal Products Manufacturing. | 1,117 | 30,652,067 | 27,441 | 274,414 | 93.71 | 2,928 |
| 325 | Chemical Manufacturing | 9,976 | 138,356,916 | 13,869 | 138,690 | 93.71 | 1,480 |
| 326 | Plastics and Rubber Products Manufacturing. | 9,574 | 82,161,688 | 8,582 | 85,818 | 93.71 | 916 |
| 327 | Nonmetallic Mineral Product Manufacturing | 11,175 | 48,381,252 | 4,329 | 43,294 | 93.71 | 462 |
| 331 | Primary Metal Manufacturing | 3,256 | 48,567,821 | 14,916 | 149,164 | 93.71 | 1,592 |
| 332 | Fabricated Metal Product Manufacturing | 50,939 | 188,740,011 | 3,705 | 37,052 | 93.71 | 395 |
| 333 | Machinery Manufacturing | 20,542 | 122,991,169 | 5,987 | 59,873 | 93.71 | 639 |
| 334 | Computer and Electronic Product Manufacturing. | 10,603 | 67,937,359 | 6,407 | 64,074 | 93.71 | 684 |
| 335 | Electrical Equipment, Appliance, and Component Manufacturing. | 4,626 | 33,346,239 | 7,208 | 72,084 | 93.71 | 769 |
| 336 | Transportation Equipment Manufacturing | 9,295 | 87,082,439 | 9,369 | 93,687 | 93.71 | 1,000 |
| 337 | Furniture and Related Product Manufacturing. | 13,960 | 36,138,030 | 2,589 | 25,887 | 93.71 | 276 |
| 339 | Miscellaneous Manufacturing | 26,481 | 55,483,581 | 2,095 | 20,952 | 93.71 | 224 |
| 611 | Educational Services | 97,786 | 137,228,479 | 1,403 | 14,034 | 93.71 | 150 |
| 621 | Ambulatory Health Care Services | 530,341 | 602,083,936 | 1,135 | 11,353 | 93.71 | 121 |
| 622 | Hospitals | 1,712 | 41,733,980 | 24,377 | 243,773 | 93.71 | 2,601 |
| 623 | Nursing and Residential Care Facilities | 56,163 | 113,790,097 | 2,026 | 20,261 | 93.71 | 216 |
| 624 | Social Assistance | 155,830 | 145,159,610 | 932 | 9,315 | 93.71 | 99 |

Source: OSHA, based on 2017 County Business Patterns and Economic Census.

HOURS TO REACH SIGNIFICANT ECONOMIC IMPACT, SELECT INDUSTRIES BY NAICS INDUSTRY, <20 EMPLOYEES

| NAICS | NAICS description | Establishments | Revenue ($1,000) | Revenue per establishment ($1,000) | 1% of revenue per establishment | Manager per hour wages | Hours to exceed 1% |
|---|---|---|---|---|---|---|---|
| 2361 | Residential Building Construction | 166,548 | $142,652,292 | $857 | $8,565 | $93.71 | 91 |
| 2362 | Nonresidential Building Construction | 34,342 | 83,675,671 | 2,437 | 24,365 | 93.71 | 260 |
| 2371 | Utility System Construction | 13,854 | 18,796,751 | 1,357 | 13,568 | 93.71 | 145 |
| 2372 | Land Subdivision | 4,586 | 4,394,749 | 958 | 9,583 | 93.71 | 102 |
| 2373 | Highway, Street, and Bridge Construction | 6,205 | 13,358,821 | 2,153 | 21,529 | 93.71 | 230 |
| 2379 | Other Heavy and Civil Engineering Construction. | 3,550 | 4,180,174 | 1,178 | 11,775 | 93.71 | 126 |
| 2381 | Foundation, Structure, and Building Exterior Contractors. | 83,239 | 63,851,419 | 767 | 7,671 | 93.71 | 82 |
| 2382 | Building Equipment Contractors | 161,010 | 111,658,403 | 693 | 6,935 | 93.71 | 74 |
| 2383 | Building Finishing Contractors | 107,882 | 57,678,342 | 535 | 5,346 | 93.71 | 57 |
| 2389 | Other Specialty Trade Contractors | 62,284 | 52,959,403 | 850 | 8,503 | 93.71 | 91 |
| 311 | Food Manufacturing | 17,010 | 20,699,769 | 1,217 | 12,169 | 93.71 | 130 |
| 312 | Beverage and Tobacco Product Manufacturing. | 6,913 | 7,189,394 | 1,040 | 10,400 | 93.71 | 111 |
| 313 | Textile Mills | 1,122 | 1,357,262 | 1,210 | 12,097 | 93.71 | 129 |
| 314 | Textile Product Mills | 4,685 | 2,499,124 | 533 | 5,334 | 93.71 | 57 |
| 315 | Apparel Manufacturing | 4,789 | 2,306,249 | 482 | 4,816 | 93.71 | 51 |

HOURS TO REACH SIGNIFICANT ECONOMIC IMPACT, SELECT INDUSTRIES BY NAICS INDUSTRY, <20 EMPLOYEES—Continued

| NAICS | NAICS description | Establishments | Revenue ($1,000) | Revenue per establishment ($1,000) | 1% of revenue per establishment | Manager per hour wages | Hours to exceed 1% |
|---|---|---|---|---|---|---|---|
| 316 ............ | Leather and Allied Product Manufacturing .. | 922 | 623,259 | 676 | 6,760 | 93.71 | 72 |
| 321 ............ | Wood Product Manufacturing ..................... | 9,230 | 9,107,739 | 987 | 9,868 | 93.71 | 105 |
| 322 ............ | Paper Manufacturing ................................. | 1,138 | 2,503,951 | 2,200 | 22,003 | 93.71 | 235 |
| 323 ............ | Printing and Related Support Activities ....... | 20,213 | 11,430,249 | 565 | 5,655 | 93.71 | 60 |
| 324 ............ | Petroleum and Coal Products Manufacturing. | 488 | 2,148,587 | 4,403 | 44,028 | 93.71 | 470 |
| 325 ............ | Chemical Manufacturing ............................ | 6,048 | 14,751,260 | 2,439 | 24,390 | 93.71 | 260 |
| 326 ............ | Plastics and Rubber Products Manufacturing. | 5,078 | 8,127,328 | 1,600 | 16,005 | 93.71 | 171 |
| 327 ............ | Nonmetallic Mineral Product Manufacturing | 6,589 | 8,840,877 | 1,342 | 13,418 | 93.71 | 143 |
| 331 ............ | Primary Metal Manufacturing ..................... | 1,806 | 3,595,790 | 1,991 | 19,910 | 93.71 | 212 |
| 332 ............ | Fabricated Metal Product Manufacturing ..... | 36,783 | 34,117,477 | 928 | 9,275 | 93.71 | 99 |
| 333 ............ | Machinery Manufacturing ........................... | 13,539 | 18,377,762 | 1,357 | 13,574 | 93.71 | 145 |
| 334 ............ | Computer and Electronic Product Manufacturing. | 7,057 | 10,239,147 | 1,451 | 14,509 | 93.71 | 155 |
| 335 ............ | Electrical Equipment, Appliance, and Component Manufacturing. | 3,011 | 4,501,315 | 1,495 | 14,950 | 93.71 | 160 |
| 336 ............ | Transportation Equipment Manufacturing .... | 5,847 | 9,466,353 | 1,619 | 16,190 | 93.71 | 173 |
| 337 ............ | Furniture and Related Product Manufacturing. | 11,211 | 7,486,646 | 668 | 6,678 | 93.71 | 71 |
| 339 ............ | Miscellaneous Manufacturing ..................... | 22,726 | 14,022,304 | 617 | 6,170 | 93.71 | 66 |
| 621 ............ | Ambulatory Health Care Services ............... | 446,980 | 289,281,532 | 647 | 6,472 | 93.71 | 69 |
| 622 ............ | Hospitals ................................................... | 118 | 1,144,688 | 9,701 | 97,007 | 93.71 | 1,035 |
| 623 ............ | Nursing and Residential Care Facilities ....... | 21,683 | 9,296,715 | 429 | 4,288 | 93.71 | 46 |
| 624 ............ | Social Assistance ...................................... | 99,490 | 32,772,130 | 329 | 3,294 | 93.71 | 35 |

Source: OSHA, based on 2017 County Business Patterns and Economic Census.

OSHA estimates for the cost of compliance with a rule assume that employers will take the most rational, lowest-cost option to comply. It is well known that OSHA only inspects a small fraction of workplaces in a given year and most businesses will never be subject to an OSHA inspection.[6] Only a small subset of those worksites inspected annually will have a third-party representative accompanying the CSHO because of the revisions to this final rule. While OSHA does not generally establish a threshold for what is considered a "substantial number of small entities," other agencies in the Department of Labor, including the Employment and Training Administration and the Wage and Hour Division, define a substantial number to be more than 15 percent (see 80 FR 62957, 63056; 79 FR 60634, 60718). Commenters did not present any reasonable argument that a substantial number of employers (much less a substantial number of small employers) would dedicate a week or more to activities not required by OSHA for an inspection that only has a very small chance of occurring. Again, apart from the rule familiarization cost of $5 per employer that chooses to read it, OSHA

finds that employers will incur no direct costs because of this rule. However, even if OSHA were incorrect in estimating that there were no such additional direct costs, this analysis shows that it is not reasonable to assume that such costs would have a significant economic impact. Therefore, OSHA certifies that the final rule will not have a significant economic impact on a substantial number of small entities.

*E. Small Business Regulatory Enforcement Fairness Act*

OSHA did not convene a Small Business Advocacy Review panel under the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA). The Chamber of Commerce asserted that OSHA failed to comply with requirements under SBREFA (Document ID 1952, p. 4–5). The Employers Walkaround Representative Rulemaking Coalition recommended that OSHA voluntarily establish a Small Business Advocacy Review (SBAR) panel to receive input directly from small businesses (Document ID 1976, p. 26).

OSHA considers the possibility of disproportionate impact on small businesses when deciding whether a SBAR panel is warranted. As explained above, because OSHA preliminarily determined that the proposed rule would not result in a significant economic impact on a substantial number of small entities (see 88 FR

59831), OSHA determined that a SBAR panel was not required. Nothing in the record has disturbed OSHA's preliminary determination that this rule will not have a significant economic impact on a substantial number of small entities, nor did OSHA's threshold calculations indicate that the preliminary determination was incorrect. Therefore, OSHA has concluded that a SBAR panel was not required for this rule.

**VI. Office of Management and Budget (OMB) Review Under the Paperwork Reduction Act**

This rule for Worker Walkaround Representative Designation Process contains no collection of information requirements subject to OMB approval under the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3501 *et seq.*) and its implementing regulations at 5 CFR part 1320. The PRA defines a collection of information as "the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format." 44 U.S.C. 3502(3)(A). Under the PRA, a Federal agency cannot conduct or sponsor a collection of information unless OMB approves it, and the agency displays a currently valid OMB control number (44 U.S.C. 3507). Also, notwithstanding any other provision of law, no employer shall be subject to penalty for failing to comply with a collection of information if the

---

[6] As mentioned previously, the average employer has a 0.43 percent chance of being inspected by OSHA annually. At the current rate of inspection and enforcement staffing levels, it would take OSHA more than 100 years to inspect every covered workplace one time. See Commonly Used Statistics, *available at https://www.osha.gov/data/commonstats.*

collection of information does not display a currently valid OMB control number (44 U.S.C. 3512).

## VII. Federalism

OSHA reviewed this final rule in accordance with the Executive Order 13132 (64 FR 43255 (Aug. 10, 1999)), which, among other things, is intended to ''ensure that the principles of federalism established by the Framers guide the executive departments and agencies in the formulation and implementation of policies.''

Several commenters submitted cover letters and attached a report from the Boundary Line Foundation (Boundary Line document) expressing a concern that OSHA failed to conduct consultation with States adequate to comply with Executive Order 13132 (see, *e.g.*, Document ID 1965; 1967; 1968; 1973, 1975). The Boundary Line document also argues that OSHA's rulemaking process ''neglects to assess foreseeable impacts to State legislative or regulatory actions or consider alternatives that can only be revealed through the State consultation process'' (see, *e.g.*, Document ID 1965, p. 5–9; 1975, p. 5–9; 1968, p. 5–9).[7] OSHA disagrees.

In fact, the Boundary Line document, along with several State comments that reference this document, set out a number of alternatives, including not making the proposed changes or providing a more specific set of criteria to be referenced by the CSHOs (Document ID 1965, p. 11, 15–16, 21, 30; 1967; 1968; 1973, 1975). OSHA has considered and discussed those alternatives but did not select them for the reasons fully explained in the Summary and Explanation.

After analyzing this action in accordance with Executive Order 13132, OSHA determined that this regulation is not a ''policy having federalism implications'' requiring consultation under Executive Order 13132. This final rule merely clarifies OSHA's longstanding practice under which third-party representatives may accompany OSHA inspectors conducting workplace safety and health inspections authorized by the OSH Act. It will not have substantial direct effect on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various

levels of government that would affect the States' ability to discharge traditional State governmental functions.

The effect of the final rule on States and territories with OSHA-approved occupational safety and health State Plans is discussed in Section VIII, State Plans.

## VIII. State Plans

As discussed in the Summary and Explanation section of this preamble, this final rule revises the language in OSHA's Representatives of Employers and Employees regulation, found at 29 CFR 1903.8(c), to explicitly clarify that the representative(s) authorized by employees may be an employee of the employer or a third party for purposes of an OSHA walkaround inspection. Additionally, OSHA clarified that when the CSHO has good cause to find that a representative authorized by employees who is not an employee of the employer would aid in the inspection, for example because they have knowledge or experience with hazards in the workplace, or other skills that would aid the inspection, the CSHO may allow the employee representative to accompany the CSHO on the inspection.

Among other requirements, section 18 of the OSH Act requires OSHA-approved State Plans to enforce occupational safety and health standards in a manner that is at least as effective as Federal OSHA's standards and enforcement program, and to provide for a right of entry and inspection of all workplaces subject to the Act that is at least as effective as that provided in section 8 (29 U.S.C. 667(c)(2)–(3)). As described above and in the Summary and Explanation of this preamble, OSHA concludes that these clarifying revisions enhance the effectiveness of OSHA's inspections and enforcement of occupational safety and health standards. Therefore, OSHA has determined that, within six months of the promulgation of a final rule, State Plans are required to adopt regulations that are identical to or ''at least as effective'' as this rule, unless they demonstrate that such amendments are not necessary because their existing requirements are already ''at least as effective'' in protecting workers as the Federal rule. See 29 CFR 1953.4(b)(3).

Several commenters representing state and local governments (but not State Plan officials) submitted similar comments and included the Boundary Line document. The Boundary Line document questioned OSHA's application of section 18(c)(2) (29 U.S.C. 667(c)(2)) to State Plans' obligations with respect to this rulemaking (see

Document ID 1965, p. 10–11; 1967, p. 10–11; 1968, p. 10–11; 1975, p. 10–11). (The report incorrectly cites 29 U.S.C. 677(c)(2), but this appears to be a typographical error.) Section 18(c)(2) of the OSH Act provides that one condition of OSHA approval is that a State Plan ''provides for the development and *enforcement* of safety and health standards . . . which standards (*and the enforcement of which* standards) are or will be at least as effective in providing safe and healthful employment and places of employment'' (emphasis added). Because this rule enhances the effectiveness of the enforcement of OSHA standards, section 18(c)(2) applies.

The same document also questioned the impact of this rulemaking on State Plans' obligations to develop strategic plans (Document ID 1965, p. 9; 1967, p. 9; 1968, p. 9; 1975, p. 9). OSHA requires State Plans to submit 5-year strategic plans as a condition of receiving Federal funding grants pursuant to section 23(g) of the OSH Act (29 U.S.C. 672). This is distinct from State Plans' statutory obligations under section 18 of the OSH Act to maintain at least as effective enforcement programs and inspections. Although a State Plan's 5-year strategic plan might reference rulemaking obligations, OSHA is not prescriptive about whether specific rulemakings would need to be listed in such strategic plans.

Of the 29 States and Territories with OSHA-approved State Plans, 22 cover both public and private-sector employees: Alaska, Arizona, California, Hawaii, Indiana, Iowa, Kentucky, Maryland, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Puerto Rico, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, and Wyoming. The remaining seven States and Territories cover only state and local government employees: Connecticut, Illinois, Maine, Massachusetts, New Jersey, New York, and the Virgin Islands.

## IX. Unfunded Mandates Reform Act

OSHA reviewed this proposal according to the Unfunded Mandates Reform Act of 1995 (''UMRA''; 2 U.S.C. 1501 *et seq.*). As discussed above in Section V of this preamble, the agency preliminarily determined that this proposal would not impose costs on any private- or public-sector entity. Accordingly, this proposal would not require additional expenditures by either public or private employers.

As noted above, the agency's regulations and standards do not apply to State and local governments except in

---

[7] Some of these commenters request that OSHA withdraw the rulemaking to complete ''its obligation'' to consult with states, ignoring section 11 of E.O. 13132 which specifies that the E.O. does not ''create any right or benefit, substantive or procedural enforceable at law.'' (64 FR 43255, 43259).

States that have elected voluntarily to adopt a State Plan approved by the agency. Consequently, this proposal does not meet the definition of a ''Federal intergovernmental mandate.'' See section 421(5) of the UMRA (2 U.S.C. 658(5)). Therefore, for the purposes of the UMRA, the agency certifies that this proposal would not mandate that State, local, or Tribal governments adopt new, unfunded regulatory obligations. Further, OSHA concludes that the rule would not impose a Federal mandate on the private sector in excess of $100 million (adjusted annually for inflation) in expenditures in any one year.

## X. Consultation and Coordination With Indian Tribal Governments

OSHA reviewed this final rule in accordance with Executive Order 13175 (65 FR 67249) and determined that it would not have ''tribal implications'' as defined in that order. The clarifications to 29 CFR 1903.8(c), do not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

## XI. Environmental Impact Assessment

OSHA reviewed the final rule in accordance with the requirements of the National Environmental Policy Act (NEPA) (42 U.S.C. 4321 *et seq.*), the regulations of the Council on Environmental Quality (40 CFR parts 1500 through 1508), and the Department of Labor's NEPA procedures (29 CFR part 11). The agency finds that the revisions included in this proposal would have no major negative impact on air, water, or soil quality, plant or animal life, the use of land or other aspects of the environment.

## XII. List of Subjects in 29 CFR Part 1903

Occupational safety and health, Health, Administrative practice and procedures, Law enforcement.

## XIII. Authority and Signature

Douglas L. Parker, Assistant Secretary of Labor for Occupational Safety and Health, U.S. Department of Labor, authorized the preparation of this document pursuant to 29 U.S.C. 657; 5 U.S.C. 553; Secretary of Labor's Order 8–2020, 85 FR 58393 (2020).

Signed at Washington, DC.

**Douglas L. Parker,**

*Assistant Secretary of Labor for Occupational Safety and Health.*

For the reasons stated in the preamble, OSHA is amending 29 CFR part 1903 to read as follows:

## PART 1903—INSPECTIONS, CITATIONS AND PROPOSED PENALTIES

■ 1. The authority citation for part 1903 is revised to read as follows:

**Authority:** 29 U.S.C. 657; Secretary of Labor's Order No. 8–2020 (85 FR 58393); and 5 U.S.C. 553.

■ 2. Revise paragraph (c) of § 1903.8 to read as follows:

### § 1903.8   Representatives of employers and employees.

\*    \*    \*    \*    \*

(c) The representative(s) authorized by employees may be an employee of the employer or a third party. When the representative(s) authorized by employees is not an employee of the employer, they may accompany the Compliance Safety and Health Officer during the inspection if, in the judgment of the Compliance Safety and Health Officer, good cause has been shown why accompaniment by a third party is reasonably necessary to the conduct of an effective and thorough physical inspection of the workplace (including but not limited to because of their relevant knowledge, skills, or experience with hazards or conditions in the workplace or similar workplaces, or language or communication skills).

\*    \*    \*    \*    \*

[FR Doc. 2024–06572 Filed 3–29–24; 8:45 am]

**BILLING CODE 4510–26–P**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

*/s/ Brett A. Shumate*
Brett A. Shumate